**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COVIA HOLDINGS CORPORATION, *et al.*,[1] | ) | Case No. 20-33295 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 30, 2020, AT 2:30 P.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JUNE 30, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Covia. The location of Debtor Covia Holdings Corporation's principal place of business and the Debtors' service address is: 3 Summit Park Drive, Suite 700, Independence, Ohio 44131.

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT COVIA HOLDINGS CORPORATION, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**

**7) AFTER SELECTING COVIA HOLDINGS CORPORATION, ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively, the "Employee Obligations") and (b) granting related relief.

2. By this Motion, the Debtors seek authority, but not direction, to continue to honor the Employee Compensation and Benefits (as defined herein) associated with the following

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Andrew Eich, Executive Vice President, Chief Financial Officer, and Treasurer of Covia Holdings Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

Employee Obligations in the ordinary course of business and in a manner consistent with the Debtors' prepetition policies and to honor, pay, satisfy, or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs all prepetition amounts outstanding on account of the following Employee Obligations in an aggregate amount of approximately $9.5 million:

| Relief Sought | Approximate Amount Accrued but Unpaid as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $1,800,000 | $1,800,000 |
| Unpaid Temporary Staff Compensation | $190,000 | $100,000 |
| Unpaid Withholding Obligations | $1,000,000 | $1,000,000 |
| **Health and Welfare Benefit Programs** | | |
| Health Benefits | $4,605,000 | $3,505,000 |
| Retiree Health Plan | $180,000 | $180,000 |
| Retiree Life Benefits | $4,000 | $0 |
| Life, Disability and Accidental Death & Dismemberment Benefits | $100,000 | $100,000 |
| Time-Off Benefits | $130,000 | $130,000 |
| **Retirement Plans** | | |
| 401(k) Plan | $270,000 | $270,000 |
| Covia Pension Plan | $800,000 | $0 |
| Multiemployer Pension Plans | $40,000 | $40,000 |
| **Other Obligations** | | |
| Reimbursable Expenses | $35,000 | $35,000 |
| Non-Insider[3] Severance Programs | $77,000 | $77,000 |
| Key Employee Annual Compensation Plan[4] | N/A | N/A |
| Miscellaneous Employee Benefits | $190,000 | $190,000 |
| **Unions** | | |
| Union Severance | $64,000 | $64,000 |
| **TOTAL** | $9,485,000 | $7,491,000 |

## Jurisdiction and Venue

3. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core

[3] "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

[4] The Debtors seek authorization, but not direction, to continue the Key Employee Annual Compensation Plan on a postpetition basis and honor their obligations accruing thereunder, including with respect to employment periods

proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

6. Covia Holdings Corporation and its Debtor and non-Debtor affiliates are providers of diversified mineral-based and material solutions for industrial and energy markets in the United States, Canada, Argentina, Mexico, China, and northern Europe. The Debtors produce a specialized range of industrial materials, including silica sand, feldspar, nepheline syenite, calcium carbonate, clay, and kaolin products for use in the glass, ceramics, coatings, foundry, polymers, construction, water filtration, sports and recreation, and oil and gas markets. The Debtors' operations currently include 32 active mining facilities, with over 25 million tons of active annual mineral processing capacity. Headquartered in Independence, Ohio, the Debtors and their non-Debtor subsidiaries employ approximately 1,600 employees in the United States, and reported revenues of approximately $1.6 billion for the period ending December 31, 2019. As of the Petition Date, the Debtors have funded-debt obligations of approximately $1.6 billion.

beginning prior to the Petition Date. A condition to receiving any payment under the Key Employee Annual Compensation Plan is the eligible Employees' continued employment through the applicable payment date. Accordingly, no prepetition amounts are included in this chart.

7. On June 29, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

8. As of the Petition Date, the Debtors employ approximately 1,604 employees (collectively, the "Employees") and have retained 22 independent contractors and 9 temporary workers from 6 staffing agencies (collectively, the "Temporary Staff") (the Employees and Temporary Staff are referred to herein collectively as the "Workers"). Approximately 1,597 of the Debtors' Employees work full time, and approximately seven of the Debtors' Employees work part-time. Approximately 391 Employees are members of various labor unions (collectively, the "Represented Employees"), including the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, the Laborers International Union of North America, Carpenters Industrial Council,[5] and the International Association of Machinists and Aerospace Workers (collectively, the "Unions") and are parties to 13 collective bargaining agreements (the "CBAs") between the Debtors and the Unions in the United States. The Debtors request authority, but not direction, to continue to honor

5 Local Union 1017 of the Carpenters Industrial Council was subsequently dissolved and became part of the Pacific Northwest Regional Council of Carpenters in April 2019.

all obligations to Represented Employees under the terms of the existing CBAs to which the Debtors are party.[6]

9. Employees perform a variety of functions critical to the Debtors' mining and sand coating operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. In many instances, the Debtors' Employees include highly trained personnel who are not easily replaced. The Employees' skills, knowledge, and understanding of the Debtors' operations, customer relations, and infrastructure are essential to the effective operation of the Debtors' businesses.

10. The Debtors also supplement their workforce from time to time by relying on the Temporary Staff to complete discrete projects and fulfill certain duties on a short and long-term basis. The Temporary Staff are a critical and cost-effective supplement to the efforts of the Debtors' Employees. While some Temporary Staff are independent contractors that the Debtors pay directly, generally, the Debtors make payments to staffing agencies who then pay the Temporary Staff directly and also provide employee benefits (collectively, the "Temporary Staff Compensation"). The staffing agencies' ability to pay the Temporary Staff hinges upon timely receipt of the Temporary Staff Compensation from the Debtors.

11. The vast majority of Workers rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Employees and Temporary Staff will be exposed to significant financial hardships if the Debtors are not permitted to continue paying wages and salaries, provide benefits, and maintain certain programs benefitting Workers

[6] By requesting authority to honor obligations relating to any CBAs in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBAs, and the Debtors reserve all of their rights with regard to any CBAs.

in the ordinary course of business. Consequently, the Debtors submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## Employee Compensation and Benefits

12. The Debtors seek to minimize the personal financial burden Workers would suffer if prepetition Employee and Temporary Staff-related obligations are not paid or remitted when due or as expected. By this Motion, the Debtors seek authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, salaries, temporary staff fees, withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) plan deferrals), reimbursable expenses, defined benefit pension plans, multiemployer pension plans, deferred compensation plans, health benefits, health savings accounts, flexible spending accounts, life and accidental death and dismemberment insurance, voluntary critical illness, employee assistance program, short and long-term disability benefits, the workers' compensation program, defined contribution retirement plan, benefit administration and recordkeeping services, time-off benefits (including vacation time, sick days, holidays and statutory leave), non-Insider severance programs, non-Insider key employee annual compensation plan, retiree health and welfare benefits, COBRA benefits, and other benefits and compensation the Debtors historically have provided to Employees and/or Temporary Staff (collectively, the "Employee Compensation and Benefits"), as detailed herein and summarized in the chart above.

13. In addition, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Employee Compensation and Benefits and to continue honoring their Employee Compensation and Benefits obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## I. Compensation and Withholding Obligations.

### A. Wages.

14. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to Employees (collectively, the "Wages") on a: (a) semi-monthly basis for exempt[7] Employees on the 15th and last calendar day of each month; and (b) weekly basis for non-exempt Employees.

15. Because the majority of Employees are paid in arrears, certain Employees are owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees or (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

16. As of the Petition Date, the Debtors estimate that they owe Employees approximately $1.8 million in accrued and unpaid Wages (excluding Withholding Obligations, Reimbursable Expenses, Time-Off Benefits, and any payments provided under the Non-Insider Severance Programs, and Retirement Plans) (each as defined herein) (the "Unpaid Wages").

17. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Wages and to continue honoring their Wages obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

[7] Employees are classified as exempt or non-exempt according to the Fair Labor Standards Act and analogous state wage and hour laws.

**B. Unpaid Temporary Staff Compensation.**

18. As stated above, the Debtors utilize the services of approximately 22 Temporary Staff. The Debtors generally hire Temporary Staff directly or through third-party staffing agencies and pay Temporary Staff Compensation for services provided by the Temporary Staff at varying frequencies. On average, the Debtors pay approximately $200,000 in Temporary Staff Compensation each month. The Temporary Staff are not eligible to receive the Health and Welfare Benefits (as defined herein) or any other benefits provided by the Debtors and further described in this Motion.

19. As of the Petition Date, the Debtors estimate that they owe approximately $190,000 in accrued and unpaid Temporary Staff Compensation (the "Unpaid Temporary Staff Compensation"). The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Temporary Staff Compensation and to continue honoring their Temporary Staff Compensation obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices. The Debtors do not believe they owe any individual independent contractor an amount in excess of the $13,650 pursuant to section 507(a)(4) of the Bankruptcy Code on account of Unpaid Temporary Staff Compensation.

**C. Withholding Obligations.**

20. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre and post-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined herein), such as an Employee's share of health care benefits and insurance premiums, 401(k) plan deferrals, legally ordered deductions, charitable contributions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various

third-party recipients. In the months leading up to the Petition Date, average monthly Deductions were approximately $2.1 million.

21. The Debtors also are required by law to withhold from the Employees' compensation amounts related to, among other things, federal, state, and local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The majority of Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed, or on a monthly or quarterly basis in accordance with applicable state and local taxing authority requirements. In the months leading up to the Petition Date, average monthly Payroll Taxes were approximately $4.1 million.

22. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $1.0 million. The Debtors seek authority, but not direction, to pay or deduct any prepetition amounts owed on account of the Withholding Obligations and to continue honoring their Withholding Obligations on a postpetition basis in the ordinary course of the Debtors' business and in a manner consistent with past practices.

**II. Health and Welfare Benefit Programs.**

23. The Debtors offer eligible Employees medical, prescription drug, dental, and vision care coverage and certain other welfare benefits, including Basic Life, Disability and AD&D Insurance, the Workers' Compensation Program, the Employee Assistance Program, and Time-Off Benefits (each as defined herein and collectively, the "Health and Welfare Programs").

24. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Health and Welfare Programs and to continue honoring their Health and Welfare Programs obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**A. Health Benefits.**

25. The Debtors offer Employees the opportunity to participate in a variety of health benefit plans, including the Medical Plans, Stop-Loss Policy, Retiree Health Plans, the Dental Plans, the Vision Plan, the HSA, and the FSAs (each as defined herein and collectively, the "Health Benefits"). The Debtors self-insure the Medical Plans, the Dental Plan, the HSAs and the FSAs; all other Health Benefits are fully insured. The Health Benefits are customary for similarly sized companies, and the participants and their dependents have come to rely on the Health Benefits, without which participants would be forced to either forego Health Benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage that would adversely affect Employee morale.

26. As of the Petition Date, the Debtors estimate that they owe approximately $4.6 million on account of the Health Benefits. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Health Benefits and to continue honoring their Health Benefits obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices. The following is a detailed description of each of the Health Benefits provided by the Debtors.

**1. Medical Plans.**

27. The Debtors offer their current and former non-Represented Employees the opportunity to participate in one of two medical plans, a PPO plan or a Consumer-Driven

High-Deductible plan (collectively, the "Non-Union Medical Plans") administered by Anthem Blue Cross and Blue Shield Health Plans, Inc., which are both partially self-insured. The costs of the Non-Union Medical Plans are dependent upon the level of coverage Employees elect to receive and whether the Employee elects to cover dependents.

28. The Debtors also maintain a stop-loss insurance policy, insured by Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem"), in relation to the provision of the Medical Plans (the "Stop-Loss Policy"), which provides the Debtors excess coverage to the extent one or more claims under its Medical Plans exceeds the applicable claims threshold of $500,000 per covered individual. The Debtors pay $30.07 per month per covered employee under the Stop-Loss Policy, which is not subject to deductibles or an aggregate coverage limit. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Stop-Loss Policy. Out of an abundance of caution, however, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Stop-Loss Policy and to continue honoring their Stop-Loss Policy obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

29. The Debtors' Represented Employees are also eligible to participate in the same medical plans offered to the non-Represented Employees (the "Union Medical Plans").

30. All Employees covered by the Union Medical Plans and Non-Union Medical Plans also participate in a prescription drug plan administered by Caremark, L.L.C./CaremarkPCS Health, L.L.C. ("CVS/Caremark"), respectively (the "Prescription Plan," and together with the Union Medical Plans and Non-Union Medical Plans, collectively, the "Medical Plans").

31. The Debtors fund approximately $3.4 million of claims per month under the Medical Plans on behalf of their Employees and eligible, covered dependents, a portion of which

is covered by premiums paid by the Employees. The Debtors make payments on account of claims reported under the Medical Plans on a weekly basis. In addition, the Debtors also pay monthly administration fees of approximately $173,000 (the "Administration Fees") to Anthem and CVS/Caremark (the "Administrators"). On average, the Administrators submit claims approximately one week after the covered Employee incurs such expense, so the Debtors are unable to ascertain the prepetition amounts due and outstanding on account of the Medical Plans as of the Petition Date. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $4.5 million for unreimbursed prepetition medical claims.

32. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Medical Plans and to continue honoring their Medical Plans obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**a. Flexible Spending Accounts.**

33. The Debtors offer their Employees additional options for saving pre-tax dollars to help pay for health care and dependent care expenses under flexible spending accounts (collectively, the "FSAs"), which are administered by Discovery Benefits, Inc. Employees who enroll in the Debtors' PPO plan can enroll in a health care FSA to help pay for certain medical, prescription drug, dental, and vision expenses. Employees can contribute to a dependent care FSA (regardless of whether the Employee is enrolled in the Medical Plans), which can be used to pay for certain dependent care expenses. The annual limit for contributions to the health care and dependent care FSAs is $2,750, and $5,000, respectively. Contributions to a FSA are deducted from the applicable Employee's paycheck. Approximately 388 Employees are enrolled in FSAs. On average, the Debtors pay less than $3 per participant per month in administration costs on account of the FSAs. As of the Petition Date, the Debtors believe that they owe approximately $7,000 in the aggregate on account of the FSAs, including administrative fees.

34. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the FSAs and to continue honoring their FSA obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**b. Health Savings Accounts.**

35. Employees who participate in the Consumer-Driven High-Deductible plan may contribute through payroll deductions a portion of their pre-tax compensation into a health savings account (the "HSA") administered by Fidelity Workplace Services LLC, which may be used to pay eligible health-related expenses. The annual limit for contributions is $3,550 and $7,100 annually for employees enrolled in single and family coverage, respectively. The Debtors contribute to the Employees' HSAs by offering an annual contribution based on the applicable Employee's elected tier level of coverage which ranges from $500 to $1,500. On average, the Debtors pay less than $4 per participant each month in administrative fees on account of the HSAs. The Debtors believe they owe approximately $6,000 on account of the HSAs. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the HSAs and to continue honoring their HSA obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**c. COBRA.**

36. The Debtors also provide former Employees and their eligible dependents and beneficiaries with the ability to elect Health Benefit continuation coverage following an Employee's termination of employment, retirement or death from the Debtors. More specifically, pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, ("COBRA"), former Employees of the Debtors and their eligible dependents and beneficiaries (the "COBRA Employees") may elect to continue coverage under the Medical Plans, HSAs, FSAs, Dental Plans, and Vision Plan (the "COBRA Benefits"). COBRA Employees are entitled by law

to continue to receive COBRA Benefits for up to eighteen months following termination of employment, and in some instances up to 36 months.

37. The Debtors provide for COBRA Benefits as part of their usual expenditures on account of the Health Benefits, and pay $0.40 per employee per month in administrative fees for COBRA Benefits, which are paid in arrears. Accordingly, the Debtors believe they owe approximately $2,000 in the aggregate on account of COBRA Benefits. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the COBRA Benefits and to continue honoring their COBRA Benefits obligations, including to those Employees who may be terminated after the Petition Date, on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**2. Retiree Health Plans.**

38. The Debtors provide health benefits, such as medical, dental, vision and prescription drug benefits, to certain retired Represented and non-Represented Employees (the "Retiree Health Coverage"). In some instances, retirees are eligible for the same Medical Plans, Dental Plans, and Vision Plans offered to active Employees. The Debtors currently provide Retiree Health Coverage to approximately 57 U.S.-based former Employees and their eligible dependents and approximately 15 U.S.-based Employees are currently eligible to receive Retiree Health Coverage following retirement, and collect monthly premiums of approximately $1,626 in the aggregate on account of the Retiree Health Coverage. The monthly costs of providing the Retiree Health Coverage are approximately $180,000 in the aggregate, which amount is included in the monthly claims amount for the Medical Plans described in paragraph 31 above.

39. As of the Petition Date, the Debtors estimate that they owe approximately $180,000 on account of Retiree Health Coverage obligations. The Debtors seek authority, but not direction,

to pay any prepetition amounts owed on account of the Retiree Health Coverage and to continue honoring their Retire Health Coverage obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**3. Dental Plans.**

40. The Debtors provide their Employees with the opportunity to participate in one of two self-insured dental plans administered by Delta Dental Plan of Ohio, Inc., although certain Represented Employees are offered dental benefits administered by Anthem (collectively, the "Dental Plans"). Generally, the Dental Plans provide benefits for preventative services, basic care, and restorative services for covered Employees and their eligible dependents. The average claims incurred under the Dental Plans are approximately $124,000 per month, a portion of which is paid for by Employees through premium payments. In addition, the Debtors pay monthly administration fees on account of the Dental Plans of approximately $7,000. Based on historical trends, the Debtors estimate that, as of the Petition Date, they owe approximately $90,000 for unreimbursed prepetition dental claims. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Dental Plans and to continue honoring their Dental Plans obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**4. Vision Plan.**

41. The Debtors provide a separate, fully insured vision plan (the "Vision Plan") to their eligible Employees issued and administered by Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield. The Vision Plan provides benefits for annual eye exams, eyeglasses, and contact lenses for covered Employees and their respective eligible dependents. The total cost of the Vision Plan is approximately $17,000 per month, the full amount of which is

paid for by the Employees through payroll deductions. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Vision Plan, including administrative fees. Out of an abundance of caution, however, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Vision Plan and to continue honoring their Vision Plan obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

### B. Life and Accidental Death and Dismemberment Insurance, Disability Insurance, and Workers' Compensation Programs.

#### 1. Life and AD&D Insurance.

42. The Debtors provide basic life insurance ("Basic Life Insurance") and basic accidental death and dismemberment insurance ("Basic AD&D Insurance," and, together with Basic Life Insurance, the "Basic Life and AD&D Insurance") to all Employees pursuant to group policies issued and administered by Unum Life Insurance Company of America ("Unum"). Under the Unum Basic Life and AD&D Insurance, eligible Employees and their dependents also have the option to purchase additional levels of coverage. In addition, the Debtors provide executive life insurance (the "Executive Life Insurance") covering nine executive Employees, which is issued and administered by Massachusetts Mutual Life Insurance Company ("MassMutual").

43. The Basic Life and AD&D Insurance through Unum is provided at no cost to Employees. For non-Represented Employees, the Basic Life and AD&D Insurance provides a benefit equal to one and a half times such Employee's annual base salary, up to $50,000 for non-exempt Employees and a maximum benefit of $200,000 for exempt Employees. For Represented Employees, the Basic Life and AD&D Insurance provides a fixed benefit governed by the applicable CBA, with benefits ranging from $5,000 to $100,000. The Executive Life Insurance offered through MassMutual is provided to nine executive Employees and covers up to

one and a half times executive Employees' annual salary. The Debtors pay approximately $70,000 per month in premiums for the Basic Life and AD&D Insurance and the Executive Life Insurance.

44. The Debtors believe that continuing the Basic Life and AD&D Insurance is essential to maintaining morale, adhering to Employees' expectations, and protecting their families from the impact of a death or serious injury. As of the Petition Date, the Debtors believe that they owe approximately $100,000 in the aggregate on account of the Basic Life and AD&D Insurance. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Basic Life and AD&D Insurance and to continue honoring their Basic Life and AD&D Insurance obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**a. Employee Assistance Program.**

45. The Debtors provide their Employees with a confidential counseling and referral service (the "Employee Assistance Program") that pairs Employees with clinicians, financial professionals, and attorneys. The Employee Assistance Program is administered by Unum as part of the Basic Life Insurance, and the Debtors do not owe any amounts separately on account of the Employee Assistance Program. Out of an abundance of caution, however, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Employee Assistance Program, and to continue honoring their Employee Assistance Program obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**2. Retiree Life Benefits.**

46. The Debtors provide two former Represented Employees with life insurance benefits following their employment termination (collectively, the "Retiree Life Benefits"). The Retiree Life Benefit provided to one of the former Represented Employees is in accordance with

the terms of the applicable CBA, and the benefit is fully insured with an insurance policy through Unum. The Retiree Life Benefit for the other former Represented Employee is self-insured by the Debtors, and upon the Employee's death, the designated beneficiary is entitled to a $4,000 payment.

47. The Debtors pay approximately $3 a month for the fully insured Retiree Life Benefit and pay no average monthly costs for the self-insured Retiree Life Benefit. As of the Petition Date, the Debtors believe they owe approximately $4,000 in the aggregate on account of the Retiree Life Benefits. The beneficiaries of the former Employees may rely on the Retiree Life Benefits for income in the future. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Retiree Life Benefit and to continue honoring their Retiree Life Benefit obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**3. Disability Benefits.**

48. The Debtors provide certain Employees with both short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, collectively, the "Disability Benefits"). The Short-Term Disability Benefits are paid from the general assets of the Debtors, and claims are processed by Unum. The Long-Term Disability Benefits are fully insured under a group policy issued and administered by Unum, and certain Long-Term Disability Benefits for executive Employees are fully insured under a group policy issued and administered by MassMutual.

49. Under the Short-Term Disability Benefits program, Employees are generally eligible to receive coverage for a total of 26 weeks after the expiration of the applicable eligibility

period, with certain Represented Employees eligible for up to 52 weeks.[8] Most non-Represented Employees who are classified as non-exempt receive 75% of their base wages for the first 13 weeks of disability, and 67% of their base wages for the remaining 13 weeks. Non-Represented Employees who are classified as exempt receive 100% of their base wages for the first 13 weeks of disability, and 75% of their base wages for the remaining 13 weeks. Certain non-Represented hourly production Employees may receive weekly payments for 26 weeks ranging from $370 to $435, depending on such Employee's location instead of a percentage of base salary.

50. Certain Employees are eligible to receive the Long-Term Disability Benefits which commence following the end of the applicable Short-Term Disability Benefit period. In general, under the Long-Term Disability Benefits program administered by Unum, non-Represented, non-executive Employees and Represented Employees covered by the CBA with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers (United Steel Workers USW) AFL-CIO, CLC (the "USW") and its Local 31G-04 and the CBA with the USW Local 31-G receive 60% of their monthly salary, up to $5,000 per month, and non-Represented executive Employees receive 60% of their monthly salary, up to $15,000 per month, for a period up to and including the age of 67. Certain Employees are eligible to participate in the Executive Long Term Disability plan through MassMutual, which pays 80% of the participants' monthly salary less the Long-Term Disability Benefits under the policy administered by Unum. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Executive Long Term Disability plan. Out of an abundance of caution, however,

---

8 In addition, certain of the Debtors' Represented Employees are eligible to receive weekly payments ranging from $240 to $545, depending on such Employees' location.

the Debtors seek authority, but not direction, to pay any amounts due and outstanding on account of the Executive Long Term Disability plan, including any prepetition amounts related thereto.

51. The Debtors pay approximately $30,000 per month of premiums and administrative fees on account of Disability Benefits, which are paid one month in arrears. Employees may have to rely on the Disability Benefits as their sole form of wage-loss relief should they be unable to work in the future. As of the Petition Date, the Debtors believe they owe approximately $30,000 in the aggregate on account of the Disability Benefits. Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Disability Benefits and to continue honoring their Disability Benefits obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**4. Workers' Compensation Programs.**

52. In the ordinary course of business, the Debtors maintain multiple workers' compensation policies, including certain legacy policies[9] that have only run-off claims, for their Employees at the statutorily required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Programs"). The Debtors maintain coverage for the Workers' Compensation Programs through Commerce & Industry Insurance Company ("C&II"), and Ohio Bureau of Workers' Compensation ("OBWC"). The Debtors pay approximately $2.4 million in premiums and fees to C&II and OBWC annually for maintaining the Workers' Compensation Programs.[10] As of the Petition Date, the Debtors do not owe any amounts separately

---

9 The carriers for these policies are Chubb Group, Zurich Insurance Company, and Safety National Casualty Corporation.

10 Concurrently herewith, the Debtors have filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Supplement, and Enter into New Insurance Policies and (II) Granting Related Relief* (the "Insurance Motion"). For the avoidance of doubt, any relief with respect to premiums and administrative fees payable on account of the Workers' Compensation Programs will be sought

on account of the Workers' Compensation Programs for OBWC and C&II. Out of an abundance of caution, however, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the OBWC and C&II Workers' Compensation Programs, and to continue honoring their Workers' Compensation Programs obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

53. In 2019, the Debtors paid approximately $209,000 in claims related to the Workers' Compensation Programs (the "Workers' Compensation Obligations"). As of the Petition Date, the Debtors estimate that approximately 44 claims for current and legacy programs are outstanding. The current and legacy Workers' Compensations carriers estimate reserve for each open claim which fluctuates due to the ongoing medical treatment protocol and any related legal proceedings associated with each claim. Workers' Compensation claims count and reserves exposure will also fluctuate as closed claims may re-open and new claims are incurred as a result of the ordinary course of business. The Debtors must continue the claim assessment, determination, adjudication, and payment process in connection with the Workers' Compensation Obligations without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable laws and requirements.[11]

54. Accordingly, by this Motion, the Debtors seek authority, but not direction to continue honoring their Workers' Compensation Obligations on a postpetition basis in the ordinary course of business, including by modifying the automatic stay, solely to facilitate the

---

pursuant to the Insurance Motion, and any relief with respect to the Workers' Compensation Obligations will be sought pursuant to this Motion.

[11] The Workers' Compensation Programs may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. The Debtors request authority to continue making all payments related to Workers' Compensation Obligations postpetition, including making any changes to current policy and practices that become necessary.

administration of the Workers' Compensation Programs, and in a manner consistent with past practices.

**C. Time-Off Benefits.**

55. The Debtors offer several paid and unpaid time-off benefits for all Employees, including Vacation Time, Sick Leave, Holidays, and Other Paid Leave (each as defined herein, and collectively, the "Time-Off Benefits").

56. In the ordinary course of business, the Debtors provide Employees with vacation time ("Vacation Time") as a paid Time-Off Benefit. Unless otherwise negotiated, eligible Employees receive between ten and twenty-five working days of Vacation Time per year depending on such Employee's seniority, and length of employment. Vacation Time is pro-rated based on the amount of time remaining in the year for new hires. Generally, Employees forfeit unused Vacation Time at the end of each calendar year, except certain CBAs require payout of unused Vacation Time. Most Employees who are terminated or resign with accrued but unused Vacation Time during the year of termination are entitled to cash payments based on such unused Vacation Time.

57. In the ordinary course of business, Represented Employees are eligible for sick leave ("Sick Leave"). The amount of Sick Leave provided to Employees depends upon their CBA and as required by local or state law. Generally, unless required under the applicable CBA or state or local law, Employees may not cash out their unused Sick Leave upon termination/resignation.

58. In addition, the Debtors offer their Employees ten fixed paid holidays and for full-time Employees two floating/personal holidays throughout the year (collectively, the "Holidays"). Generally, eligible Employees are not required to work on a designated Holiday but are paid at their regular base rate of pay.

59. The Debtors also provide eligible Employees extended time to attend to certain family or personal needs such as bereavement leave, jury duty, military duty, or community service (the "Other Paid Leave"). In general, there is no entitlement to any additional unpaid leave, although the Debtors may make certain exceptions on an emergency basis.

60. The Debtors believe that the continuation of the Time-Off Benefits in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. As of the Petition Date, the Debtors' estimate they owe approximately $130,000 on account of Time-Off Benefits. Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Time-Off Benefits and to continue honoring their Time-Off Benefits obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## III. Retirement Plans

61. The Debtors offer retirement plans in the form of a 401(k) defined contribution plan and a defined benefit pension plan (collectively, the "Retirement Plans"). The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Retirement Plans and to continue honoring their Retirement Plans obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

### A. The 401(k) Plan.

62. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan") administered by Fidelity Investments Institutional Operations Company, Inc. ("Fidelity IIOC") that generally provides for automatic pre-tax salary deferrals of compensation up to 75% of eligible compensation, and subject to the limits set forth in the Internal Revenue Code (the "IRC"). Each Employee's 401(k) Plan deferrals are deducted automatically from each paycheck (the "401(k) Deductions"). The Debtors pay no administrative fees on account of the

401(k) Plan each year; instead such amounts are passed through to the 401(k) Plan participants. The Debtors hold the 401(k) Deductions in the 401(k) Plan's trust and, as a result, the Debtors do not consider these as assets of their estates.

63. The Debtors make employer matching contributions to the 401(k) Plan on behalf of certain of their Employees. More specifically, the Debtors match 100% of the first three percent of an Employee's eligible deferrals plus 50% of the next two percent of the Employee's eligible deferrals (the "401(k) Matching Contributions"). Employees are immediately fully vested in the 401(k) Deductions and 401(k) Matching Contributions. Represented Employees can also participate in the 401(k) Plan; contribution rates and the employer matching formula are governed by the applicable CBA.

64. The Debtors pay on average approximately $435,000 in 401(k) Matching Contributions each month and remit both the 401(k) Deductions and 401(k) Matching Contributions to Fidelity IIOC with each Employee pay period. As of the Petition Date, the Debtors estimate that they owe approximately $140,000 in prepetition 401(k) Matching Contributions.

65. The Debtors also maintain a defined contribution profit sharing component of the 401(k) Plan for the benefit of Certain Employees (the "Profit Sharing Contribution"). With respect to the non-Represented Employees, the Debtors hold discretion over the annual profit sharing contribution rate, which is the same for every participant, and such amounts are subject to limits imposed by the IRC. Currently the Debtors contribute to the 401(k) Plan a Profit Sharing Contribution equal to 4% of the applicable Employee's eligible compensation, which is funded each pay period. The defined contribution Profit Sharing Contributions cliff vest after three years of service, meaning participants are entitled to the Profit Sharing Contributions following three

years of employment. For certain non-Represented, salaried Employees who transitioned from the Pension Plan (as defined herein), for the plan years 2019 through 2021, the Debtors make a contribution equal to 8% of eligible compensation, which is funded in the January following the end of the applicable calendar year. The Debtors may also make contributions on behalf of Represented Employees as specified in the applicable CBA, which are funded in the January following the end of the applicable calendar year. As of the Petition Date, the Debtors estimate that they owe approximately $130,000 in prepetition Profit Sharing Contributions.

66. Many Employees' retirement savings consist solely of their 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Contributions and Profit Sharing Contribution. Thus, the Debtors believe that continuing the 401(k) Plan, the 401(k) Matching Contribution and Profit Sharing Contributions are essential to maintaining Employee morale. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the 401(k) Plan, including any 401(k) administrative fees, 401(k) Matching Contributions, Profit Sharing Contributions and to continue honoring their 401(k) Plan obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

**B. Covia Pension Plan**

67. The Debtors sponsor the Covia Holdings Corporation Pension Plan (the "Pension Plan") which is a defined benefit pension plan under the Employee Retirement Income Security Act of 1974, as amended, for certain Represented and non-Represented Employees. The Pension Plan consists of a combination of previously separate plans covering Employees in the United States. The Pension Plan was closed to new non-Represented Employee entrants and Represented Employee entrants effective as of January 1, 2008 and November 1, 2017, respectively. The Pension Plan was frozen to future benefit accruals effective as of December 31, 2018 for all

non-Represented Employees. Approximately 415 current Employees and 621 former Employees participate in the Pension Plan. As of the Petition Date, Debtors owe approximately $800,000 in the aggregate on account of the Pension Plan.

### C. Multiemployer Pension Plans

68. The Debtors contribute to four multiemployer pension plans as required by the terms of the CBAs, the I.A.M. National Pension Fund Trust, Laborers National (Industrial) Pension Fund, National Integrated Group Pension Plan and the United Steelworkers National Trust (collectively, the "Multiemployer Pension Plans"). The Debtors make monthly contributions on behalf of Represented Employees in amounts specified under the CBAs. Approximately 94 Represented Employees are covered by the Multiemployer Pension Plans, and since 2018, the Debtors' have contributed approximately $100,000 annually to the Multiemployer Pension Plans. As of the Petition Date, Debtors owe approximately $40,000 in the aggregate on account of the Multiemployer Pension Plans. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Multiemployer Pension Plans and to continue honoring their Multiemployer Pension Plans obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## IV. Deferred Compensation Plans.

69. The Debtors maintain a non-qualified deferred compensation plan (the "Deferred Compensation Plan") for the benefit of certain current and former management-level Employees. Participants receive distributions under the Deferred Compensation Plan upon or following certain permissible payment events, including their termination of employment, death or a specific date previously designated by the participant. Such amounts are accrued for over the estimated employment periods of the participants.

70. The Debtors maintain trustee accounts at Matrix in connection with the Deferred Compensation Plan for 19 current and former management-level Employees, the balance of which, as of June 22, 2020, was approximately $1,100,000. While some Insiders participate in the Deferred Compensation Plan, the Debtors do not anticipate making distributions from the Deferred Compensation Plan during these chapter 11 cases. Out of an abundance of caution, however, the Debtors seek authority, but not direction, to continue honoring their Deferred Compensation Plan obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## V. Other Obligations.

### A. Reimbursable Expenses.

71. The Debtors pay for or directly reimburse Employees for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, per diems, car rentals, parking, fuel costs, and other qualifying expenses (collectively, the "Reimbursable Expenses"). Employees who incur Reimbursable Expenses are expected to submit expense reports to the Debtors for the purchase of all authorized goods and services. Employees are then reimbursed for all Reimbursable Expenses via the Debtors' accounts payable system.

72. As of the Petition Date, the Debtors estimate that they owe approximately $35,000 in outstanding prepetition Reimbursable Expenses.

73. Although the Debtors ask that expense reports be submitted promptly, sometimes submission delays occur. Accordingly, Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Reimbursable Expenses are incurred with the understanding that they will be reimbursed, as may be required by pursuant to certain wage and hour laws. Without continued reimbursement of the Reimbursable Expenses, Employees relying

on these benefits would be saddled with additional costs, causing personal financial hardship. Accordingly, to avoid harming Employees who incurred Reimbursable Expenses, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Reimbursable Expenses and to continue honoring their Reimbursable Expenses obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

### B. Non-Insider Severance Programs.

74. In the ordinary course of business, the Debtors provide severance benefits to non-Insider Employees[12] in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns under certain circumstances, under four separate arrangements:[13] (a) as mandated by individual employment agreements; (b) pursuant to the Debtors' severance plans (the "Severance Plans"); (c) as mandated by the CBAs, as applicable; and (d) pursuant to severance arrangements entered into at the time of separation that are neither under the Severance Plans nor pursuant to an individual employment agreement (collectively, the "Non-Insider Severance Programs"). Under the Non-Insider Severance Programs, eligible non-union Employees generally receive, upon termination and determined by the Employee's job level, a lump sum severance payment and other potential payments and benefits in exchange for the Employee's execution of a release of claims in favor of the Debtors and the Employee's compliance with certain post-termination restrictive covenants.

---

[12] The Debtors believe that none of the Employees proposed to be paid on account of the Non-Insider Severance Programs are Insiders of the Debtors for purposes of section 503(c) of the Bankruptcy Code because none of the Employees: (a) participate in the management of the Debtors; (b) have decision-making authority with respect to policies of the Debtors; (c) report directly to the Debtors' board of directors; (d) were appointed by the Debtors' board of directors; (e) qualify as an Insider under Rule 16a-1(f) of the Securities Exchange Act; (f) undertake budget control over the Debtors' business operations; or (g) are relatives of any Insider of the Debtors. To the extent the Debtors propose to make a severance payment to, or implement a severance program for, any Insiders, the Debtors will seek separate approval from the Court with respect to such payments or programs.

[13] The Debtors also provide Union Severance (as defined herein) to certain Represented Employees pursuant to the applicable CBAs.

75. The Debtors believe that the Non-Insider Severance Programs have been critical to maintaining Employee morale and loyalty. Current Employees have come to depend on the Non-Insider Severance Programs upon their separation from the Debtors, and increased uncertainty around the Non-Insider Severance Programs will have an adverse impact on Employee morale, cause current Employees to seek outside employment, or cause potential employees to avoid joining the Debtors. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation and to be positioned for long-term success. Moreover, as a condition to receiving benefits under the Non-Insider Severance Programs, each eligible Employee is typically required to execute a release of claims in favor of the Debtors and to comply with certain post-termination restrictive covenants.

76. As of the Petition Date, the Debtors estimate that approximately $77,000 in unpaid obligations is outstanding on account of the Non-Insider Severance Programs. The Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Non-Insider Severance Programs and to continue honoring their Non-Insider Severance Programs obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices. For the avoidance of doubt, the Debtors will exercise their discretion as to which Employees receive benefits under such programs.

**C. Key Employee Annual Compensation Plan.**

77. The Debtors maintain an annual compensation plan for approximately 194 non-Insider Employees (the "Key Employee Annual Compensation Plan"). Under the Key Employee Annual Compensation Plan, each participating Employee may earn a total amount equal to the sum of the Employee's short- and long-term incentive compensation opportunity for the Debtors' fiscal year 2020, payable in equal quarterly installments, subject to the Employee's continued employment and satisfactory job performance through the applicable calendar quarter.

As a condition to participating in the Key Employee Annual Compensation Plan, each participating Employee agreed to waive participation in the Debtors' annual bonus plan for fiscal year 2020, and will not receive any equity-based awards from the Debtors for such fiscal year. The Debtors implemented the Key Employee Annual Compensation Plan in April of 2020.

78. By this Motion, the Debtors seek authority, but not direction, to continue to pay any amounts, up to $7.0 million, which become payable pursuant to the terms of the Key Employee Annual Compensation Plan in the ordinary course of business on a postpetition basis. Continuity of the Debtors' workforce is critical to the Debtors' operations and continuance of the Key Employee Annual Compensation Plan is expected to mitigate flight risk of the Employees. For further avoidance of doubt, the relief sought under this Motion under the Key Employee Annual Compensation Plan does not include any payments to any Insiders. Additionally, the Debtors will not seek to pay any outstanding amounts incurred on account of the Key Employee Annual Compensation Plan in advance of the date they become due.

**D. Miscellaneous Employee Benefits.**

79. In the ordinary course of business, the Debtors also offer eligible Employees certain additional benefits, including, but not limited to, critical illness coverage insured by Unum, a special accident insurance benefit insured by Cigna, a leased vehicle program, a tuition reimbursement program administered by the Debtors through direct reimbursements and relocation costs reimbursements (collectively, the "Miscellaneous Employee Benefits").

80. As of the Petition Date, the Debtors estimate that approximately $190,000 in unpaid obligations is outstanding on account of the costs of the Miscellaneous Employee Benefits. Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Miscellaneous Employee Benefits and to continue honoring their

Miscellaneous Employee Benefits obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## VI. Unions.

### A. Union Dues

81. As described above, the Debtors employ approximately 345 Represented Employees who are party to 13 CBAs with the various Unions. Under the CBAs, the Debtors are required to withhold, via payroll deduction, union member dues and typically remit such dues on a monthly basis to the Unions (collectively, the "Union Dues"). On average, the Debtors remit approximately $30,000 each month on account of Union Dues. The Debtors generally hold the Union Dues, which are generally deducted from the Represented Employee's compensation, in trust. As a result, these Union Dues are generally not considered to be assets of the Debtors' estates. As such, the Debtors do not believe they need authority to remit such payments to the Unions. Out of an abundance of caution, however, by this Motion, the Debtors seek the authority, but not the direction, to pay any prepetition amounts owed on account of the Union Dues, and to continue honoring their Union Dues obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

### B. Union Severance

82. In addition, pursuant to the applicable CBA, the Debtors are contractually obligated to provide certain severance obligations to the Represented Employees (the "Union Severance"). As of the Petition Date, the Debtors estimate that approximately $64,000 is outstanding on account of Union Severance. Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Union Severance and to continue honoring their Union Severance obligations on a postpetition basis in the ordinary course of business and in a manner consistent with past practices.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor Employee Compensation and Benefit Obligations.

#### A. Certain of the Employee Compensation and Benefits Are Entitled to Priority Treatment.

83. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As these are priority claims, the Debtors are required to pay these claims in full in order to confirm a chapter 11 plan. *See* 11 U.S.C. §1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that a Worker receives no more than the statutory prescribed limit on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Workers and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

84. The Debtors seek authority, but not direction, to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' Wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold

certain tax payments from Employees' Wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors do not believe they need authority, but not direction, to remit these payments. Nevertheless, out of an abundance of caution, by this Motion, the Debtors request authority, but not direction, to transmit the Withholding Obligations to the proper parties in the ordinary course of business and consistent with prepetition practices.

85. Similarly, state laws and laws of other jurisdictions require the Debtors to maintain the Workers' Compensation Programs. If the Debtors fail to maintain the Workers' Compensation Programs, state laws and laws of other jurisdictions may prohibit the Debtors from operating in those states or jurisdictions. Payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II. Payment of the Employee Compensation and Benefits Is Warranted under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

86. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages). In authorizing payments of certain prepetition

obligations, courts have relied on several legal theories rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

87. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtors' fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

88. Consistent with a debtors' fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); *see also Armstrong*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

89. In addition, this Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a) of the Bankruptcy Code, courts may permit preplan payments of prepetition obligations when essential to the continued operation of the debtors' business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

90. Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *See Ionosphere Clubs*, 98 B.R. at 175-76; *see also In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

91. This flexible approach is particularly critical where prepetition creditors, here Workers and related third parties, provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court

stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id*. (citation omitted). The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

92. The relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003. Paying prepetition wages, employee benefits, and similar ordinary course expenses will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Without these payments, the Workers may become demoralized and unproductive, and ultimately the non-payment of prepetition claims could result in the loss of a significant portion of the Workers. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and detrimentally impact enterprise value. The Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

93. In addition, the majority of Workers rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Workers will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Moreover, failure to satisfy such obligations will undermine Worker morale and loyalty at a time when Worker support is critical to the Debtors' business. If this Court

does not authorize the Debtors to honor their various obligations under the benefits programs described herein, Employees will not receive health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

94. The Debtors request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

## III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.

95. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

96. The Debtors seek authorization to, under section 362(d) of the Bankruptcy Code, permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being of Employees and Employee morale and lead to the departure of certain Employees

who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all parties in interest. In addition, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

97. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested hereunder. The Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Emergency Consideration

98. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first

21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and therefore request that the Court approve the relief requested in this Motion on an emergency basis.

**Reservation of Rights**

99. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

100. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

101. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition senior secured term loan and counsel thereto; (d) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the ad hoc group of prepetition senior secured term loan lenders (the "Ad Hoc Term Lender Group") (Attn: Brian S. Hermann, Esq., Andrew Parlen, Esq., and Sean A. Mitchell, Esq.); (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) the state attorneys general for states in which the Debtors conduct business; (j) the Pension Benefit Guaranty Corporation; (k) Unions; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter the Order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 30, 2020

/s/ *Matthew D. Cavenaugh*
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Genevieve M. Graham (TX Bar No. 24085340)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752 -4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
vanaya@jw.com
ggraham@jw.com
vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Jonathan S. Henes, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: jonathan.henes@kirkland.com
joshua.sussberg@kirkland.com

-and-

Benjamin M. Rhode (*pro hac vice* pending)
Scott J. Vail (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: benjamin.rhode@kirkland.com
scott.vail@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on June 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh