*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COVIA HOLDINGS CORPORATION, *et al.*,[1] | ) Case No. 20-33295 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DISCLOSURE STATEMENT RELATING TO
THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
COVIA HOLDINGS CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Genevieve M. Graham (TX Bar No. 24085340)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752 -4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                    vanaya@jw.com
                    ggraham@jw.com
                    vargeroplos@jw.com

Jonathan S. Henes, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          jonathan.henes@kirkland.com

-and-

Benjamin M. Rhode (admitted *pro hac vice*)
Scott J. Vail (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          benjamin.rhode@kirkland.com
                    scott.vail@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 13, 2020

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims, noticing and solicitation agent at http://cases.primeclerk.com/Covia.  The location of Debtor Covia Holdings Corporation's principal place of business and the Debtors' service address is: 3 Summit Park Drive, Suite 700, Independence, Ohio 44131.

<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEADLINE TO VOTE ON THE PLAN IS
NOVEMBER 27, 2020, AT 11:59 P.M. (PREVAILING CENTRAL TIME)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY
PRIME CLERK LLC BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests entitled to vote for purposes of soliciting votes to accept or reject the *Joint Chapter 11 Plan of Reorganization of Covia Holdings Corporation and its Debtor Affiliates*. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article VIII herein.

The Plan is supported by the Debtors and certain parties in interest that have executed the Restructuring Support Agreement, including Holders of approximately 63.7 percent of Term Loan Claims. The Plan is not supported by the Official Committee of Unsecured Creditors (defined below as the "Committee"). The Debtors urge Holders of Claims whose votes are being solicited to vote to accept the Plan. The Committee urges unsecured creditors not to vote to accept the Plan. Information regarding the Committee's position is set forth in certain sections of this Disclosure Statement and in the letter from the Committee accompanying this Disclosure Statement.

The Debtors urge each Holder of a Claim or Interest entitled to vote on the Plan to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the proposed Restructuring Transactions contemplated thereby. Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein, an endorsement by the Bankruptcy Court of the merits of the Plan, or the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, financial information and documents annexed to this Disclosure Statement, certain statutory provisions, and certain anticipated events in the Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future

results and operations.  The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors or any other authorized party may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise.  Holders of Claims or Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.  Information contained herein is subject to completion, modification, or amendment.  The Debtors reserve the right to file an amended or modified plan and related disclosure statement from time to time.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims or Interests (including those Holders of Claims or Interests who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article X of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions that are required for the Effective Date to occur, pursuant to the Plan, will be satisfied (or waived).

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Consummation of the Plan, certain of the Securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent that section 1145 of the Bankruptcy Code is either not permitted or

not applicable, Securities may be issued pursuant to other applicable exemptions under the federal securities laws. The Debtors recommend that potential recipients of Securities issued under the Plan consult their own counsel concerning their ability to freely trade such Securities in compliance with the federal securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such Securities.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- the amount, nature, and timing of capital expenditures;

- availability and terms of capital;

- successful results from the Debtors' operations;

- the integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- costs of conducting the Debtors' other operations;

- general economic and business conditions;

- effectiveness of the Debtors' risk management activities;

- counterparty credit risk;

- the outcome of pending and future litigation;

- governmental regulation and taxation of the industry in which the Debtors operate;

- uncertainty regarding the Debtors' future operating results;

- plans, objectives, and expectations;

- the adequacy of the Debtors' capital resources and liquidity;

- risks in connection with acquisitions;

- the potential adoption of new governmental regulations; and

- the Debtors' ability to satisfy future cash obligations.

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties, and factors may include the following:  the Debtors' ability to confirm and consummate the Plan;  the potential that the Debtors may need to pursue an alternative transaction if the Plan is not consummated;  the Debtors' ability to reduce their overall financial leverage;  the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees;  the risks associated with operating the Debtors' businesses during the Chapter 11 Cases;  customer responses to the Chapter 11 Cases;  the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases;   general economic, business, and market conditions;   currency fluctuations;  interest rate fluctuations;  price increases;  exposure to litigation;  a decline in the Debtors' market share due to competition;   the Debtors' ability to implement cost reduction initiatives in a timely manner;  the Debtors' ability to divest existing businesses;  financial conditions of the Debtors' customers;  adverse tax changes;  limited access to capital resources;  changes in domestic and foreign laws and regulations;   trade balance;   natural disasters;   pandemics;  geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.**

**TABLE OF CONTENTS**

Page

ARTICLE I. INTRODUCTION..........................................................................................................1

ARTICLE II. PRELIMINARY STATEMENT ................................................................................1
    A.    Overview of the Debtors' Businesses .................................................................1
    B.    Circumstances Leading to these Chapter 11 Cases..............................................2
    C.    Development of the Plan......................................................................................3
    D.    Restructuring Support Agreement and Plan Overview........................................3
    E.    Summary of Value Allocation .............................................................................6
    F.    Recovery Analysis .............................................................................................16
    G.    Debtors' Recommendation That Creditors Vote to Accept the Plan ...............23
    H.    Committee's Recommendation That Creditors Vote to Reject the Plan...........23

ARTICLE III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
    STATEMENT AND THE PLAN ..........................................................................24
    A.    What is chapter 11?............................................................................................24
    B.    Why are the Debtors sending me this Disclosure Statement?...........................25
    C.    Am I entitled to vote on the Plan? .....................................................................25
    D.    What will I receive from the Debtors if I hold an Allowed Administrative Claim,
            L/C Facility Claim or Priority Tax Claim? ........................................................26
    E.    How will Intercompany Claims and Intercompany Interests be treated under the
            Plan and will they affect my recovery under the Plan?.....................................29
    F.    Will royalty interests be affected by the Plan? .................................................30
    G.    How will employee wages, compensation, benefit, and incentive programs be
            treated under the Plan?......................................................................................30
    H.    Are any regulatory approvals required to consummate the Plan?.....................31
    I.    What happens to my recovery if the Plan is not confirmed or does not go
            effective?...........................................................................................................31
    J.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
            when the Plan goes effective, and what is meant by "Confirmation," "Effective
            Date," and "Consummation?".........................................................................31
    K.    Is there potential litigation related to the Plan?.................................................31
    L.    How will the preservation of certain Causes of Action affect my recovery under
            the Plan?............................................................................................................31
    M.    Will there be releases and exculpation granted to parties in interest as part of the
            Plan? .................................................................................................................32
    N.    What is the deadline to vote on the Plan?.........................................................38
    O.    How do I vote for or against the Plan? ..............................................................38
    P.    Why is the Bankruptcy Court holding a Confirmation Hearing? ......................38
    Q.    When is the Confirmation Hearing set to occur?..............................................38
    R.    What is the purpose of the Confirmation Hearing? ..........................................39
    S.    What is the effect of the Plan on the Debtors' ongoing businesses? ................39
    T.    Who do I contact if I have additional questions with respect to this Disclosure
            Statement or the Plan? ......................................................................................39
    U.    Do the Debtors recommend voting in favor of the Plan? .................................40

**ARTICLE IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN**.................................................................................................................. **40**
    A.    Restructuring Support Agreement ............................................................... 40
    B.    The Plan ...................................................................................................... 40

**ARTICLE V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**............................................................................................................ **44**
    A.    Covia's Corporate History .......................................................................... 44
    B.    The Company's Business Operations .......................................................... 44
    C.    Customers ................................................................................................... 46
    D.    Competition ................................................................................................ 47
    E.    Employees................................................................................................... 47
    F.    The Debtors' Prepetition Capital Structure................................................ 47

**ARTICLE VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS** ........................................... **49**
    A.    Market Decline and Industry-Specific Challenges ..................................... 49
    B.    Credit Downgrade....................................................................................... 51
    C.    Reducing Costs and Other Operational Initiatives..................................... 51
    D.    Restructuring Negotiations with Stakeholders........................................... 52
    E.    Appointment of Independent Directors and Investigation of Potential Causes of Action Related to the UFS Merger ............................................ 53
    F.    The Committee's Investigation and Position Regarding Potential Estate Claims Related to the UFS Merger ............................................................ 55
    G.    Railcar Lessor Negotiations........................................................................ 57

**ARTICLE VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ............................................................................................ **58**
    A.    Expected Timetable of the Chapter 11 Cases ............................................ 58
    B.    First/Second Day Relief.............................................................................. 59
    C.    Other Procedural and Administrative Motions ........................................... 59
    D.    Appointment of Official Committee ........................................................... 60
    E.    Motions to Reject Executory Contracts and Unexpired Leases.................. 60
    F.    Schedules and Statements ........................................................................... 61
    G.    Establishment of a Claims Bar Date ........................................................... 61
    H.    Certain Litigation Matters........................................................................... 61
    I.    The Committee's Standing Motion.............................................................. 63
    J.    SEC Matters ................................................................................................ 63

**ARTICLE VIII. RISK FACTORS** ............................................................................................. **63**
    A.    Bankruptcy Law Considerations................................................................. 64
    B.    Risks Related to Recoveries under the Plan................................................ 67
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses. ....... 69

**ARTICLE IX. SOLICITATION AND VOTING PROCEDURES** ....................................................... **78**
    A.    Holders of Claims or Interests Entitled to Vote on the Plan........................... 78
    B.    Voting Record Date .................................................................................... 78
    C.    Voting on the Plan ...................................................................................... 78
    D.    Ballots Not Counted.................................................................................... 79

**ARTICLE X. CONFIRMATION OF THE PLAN** ....................................................................... **79**
    A.    Requirements for Confirmation of the Plan................................................ 79

B. Best Interests of Creditors/Liquidation Analysis ............................................................. 80
C. Feasibility............................................................................................................................. 80
D. Acceptance by Impaired Classes ...................................................................................... 81
E. Confirmation Without Acceptance by All Impaired Classes.......................................... 81
F. Valuation of the Debtors.................................................................................................... 82

**ARTICLE XI. CERTAIN SECURITIES LAW MATTERS ................................................................... 83**
A. Issuance of Securities under the Plan.............................................................................. 83
B. Subsequent Transfers of Securities Issued under the Plan............................................ 83

**ARTICLE XII. CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN........................................................................................... 84**
A. Introduction........................................................................................................................ 84
B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
the Reorganized Debtors................................................................................................... 86
C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of
Claims Entitled to Vote..................................................................................................... 88
D. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders
of Claims Entitled to Vote ............................................................................................... 96

**ARTICLE XIII. RECOMMENDATION ................................................................................................ 101**

**Exhibit A Plan of Reorganization.............................................................................................. 102**

**Exhibit B Restructuring Support Agreement ......................................................................... 103**

**Exhibit C Corporate Organization Chart ............................................................................... 104**

**Exhibit D Disclosure Statement Order ..................................................................................... 105**

**Exhibit E Liquidation Analysis.................................................................................................. 106**

**Exhibit F Financial Projections ................................................................................................ 107**

**Exhibit G Valuation Analysis .................................................................................................... 108**

## ARTICLE I.
## INTRODUCTION

Covia Holdings Corporation ("Covia") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with Covia's non-Debtor affiliates, collectively, the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Covia Holdings Corporation and Its Debtor Affiliates*, dated September 25, 2020 [Docket No. 584] (as amended, supplemented, or modified from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**The Debtors believe that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Debtors' Estates, and provide the best recovery to stakeholders under the circumstances.  At this time, the Debtors believe the Plan represents the best available option for completing the Chapter 11 Cases.  The Debtors strongly recommend that you vote to accept the Plan.  The Committee disagrees with the Debtors' assessment and is urging unsecured creditors to vote to reject the Plan.**

## ARTICLE II.
## PRELIMINARY STATEMENT

The proposed Plan achieves a value-maximizing restructuring that comprehensively addresses the Debtors' funded debt obligations and positions their businesses for growth and long-term success. Following extensive negotiations between the Debtors and an ad hoc group of their prepetition senior secured term lenders, on June 29, 2020, the Debtors entered into a restructuring support agreement, which was amended and restated on July 7, 2020 (as may be further amended, supplemented, or modified from time to time and collectively with the exhibits thereto, the "Restructuring Support Agreement").[3]  As a result, the transactions embodied by the Plan enjoy the support of Holders of approximately $993 million, or 63.7%, of the Debtors' prepetition term loan indebtedness.  The Plan will reduce the Debtors' funded debt by nearly half; a reduction of approximately $735 million.   The consensus embodied in the Restructuring Support Agreement provides a sound foundation for the Debtors' Chapter 11 Cases to proceed in an efficient, cost-effective, and value-maximizing manner.

A.      **Overview of the Debtors' Businesses**

As set forth further herein and in the *Declaration of Andrew Eich, Executive Vice President, Chief Financial Officer, and Treasurer of Covia Holdings Corporation, in Support of Chapter 11 Petitions and First Day Motions*, filed on June 30, 2020 [Docket No. 15] (the "First Day Declaration"), Covia was formed in 2018 through a business combination of Unimin Corporation ("Unimin") and Fairmount Santrol Holdings Inc. ("Fairmount Santrol"), the largest and third largest U.S. producers of frac sand used in the hydrocarbon industry, respectively.  On June 1, 2018, Unimin completed the business combination whereby Fairmount Santrol merged into a wholly-owned subsidiary of Unimin and thereafter ceased to operate as a

---

[2]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

[3]     A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B**.

separate corporate entity (the "UFS Merger").  Immediately following the completion of the UFS Merger, Unimin changed its name to Covia Holdings Corporation.

Since its formation, Covia has been a leading provider of diversified mineral-based and material solutions for global energy and industrial markets.  It produces a wide range of specialized silica sand, feldspar, nepheline syenite, calcium carbonate, clay, and kaolin products, which serve as raw materials for the production of glass, ceramic tiles, sanitaryware, paints, plastics, roofing tiles, filtration media, artificial turf, golfing sands, hydrocarbon recovery, and other end markets.  Covia currently has 32 mining facilities with approximately 25 million tons of annual mineral processing capacity.  Its mining and coating facilities span throughout the United States, Canada, Mexico and Denmark.  Covia has many sites in close proximity to its various customer bases in states such as Texas, Minnesota, Wisconsin, Illinois, Missouri, Ohio, North Carolina, South Carolina, Georgia and Oklahoma, as well as in Mexico and Canada.  To serve these locations and customers, Covia depends on rail, truck, and barge services to move products from its mining and production facilities to Covia's customers.

**B.      Circumstances Leading to these Chapter 11 Cases**

Prior to the UFS Merger, the frac sand market was in a period of growth driven by increased hydrocarbon well completion activity and relatively tight supply of frac sand and, therefore, the opportunity appeared ripe to consolidate the assets of Unimin and Fairmount Santrol and leverage their complementary synergies around the core energy product, northern white sand ("NWS").  In late 2018, however, the global and U.S. oil and gas markets began a series of structural shifts that limited the Debtors' ability to generate cash flows and grow their businesses.

- First, a substantial decline in the availability of debt and equity capital to exploration and production ("E&P") companies, which are key customers for proppants, negatively impacted well completion activity and, as a result, the demand for proppants.

- Second, proppant supply had nearly doubled from early 2017 as many new in-basin sand mines (*i.e.*, sand directly mined, processed and delivered in the basin where consuming wells are located) were built and new suppliers entered the market, while demand remained relatively flat, leading to an oversupply of proppants to the market, negatively impacting both volumes and pricing.

- Third, lower oil prices and capital restraints led to an unforeseen, increased shift in demand from NWS to lower-cost in-basin sand, which substantially reduced the overall addressable market for NWS proppants.  The in-basin sand, while lower quality, was substantially cheaper compared to NWS, and E&P companies demanded the shift in order to lower up-front well costs.  The declines in demand across the energy industry and surplus frac sand supply have fundamentally impaired the Debtors' business in the oil and gas industry (the "Energy Segment") for the foreseeable future.

- Finally, the onset of the COVID-19 pandemic not only exacerbated struggles within the energy industry, it also hastened a considerable reduction in the U.S. gross domestic product, which had a negative flow-through impact on many facets of the Debtors' industrial segment (the "Industrial Segment").  The compounded effects of these macroeconomic drivers have magnified an existing contraction in the Debtors' EBITDA and free cash flow over the past two years, which is expected to accelerate through fiscal year 2020 and 2021 in light of challenging economic circumstances.

In response to these rapidly changing market dynamics over the last two years, the Debtors proactively addressed balance sheet challenges head-on by, among other actions, (1) idling over 20 million tons of active annual NWS capacity, (2) divesting several non-core, high-value assets, which collectively

generated approximately $240 million in sales proceeds, (3) taking advantage of favorable trading conditions to repurchase $63 million of obligations under the Term Loan Agreement (as defined below) for $48 million, (4) improving working capital by more than $215 million since the UFS Merger, (5) reducing SG&A and overhead costs by $109 million through workforce reductions of approximately 1,120 individuals, and (6) eliminating $195 million in railcar purchase commitments and expediting the return of over 4,200 railcars from Covia's fleet.  After pursuing all of the actions set forth above (among other mitigating efforts described in more detail herein), the Debtors' current financial and liquidity forecasts indicate that a restructuring is the only course of action remaining.

**C.      Development of the Plan**

The Debtors commenced the Chapter 11 Cases with a balance sheet that carried approximately $1.6 billion of funded debt.  In 2019 alone, this funded debt required payment of approximately $107.9 million of interest expense compared to $1.6 billion of revenue.  Although the Debtors' businesses remain operationally strong, they simply could not continue to service a capital structure with approximately $1.6 billion of funded debt given the excess liabilities and costs relating to their railcar lease obligations and Energy Segment operations.  Therefore, materially deleveraging this capital structure became critical to maximizing the value of the Debtors' businesses going forward.

To address their burdensome balance sheet, in the period leading up to the Petition Date, the Debtors began to engage with the principals and advisors of an ad hoc group of Holders of Term Loan Claims (collectively, the "Senior Creditors") represented by Paul, Weiss, Rifkind, Wharton, & Garrison LLP, as counsel ("PW"), and Centerview Partners LLC, as financial advisor ("Centerview" and, together with the Senior Creditors and PW, the "Term Loan Group").  Following extensive discussions and negotiations between the Debtors and the Term Loan Group, on June 29, 2020, the Debtors and the Senior Creditors entered into the Restructuring Support Agreement, which was amended and restated on July 7, 2020.  Although the Restructuring Support Agreement provided the framework for many of the key components of the Debtors' Plan, it did not resolve certain matters that remained open and subject to negotiation, including the distributable value associated with the Debtors' unencumbered assets.  Accordingly, the Restructuring Support Agreement did not specify a treatment for General Unsecured Claims, other than to specify that the recovery on such Claims would be provided in the form of equity in the Reorganized Debtors.

Since the execution of the Restructuring Support Agreement and the filing of the Chapter 11 Cases, and building on the foundation provided by the Restructuring Support Agreement, the Debtors have worked with the Term Loan Group and other key stakeholders to develop the Plan.  The Debtors filed the Plan contemporaneously herewith in order to comply with milestones under the Restructuring Support Agreement. Importantly, the Restructuring Support Agreement does not require the Debtors to take any actions or refrain from taking any actions to the extent that doing so would be inconsistent with their fiduciary duties.  The Debtors are therefore focused on continuing to engage with their stakeholders (including those that did not sign the Restructuring Support Agreement) to possibly obtain broader support for the Plan.

**D.      Restructuring Support Agreement and Plan Overview**

The agreement in principle, as reflected in the Restructuring Support Agreement and embodied in the Plan, provides for a global compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Reorganized Debtors will emerge from chapter 11 with a New Term Loan of $825 million (subject to reduction by up to $25 million), which will be guaranteed by each of the material wholly-owned direct and indirect subsidiaries of Reorganized Debtors (including, for the avoidance of doubt, subsidiaries domiciled in Canada and Mexico), subject to certain exceptions, and secured by liens on substantially all

assets of the Reorganized Debtors and the subsidiaries providing such guarantees. In addition, the Debtors are required to obtain a senior secured revolving credit facility of at least $100 million, which will be available to the Reorganized Debtors upon emergence.

The material terms of the Plan and Restructuring Support Agreement are as follows:

- Each Holder of an Allowed Secured Tax Claim shall receive at the option of the Reorganized Debtors: (1) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or (2) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under applicable non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

- Each Holder of an Allowed Other Secured Claim shall receive at the option of the Reorganized Debtors (1) payment in full in Cash; (2) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; (3) delivery of the collateral securing such Allowed Other Secured Claim; or (4) such other treatment rendering such Allowed Other Secured Claim Unimpaired.

- Each Holder of an Allowed Other Priority Claim shall receive at the option of the Reorganized Debtors: (1) Cash in an amount equal to such Allowed Other Priority Claim; or (2) such other treatment rendering such Allowed Other Priority Claim Unimpaired.

- Each Holder of an Allowed Secured Term Loan Claim or an Allowed Secured Swap Agreements Claim, respectively, shall receive its Pro Rata share of (1) the Excess Cash; (2) the New Term Loan; and (3) the Financing Claims Equity Pool.

- Each Holder of a Claim against Covia that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Parent Unsecured Claims Equity Pool.

- Each Holder of a Claim against TechniSand that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the TechniSand Unsecured Claims Equity Pool.

- Each Holder of a Claim against Cheyenne that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Cheyenne Unsecured Claims Equity Pool.

- Each Holder of a Claim against one or more Debtors other than Covia, TechniSand, and Cheyenne that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Other Unsecured Claims Equity Pool.

- All Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (1) Reinstated or (2) distributed, contributed, set off, settled, cancelled, released, or otherwise addressed.

4

- All Intercompany Interests shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (1) Reinstated in accordance with Article III.G of the Plan, distributed, contributed, or (2) cancelled, released, or otherwise addressed.

- On the Effective Date, Covia Interests will be cancelled, released, and extinguished without any distribution on account of such Covia Interests.

- All Section 510(b) Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

- The Plan incorporates a settlement between the Debtors and the Senior Creditors regarding the amount of the Debtors' unencumbered going concern distributable value and the form in which that value will be distributed (the "Unencumbered Value Settlement"). The Unencumbered Value Settlement takes into account certain disputed issues, including: (1) how the Debtors' estimated total enterprise value should be allocated among the Debtors and their non-Debtor foreign subsidiaries; and (2) whether certain of the Debtors' accounts receivable are subject to the security interests securing the Debtors' obligations under the Term Loan Credit Agreement (such security interests, the "Term Loan Liens"). In addition, solely as part of the Unencumbered Value Settlement, the Senior Creditors have agreed that a change of control with respect to the Reorganized Debtors will not constitute an event of default or an acceleration event under the New Term Loan Documents. As described in greater detail below, the Debtors believe that the Unencumbered Value Settlement strikes a reasonable balance between divergent views and legal theories. Accordingly, the Unencumbered Value Settlement provides for reasonable recoveries to the Debtors' stakeholders—both secured and unsecured. Moreover, the recoveries to the Debtors' stakeholders under the Unencumbered Value Settlement significantly exceed those that the Debtors anticipate would be available in a liquidation, satisfying the "floor" established by section 1129(a)(7) of the Bankruptcy Code. Finally, the component parts of the Unencumbered Value Settlement constitute an interconnected, integrated, and indivisible compromise and are not severable from one another. A more detailed discussion of the Unencumbered Value Settlement is provided in Article II.E of this Disclosure Statement.

- Contrary to the Debtors' view, the Committee does not believe that the Unencumbered Value Settlement represents a fair or reasonable settlement of the Debtors' unencumbered going concern distributable value for Holders of General Unsecured Claims. The Committee believes that the Unencumbered Value Settlement undervalues unencumbered assets, thereby providing for distributions to unsecured creditors that are lower than what is required by law. A more detailed discussion of the Committee's views regarding the Unencumbered Value Settlement and its various components is provided in Article II.E.4 of this Disclosure Statement.

- The Plan also provides for the releases of estate claims against the Senior Creditors and various insiders, including the Debtors' present and former shareholders, directors, and officers. As explained below in Articles VI.F and VII.I, the Committee believes that the Debtors' estates have colorable claims against these parties related to the UFS Merger and that the pursuit of these claims could produce significant recoveries that could materially improve returns to unsecured creditors under the Plan. For this reason, the Committee does not believe that the releases contained in the Plan are appropriate. The Committee also believes that claims could be preserved without significantly delaying confirmation of a Plan. In other words, the Committee believes that a revised Plan (with acceptable terms and revised releases) could be confirmed that preserves the litigation for resolution after the revised Plan is confirmed. The Senior Creditors vigorously disagree that such a Plan could be confirmed because, among other reasons, they will not support a Plan that preserves

claims against them or escrows their recoveries.  Further, the Debtors disagree with the Committee's assessment of potential estate claims related to the UFS Merger and the propriety of the Plan's release provisions.  The Debtors do not believe there are any colorable claims related to the UFS Merger and thus consider the Plan's release of any such claims to be appropriate.  The Debtors' assessment of potential estate claims related to the UFS Merger is reinforced by the conclusions of an independent investigation regarding these matters.  This investigation, and its conclusions, are discussed further in Article VI.E below.

**E.      Summary of Value Allocation**

To guide them in developing the Plan, the Debtors, with the assistance of their advisors, created a "natural recovery model" (the "Recovery Model").  As described below, this Recovery Model allocates the Debtors' *going concern* distributable value across each of the Company's geographic segments (U.S., Canada, Mexico, China, and Denmark).  It also allows for the Debtors to analyze the effect of modifying certain assumptions regarding the key drivers of unencumbered value to account for parties' divergent views and legal theories.  It then calculates creditor recoveries on a waterfall basis based on the underlying assumptions and in accordance with the priority of each creditor's respective Claims.

1.      Estimation of Total Distributable Value

For purposes of the Recovery Model, the Debtors estimated the total distributable value at $1.193 billion.  This estimate comprises two components:  (1) the estimated total enterprise value of the Company as described in the valuation analysis attached as **Exhibit G** hereto (the "Valuation Analysis"); and (2) the Company's projected excess balance sheet cash as of December 31, 2020 (excluded from the Debtors' estimated total enterprise value) prior to the excess cash sweep in respect of Term Loan Claims and Swap Agreements Claims (collectively, "Term Loan/Swap Claims").  The estimated value of each component is summarized as follows:

| Component | Distributable Value ($ in millions) |
|---|---:|
| Debtors' Total Enterprise Value | $1,025[4] |
| Distributable Excess Cash | $168[5] |
| **Total Distributable Value** | **$1,193** |

The Debtors' total distributable value estimate does not assign any value to potential claims or causes of action related to the UFS Merger, as the Debtors do not believe there are any colorable claims related to the UFS Merger and the Plan releases any such claims.  See Article VI.E of this Disclosure Statement, entitled "Appointment of Independent Directors and Investigation of Potential Causes of Action Related to the UFS Merger" for further discussion of these matters.

2.      Potential Sources of Unencumbered Value

For purposes of calculating creditor recoveries under the Recovery Model, the Debtors, with the assistance of their advisors, undertook a thorough, rigorous analysis of potential unencumbered distributable

---

[4]     *See* Valuation Analysis, attached hereto as **Exhibit G**.

[5]     This distributable excess cash figure takes in account the estimated excess cash sweep in respect of Term Loan Claims and Swap Agreements Claims and the Company's projected excess balance sheet cash following such excess cash sweep.

value, including taking into account various legal theories that parties could assert and engaging in discussions with the Committee's advisors. In undertaking this analysis, the Debtors used their selected total distributable value midpoint of $1.193 billion as described in **Exhibit G** hereto and evaluated the range of reasonable potential outcomes if the issues that are being settled pursuant to the Unencumbered Value Settlement were litigated to conclusion. Based on this analysis, the Debtors estimated that if litigated, the reasonable range of value of the collateral securing the Term Loan/Swap Claims (the "Term Loan Collateral") would likely fall between approximately $1.01 billion and $1.10 billion in the aggregate (the "Collateral Value Range") and the total unencumbered going concern distributable value would likely fall between approximately $93 million and $183 million (the "Unencumbered Value Range").

In an effort to strike a reasonable balance between parties' divergent views and legal theories, the Debtors engaged in arm's-length, good faith negotiations with the Term Loan Group regarding an appropriate settlement amount to ascribe to the unencumbered going concern distributable value. These negotiations resulted in the Unencumbered Value Settlement, which takes into account the Debtors' estimated Collateral Value Range and Unencumbered Value Range as well as the litigation risk associated with particular value allocation approaches.

The Unencumbered Value Settlement's values with respect to the Term Loan Collateral and the total going concern unencumbered distributable value (as well as the reasonable low and high cases) are set forth in the following chart:

| Value Type | Distributable Value ($ in millions)[6] | | |
| --- | --- | --- | --- |
| | Low Case (Illustrative) | Unencumbered Value Settlement | High Case (Illustrative) |
| Collateral Value | $1,100 | $1,078[7] | $1,010 |
| Unencumbered Value | $93 | $115 | $183 |

Certain key components and considerations regarding the Unencumbered Value Settlement's values for the Term Loan Collateral (the "Collateral Value") and the total unencumbered going concern distributable value (the "Unencumbered Value") are discussed in greater detail below.

        (a)     *No Distributable Value Assigned to Potential Causes of Action Related to the UFS Merger*

As noted above, the Debtors' total distributable value estimate does not assign any value to potential causes of action related to the UFS Merger, and the Plan releases any such claims. Accordingly, none of the Collateral Value or Unencumbered Value is assigned to such potential causes of action.

---

[6]    Allocation of total enterprise value also takes into account minority non-Company ownership of two joint venture entities. These entities are Technimat LLC ("Technimat"), a 90% subsidiary of TechniSand, and Santrol (Yixing) Proppant Co. Ltd. ("Santrol China"), a 70% subsidiary of Technimat.

[7]    This figure is gross of any recovery to Other Secured Claims under the Plan and $1.5 million of other secured debt at the Debtors' non-Debtor Canadian subsidiaries.

(b)  *Allocation of Enterprise Value*

(i)  Step 1:  Allocation of Enterprise Value Among the Debtors and Their Non-Debtor Foreign Subsidiaries

As noted above, one potential disputed issue that the Unencumbered Value Settlement takes into account is the appropriate allocation of the Company's estimated enterprise value among the Debtors and their non-Debtor foreign subsidiaries.  This issue bears on the Debtors' unencumbered going concern distributable value because the Term Loan Credit Agreement Documents' security and collateral provisions distinguish between the equity interests of different Company entities, generally providing for a pledge of 65% of the Debtors' equity interests in the non-U.S. subsidiaries.[8]  Pursuant to the Unencumbered Value Settlement, the Debtors and the Senior Creditors have agreed to allocate the Company's estimated enterprise value across the Debtors and their non-Debtor foreign subsidiaries as follows:

| Entities | Enterprise Value ($ in millions) | Enterprise Value (%) |
| --- | --- | --- |
| Debtors | $689 | 67.3% |
| Non-Debtor Mexican Subsidiaries[9] | $163 | 15.9% |
| Non-Debtor Canadian Subsidiaries[10] | $147 | 14.3% |
| Other Non-Debtor Foreign Subsidiaries[11] | $26 | 2.5% |

The Unencumbered Value Settlement allocation is based on the Debtors' thorough analysis of various allocation methods, the particular value allocations that these methods yield, and the litigation risks associated with each.  Specifically, the Debtors believe that the Unencumbered Value Settlement allocation reflects an appropriately weighted allocation among the Debtors' "base case" allocation (the "Base Case") and potential alternative allocations.  Based on the Debtors' analysis, summarized below, the Debtors believe that the Unencumbered Value Settlement allocation is within the range of reasonableness.

---

[8]  As set forth below in Article II.E.2(b)(ii), while 65% of the equity interests of certain non-Debtor foreign subsidiaries are pledged, approximately 83% of the equity value of the non-Debtor Mexican subsidiaries constitutes Collateral Value.

[9]  These entities are Grupo Materials Primas de Mexico S. de R. L. de C.V. ("GMP I"), Grupo Materias Primas, S. de R. L. de C. V. ("GMP II") and its direct subsidiaries, Fairmount Minerals Sales de Mexico, S. de R. L. de C.V. ("Fairmount Mexico"), and Santrol de Mexico, S. de R. L. de C.V. ("Santrol Mexico").  GMP I and GMP II are direct subsidiaries of Covia Finance, Fairmount Mexico is a direct, wholly-owned subsidiary of Debtor Fairmount Santrol Inc., and Santrol Mexico is a direct subsidiary of Fairmount Mexico.

[10]  These entities are 909273 Ontario Inc. ("909273 Ontario"), Covia Canada Ltd. ("Covia Canada"), and Lake Shore Sand Company (Ontario) Ltd. ("Lake Shore Sand").  Covia Canada and 909273 Ontario are direct, wholly-owned subsidiaries of Covia, and Lake Shore Sand is a direct, wholly-owned subsidiary of Debtor Cheyenne Sand Corp ("Cheyenne").  Covia Canada is also the 100% owner of Debtor Covia Finance Company LLC ("Covia Finance") and the 49.9% owner of GMP I and GMP II.

[11]  These entities are Covia Europe ApS ("Covia Europe") and Santrol China.  Covia Europe is a direct, wholly-owned subsidiary of Debtor TechniSand, and Santrol China is an indirect subsidiary of TechniSand.

8

*Base Case*

The Base Case allocates the Company's estimated enterprise value across each of the Company's geographic segments (U.S., Canada, Mexico, China, and Denmark) based on each segment's average adjusted EBITDA contribution for the twelve-month periods ending on December 31, 2019, April 30, 2020, and June 30, 2020, resulting in the following allocation:

| Entities | Enterprise Value ($ in millions) | Enterprise Value (%) |
|---|---|---|
| Debtors | $735 | 71.6% |
| Non-Debtor Mexican Subsidiaries | $141 | 13.8% |
| Non-Debtor Canadian Subsidiaries | $127 | 12.4% |
| Other Non-Debtor Foreign Subsidiaries | $22 | 2.2% |

The adjusted EBITDA figures used for enterprise value allocation in the Base Case incorporate adjustments to account for historic above-market railcar expenses, excess rail terminal expenses, and certain intercompany sales commissions, while the use of multiple reference periods controls for certain atypical historic macroeconomic conditions. The adjustment with respect to railcar and rail terminal expenses is based on the Debtors' rationalization of their railcar and rail terminal portfolio through the Chapter 11 Cases and the Plan. This rationalization will significantly reduce the Debtors' railcar and rail terminal expenses going forward, contributing between approximately $55 million and $80 million of additional EBITDA annually over the next several years (primarily associated with the U.S. Debtors). The adjustment with respect to intercompany sales commissions is based on the termination (or modification) of the corresponding intercompany arrangements following the Effective Date.

*Alternative Allocation Methods*

The Unencumbered Value Settlement allocation also takes into account potential alternative methods of allocating the Company's estimated enterprise value among the Debtors and their non-Debtor foreign subsidiaries that the Committee (and other parties in interest) may advocate, including the alternative method described in Article II.E.4 below, entitled "The Committee's Position on the Unencumbered Value Settlement."

The Debtors respectfully disagree with the Committee's approach to allocating the Company's estimated enterprise value among the Debtors and their non-Debtor foreign subsidiaries. Specifically, the Debtors believe that the allocations yielded by the Committee's approach—or other potential alternative approaches—do not accurately reflect their operative reality on a historic or go-forward basis. Accordingly, the Debtors believe that if the Committee (or other parties in interest) were to advocate adoption of such an allocation in a litigation scenario, they likely would not prevail on the merits.

Based on the foregoing, the Debtors believe that the Unencumbered Value Settlement allocation is within the range of reasonableness.

          (ii)        Step 2: Determining the Amount of Unencumbered Value Attributable to the Non-Debtor Foreign Subsidiaries

As set forth above, the Debtors and the Senior Creditors agreed pursuant to the Unencumbered Value Settlement to allocate 67.3% of the Debtors' estimated total enterprise value to Debtor entities and 32.7% of the Debtors' total enterprise value to their non-Debtor foreign subsidiaries. Certain of the

9

equity interests of these non-Debtor foreign subsidiaries are pledged as collateral for Term Loan Claims and are thus subject to the Term Loan Liens, as reflected in the chart below:[12]



---

[12]   The rights of all parties in interest are reserved regarding whether the equity interests of Covia Financing LLC constitute Term Loan Collateral.

As a result of the Company's capital structure, the equity value associated with certain of the non-Debtor foreign subsidiaries is partially encumbered, as set forth below:

| Equity Interests | % of Value Encumbered |
|---|---|
| Value of Non-Debtor Mexican Subsidiaries | ~83% |
| Value of Non-Debtor Canadian Subsidiaries | 65% |
| Value of Covia Europe | 65% |
| Value of Santrol China | 0% |

Based on the foregoing, the amount of encumbered and unencumbered value attributable to the non-Debtor foreign subsidiaries is as set forth in the below chart:

| Entities | Enterprise Value Allocated to Collateral Value | | Enterprise Value Allocated to Unencumbered Value | |
|---|---|---|---|---|
| | % | $ (in millions) | % | $ (in millions) |
| Non-Debtor Mexican Subsidiaries | ~83% | $135 | ~17% | $28 |
| Non-Debtor Canadian Subsidiaries | 65% | $96[13] | 35% | $51 |
| Covia Europe | 65% | $16 | 35% | $9 |
| Santrol China[14] | 0% | $0 | 63% | $1 |

(c)    *Allocation of Value of Certain Accounts Receivable*

The Unencumbered Value Settlement also addresses the extent to which certain of the Debtors' accounts receivable are subject to the Term Loan Liens. Pursuant to the orders entered at Docket Nos. 86 and 405, on July 1, 2020, the Debtors terminated their prepetition receivables financing facility (the "Receivables Financing Facility") and transferred the outstanding letters of credit thereunder to a new letter of credit arrangement (the "L/C Facility"). In connection with the termination of the Receivables Financing Facility, and as a key feature of the termination transaction (i) Covia transferred approximately $39.5 million of the Term Loan/Swap Claimants' Term Loan Cash Collateral to an account maintained by non-Debtor Covia Financing LLC ("Covia Financing"), a bankruptcy-remote special purpose vehicle, to

---

[13]    Allocation of total enterprise value to non-Debtor Canadian subsidiaries does not reflect approximately $1.5 million of other secured debt at these subsidiaries, which reduces the equity value of the non-Debtor Canadian Subsidiaries. Collateral Value and Unencumbered Value from the non-Debtor Canadian subsidiaries used in the Recovery Model are burdened on a pro rata basis for such other secured debt.

[14]    The Santrol China figures set forth in this chart take into account minority non-Company ownership of Santrol China and its 70% parent, Technimat.

repay all amounts owed under the Receivables Financing Facility and to cash collateralize the letters of credit transferred to the L/C Facility; and (ii) Covia Financing transferred back to Covia accounts receivable totaling approximately $85.6 million in aggregate face amount (the "Returned Receivables").[15]

Pursuant to the Unencumbered Value Settlement, the Debtors and the Senior Creditors have agreed that approximately $59.4 million (or approximately 69.5%) of the distributable value associated with the Returned Receivables will be treated as Collateral Value, while the remaining distributable value associated with the Returned Receivables (approximately $26.1 million) will be treated as Unencumbered Value. The Unencumbered Value Settlement allocation is based on the Debtors' thorough analysis of various value allocation approaches with respect to the Returned Receivables, including the four described below, and the litigation risks associated with each. Specifically, the Unencumbered Value Settlement allocation takes into account the range of reasonable potential outcomes if the appropriate allocation of the distributable value associated with the Returned Receivables were litigated to conclusion. Based on the Debtors' analysis, summarized below, the Debtors believe that the Unencumbered Value Settlement allocation is within the range of reasonableness.[16]

- Allocation Approach 1: All distributable value associated with the Returned Receivables is Collateral Value because (i) the Returned Receivables are proceeds of Term Loan Cash Collateral, *i.e.*, the approximately $39.5 million transferred from Covia to Covia Financing in connection with the termination of the Receivables Financing Facility; and/or (ii) (A) the Term Loan Collateral includes 100% of Covia Financing's equity interests (all of which are owned by Covia); (B) Covia Financing's transfer of the Returned Receivables to Covia should be treated as a dividend in respect of Covia Financing's equity interests; and (C) the perfected Term Loan Liens on 100% of Covia Financing's equity interests attached to the proceeds of that transfer (*i.e.*, to 100% of the Returned Receivables).

- Allocation Approach 2: Approximately 46% (or approximately $39.5 million) of the distributable value associated with the Returned Receivables is Collateral Value because (i) the Returned Receivables are proceeds of Term Loan Cash Collateral; and (ii) the perfected Term Loan Liens on that Term Loan Cash Collateral attached to the Returned Receivables only to the extent of the value transferred to Covia Financing.

- Allocation Approach 3: Approximately 65% of the distributable value associated with the Returned Receivables (or approximately $55.6 million) is Collateral Value because (i) the Term Loan Collateral includes 65% of Covia Financing's equity interests; (ii) Covia Financing's transfer of the Returned Receivables to Covia should be treated as a dividend in respect of Covia Financing's equity interests (all of which are owned by Covia); and (iii) the perfected Term Loan Liens on 65% of Covia Financing's equity interests attached to the proceeds of that transfer (*i.e.*, to 65% of the Returned Receivables).

- Allocation Approach 4: Approximately 81.1% of the distributable value associated with the Returned Receivables (or approximately $69.4 million) is Collateral Value because (i) approximately $39.5 million of the Returned Receivables are proceeds of the Term Loan Cash Collateral transferred to Covia Financing in connection with the termination of the

---

[15] "Term Loan/Swap Claimants" means, collectively, Holders of Term Loan Claims and Swap Agreements Claims. "Term Loan Cash Collateral" means Term Loan Collateral comprising cash.

[16] Although the Debtors recognize that certain parties in interest (including the Committee) may assert positions in addition to those set forth below, including the position that none of the Returned Receivables constitute Term Loan Collateral, the Debtors believe that such positions lack merit.

12

Receivables Financing Facility; and (ii) 65% of the remaining approximately $46 million of Returned Receivables should be treated as proceeds of the Term Loan Cash Collateral due to the Term Loan/Swap Claimants' asserted security interest in 65% of Covia Financing's equity interests.

Taking into account the litigation risk associated with these allocation approaches and the range of reasonable potential outcomes in a litigation scenario, the Debtors believe that the Unencumbered Value Settlement allocation is within the range of reasonableness.

(d)     *Allocation of Distributable Cash*

The Debtors' Recovery Model allocates substantially all distributable cash ("Distributable Cash") to Collateral Value, as the Debtors believe that substantially all of their cash constitutes Term Loan Collateral.[17]  The Bank Accounts[18] used in the Debtors' cash management system are subject to the Term Loan Liens.  None of the Bank Accounts, however, are (or were) subject to a deposit account control agreement in favor of the Term Loan/Swap Claimants or the Term Loan Agent or held at an institution of any Term Loan/Swap Claimants or the Term Loan Agent.

Nevertheless, the Debtors believe that even if the Term Loan Liens on the Bank Accounts were not perfected, substantially all of the Distributable Cash would still be collateral of the Term Loan/Swap Claimants for the following reasons.  The Debtors are not aware of any arguments to the contrary that have merit.

- Substantially all Distributable Cash constitutes (or will constitute) cash proceeds of property that was subject to the Term Loan Liens at the time of disposition, including (i) the Debtors' interests in a Calera, Alabama lime processing facility and former subsidiary, Winchester & Western Railroad (both of which were sold in the later part of 2019); and (ii) accounts receivable generated postpetition from the sale of inventory subject to the Term Loan Liens.  The Term Loan Liens on such property were (or will be) perfected as of the disposition of that property, such that those perfected Term Loan Liens attached (or will attach) to the proceeds received by the Debtors on account of such property, including any cash proceeds.[19]

- To the extent the Debtors' operations generated (or generate) any unencumbered cash that was (or will be) commingled with encumbered cash, standard tracing principles applicable to cash proceeds establish that such cash was (or will be) expended before any encumbered cash is expended.

---

[17]  To the extent that a portion of the value of the Returned Receivables is treated as Unencumbered Value pursuant to the Unencumbered Value Settlement, the Debtors' Recovery Model treats the value of cash proceeds of that portion of the Returned Receivables as Unencumbered Value.

[18]  "Bank Accounts" has the meaning ascribed to such term in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 23].

[19]  U.C.C. §§ 9-315(a)(2) ("[A] security interest attaches to any identifiable proceeds of collateral."), 9-315(c) ("A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected."), 9-102(64) (defining "proceeds" to include "whatever is acquired upon the sale . . . or other disposition of collateral").

13

- Under U.C.C. § 9-315 (as adopted by applicable state statutes), a perfected security interest in identifiable cash proceeds of collateral remains perfected until the filed financing statement covering the original collateral expires.[20]  Cash proceeds are identifiable to the extent identified by a tracing method, "including application of equitable principles," permitted by relevant applicable law with respect to cash proceeds.[21]  These principles include the "lowest intermediate balance" principle, which applies where unencumbered cash is commingled with encumbered cash.  Under the lowest intermediate balance principle, in a commingling situation, unencumbered cash is deemed to be expended before any encumbered cash.

- Here, the Debtors generally were cash flow negative from the time they sold their interests in the Calera, Alabama lime processing facility and Winchester & Western Railroad subsidiary through the Petition Date.  To the extent the Debtors' operations generated (or generate) any unencumbered cash, the lowest intermediate balance principle provides that such cash was (or will be) expended before any cash proceeds from the Debtors' sale of their interests in the Alabama lime processing facility and the Winchester & Western Railroad subsidiary.

- The same principal remains applicable during the Chapter 11 Cases.  The Bankruptcy Code itself recognizes this in section 506(c), which allows a debtor *in certain circumstances* to recover from encumbered property "the necessary costs and expenses of preserving, or disposing of, such property."  Such circumstances are limited, however, and the ability to surcharge the Term Loan Collateral was waived in these Chapter 11 Cases under the Cash Collateral Order.[22]

### 3. Summary

Based on the foregoing, under the Unencumbered Value Settlement, the Debtors and the Senior Creditors have agreed that (a) the Collateral Value is $1,078;[23] and (b) the total going concern Unencumbered Value distributable to the Debtors' stakeholders is approximately $115 million.  These values factor into the projected recoveries described in Article II.F below.

### 4. The Committee's Position on the Unencumbered Value Settlement

The Committee is not a party to the Unencumbered Value Settlement.  The Committee disagrees strongly with many of the assumptions and conclusions reached by the Debtors and the Senior Creditors in reaching the Unencumbered Value Settlement.  As a result, the Committee believes that the Unencumbered Value Settlement materially understates the amount of distributions that should be made to certain Holders of General Unsecured Claims for reasons that include the following.  The following discussion recites the Committee's current views and analysis, much of which the Debtors disagree with (including as set forth elsewhere in this Disclosure Statement), and the Debtors reserve all rights to challenge these views and analysis, as well as any factual recitation in the following discussion:

---

[20]  U.C.C. § 9-315(c), (d).  None of the all-assets financing statements covering the Term Loan Collateral will expire before June 1, 2023.

[21]  U.C.C. § 9-315(b)(2).

[22]  Docket No. 404 ¶ 15.

[23]  This figure is gross of any recovery to Other Secured Claims under the Plan and $1.5 million of other secured debt at the non-Debtor Canadian subsidiaries.

- First, in the determination of the Debtors' total distributable value in Article II.E.1 above, the Debtors' Recovery Model adopts the Debtors' estimate of the Company's total enterprise value ("TEV"):  $1.025 billion.  Based upon information received to date, the Committee's valuation analysis suggests that the Debtors' TEV could be understated by as much as $275 million.  TEV is highly relevant for Holders of General Unsecured Claims for several reasons.  A depressed TEV has the effect of lowering the value of New Common Equity in Reorganized Covia, thereby decreasing the Debtors' valuation of the New Common Equity provided to the Term Loan/Swap Claimants on account of their Claims.  This, in turn, artificially inflates the amount of the Term Loan Deficiency Claims and Swap Agreements Deficiency Claims (together, the "Deficiency Claims"), which, under the Plan, share pro rata with Holders of General Unsecured Claims with respect to the Debtors' unencumbered asset value.  Equally important, approximately 35% of the Debtors' equity in certain of their non-Debtor foreign subsidiaries is unencumbered by the Term Loan Liens, and thus available for distribution to certain Holders of General Unsecured Claims.  The Committee believes that the Unencumbered Value Settlement depresses the TEV in the calculation of total distributable value, thereby depressing the value of the Debtors' unencumbered equity in these non-Debtor foreign subsidiaries to the detriment of General Unsecured Claims.

- Second, as set forth above in Article II.E.2(b), the Debtors' Recovery Model ascribes value to the non-Debtor foreign subsidiaries, and therefore to the unencumbered foreign equity, by assigning the foreign subsidiaries a percentage of the Company's settled TEV.  The Debtors and the Senior Creditors unilaterally agreed to allocate 67.3% of the TEV to Debtor entities and an aggregate 32.7% of the TEV to the non-Debtor foreign subsidiaries.[24]  The Debtors disclose that the allocation is a function of each geographic segment's average historical adjusted EBITDA contribution.  As an initial matter, the Committee disagrees with the calculation of value based upon historical adjusted financial results.  Specifically, the Committee believes that the correct approach is to look at *prospective* financial projections and apply different multiple ranges to each geographic region based on the Debtors' energy/industrial business mix.  In the Committee's view, the Debtors' chosen methodology based on  historical financial results is skewed by the impact of profitable domestic-based energy operations *from the past* which are not currently profitable and are forecasted to contribute less than 10% of overall gross profit over the next two years.  Accordingly, the Committee believes that Debtors' purely historical based allocation unjustly over-allocates value to the Debtors' domestic subsidiaries, which have a mix of industrial and energy sales, and under-allocates value to the non-Debtor foreign subsidiaries, which have primarily industrial focused operations.

- Even if the Debtors' valuation approach based on historical performance is used, the Committee believes that the allocation of the Company's TEV among the Debtors and their non-Debtor foreign subsidiaries should be closer to an even, 50-50 split, given that, among other things, the non-Debtor foreign subsidiaries are almost exclusively focused on the industrial side of the Debtors' business and, unlike the Debtors' domestic subsidiaries, are largely insulated from the volatile and depressed energy segments.  A 50-50 allocation would increase the amount of unencumbered value in the Debtors' Recovery Model, value that should benefit certain Holders of General Unsecured Claims.

---

[24]   The aggregate figure of 32.7% represents the Unencumbered Value Settlement's allocation to "Non-Debtor Mexican Subsidiaries," "Non-Debtor Canadian Subsidiaries," and "Other Non-Debtor Foreign Subsidiaries" in Article II.E.2(b)(i) above.

15

- Third, in the Committee's view, the Debtors and Senior Creditors' settled value of $26.1 million in unencumbered Returned Receivables does not account for the Committee's claims in its standing motion [Docket No. 610] (the "Standing Motion"), which is discussed in greater detail in Articles VI.F and VII.I below.  The Committee believes that all of the Returned Receivables (in the approximate amount of $85.6 million) are entirely unencumbered.  If the Standing Motion is approved, the Committee's challenge to the Debtors and Senior Creditors' calculation of unencumbered Return Receivables may result in substantially more value flowing to the Debtors' unsecured creditors.

- Finally, the Unencumbered Value Settlement does not ascribe *any* value to various estate claims that Committee believes are colorable and that the Committee seeks to pursue in the Standing Motion.  These include, without limitation, claims challenging the scope of the Term Loan Liens on certain of the Debtor' assets, and claims related to the UFS Merger against Sibelco, other shareholders, the Senior Creditors, and other parties.  While the overall success of such claims is uncertain, if pursued and successful, the Committee believes that these claims could result in significant, material returns to unsecured creditors much greater than the returns provided for under the Debtors and Senior Creditors' Unencumbered Value Settlement.[25]

## F.      Recovery Analysis

### 1.      Summary of Anticipated Plan Recoveries

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  The ability of Holders of Claims or Interests to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and satisfy the conditions necessary to obtain Consummation of the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of an Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change.  For a complete description of the Debtors' classification and treatment of Claims and Interests, reference should be made to the entire Plan.[26]**

---

[25]     The Senior Creditors vigorously and categorically dispute the allegations in the Committee's Standing Motion that are asserted against the Term Loan Lenders and that relate to the Returned Receivables.

[26]     The projected recoveries set forth in the below chart are based on (a) the midpoint of the valuation range in the Valuation Analysis performed by PJT Partners LP, the Debtors' investment banker and financial advisor, and attached hereto as **Exhibit G**; and (b) the Debtors' estimate of General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims.  The projected recoveries with respect to Claims in Classes 5A, 5B, and 5C take into account the possible assertion of an Adequate Protection Superpriority Claim against the Debtors; *provided* that the rights of all parties in interest to contest any Adequate Protection Superpriority Claim that the Term Loan/Swap Claimants may assert are preserved.  The projected recoveries set forth in the below chart may change based upon changes in the amount of Claims that are Allowed (as defined in the Plan) as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim will receive at the option of the Reorganized Debtors: (a) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or (b) equal semiannual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under applicable non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | $0 | 100% |
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive at the option of the Reorganized Debtors (a) payment in full in Cash; (b) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; (c) delivery of the collateral securing such Allowed Other Secured Claim; or (d) such other treatment rendering such Allowed Other Secured Claim Unimpaired. | $13.6 million | 100% |
| 3 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive at the option of the Reorganized Debtors: (a) Cash in an amount equal to such Allowed Other Priority Claim; or (b) such other treatment rendering such Allowed Other Priority Claim Unimpaired. | $1.5 million | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 4 | Secured Term/ Swap Claims | Each Holder of an Allowed Secured Term Loan Claim or an Allowed Secured Swap Agreements Claim, respectively, shall receive its Pro Rata share of (a) the Excess Cash; (b) the New Term Loan; and (c) the Financing Claims Equity Pool. | $1,614 million | 66% |
| 5A | Parent General Unsecured & Deficiency Claims | Each Holder of a Claim against Covia that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Parent Unsecured Claims Equity Pool. | $782 million - $857 million | 9-12% |
| 5B | TechniSand General Unsecured & Deficiency Claims | Each Holder of a Claim against TechniSand that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim will receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the TechniSand Unsecured Claims Equity Pool. | $633 million - $1,726 million[27] | 1% |
| 5C | Cheyenne General Unsecured & Deficiency Claims | Each Holder of a Claim against Cheyenne that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim will receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Cheyenne Unsecured Claims Equity Pool. | $518 million - $1,610 million[28] | 0% |

---

[27] This range accounts for the calculation of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims on an aggregate basis, on one hand, and a per Debtor basis, on the other hand; *provided* that the rights of all parties in interest with respect to the calculation and amount of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against Debtors other than Covia are preserved. These matters are discussed further in Article II.F.3(c).

[28] This range accounts for the calculation of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims on an aggregate basis, on one hand, and a per Debtor basis, on the other hand; *provided* that the rights of

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 5D | Other General Unsecured & Deficiency Claims | All Other General Unsecured & Deficiency Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Other General Unsecured & Deficiency Claims will not receive any distribution on account of such Allowed Other General Unsecured & Deficiency Claims. | $713 million - $1,822 million | 0% |
| 6 | Intercompany Claims | All Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (a) Reinstated or (b) distributed, contributed, set off, settled, cancelled, released, or otherwise addressed. | N/A | 100% or 0% |
| 7 | Intercompany Interests | All Intercompany Interests shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (a) Reinstated in accordance with Article III.G of the Plan, distributed, contributed or (b) or cancelled, released or otherwise addressed. | N/A | 100% or 0% |
| 8 | Covia Interests | On the Effective Date, Covia Interests will be cancelled, released, and extinguished without any distribution on account of such Covia Interests. | N/A | 0% |

---

all parties in interest with respect to the calculation and amount of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against Debtors other than Covia are preserved. These matters are discussed further in Article II.F.3(c) below.

19

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 9 | Section 510(b) Claims | All Section 510(b) Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | N/A |

The projected recovery range for Claims in Classes 5A, 5B, and 5C set forth in the above chart is a function of several factors, including those discussed in the Valuation Analysis attached hereto as **Exhibit G**. Certain significant factors are discussed in greater detail in Articles II.F.2 and II.F.3 below.

2.　　Plan Treatment of Claims in Classes 5A, 5B, 5C, and 5D

*Class 5A (General Unsecured Claims and Deficiency Claims Against Covia)*:  Under the Plan, Holders of allowed unsecured Claims against Covia, including Deficiency Claims of the Term Loan/Swap Claimants estimated to be in excess of $500 million, will receive a recovery in the form of a pro rata share of 28.4% of the New Common Equity in Reorganized Covia, with this amount subject to reduction by an Adequate Protection Superpriority Claim that may be asserted by the Term Loan/Swap Claimants (which Claim is subject to dispute).  Based on the Debtors' estimate of the amount of allowed unsecured Claims against Covia, and taking into account the possible assertion of an Adequate Protection Superpriority Claim, the Debtors estimate that Holders of Claims in Class 5A will receive an recovery of approximately 9%-12%.  In other words, if a creditor has a $100,000 allowed unsecured Claim against Covia, the Debtors project that such creditor will receive equity in Reorganized Covia with a value estimated at approximately $9,000-$12,000.  This recovery could be further diluted by a post-Effective Date Management Incentive Plan (the "MIP"), which may provide for the issuance of New Common Equity to Reorganized Covia's management.  The terms of the MIP have not yet been determined; however, the MIP's material terms, including the size of the equity portion of the MIP Pool, will be disclosed in the Plan Supplement, which will be filed at least 10 days before the Voting Deadline.

*Class 5B (General Unsecured Claims and Deficiency Claims Against TechniSand)*:  Under the Plan, Holders of allowed unsecured Claims against TechniSand, including Deficiency Claims of the Term Loan/Swap Claimants, will receive a recovery in the form of a pro rata share of 2.6% of the New Common Equity in Reorganized Covia, which is also subject to reduction by any Adequate Protection Superpriority Claim that may be asserted by the Term Loan/Swap Claimants. The Debtors estimate that Holder of Claims in Class 5B will receive a recovery of approximately 1%, subject to dilution by the MIP.  As an example, a creditor with a $100,000 allowed unsecured Claim against TechniSand will receive equity in Reorganized Covia estimated to be worth approximately $1,000, again subject to dilution by the MIP.

*Class 5C (General Unsecured Claims and Deficiency Claims Against Cheyenne)*:  Under the Plan, Holders of allowed unsecured Claims against Cheyenne, including Deficiency Claims of the Term

Loan/Swap Claimants, will receive a recovery in the form of a pro rata share of 0.7% of the New Common Equity in Reorganized Covia, which is also subject to reduction by any Adequate Protection Superpriority Claim that may be asserted by the Term Loan/Swap Claimants. The Debtors estimate that Holders of Claims in Class 5C will receive a minimal recovery, which is subject to dilution by the MIP. However, the Debtors do not believe that there will be any Allowed General Unsecured Claims against Cheyenne.

*Class 5D (General Unsecured Claims and Deficiency Claims Against Other Debtors)*: Under the Plan, Holders of allowed unsecured Claims against Debtors other than Covia, TechniSand, and Cheyenne will not receive any recovery on account of such Claims and are therefore deemed to reject the Plan and will not receive voting ballots.

Finally, any distributions flowing to Holders of Claims in Class 5A, Class 5B, or Class 5C will be in the form of equity in Reorganized Covia, which will be issued without registration under the Securities Act. As a result, there may be no active market or exchange for such creditors to easily convert the New Common Equity into cash.

3.  <u>Certain Factors that May Impact Recoveries to Claims in Classes 5A, 5B, and 5C</u>

(a)  *The Term Loan/Swap Claimants' Assertion of an Adequate Protection Superpriority Claim*

The Cash Collateral Order grants the Term Loan Agent certain entitlements (for the benefit of the Term Loan/Swap Claimants) as adequate protection of the value of the Term Loan Liens on the Term Loan Collateral. These entitlements include an "allowed superpriority administrative expense claim against each Debtor on a joint and several basis" to the extent of, and in an aggregate amount equal to, any diminution in value of the Term Loan Liens on the Term Loan Collateral.[29]

The Term Loan/Swap Claimants have noted that they may assert a superpriority administrative expense claim against the Debtors on account of an alleged diminution in the value of the Term Loan Liens on the Term Loan Collateral (the "<u>Adequate Protection Superpriority Claim</u>"). By way of example, the Term Loan/Swap Claimants assert that the value of the Term Loan Cash Collateral has declined as non-lender Professional Fee Claims have accrued.[30] As of the date hereof, the Debtors' estimate of non-lender Professional Fee Claims during the Chapter 11 Case is approximately $33.4 million.

Any diminution in value of the Term Loan Cash Collateral may increase the amount of any Adequate Protection Superpriority Claim, which in turn may materially affect Plan recoveries to Holders of Claims in Classes 5A, 5B, and 5C. Specifically, the Plan provides that any Allowed Adequate Protection Superpriority Claim will receive an amount of New Common Equity equal to the Allowed amount of such Claim (at Plan value of such New Common Equity), and any such distribution will necessarily reduce the amount of New Common Equity available to other creditors in Classes 5A, 5B, and 5C. Solely for purposes of estimating recoveries to Holders of Claims in Classes 5A, 5B, and 5C, the Debtors have assumed a range for any Adequate Protection Superpriority Claim of between $0 and $33.4 million, though the upper end of this range could prove to be higher or lower.

---

[29]  Docket No. 404 ¶ 5(b).

[30]  As noted above, the rights of all parties in interest to contest any Adequate Protection Superpriority Claim that the Term Loan/Swap Claimants may assert are preserved.

(b)     *Calculation and Amount of Rejection Damages Claims*

Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases (collectively, "Rejection Damages Claims") are classified as General Unsecured Claims under the Plan. The Debtors estimate that the General Unsecured Claims include approximately $382 million to $429 million in estimated Rejection Damages Claims. The Debtors have rejected and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional Rejection Damages Claims not accounted for in this estimate.  To the extent that the actual amount of Rejection Damages Claims differs from the Debtors' estimate, the recoveries to Holders of Claims in Classes 5A, and 5B, 5C could change as well, and such changes could be material.

In particular, the Debtors have rejected certain railcar leases, as detailed further in Article VII.E herein.  The Rejection Damages Claims associated with the Debtors' rejection of railcar leases ("Railcar Rejection Damages Claims") are expected to compose approximately 95% of all Rejection Damages Claims in the Chapter 11 Cases.  The total amount of Railcar Rejection Damages Claims will depend in part on the appropriate method for calculating such Claims, as the Allowed amount of each Rejection Damages Claim will be determined by the net present value of each such Claim.  There are multiple potential positions that parties in interest may take regarding the appropriate method to fix the amount of Railcar Rejection Damages Claims, including whether:  (1) the Debtors calculate the present value of Railcar Rejection Damages Claims using (a) the discount rate in the liquidated damages provision of the rejected leases, if such a rate is specified or (b) the Debtors' weighted average cost of capital at the time of entry into such leases; or (2) the Debtors calculate the present value of Railcar Rejection Damages Claims using a uniform discount rate for each rejected lease.[31]  The recovery percentages with respect to Claims in Classes 5A and 5B are subject to change based on the aggregate amount of Railcar Rejection Damages Claims ultimately Allowed, and such changes could be material.[32]

(c)     *Calculation and Amount of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims*

The Plan places General Unsecured Claims against Covia in the same class as Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against Covia (Class 5A).  It also places General Unsecured Claims against TechniSand in the same class as Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against TechniSand (Class 5B) and General Unsecured Claims against Cheyenne in the same class as Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against TechniSand (Class 5C).  Accordingly, the calculation and aggregate Allowed amount of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims may impact the recovery to Claims in Classes 5A, 5B, and 5C under the Plan.

For purposes of calculating the recovery percentages in Article II.F.1 above, the Debtors calculated the amount of the Deficiency Claims as the positive difference between (i) the total amount of Term Loan Claims and Swap Agreements Claims; and (ii) the amount of distributable value allocated to Collateral Value at (A) each Debtor entity (the per Debtor approach) or (B) at all Debtor entities

---

[31]   The Debtors do not adopt or acknowledge the validity of any of these positions.  The discussion of such positions herein is solely to provide illustrative examples of positions that parties in interest may take.

[32]   The Debtors do not anticipate that Class 5C will include any Railcar Rejection Damages Claims, as Cheyenne was not a lessee under any of the railcar leases rejected by Debtors.

(the aggregate approach), *less* the recovery to Other Secured Claims under the Plan.[33]   This calculation yields a range for Covia of approximately $518 million to $552 million for the amount of the Deficiency Claims.[34]

## G.      Debtors' Recommendation That Creditors Vote to Accept the Plan

As discussed herein, the formulation of the Plan is a significant achievement for the Debtors in the face of lengthy and hard-fought negotiations.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' Estates and represents the best available alternative at this time.  Given the Debtors' core operational strengths, the Debtors are confident they can efficiently implement the restructuring set forth in the Plan to ensure their long-term viability and success.  For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

With respect to the putative estate claims identified in the Committee's Standing Motion, the Debtors believe that such claims are without legal merit and lack any basis in the facts.  Moreover, to the extent any such claims may exist, the Debtors believe that the cost and associated delay of prosecuting such claims would far exceed any anticipated benefit to the Debtors' estates.  Accordingly, the Debtors believe that the Plan's release of any such claims is appropriate.  The Debtors' assessment of potential estate claims related to the UFS Merger is reinforced by the conclusions of an independent investigation regarding these matters.  This investigation, and its conclusions, are discussed further in Article VI.E below.

The Senior Creditors also vigorously and categorically dispute the allegations in the Committee's Standing Motion that are asserted against the Term Loan Lenders and believe such claims are frivolous.  Further, the Senior Creditors strenuously disagree that a Plan that preserves claims against them or escrows their recoveries could be confirmed.

## H.      Committee's Recommendation That Creditors Vote to Reject the Plan

As set forth in the Committee's Standing Motion (as discussed in Articles VI.F and VII.I below), the Committee seeks derivative standing to pursue claims against the Debtors' Senior Creditors, Sibelco and other current or former shareholders, and current or former directors and officers relating to the UFS Merger that formed Covia.  Pursuant to an investigation (which remains ongoing), the Committee believes that there are colorable estate claims relating to the UFS Merger that could be worth as much as $1 billion.  The Debtors, however, believe these claims to be without merit or value, and the Plan provides for releases of these claims with no consideration flowing back to the bankruptcy estates.  The Committee firmly believes that all Holders of General Unsecured Claims should oppose the Plan to preserve these litigation claims.  While (as noted above) the overall success of these claims is uncertain, if the Committee is authorized to pursue these claims and they are successful, the Committee believes that these claims could result in significant, material recoveries for unsecured creditors as compared to the Debtors' Plan.  The

---

[33]   The Term Loan/Swap Claimants contend that the per Debtor approach is appropriate and, as such, assert that their Term Loan Deficiency Claims and Swap Agreements Deficiency Claims should be separately calculated at each Debtor entity other than Covia based on the positive difference between (a) the total face amount of the Term Loan Claims and Swap Agreements Claims and (b) the aggregate amount of the distributable value at such Debtor entity that is Collateral Value.  The rights of all parties in interest regarding the amount of the Term Loan/Swap Claimants' Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against the non-Covia Debtors are reserved.

[34]   This range is based on whether an Adequate Protection Superpriority Claim is asserted against the Debtors; *provided* that the rights of all parties in interest to contest any Adequate Protection Superpriority Claim that the Term Loan/Swap Claimants may assert are preserved.

23

Committee believes that claims could be preserved without significant delay or cost.  Specifically, the Committee believes that if the Plan could otherwise be approved (*i.e.*, if what the Committee perceives to be the other defects to the Plan regarding valuation and other matters were fixed), then a Plan could be confirmed that provides for post-confirmation litigation of the claims the Committee has identified, either through a litigation trust or some other means, with the Senior Creditors' recovery escrowed until claims against them are resolved.

Moreover, the Debtors' Plan incorporates the Unencumbered Value Settlement between the Debtors and the Senior Creditors that allegedly undervalues the Debtors' unencumbered assets.  As highlighted above, the Committee believes that certain of the assumptions and methodologies that form the basis of the Unencumbered Value Settlement (and the related Recovery Model) are erroneous and improperly skewed in favor of reducing unsecured creditor recoveries.

Accordingly, the Committee urges all Holders of General Unsecured Claims in Class 5A, Class 5B, and Class 5C to each VOTE TO REJECT THE PLAN by selecting the appropriate box in Item 1 on the Plan voting ballot for your claim class, and submitting such ballot to the Debtors' Claims, Noticing, and Solicitation Agent as directed.

Additionally, the Committee urges all Holders of General Unsecured Claims in Class 5A, Class 5B and Class 5C, to each OPT-OUT of the THIRD PARTY RELEASE by selecting the appropriate box in Item 2 on the Plan voting ballot for your claim class.

The Committee also urges all Holders of General Unsecured Claims in Class 5D to each OPT-OUT of the THIRD PARTY RELEASE by selecting the appropriate box on the "Release Opt-Out Form" accompanying the notice of non-voting status and returning that notice to Debtors' Claims, Noticing, and Solicitation Agent as directed.

<div align="center">

**ARTICLE III.**
**QUESTIONS AND ANSWERS**
**REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

</div>

**A.      What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on the Plan, if at all, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Secured Term/Swap Claims | Impaired | Entitled to Vote |
| 5A | Parent General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5B | TechniSand General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5C | Cheyenne General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5D | Other General Unsecured & Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Covia Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim, L/C Facility Claim or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, L/C Facility Claims, Ad Hoc Term Lender Group Fees and Expenses, Term Loan Agent Fees and Expenses, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    Administrative Claims

Except as otherwise specifically provided in the Plan, and except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment with respect to such Holder, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and L/C Facility Claims) will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Administrative Claim, an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. For the avoidance of doubt, the Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses shall be Allowed Administrative Claims payable on the Effective Date; *provided* that, notwithstanding anything to the contrary in Article II.A of the Plan, each Holder of an Allowed Adequate Protection Superpriority Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Adequate Protection Superpriority Claim, an amount of New Common Equity equal to the amount of such Allowed Adequate Protection Superpriority Claim as of the Effective Date.

Except as otherwise provided in Article II.A of the Plan, and except for Professional Fee Claims, L/C Facility Claims, and claims for the Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses, and unless previously Filed, requests for payment of Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

2.        Professional Fee Claims

a.   *Final Fee Applications and Payment of Professional Fee Claims*

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay Professional Fee Claims owing to the Professionals in Cash to such Professionals in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that* the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

b.   *Professional Fee Escrow Account*

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

c.   *Professional Fee Escrow Amount*

The Professionals shall deliver to the Debtors a reasonable and good faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five (5) Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided that* the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

d.   *Post Confirmation Fees and Expenses*

Except as otherwise specifically provided in the Plan, for any fees and expenses incurred from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented

27

legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, or the Committee.  For any fees and expenses incurred from and after the Confirmation Date, the Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, Reorganized Debtors, and the Committee, as applicable.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    L/C Facility Claims

The L/C Facility Claims shall be Allowed as of the Effective Date in an amount equal to (a) the face amount of all letters of credit outstanding under the L/C Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment and (c) any and all accrued and unpaid fees, expenses and indemnification or other obligations of any kind payable under the L/C Facility.

Except to the extent that a Holder of an Allowed L/C Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed L/C Facility Claim, on the Effective Date, each Holder of an Allowed L/C Facility Claim shall, receive either:  (a) to the extent clause (b) below does not apply, reinstatement of such L/C Facility Claim, and all liens and security interests on the Cash Collateral Account (as defined in the L/C Order) granted under the L/C Order to secure the obligations arising under the L/C Facility shall continue to remain in effect and be deemed granted to secure the obligations arising under the Exit Facility Documents (or shall have its applicable Letters of Credit cancelled and replaced by a replacement letter of credit as soon as reasonably practicable following the Effective Date), or (b) conversion of such Allowed L/C Facility Claims into Converted L/C Facility Claims, and the Holders of such Converted L/C Facility Claims shall upon such conversion become outstanding letters of credit under the Exit Facility and the issuers thereof shall be secured parties under the Exit Facility.  If the Allowed L/C Facility Claims become Converted L/C Facility Claims, contemporaneously with such conversion, then such Converted L/C Facility Claims shall have the benefit of all liens and claims granted under the Exit Facility Documents and the L/C Collateral (as defined in the L/C Order) shall be released.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, requests for payment and expenses of professionals compensated pursuant to the L/C Order are not required to be Filed and served other than in compliance with the procedures set forth in the L/C Order.

4.    Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses

The Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses shall be Allowed Administrative Claims without the need for any application to the Bankruptcy Court.  On the Effective Date, unless otherwise agreed, the Debtors or the Reorganized Debtors, as applicable, shall pay in full in Cash all outstanding Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses not previously paid without the need for any application or notice to or approval by the Bankruptcy Court.  Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses invoiced after the Effective Date, but covering the period prior to or on the Effective Date, shall

28

be paid by the applicable Reorganized Debtors following receipt of invoices therefor.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses related to implementation, consummation and defense of the Plan, the Plan Supplement, and the Restructuring Transactions.

     5.        <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**E.**       **How will Intercompany Claims and Intercompany Interests be treated under the Plan and will they affect my recovery under the Plan?**

In the ordinary course of business, each of the Debtors maintains routine business relationships with one or more of the other Debtors that may result in Intercompany Claims owing by one Debtor to another Debtor or Intercompany Interests held by one Debtor in another Debtor.  Historically, Intercompany Claims have been made to reimburse certain Debtors for various expenditures including the payment of corporate and franchise taxes, expenses related to payroll and benefits, general administrative expenses, and to facilitate other transfers between Debtors to maintain the seamless operation of the Debtors' businesses.  Indeed, the Intercompany Claims and Intercompany Interests are critical to the Debtors continuing their businesses in an uninterrupted fashion, as funds are routinely transferred between Debtor entities to fund the necessary corporate and operating expenses.  No Intercompany Claims or Intercompany Interests are held or will be transferred to non-Debtor entities.

The Plan provides that (1) Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (a) Reinstated or (b) distributed, contributed, set off, settled, canceled and released or otherwise addressed, and (2) Intercompany Interests shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, (a) Reinstated in accordance with Article III.G of the Plan, distributed, contributed, or (b) cancelled, released, or otherwise addressed.  Holders of Intercompany Claims in Class 6 and Holders of Intercompany Interests in Class 7 are not entitled to vote on the Plan because they will either be Unimpaired (and therefore not entitled to vote under section 1126(f) of the Bankruptcy Code) or will receive no recovery (and will therefore not be entitled to vote under section 1126(g) of the Bankruptcy Code).

Any Reinstatement of Intercompany Interests or Intercompany Claims is merely to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure, permitting the Reorganized Debtors to address post-restructuring accounting, tax, human resources, regulatory and tax issues in an efficient manner—thereby maximizing the value of the post-emergence enterprise.  With respect to the Reinstatement of Intercompany Interests in particular, eliminating such Intercompany Interests could also potentially have significant state or federal tax implications.

Based on the mutually offsetting nature of the Intercompany Claims and Intercompany Interests, no value will shift between creditors on account of the treatment of Intercompany Claims or Intercompany Interests—rather, their flexibility of treatment is merely for the convenience of continuing the Debtors' ordinary business practices.

29

**F.      Will royalty interests be affected by the Plan?**

The legal and equitable rights, interests, defenses, and obligations of holders of certain royalty interests related to the Debtors' business activities and owners of royalty and other interests in the Debtors' extracted minerals, and holders of claims related to royalty interests shall not be impaired in any manner by the provisions of the Plan.  Nor shall anything in the Plan impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors.  To the extent applicable, such Claims or Interests shall be Reinstated pursuant to the Plan.

Notwithstanding the foregoing, nothing in Article IV.J of the Plan shall limit the Debtors' rights to reject any Executory Contract or Unexpired Lease in accordance with the Bankruptcy Code or pursuant to Article V of the Plan.

**G.      How will employee wages, compensation, benefit, and incentive programs be treated under the Plan?**

Unless otherwise provided in the Plan, including with regard to the New Employment Agreements, or otherwise amended or modified as set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases, all employee wages, compensation, benefit, and incentive programs and arrangements in place as of the Effective Date with the Debtors, including any Severance Obligations, shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Covia is the contributing sponsor of, and the other Debtors are alleged by the Pension Benefit Guaranty Corporation ("PBGC") to be members of the contributing sponsor's controlled group (as defined in 29 U.S.C. § 1301(a)(14)) for the Covia Holdings Corporation Pension Plan (the "Pension Plan").  The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  PBGC, a United States Government corporation and federal agency, guarantees the payment of certain pension benefits upon termination of a pension plan by Title IV of ERISA.  PBGC has filed proofs of claim (collectively, the "PBGC Claims") against the Debtors for: (1) the Pension Plan's underfunding on a termination basis under 26 U.S.C. § 1362; (2) unpaid minimum funding contributions under 26 U.S.C. §§ 412, 430 and 29 U.S.C. §§ 1082, 1083; and (3) pension-insurance premiums owed to PBGC pursuant to 29 U.S.C. §§ 1306, 1307.  In the event of a termination of the Pension Plan under 29 U.S.C. §§ 1341(c) or 1342, PBGC will assert that the contributing sponsor and all members of its controlled group will be jointly and severally liable for the PBGC Claims pursuant to 29 U.S.C. § 1362(a), 26 U.S.C. § 412, and 29 U.S.C. § 1307, all as applicable.  The Debtors and Reorganized Debtors respectfully disagree with many of PBGC's foregoing assertions and reserve all rights relating to any asserted liability, including but not limited to contesting the validity and amount of any PBGC Claims.

Upon confirmation of the Plan, the Pension Plan will remain in effect in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder).  Therefore, as a result, PBGC and the Debtors agree that PBGC shall also be deemed to have withdrawn the PBGC Claims as of the Effective Date with prejudice and without incurring liability in the bankruptcy and without any further action of the Debtors or the Reorganized Debtors or PBGC and without any further action, order, or approval of the Bankruptcy Court.

30

Prior to the Effective Date, Reorganized Covia shall have entered into the New Employment Agreements in accordance with Article IV.G of the Plan.

**H.      Are any regulatory approvals required to consummate the Plan?**

There are no known U.S. regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**I.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article X.B of this Disclosure Statement and the Liquidation Analysis attached hereto as **Exhibit E**.

**J.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date of the Plan.  See Article X of the Plan for the conditions precedent to Effective Date of the Plan.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article VIII.C.15 of this Disclosure Statement.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cram down" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.5 of this Disclosure Statement.

**L.      How will the preservation of certain Causes of Action affect my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of

Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

Except as otherwise provided for in the Plan, the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan, or pursuant to a Final Order.** Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

Except as otherwise provided for in the Plan, the Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. Except as otherwise provided for in the Plan, the applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. Except as otherwise provided for in the Plan, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

The recoveries received as a result of the successful prosecution of any retained Causes of Action will vest in the Reorganized Debtors for the benefit of the Reorganized Debtors' creditors and other stakeholders.

**M.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides for releases by both the Debtors and third parties of the Released Parties, and exculpation of the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties to the Restructuring Support Agreement in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement. The Consenting Stakeholders would not have agreed to the terms and conditions of the Restructuring Support Agreement and to support the Plan pursuant thereto without the release and exculpation provisions.

**If the Plan is approved, the Debtors, pursuant to the definition of "Released Parties," will release any and all claims that the Debtors' estates may have against the Senior Creditors, Sibelco, and all of the Debtors' current and former directors, officers and shareholders.  As a result, all of the litigation claims identified by the Committee in the Standing Motion, including all litigation claims against the Senior Creditors, Sibelco and other current or former shareholders, and the Debtors' directors and officers in connection with the UFS Merger, would be released.**

**Further, each unsecured creditor will be deemed to have released all of the Released Parties (including those identified by the Committee above) pursuant to the Third Party Release under Article VIII.C of the Plan unless such unsecured creditor (i) elects to "opt-out" of the Third Party Release on a timely submitted Ballot or opt out form; or (ii) files an objection to the Plan with respect to the releases.**

**Importantly, all Holders of Claims or Interests that do not opt out of the releases contained in Article VIII of the Plan or File an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such Holder as a Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan.  The releases are an integral element of the Plan.**

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  For example, certain of the Consenting Stakeholders have agreed to significant reductions in the amounts of their claims against the Debtors' Estates and have also agreed to equitize certain secured, valid debt.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

With respect to the Pension Plan, no provision of the Disclosure Statement, the Plan, the Confirmation Order, or Section 1141 of the Bankruptcy Code shall release the Reorganized Debtors, or any of their successors, from any liability to the Pension Plan or PBGC imposed under ERISA or the Internal Revenue Code solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan.  PBGC and the Pension Plan will not be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code with respect to the Pension Plan as a result of the Plan or the Confirmation Order.

The Plan embodies a global settlement of claims and causes of action between the Debtors and the Consenting Stakeholders.  Prior to the Petition Date, the Debtors negotiated a comprehensive Restructuring Support Agreement with an organized group of their secured term loan lenders.  Such efforts culminated in the execution of the Restructuring Support Agreement that carries the support of the Consenting Stakeholders, including a majority of claims across the Debtors' capital structure constituting nearly $1.6 billion of outstanding funded debt obligations.

To effectuate the global settlement embodied in the Plan, the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good faith, arms'-length negotiations, were material inducements for the Consenting Stakeholders to enter into the Restructuring Support Agreement and the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Consenting Stakeholders.

33

1. **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to or related to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Article VIII.B of the Plan shall not operate to waive or release any right, Claim, or Cause of Action (a) in favor of any Debtor or Reorganized Debtor, as applicable, arising in the ordinary course of business under any contractual obligation owed to such Debtor or Reorganized Debtor (including any such accounts receivables obligations carried on the Debtors' books and records and any such obligations under any Executory Contract or Unexpired Lease assumed by a Debtor or Reorganized Debtor, as applicable) that is not satisfied or discharged under the Plan or (b) as expressly set forth herein, any Definitive Documents, the Confirmation Order, or the Plan Supplement.**

34

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such Causes of Action; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

2.     **Releases by Holders of Claims and Interests**

On and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or any Definitive Document, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the Definitive Documents, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  Nothing in the Plan, the Confirmation Order, or Section 1141 of the Bankruptcy Code shall be construed as discharging, releasing or relieving the

35

Reorganized Debtors, or their successors, from any liability imposed under ERISA or the Tax Code with respect to the Pension Plan solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability as a result of the Plan or Confirmation Order.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above provided by any Holders of Covia Interests (other than Covia Interests held by SRC-Sibelco NV and its Affiliates) do not release any Entity from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.C of the Plan is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such Causes of Action; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

3.     **Exculpation**

Notwithstanding anything in the Plan to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim or Interest related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or

36

regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

    4.      **Injunction**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, or compromised pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.**

**Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party from enforcing their rights under the Plan or under any document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan, including by bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan.**

    5.      **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, the New Term Loan Documents, the Exit Facility Documents, the L/C Facility (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than, solely in the event that the Allowed L/C Facility Claims become Converted L/C Facility Claims) shall be fully released, settled, compromised, and discharged, and all of the right,**

**title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Reorganized Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

<div align="center">

6.      <u>**Release of Preference Actions**</u>

</div>

**As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law;** *provided that*, **except as expressly provided in the Plan (whether in Article VIII of the Plan or otherwise), or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.**

**N.**      **What is the deadline to vote on the Plan?**

The Voting Deadline is November 27, 2020, at 11:59 p.m. (prevailing Central Time).

**O.**      **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is ***actually received*** by Prime Clerk LLC, the Debtors' Claims, Noticing, and Solicitation Agent, ***on or before the Voting Deadline, i.e., November 27, 2020, at 11:59 p.m. (prevailing Central Time)***.  See Article IX of this Disclosure Statement for more information.

**P.**      **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.**      **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for December 7-10, 2020.  The Confirmation Hearing will commence on December 7, 2020 at 9:00 am (prevailing Central Time) and will continue from day to day, as the Court's schedule permits, until completed.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than November 28, 2020, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of

<div align="center">38</div>

the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.[35]

### R.   What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### S.   What is the effect of the Plan on the Debtors' ongoing businesses?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be forced to go out of business.  Rather, the Plan will eliminate approximately $735 million in funded debt obligations from the Debtors' balance sheet, permitting the Reorganized Debtors to continue ongoing operations without the unsustainable burden of their existing debt load.  Following the Effective Date, and unless otherwise provided in the Plan or Confirmation Order, the Reorganized Debtors may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### T.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims, Noticing, and Solicitation Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Covia Ballot Processing
C/O Prime Clerk, LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

*By electronic mail at:*
CoviaBallots@primeclerk.com

*By telephone (domestic toll free) at:*
(877) 606-3610

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Claims, Noticing,

---

[35]   For the avoidance of doubt, Bankruptcy Rule 9006 shall not apply to the deadline for filing and service of objections to Confirmation.

and Solicitation Agent at https://cases.primeclerk.com/Covia (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).

**U.      Do the Debtors recommend voting in favor of the Plan?**

Yes.   The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to expeditiously emerge from chapter 11, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

<div align="center">

**ARTICLE IV.**
**THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN**

</div>

**A.      Restructuring Support Agreement**

On June 29, 2020, the Debtors and Holders of approximately 51 percent of Term Loan Claims entered into the Restructuring Support Agreement.  The Restructuring Support Agreement did not provide for the treatment of, among other things, general unsecured creditors because the Committee had not yet been formed at that time and the Debtors had yet to meaningfully analyze (let alone conclude) the appropriate treatment of such claims.  Since executing the Restructuring Support Agreement, the Debtors have further documented the terms of the restructuring contemplated thereby, including the Plan.  The restructuring transactions contemplated by the Plan will: (1) reduce overall leverage through the replacement of approximately $1.559 billion of existing funded debt obligations with a New Term Loan of $825 million (subject to reduction by up to $25 million) and equitization of the remaining funded debt obligations; and (2) provide Holders of Allowed General Unsecured Claims with recoveries as set forth pursuant to the chart in Article II.F.1 herein.  Each of the major restructuring transactions and settlements contemplated by the Restructuring Support Agreement is described in greater detail below.  The Debtors believe that the transactions contemplated by the Restructuring Support Agreement are the best available restructuring terms under the circumstances and will allow Covia to succeed as a restructured company after emergence from the Chapter 11 Cases.

**B.      The Plan**

The Plan contemplates the following key terms, among others described herein and therein:

1.      <u>General Settlement of Claims and Interests</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan (including the Unencumbered Value Settlement) shall constitute a good-faith compromise and settlement of all Claims and Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

<div align="center">40</div>

2.     Sources of Consideration for Plan Distribution

Distributions under the Plan will be funded with, or effectuated by, as applicable, (a) Cash held on the Effective Date by or for the benefit of the Debtors, (b) the issuance of the New Common Equity, (c) the issuance of the New Term Loan, and (d) the issuance of or borrowings under the Exit Facility Credit Agreement.

3.     Issuance and Distribution of New Common Equity

All Covia Interests shall be canceled on the Effective Date and Reorganized Covia shall issue the New Common Equity to Holders of Claims entitled to receive the New Common Equity pursuant to the Plan in the proportions set forth in the Plan. The issuance of New Common Equity shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as applicable.  All New Common Equity issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  For the avoidance of doubt, the acceptance of New Common Equity by any Holder of any Claim or Interest shall be deemed as such Holder's agreement to the New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with its terms.

4.     Management Incentive Plan

The Debtors, with the consent of the Required Consenting Stakeholders, shall establish the aggregate percentage of the Management Incentive Plan, which shall be disclosed in the Plan Supplement. Immediately prior to the Effective Date, the Debtors shall reserve the equity portion of the MIP Pool consistent with the Plan Supplement.  Within 90 days following the Effective Date, the New Board shall: (a) otherwise determine the terms and conditions of the Management Incentive Plan, (b) implement the Management Incentive Plan, and (c) approve of the grant of certain awards under the Management Incentive Plan.

5.     Issuance of the New Term Loan

On the Effective Date, Reorganized Covia and its applicable Affiliates will execute the New Term Loan Documents, pursuant to which Reorganized Covia (or a specified Debtor Affiliate) will issue the New Term Loan to applicable Holders of Claims in partial exchange for such Holders' respective Claims as set forth in Article III.C of the Plan.  The issuance of the New Term Loan is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims or Interests.  All Holders of Allowed Term Loan Credit Agreement Claims entitled to distributions of the New Term Loan hereunder shall be deemed to be a party to, and bound by, the applicable New Term Loan Documents, regardless of whether such Holder has executed a signature page.  On the Effective Date, all of the Liens, guarantees, and security interests to be granted in accordance with the New Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Term Loan Documents, (c) shall be deemed perfected on the Effective Date and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

Subject to the occurrence of the Effective Date, the New Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Covia and its applicable Affiliates party thereto and shall be enforceable in accordance with their respective terms.  Each distribution and issuance of the New Term Loan under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to

41

such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of the New Term Loan by any Holder of any Claim shall be deemed as such Holder's agreement to the New Term Loan Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

The Reorganized Debtors and the Holders (or the agent for the Holders) that are granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.  Exit Facility

On the Effective Date, the applicable Reorganized Debtors and certain Affiliates shall enter into the Exit Facility Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith. The Confirmation Order shall include approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit Facility Documents and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders (or the agent for the lenders) under the Exit Facility shall have valid, binding, and enforceable Liens on the Exit Facility Collateral in accordance with the Exit Facility Documents. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Exit Facility Documents are granted in good faith as an inducement to the lenders under the Exit Facility to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents. The Reorganized Debtors and the Persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order and any such filings, recordings, approvals, and

consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

      7.      Disputed Claims

After the Effective Date, the Reorganized Debtors shall (directly or indirectly) issue New Common Equity to Holders of Claims ultimately determined to be Allowed after the Effective Date (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan.

New Common Equity (or other Property) may be either (a) deposited into a Disputed Claims reserve (a "Disputed Claims Reserve") rather than being issued directly by the Reorganized Debtors to Holders as Claims are resolved or (b) issued out of "treasury stock" by the Reorganized Debtors directly to Holders as Claims are resolved; *provided* that the amount of New Common Equity (or other Property) to be deposited into the Disputed Claims Reserve (if any) shall be (x) mutually acceptable to the Debtors, the Committee and the Required Consenting Stakeholders or (y) otherwise determined by an order of the Bankruptcy Court.  Such method for the issuance of New Common Equity has not yet been determined. To the extent that any Property is deposited into a Disputed Claims Reserve (*i.e.*, under clause (a) above), such Disputed Claims Reserve will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the Treasury Regulations promulgated under the Tax Code.  All corresponding elections with respect to such Disputed Claims Reserves shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to any Disputed Claims Reserve, and any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such Disputed Claims Reserves shall be paid out of the assets of the Disputed Claims Reserve (and reductions shall be made to amounts disbursed from the Disputed Claims Reserve to account for the need to pay such taxes).

      8.      Releases[36]

The Plan contains certain releases (as described more fully in Article III.M of this Disclosure Statement), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders. Additionally, all Holders of Claims or Interests that do not opt out of the releases contained in Article VIII of the Plan or file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such Holder as a Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan.

---

[36]    The Debtors' Independent Directors Committee (as defined herein), with the assistance of DLA Piper and AP (each as defined herein), undertook an investigation into potential Claims and Causes of Action.  Article VI.E of this Disclosure Statement sets forth additional information regarding the investigation.  The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.

**ARTICLE V.**
**THE DEBTORS' CORPORATE HISTORY,**
**STRUCTURE, AND BUSINESS OVERVIEW**

**A.     Covia's Corporate History**

Covia was formed through the UFS Merger.  Immediately following the consummation of the UFS Merger, Unimin changed its name to Covia Holdings Corporation and began operating under that name. The common equity of Fairmount Santrol was delisted from the NYSE prior to the market opening on June 1, 2018, and Covia commenced trading under the ticker symbol "CVIA" on that date.  Upon the consummation of the UFS Merger, the former stockholders of Fairmount Santrol (including holders of certain Fairmount Santrol equity awards) received, in the aggregate, $170 million in cash consideration and approximately 35% of the common equity of Covia.  Approximately 65% of the outstanding shares of Covia common equity was owned by Sibelco, the parent company of Unimin prior to the UFS Merger, as of December 31, 2019.

In connection with the UFS Merger, Covia redeemed approximately 18.5 million shares of Unimin common equity from Sibelco in exchange for an amount in cash equal to approximately (1) $660 million plus interest accruing at 5.0% per annum for the period from September 30, 2017 through June 1, 2018 less (2) $170 million in cash paid to Fairmount Santrol stockholders.  Covia also completed a debt refinancing transaction in connection with the UFS Merger, by entering into the Term Loan Agreement, which provides for a $1.65 billion senior secured term loan and a $200 million revolving credit facility ("Revolver").  The proceeds of the Term Loan Agreement were used to repay certain indebtedness of Unimin and Fairmount Santrol and to pay the cash portion of the UFS Merger consideration and expenses related to the UFS Merger.  Covia voluntarily canceled the Revolver, effective on December 31, 2019.  Under the terms of the Term Loan Agreement, Covia and the guarantors pledged as collateral substantially all of their assets, subject to customary exceptions, including their mining and processing facilities within the United States and no more than 65% of the voting equity interests of certain foreign subsidiaries.

As a condition to the UFS Merger, Unimin contributed certain assets of its Electronics segment, including $31 million of cash to Sibelco North America, Inc. ("HPQ Co."), a newly formed wholly owned subsidiary of Unimin, in exchange for all of the capital stock of HPQ Co. and the assumption by HPQ Co. of certain liabilities.  Unimin distributed all of the stock of HPQ Co. to Sibelco in exchange for 169,550 shares of Unimin common equity held by Sibelco.

**B.     The Company's Business Operations**

The Company is a leading provider of diversified mineral-based and material solutions for global energy and industrial markets.  It produces a wide range of specialized silica sand, feldspar, nepheline syenite, calcium carbonate, clay, and kaolin products which serve as raw materials for the production of glass, ceramic tiles, sanitaryware, paints, plastics, roofing tiles, filtration media, artificial turf, golfing sands, hydrocarbon recovery, and other end markets.  The Company currently has 32 mining facilities with approximately 25 million tons of annual mineral processing capacity.  Its mining and coating facilities span throughout North America and Denmark, and it has many sites in close proximity to its various customer bases in states such as Texas, Minnesota, Wisconsin, Illinois, Missouri, Ohio, North Carolina, South Carolina, Georgia and Oklahoma.  To serve these locations and customers, the Company depends on rail, truck, and barge services to move products from its mining and production facilities to its customers. Because transportation costs often represent a significant portion of the overall delivered product cost, the Company's position as one of the few North American mineral producers capable of both transporting significant industrial volumes long distances to customers and providing direct service to each of North America's major oil and gas producing basins provides a significant competitive advantage.

The Company's operations are organized into two complementary segments based on the primary end markets it serves—the Energy Segment and the Industrial Segment. The Energy Segment, which represented approximately 54% of the Company's total revenues for 2019, offers the oil and gas industry a comprehensive portfolio of raw frac sand, value-added proppants, well-cementing additives, gravel-packing media and drilling mud additives, and a last-mile logistic service which delivers product directly to the well site. The Energy Segment products serve hydraulic fracturing operations in the U.S., Canada, Argentina, Mexico, China, and northern Europe. The Industrial Segment, which represented approximately 46% of the Company's total revenues for 2019, provides whole-grain, value-added, and custom-blended products to the glass, ceramics, coatings, metals, foundry, polymers, construction, water filtration, sports and recreation, and various other industries, primarily in North America.

To facilitate the operation of its Energy and Industrial Segments, the Company has established a comprehensive transportation and logistics infrastructure, which includes, among other things, access to a fleet of railcars to provide direct service and opportunistically situated facilities, and enables the Company to deliver products upon demand at the desired time and location at a lower cost. The Company's ability to sell products to a wide range of customers across multiple end markets allows the Company to improve the recovery of its reserve base within its mining operations and to partially insulate the cyclicality of its earnings.

1.      Energy Segment

The Company's Energy Segment serves customers in the oil and gas industry, providing a variety of proppants and other oilfield minerals for use in hydraulic fracturing primarily in the U.S. and Canada. The oil and natural gas proppant industry is comprised of businesses involved in the mining or manufacturing, distribution, and sale of the propping agents used in hydraulic fracturing, the most widely used method for stimulating increased production from lower permeability oil and natural gas reservoirs.

There are three primary types of proppant that are utilized in the hydraulic fracturing process: raw frac sand, coated sand, and manufactured ceramic beads. The Company's customers generally choose among these proppant types based on the geology of the reservoir, expected well pressures, proppant flowback concerns, and product cost. Given the price differences between the various proppant products and well-specific considerations, oil and natural gas exploration and production and oilfield service companies continually evaluate the cost and conductivity of the various proppants that the Company provides in order to best address the geology of the well and to maximize well productivity and economic returns.

2.      Industrial Segment

The Industrial Segment manufactures products that are sold to customers in the glass, ceramics, coatings, metals, foundry, polymers, construction, water filtration, sports and recreation, and various other industries. Industrial Segment sales correlate strongly with overall economic activity levels in the U.S. and Mexico as reflected in gross domestic product, unemployment levels, vehicle production, and housing market. In addition, demand for many of the Company's products sold in the construction and coatings sectors tend to correlate with construction activity levels.

3.      Transportation Logistics and Infrastructure.

In addition to the products it supplies, the Company had established one of the largest small-cube-covered hopper rail fleets in the country. At the time of the UFS Merger, the Company had more than 20,000 railcars either owned, leased or otherwise under its control. Leased railcars, which comprised the most significant portion of the Company's fleet, were generally subject to multi-year leases with laddered

maturities, allowing the Company to flexibly reduce fleet size to match market demand should it modestly soften in a given year.  The largest use of the Company's rail fleet is to transport its NWS product mined primarily in the Upper Midwest to its Energy Segment customers.  In addition to railcars, the Company's oil and gas logistics network includes distribution terminals in all major oil and gas basins, as well as select locations to serve customers in its Industrial Segment.  This network of distribution terminals includes facilities that the Company owns or leases under fixed-term agreements and properties that are owned and operated by third parties, and the activities conducted at such distribution terminals include rail and transload operations as well as additional storage and handling.

The severe reduction in demand for NWS over the last two years has resulted in a material oversupply of leased railcars and transload facilities under long-term contracts tied principally to Covia's Energy Segment.  During that time, the Company has aggressively managed these excess assets, returning more than 4,200 maturing leased cars and exited more than 46 high-cost or obsolete terminals.  In December 2019, the Company entered into definitive agreements with certain railcar manufacturers to terminate existing railcar purchase obligations, which had been scheduled to be acquired in 2020 and 2021.  The agreements terminated all railcar purchase obligations totaling approximately $195 million in exchange for minimal cash and lease modifications to a small portion of the fleet.

Despite these efforts, however, the Company remains significantly over-fleeted and has several out-of-the-money terminal operating agreements relative to the depressed demand that exists today and for the foreseeable future.  The severe contraction in demand for NWS has resulted in a number of the Debtors' leased railcars which are no longer in use and are stored on track at idled facilities or at third-party locations.  Additionally, the market decline for NWS has resulted in a significant oversupply of available railcars in the market, making it difficult to sub-lease excess railcars.  The oversupply of these cars has also caused the market lease rates for railcars to decline significantly.  Finally, certain terminal operating agreements are long-term, high-cost, and generate losses for the Debtors.  There is currently insufficient volume for the Company to operate its Energy Segment business profitably absent a restructuring of these burdensome contracts.

## C.    Customers

One of the Company's primary strategies has been to partner with the largest companies in the markets it serves.  The strength of its customer base is driven by the Company's collaborative approach to product innovation and development, reputation for high quality, the consistency and reliability of its products and the scale of its operations and logistics network.  The Company currently serves approximately 2,000 customers across a variety of industries in the United States, Canada, Mexico and the rest of the world.  A significant portion of the Company's sales by volume is derived from customers with whom it has long-term relationships.  In 2019, no customer exceeded 10% of total revenues; however, a large portion of Energy Segment sales is generated by a limited number of customers, and therefore the loss of, or a significant reduction in purchases by, its largest Energy Segment customers could adversely affect the Company's operations.

The Company primarily sells products under supply agreements with terms that vary by customer.  Certain of its supply agreements require the customer to purchase a specified percentage of its product requirements from the Company, while others require the customer to purchase a minimum volume.  Certain minimum volume commitments, or "MVCs", may require the customer to pay the Company specified liquidated damages if the purchased volume does not meet the required minimums.  Specific custom orders are generally filled upon request, and backlog is not a material factor.

46

**D.      Competition**

The Company's Energy Segment competes with numerous large and small producers operating across all of the major frac sand producing regions of North America.  Important competitive factors in the Company's Energy Segment include reliability of supply, price, customer relationships, supply chain management, processing quality, performance, sand and proppant characteristics, transportation capabilities, and proximity of supply to a customer's well site.

Over the course of 2018 and 2019, at least 35 mines owned or operated by the Company's competitors were built, each of which averaged at least 3 million tons of nameplate capacity.  This build-up oversaturated the market and placed significant downward pressure on sand pricing.  By way of example, in 2018 the price of sand sourced from West Texas mines was approximately $40 per ton for the Debtors; that price has since plummeted to approximately $15 per ton on a weighted average basis as of June 2020.

In the Industrial Segment, the Company competes with both large diversified companies and smaller, local producers on the basis of product quality, product consistency and reliable delivery at a competitive price.  Competitors may produce minerals similar to those sold by the Company or they may produce substitute products that offer similar functionality.

**E.      Employees**

As of the Petition Date, the Company had approximately 1,600 employees operating in the United States.  The Company believes that it maintains good relations with its workforce.  It provides salaried and hourly employees a comprehensive benefits package, including medical, life and accident insurance, incentive bonus programs, and a 401(k) plan with an employer match and discretionary employer contribution, company pension (for certain employees) as well as various employee training and development programs that have been developed internally or through third parties.  As of the Petition Date, approximately 24% of the Company's employees were parties to 13 collective bargaining contracts in the United States, Canada and Mexico.  The Company believes it has strong relationships with union representatives and has maintained an active dialogue with such groups.  It has historically been able to successfully extend and renegotiate collective bargaining agreements as they expire, and has not experienced a significant work stoppage or strike at any of its facilities in nearly 20 years.

**F.      The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors were liable for approximately $1.6 billion in aggregate funded-debt obligations.  The table below summarizes the Debtors' prepetition capital structure, and attached hereto as **Exhibit C** and incorporated herein by reference is a structure chart of the Debtors' corporate organization as of the Petition Date.

|  | **Principal** *(US$ millions)* | **Guarantors** |
|---|---|---|
| Term Loan Agreement | 1,559.0 | Guarantor Debtors |
| Other Secured Debt | 16.0 | None |
| **Total Funded Debt Obligations** | **$1,575.0** | |

1.      Senior Debt Obligations (Term Loan Agreement)

As of the Petition Date, the Debtors had a total of $1.559 billion of funded debt obligations arising from the Term Loan Agreement.  The Term Loan Agreement was issued at par with a maturity date of June 1, 2025, and requires quarterly principal payments of $3.9 million and periodic interest payments

(not less than quarterly) through March 31, 2025 with the balance payable at the maturity date. Interest accrues at the quarterly rate of the three-month LIBOR plus 325 to 400 basis points depending on Total Net Leverage (*i.e.*, total debt (net of up to $150 million of non-restricted cash), divided by EBITDA) with a LIBOR floor of 1.0% or a comparable base rate. The Term Loan Agreement is guaranteed by all of Covia's wholly-owned, material, domestic, restricted subsidiaries, subject to certain exceptions. In addition, subject to various exceptions, the Term Loan Agreement is secured by substantially all of Covia's assets and those of each guarantor, including (a) a perfected first-priority pledge of all of the capital stock held by Covia or any guarantor of each existing or subsequently acquired or organized wholly owned restricted subsidiary (no more than 65% of the voting equity interests of any foreign subsidiary);[37] and (b) perfected first-priority security interests in substantially all of Covia's tangible and intangible assets and those of each guarantor. The Term Loan Agreement is not guaranteed by certain foreign subsidiaries, including Covia's Mexican and Canadian subsidiaries. Covia has the option to prepay the Term Loan Agreement without premium or penalty other than customary breakage costs with respect to LIBOR borrowings. There are no financial covenants governing the Term Loan Agreement, but it does place certain restrictions on Covia's ability to pay dividends on its common equity.

2.    Other Secured Debt

As of the Petition Date, the Debtors had a total of approximately $16.0 million of other funded debt obligations, consisting of a $10.0 million industrial revenue bond and approximately $6.0 million in other borrowings. Covia holds the industrial revenue bond in relation to the construction of a mining facility in Wisconsin (the "Revenue Bond"). The Revenue Bond bears interest, which is payable monthly at a variable rate. The bond matures on September 1, 2027 and is collateralized by a letter of credit in the amount of $10,095,891. The $6.0 million in other borrowings consists of approximately $5.9 million in capital leases and $145,000 in promissory notes with three unrelated third parties that Unimin entered into on January 17, 2011. Two of these unrelated parties received interest rates of 1.0% and 4.11%, respectively, as of December 31, 2019, and the third unrelated party was repaid with proceeds from the sale of Winchester & Western Railroad (a non-core asset in the Industrial Segment that was used to ship minerals from the Debtors' facilities in Gore, Virginia) and thus did not require any interest payments.

3.    Covia Common Equity

Shares of Covia's common equity were listed and began trading on the New York Stock Exchange on June 1, 2018. Prior to that date, there was no public market for Covia's common equity. On the Petition Date, there were 132,098,413 shares of Covia common equity outstanding. Because many of the shares of common equity are held by brokers and other institutions on behalf of stockholders, Covia is unable to estimate the total number of stockholders represented by these record holders. Approximately 65% of Covia's common equity is owned by Sibelco, previously the parent company of Unimin.

On April 14, 2020, Covia was notified by the NYSE that the average price of its shares of common equity had fallen below a $1.00 per share over a consecutive 30-day trading price, which is the minimum average closing price required to maintain listing on the NYSE. The notice provided that Covia had until December 17, 2020, to cure the deficiency and return to compliance with the NYSE's continued listing standards.

On June 30, 2020, immediately following the Petition Date, the NYSE commenced proceedings to delist Covia's common equity in response to the Debtors' filing of voluntary petitions for relief under

---

[37]    With respect to the non-Debtor Mexican subsidiaries, however, approximately 83% of the equity value of these entities constitutes Collateral Value, as discussed in Article II.E.2(b)(ii) above.

chapter 11 of the Bankruptcy Code.  On July 21, 2020, the NYSE filed a SEC Form 25 delisting notification with respect to Covia's common equity.

## ARTICLE VI.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.      Market Decline and Industry-Specific Challenges

Beginning in the second half of 2018 and continuing to the present day, U.S. energy markets have been embroiled in turmoil.  A substantial decline in the availability of debt and equity capital to E&P companies, the primary end customers for proppants, negatively affected well completion activity and, as a result, the demand for proppants.  In addition, in-basin proppant supply has exploded since 2017, while demand remained relatively flat, leading to a gross oversupply of proppants to the market, resulting in downward pressure on both volumes and pricing.  Capital restraints by E&P companies also led to an increased shift in demand from NWS to lower cost in-basin sand, which reduced the overall addressable market for NWS proppants.

While proppant market volatility has created challenges for the Debtors' Energy Segment in recent years, the onset of the COVID-19 pandemic has exacerbated struggles within the energy industry and hastened a considerable reduction in the U.S. gross domestic product, which has had a negative flow-through impact on many facets of the Debtors' Industrial Segment.  Moreover, the oil price war between the Kingdom of Saudi Arabia and Russia and the resulting sudden crash of oil prices has significantly worsened outlooks on current and future production.  The compounded effects of these macro-economic drivers have magnified the existing contraction in the Debtors' EBITDA and free cash flow over the past three years, which is expected to accelerate through fiscal year 2020 and 2021 in light of worsening economic circumstances.

The Debtors have struggled under the weight of their funded debt obligations since the end of 2018, and, despite significant success in reducing costs, strengthening the balance sheet, and navigating the challenging commodity market's effect on the Energy Segment, the exacerbation of these problems in recent months, together with the onslaught of the COVID-19 pandemic and its wide-ranging effects, ultimately made it impracticable for the Debtors to adequately address the excess cost and capital structure issues without a chapter 11 filing.

### 1.      Energy Segment Impact

From June 1, 2018 until April 20, 2020, West Texas Intermediate ("WTI") crude oil prices ranged from a high of $77.41 per barrel to a low of negative $37.63 per barrel; during that same period Henry Hub natural gas prices ranged from a high of $6.24 per mmbtu to a low of $1.55 per mmbtu.  As of June 25, 2020, and due in part to the impact of the COVID 19 pandemic, WTI was priced at $37 per barrel and natural gas was priced at $1.56 per mmbtu.  The decline in oil and gas pricing has led to reduced activity among E&Ps.  The number of frac crews (*i.e.*, teams and equipment that complete wells and, therefore, the consumers of frac sand) have declined significantly during this time leading to lower demand for frac sand.

As a direct result of volatility in oil and gas markets, the supply and demand dynamic of the Debtors' Energy Segment has drastically changed since the second half of 2018, and is expected to remain unpredictable over the next few years.  Positive oil price and fracking activity forecasts in 2017 and early 2018 led to an exaggerated outlook on future demand and led to increased supply from in-basin proppant competitors.  Contrary to these forecasts, oil prices have continued to slip through 2020 and almost all E&P companies have significantly slowed well completion activity in response, with demand for proppant slowing with it.

49

In the second half of 2018, with the combination of low commodity prices and capital markets becoming increasingly difficult to access, the proppant industry as a whole began to shift away from NWS in favor of in-basin sand, and E&P companies began to implement cost-cutting measures, including the use of low-cost proppants. From 2018 to 2019, the reductions in fracking activity and corresponding decrease in market demand for higher quality NWS, which accounts for a significant portion of the Debtors' Energy Segment revenues, caused an oversupply of proppants that drove sand prices in West Texas down approximately 63% from greater than $40 per ton to approximately $15 per ton. In 2020, market-wide demand for NWS is expected to fall over 50% and in-basin sand demand is expected to decline as much as 70%. In response, in 2018 and 2019 when demand was flat to slightly down, the Company idled and de-rated approximately 15 million tons of non-competitive NWS or regional production capacity, consolidated its remaining NWS production, and reduced its Energy Segment nameplate annual capacity. In March 2020, the Debtors idled additional capacity of approximately 5 million tons in a matter of weeks when markets declined due to the onset of COVID-19. Notwithstanding the Company's aggressive response to the proppant market shift, over-supply from in-basin producers in conjunction with decreased demand for proppant has led to significant proppant price erosion.

While the Debtors were already evaluating cost-cutting and capital structure solutions for the Energy Segment prior to the onset of the COVID-19 pandemic, the initial spread of COVID-19 caused decreased factory output and transportation demand and a further decline in energy prices. To address this, the Organization of the Petroleum Exporting Countries ("OPEC"), led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia. However, those initial efforts faltered, and the parties failed to reach an agreement as to production levels. Instead, both the Kingdom of Saudi Arabia and Russia announced that they would increase, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for energy. Meanwhile, the COVID-19 pandemic continued to spread, causing governments across the world to institute drastic measures that have further decreased energy demand. On April 12, 2020, in an effort to relieve some of the negative impacts on the energy industry, 23 countries agreed to commit to withholding 9.7 million barrels of oil per day from the global markets. Ultimately, that agreement was not enough to counteract the combined effects of the initial oil price war and the decreased demand due to COVID-19.

The effects on energy markets have been stark. Oil prices plummeted to near $20.00 per barrel in March 2020, representing the lowest point in nearly 20 years. Then, on April 20, 2020, WTI crude oil price for May contracts settled at a negative price for the first time in history. Consequently, the Debtors have experienced corresponding dislocation in the proppant market. Reduced oil production is expected to cause a significant reduction in proppant demand through 2020 and into 2021. Furthermore, due to current proppant over-supply and uncertainty in the energy markets, these figures are not expected to rebound in the near future. As result, current financial forecasts show a potential steep decline in the Debtors' 2020 adjusted EBITDA compared to 2019.

2. Industrial Segment Impact

In addition to its effects on the Energy Segment, the COVID-19 pandemic has also caused a decline in productivity across almost all of the Industrial Segment's end markets. Governmental responses to COVID-19's spread have reduced available workforce and corresponding output of the industrial sector, and decreased consumer spending in many end markets have further exacerbated these issues. Excluding certain counter-cyclical industries, the performance of the Industrial Segment is largely tied to U.S. gross domestic product, which is forecasted to decline by as much as 6% during 2020.

Specifically, the foundry, building products, flat glass, ceramics and polymers end markets (which collectively constitute approximately one-third of total product volumes sourced from the Industrial Segment) are forecasted to experience sharp declines in 2020. In addition, many customers that would

otherwise be capable of maintaining operations and purchasing levels in a distressed market have been rendered stagnant as a result of government-mandated quarantines. For instance, the construction industry exhibited robust growth early in the first quarter of 2020, which correlated with strong performances in the Debtors' float and flat glass end markets; however, the quarantine mandates resulted in reduced construction activity and a soft automobile market in the second quarter of 2020, crippling those end markets. Collectively, Company management expects overall production volumes in the Industrial Segment to drop by as much as 20% in 2020.

**B.      Credit Downgrade**

On March 31, 2020, Moody's Investors Service downgraded Covia's Corporate Family Rating to Caa1 from B3, its Probability of Default Rating to Caa1-PD from B3-PD and its rating on the Term Loan Agreement to Caa1 from B3. The downgrade reflected Moody's expectation that the Company's revenues, profitability and key credit metrics would deteriorate further during 2020 due to ongoing volatility in the oil and natural gas end market and persistent weakness in the frac sand industry. As a result of the credit downgrade, certain material vendors have requested adjustments to trade terms and other commercial arrangements from the Company.

**C.      Reducing Costs and Other Operational Initiatives**

In response to ongoing operational and financial challenges, since late 2018 the Debtors have instituted a number of measures to reduce costs, maximize free cash flow, and strengthen their balance sheet. These measures include, but are not limited to, the following: (1) consolidation of over 26 million tons of capacity to mitigate costs of the Debtors' geographic footprint; (2) significant reductions in railcar expenses; (3) termination of certain terminal leases that were no longer needed; and (4) strengthening the Debtors' financial metrics through working capital improvements and reductions in SG&A costs and capital expenditures. More specifically:

- Since late 2018, declining market conditions led the Debtors to idle at least 26 million tons of capacity. Nine plants have been fully idled, and 15 additional plants have been de-rated. Corresponding with the reduction in railcar purchase obligations, the Company successfully exited leases from terminals that were no longer necessary to serve customers. The idled capacity and reduction in terminals led to significant headcount reductions at idled facilities.

- The severe contraction in NWS demand led to a significant increase in excess railcars. Unused cars drive significant excess costs, including storage and empty freight. The Company's fleet of railcars is subject to laddered lease maturities; however, the rate of decline in NWS demand has significantly exceeded the Company's ability to return railcars in an expedient manner. In addition, industry-wide storage rates continue to increase as a result of the number of unused railcars, putting further pressure on the Company's costs. The Debtors partially mitigated these costs by cancelling the purchase of $195 million in railcars and expediting the return of more than 4,200 railcars from the fleet. Furthermore, the Company has moved swiftly to procure additional storage track early to ensure competitive storage costs. However, for the existing fleet, the Debtors are paying rents for cars that are many times higher than current market rates. To date, the Debtors have largely been unsuccessful in negotiating with the railcar lessors to meaningfully decrease these rental rates. Only recently, with the possibility of lease rejections in bankruptcy, have certain lessors made significant concessions to allow the Debtors to right size their fleet.

- The Debtors' total adjusted EBITDA in 2020 is expected to decline dramatically. Energy Segment pressures are the key drivers of the adjusted EBITDA decline. To stem the losses, the Debtors have further reduced capital expenditures and SG&A expenses.

- The Debtors had previously focused on investing in growth in energy end markets to further strengthen their balance sheet, including (among other initiatives) the commissioning of in-basin sand production facilities in the Permian and Midcontinent Basins. The Debtors also focused on investing in growth in industrial end markets; however, the COVID-19 pandemic has materially impacted the Industrial Segment, as its performance is strongly correlated with U.S. gross domestic product.

- Covia initially amended and subsequently cancelled the Revolver, effective on December 31, 2019, in response to declining financial performance and growing risk of covenant default under the Revolver. Following the cancellation of the Revolver, Covia entered into the Receivables Financing Facility, which offered the Debtors additional financial flexibility.

It became clear to the Debtors that current business initiatives alone would not provide sufficient deleveraging to satisfy their financial obligations or adequately decrease their current liabilities and excess costs. In particular, the Debtors continue to be hampered by liabilities and excess costs relating to railcar lease obligations, terminal lease obligations, rail MVCs, and sand mines and plants.

The Debtors currently have significant MVCs for certain of their railcar loads. These MVCs are set at unattainable minimum volumes due to market conditions, requiring the Debtor party to the agreements to pay penalties for railcar loads, whether or not it is fully utilizing that capacity. The MVCs were originally established to incent the Debtors to utilize specific railroads to serve market demand; however, the collapse in demand has created unmeetable obligations, as the Debtors are now essentially penalized for not utilizing the MVC.

The Debtors forecast that, absent this chapter 11 process, they would have approximately 8,400 excess railcars by the fourth quarter of 2020, costing them approximately $90 million in annualized leasing, maintenance, transportation, and storage costs. Railcars used in service are paying rents that are many times higher than current market rates. Several of the Debtor's terminals are also subject to significant long-term fixed lease payments, which are substantially above market. The chapter 11 process will enable the Debtors to reduce excess or above-market railcar and terminal lease expenses and to renegotiate railcar and terminal leases to more closely align with current demand projections and market rates.

Additionally, the Debtors continue to incur non-operating expenses in connection with several production facilities idled as part of the foregoing cost-reduction initiatives. To date, the Debtors have significantly reduced operations, or ceased operations entirely, at 24 facilities nationwide and continue to review the viability of further reductions in active production capacity. Notwithstanding the operational cost savings associated with idling these facilities, the Debtors still continue to pay above-market property taxes or property insurance premiums on idled facilities.

Finally, the COVID-19 pandemic created a public health and economic crisis in the United States and worldwide. Because of the resulting market disruption, it became clear to the Debtors' management team that ongoing business risks could pose potential liquidity challenges that were previously unforeseen, and would likely cause the Debtors to miss their business forecasts. Though the Debtors continued to engage with stakeholders, as the COVID-19 pandemic unfolded, it became apparent that preserving cash on hand was vital for the Debtors given indefinite potential liquidity challenges and market uncertainty. In light of these considerations, the Debtors have pursued various restructuring paths with its stakeholders.

**D.** **Restructuring Negotiations with Stakeholders**

Concurrently with the cost-cutting and other operational initiatives described above, the Debtors and their restructuring advisors engaged in extensive discussions and negotiations with the Term Loan

Group and Sibelco regarding a potential in-court restructuring of the Debtors' balance sheet and business operations. While discussions with the Term Loan Group and Sibelco were ongoing, it became apparent from months of robust analysis that the Debtors could not fund or grow their existing capital structure and, therefore, needed a more comprehensive restructuring of their balance sheet.

In the period leading up to the Petition Date, the Debtors provided advisors and principals of the Term Loan Group and Sibelco substantial due diligence, and the parties held numerous meetings and telephone conferences among both advisors and principals over weeks of vigorous, arm's-length negotiations. Specifically, these discussions focused on partial equitization of the obligations under the Term Loan Agreement and allocation of the equity of the Reorganized Debtors among the Term Loan/Swap Claimants, Covia's existing shareholders, and Holders of General Unsecured Claims.

On May 4, 2020, Sibelco submitted to the Debtors an initial "plan sponsor" proposal contemplating a combination of takeback debt, new-money investment from Sibelco, and cash from Covia's balance sheet. One week later, Sibelco renewed its proposal with a non-binding offer letter that reflected an increase in total estimated value to the term loan lenders from Sibelco's original proposal. After its prior proposal failed to gain traction, Sibelco further revised its proposal, further increasing the total estimated value to the term loan lenders. On June 22, 2020, the Term Loan Group countered Sibelco's proposal and Sibelco subsequently informed both the Term Loan Group and Covia advisors that it would not pursue the Term Loan Group's offer.

Ultimately, in the week leading up to the Petition Date, the Debtors and the Senior Creditors reached an agreement as incorporated in the Restructuring Support Agreement. The Restructuring Support Agreement represents an extensively-negotiated, hard-fought agreement that provides substantial value to Debtors by, among other things, avoiding litigation with the Senior Creditors avoiding a fight over collateral and use of cash collateral, providing a path to a consensual (and thus more efficient) exit, and secures the support of the Consenting Stakeholders to provide a recovery to junior creditors. The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors and the Term Loan Group, and the parties' belief in the Debtors' prospects as a reorganized enterprise. Importantly, the Restructuring Support Agreement contemplates a plan effective date that is 165 days from the Petition Date. In doing so, the Restructuring Support Agreement is intended to minimize any potential adverse effects to the Debtors' businesses, and position the Debtors for a prompt confirmation of a plan of reorganization.

**E.      Appointment of Independent Directors and Investigation of Potential Causes of Action Related to the UFS Merger**

As part of their efforts to evaluate and develop a value-maximizing restructuring for all stakeholders, the six Covia directors who are not affiliated with Sibelco formed a committee of the board of directors composed of two independent, disinterested directors (the "Independent Directors' Committee"). William P. Kelly and Jeffrey B. Scofield (the "Independent Directors") were appointed to serve on the Independent Directors' Committee as of May 20, 2020. The Independent Directors' Committee authorized the hiring of DLA Piper LLP (US) ("DLA Piper") as independent counsel, and DLA Piper hired an independent team from AlixPartners LLP ("AP" and, together with DLA Piper, the "Independent Advisors"), separate and walled off from the Debtors' restructuring advisors at AP, as independent financial advisor to assist the Independent Directors in fulfilling their fiduciary duties and addressing potential or actual conflict of interest matters for the Debtors. The Independent Directors' Committee considered and made decisions with respect to, among other things, the investigation of the UFS Merger, and investigated potential claims and causes of action related thereto.

In connection with the investigation, the Independent Directors' Committee made comprehensive diligence requests to Covia and Sibelco, Covia's 65% parent, on behalf of the Independent Directors,

53

reviewed the documents produced, and conducted witness interviews regarding the UFS Merger. The investigation included legal and factual analyses of potential claims and an evaluation of the strengths and weaknesses of such claims.

The investigation focused on potential claims arising out of (1) the UFS Merger; (2) the cash redemption payment to Sibelco in connection with the UFS Merger (the "Cash Redemption"); and (3) Sibelco's retention of Unimin's High Purity Quartz business (the "HPQ Carveout"). With respect to these transactions, the investigation evaluated, to the extent applicable, potential claims for: (1) actual fraudulent transfer; (2) constructive fraudulent transfer; (3) illegal dividend; (4) breach of fiduciary duty; and (5) aiding and abetting breach of fiduciary duty. The Independent Directors, along with the Independent Advisors, examined the strengths and weaknesses of each potential claim. AP's solvency analysis was central to this investigation.

As to potential claims for actual fraudulent transfer, the Independent Directors' investigation did not reveal evidence to support a claim with respect to either the Cash Redemption or the HPQ Carveout. Regarding the Cash Redemption, the investigation revealed that the transaction was fully negotiated among sophisticated parties and their advisors and reflected a legitimate business purpose, among other things. With respect to the HPQ Carveout, the retention of the business was fully disclosed and HPQ did not render Covia unable to pay its debts as they came due, and for these and other reasons a claim for actual fraudulent transfer would be unlikely to succeed. Additionally, any potential actual fraudulent transfer claims under state law would be subject to a safe-harbor defense.

Regarding constructive fraudulent transfer claims with respect to the Cash Redemption and HPQ Carveout, there is unlikely to be a colorable claim. Among other things, AP's analysis determined that Covia was not insolvent at the time of the transfer and did not become insolvent as a result of the transfer. Nor does the evidence suggest that Covia was left with unreasonably small capital or rendered unable to pay its debts as they came due. In addition, any potential constructive fraudulent transfer claims would be subject to a potential safe-harbor defense.

With respect to a potential illegal dividend claim, the Independent Directors' investigation found that the Cash Redemption was not an illegal dividend under either the surplus test or the net profits test. Regarding the surplus test, Unimin had significant ability to take on additional debt, and Covia was not insolvent at the time of the transfer nor did it become insolvent as a result of the transfer. The net profits test found that Covia was profitable during the relevant time period.

As to claims for breaches of fiduciary duties with respect to the UFS Merger, the Independent Directors' investigation found that creditor claims are likely precluded because Covia, Fairmount Santrol, and Unimin were all solvent during the relevant time period. Nor does the evidence support claims against the Fairmount Santrol board for breaches of their fiduciary duties in connection with the UFS Merger. As to the duty of care, the Fairmount Santrol board diligently reviewed the transaction, consulted with advisors and considered counteroffers, among other things. As to the duty of loyalty, the board sought additional value for shareholders without adding additional debt to Covia.

Regarding potential claims for aiding and abetting breaches of fiduciary duty, the investigation found no colorable claims as there are no colorable claims for breaches of fiduciary duty.

Accordingly, the Independent Advisors advised the Independent Directors that the Debtors did not have colorable claims related to the UFS Merger, the Cash Redemption, or the HPQ Carveout. The Independent Advisors further advised the Independent Directors that any benefit to the Debtors resulting from the pursuit of these potential claims, particularly given their unlikelihood of success, would be significantly outweighed by the cost and delay of pursuing such potential claims.

54

DLA Piper has regularly communicated with the Independent Directors regarding potential claims and has assisted in coordinating with the Committee, the Debtors, and the Debtors' other advisors to facilitate the completion of a parallel investigation by the Committee. The Committee also served its own diligence requests on the Debtors, to which DLA Piper has assisted in responding.

## F.   The Committee's Investigation and Position Regarding Potential Estate Claims Related to the UFS Merger[38]

Since its appointment and selection of professionals in July of 2020, the Committee has been actively investigating any and all potential claims related to the UFS Merger and other transactions. In connection with investigation, the Committee served discovery requests and reviewed a rolling production from the Debtors—to date, nearly 150,000 pages of documents. This investigation is still ongoing, but to date the Committee believes it has identified more-than-colorable litigation claims related to more than $1 billion in shareholder dividends, redemptions, spin-offs and related transaction fees, from the parties and stakeholders involved. These claims are set forth in proposed complaint filed with the Committee's Standing Motion (the "Proposed Complaint").

The following is a high-level summary of the claims identified in the Proposed Complaint based on public information. The Standing Motion and the Proposed Complaint, which were filed under seal, detail what the Committee believes is a compelling record that substantiates these claims[39] The following discussion recites the Committee's current views and analysis, much of which the Debtors and the Senior Creditors disagree with (including as set forth elsewhere in this Disclosure Statement), and the Debtors reserve all rights to challenge these views and analysis, as well as any factual recitation in the following.

- At the time of the merger in June 2018, the success of Fairmount Santrol and Unimin depended heavily on the market for high quality NWS, which they mined and transported by rail car to upstream operators and service companies in the oil and gas industry, for use in hydraulic fracturing, or "fracking." But a fundamental change in the market for raw frack sand, underway since early 2017, was gathering steam in the first half of 2018.

- In response to persistent lower commodity prices for oil and gas since mid-2014, exploration and production companies began turning away from NWS (which required long-distance transportation costs) to sands mined closer to hydraulic fracturing sites, a cheaper alternative. In 2017, as Unimin and Fairmount Santrol contemplated a merger, it became increasingly clear that this new capacity (known as "in-basin" sand) posed an existential threat to the NWS frack sand market. Goldman Sachs believed that the "level of capacity additions" in the Permian and elsewhere in Texas "should alter the structure of the market, making Texas mostly self-reliant on local sand, lowering the supply of Northern White Sand (Wisconsin/Illinois/Missouri) into Texas."[40] It predicted that Permian sand supply would "sharply rise[] in 2018, with meaningful

---

[38]   The Committee commenced its investigation of potential estate causes of action related to the UFS Merger upon the Committee's formation and selection of advisors in July 2020. In the interest of fairly presenting the Committee's position on these matters, the Debtors have included the following discussion in this Article VI (Events Leading to the Chapter 11 Cases), adjacent to discussion of the Independent Directors' investigation, rather than elsewhere in this Disclosure Statement.

[39]   The below is intended as a summary based on public information available to the Committee. In the event of any inconsistency, the Standing Motion and allegations therein shall control.

[40]   Goldman Sachs, "Americas: Energy: Oil Services" (July 20, 2017) at 3.

impact on fundamentals by mid-to-late 2018," and that the "[i]mportation of sand into the Permian" would "dramatically reduce beginning 2H/2018."[41]

• By the first half of 2018, the warning signs were flashing red: with industry analysts predicting "dramatic" reductions of NWS importation, and describing "drastic" impacts on pricing, and the "marginalization" of NWS.[42] Months before the merger closed, Credit Suisse issued what amounted to a death notice for NWS frack-sand in what would be Covia's core markets. "[In basin] sand is everywhere, and soon every basin will be self-sustaining."[43]

• Despite the warning signs, Covia was formed on June 1, 2018, when Fairmount Santrol, a publicly owned corporation, merged with and into Unimin, a wholly-owned subsidiary of Sibelco, a privately owned Belgian enterprise focused on mining sands for glass production and other industrial applications. The merger was financed with a $1.65 billion term loan, and with the addition of a $200 million revolver, the two companies added more than $600 million in debt to the combined enterprise.

• Sibelco appears to have orchestrated the transaction to avoid the impact of the coming collapse in the market for NWS. To prepare for the crisis, on the eve of closing Sibelco spun from Unimin a division, potentially worth more than $400 million, which mined high purity quartz for industrial applications (the "HPQ Division"), and extracted $520 million in cash from the merged entity to fund its non-energy operations. Covia distributed another $170 million in cash to the Fairmount Santrol shareholders. Because Covia financed the cash transfers with borrowed funds, the transaction left the company saddled with substantially more debt than the pre-merger entities carried, inadequately capitalized to face the evaporating market for NWS.

• The result was almost immediate disaster. The market for NWS declined swiftly and precipitously at the start of the third quarter of 2018, and so alarmed Covia's management that they disclosed the issue on Covia's mid-August second quarter earnings call. Covia's financial fall was quick and dramatic, and it never realized *any* of its pre-merger stated projections, as they were categorically unreasonable in light of what was known and knowable at the time. Within weeks of the closing, pricing of NWS plummeted, Covia lost market share, and its share price declined. In 2019, Covia's first full year of operation, results were catastrophic. By year end, months before the pandemic reached the United States, it had terminated its revolving credit loan and appears to have begun preparing for a bankruptcy filing. Covia and affiliates filed for relief in the Bankruptcy Court just over two years after its formation, which was shortly after expiration of the limitations period for bringing claims pursuant to Section 548 of the Bankruptcy Code relating to the UFS Merger.

• Based on the foregoing, as well as the other conduct alleged in the Proposed Complaint, the Committee believes that there are numerous colorable claims against the Senior Creditors and the Debtors' current and former equityholders, directors, and officers.

---

[41]   *Id*. at 8.

[42]   Jefferies, "Oil Services & Equipment" (Feb. 15, 2018); Jefferies, "Oil Services & Equipment" (Apr. 18, 2018).

[43]   Credit Suisse, "Oilfield Services & Equipment" (Apr. 16, 2018) at 1.

56

- The Committee believes that there are colorable fraudulent transfer claims against the Senior Creditors to the extent that a portion of the secured debt was used to fund dividends that had no direct benefit to the Debtors.  If successful, these claims could lead to the avoidance of up to $690 million of the Senior Creditors' secured claims, which would eliminate any unsecured deficiency claims (which the Plan currently seeks to classify with all General Unsecured Claims in Class 5A, Class 5B, Class 5C and Class 5D), and drastically alter the treatment to which Senior Creditors and Holders of General Unsecured Claims would be entitled under the Plan.[44]

- The Committee also believes that there are colorable fraudulent transfer claims against Sibelco and the Fairmount Santrol shareholders relating to (1) the payment of the $690 million in dividends; and (2) the spinoff of the HPQ Division immediately prior to the UFS Merger.  The circumstances surrounding the merger also suggest that there may be colorable claims against the directors and officers that approved and participated in the merger.  As with the claims against the Senior Creditors, if the Committee is authorized to pursue the litigation claims against Sibelco and other shareholders could result in a substantial increase in distributions to certain unsecured creditors under the Debtors' Plan.

- Accordingly, based on the Committee's investigation as set forth in detail in the pending Standing Motion, the Committee firmly believes that the Debtors' Plan as currently drafted should not be approved, as the Debtors intend to *release* all of the allegedly colorable and valuable litigation claims identified by the Committee, and with those releases possibly forfeit substantial distributions to unsecured creditors.

- The Committee believes that a chapter 11 plan that otherwise appropriately values the Debtors' unencumbered assets could be confirmed prior to full resolution of the claims identified by the Committee.  The Committee believes that as long as the chapter 11 plan does not release those claims, they could be preserved through creation of a litigation trust to pursue the claims after the chapter 11 plan is confirmed. The Committee believes that the plan could also include appropriate escrow or other provisions that would allow for post-confirmation approval of claims against the Senior Creditors.[45]

## G.    Railcar Lessor Negotiations

An important component of the Debtors' growth prior to 2018 was the expansion of its logistics footprint, which was vital to providing NWS across the North American shale plays.  Increased demand for proppants and positive fracking forecasts necessitated a greater number of railcars to transport the Debtors' products, and costs associated with leasing such railcars were inflated relative to the current market.  In the face of a severely depressed energy sector, the Debtors' project they will have approximately 8,400 excess railcars by the fourth quarter of 2020, substantially all of which will continue to incur third-party storage costs.  In addition, the lease rates paid for cars that are forecasted to remain in service are estimated to significantly exceed current market rates.  Prior attempts to cancel railcar purchase obligations and return leased cars early have not provided the Debtors the requisite flexibility to address excess costs on a go-forward basis.  Accordingly, the Debtors have made negotiations with railcar lessors a first-priority element

---

[44]    The Senior Creditors dispute the allegations in the Committee's Standing Motion that are asserted against the Term Loan Lenders and intend to oppose the Standing Motion.

[45]    The Senior Creditors vigorously disagree that such a Plan could be confirmed because, among other reasons, they will not support a Plan that preserves claims against them or escrows their recoveries.

of their cost-reduction initiatives, with the primary goals of (1) reducing total number of railcars leased, (2) reducing lease rates, and (3) consolidating leases with a smaller number of lessors.

Initial negotiations with railcar lessors began in January 2020 with the goal of reaching a consensual resolution, but such negotiations were largely ineffective due to the magnitude of the concessions necessary in order to prompt such railcar lessors to amend their respective railcar leases. As negotiations progressed it became apparent that consummating an out-of-court restructuring would be unlikely since it does not provide the benefits of chapter 11—most importantly, the ability to reject burdensome contracts and leases under section 365 of the Bankruptcy Code.

The Debtors elected to forgo lease payments due from April to June 2020 on all railcar leases in order to continue the negotiation process and evaluate potential economic structures that would be key to building consensus. The Debtors then reached out to certain critical railcar lessors in April 2020, setting forth a plan for restructuring its railcar leases and entering into one or more new lease agreements intended to meet the requirements of all Debtor entities. The proposed plan and lease terms included a total base fleet size of approximately 5,000 leased cars, with additional access to approximately 1,700 cars under a "flex" arrangement (allowing the Debtors to access them on an as-needed basis). Under the proposed plan, the base fleet would have staggered lease maturities with lease rates significantly below the prepetition contractual rate.

In response to this outreach, Covia received counterproposals from certain railcar lessors. Over the course of the next two months, Covia and several railcar lessors engaged in extensive negotiations, resulting in multiple exchanges of proposals and counterproposals, in an attempt to reach a mutually beneficial agreement. After negotiating the counterproposals at length, the Debtors opted to pursue the counterproposals with certain railcar lessors (collectively, the "Strategic Partners") on the basis that these Strategic Partners are able to supply the Debtors' railcar needs, provide economically beneficial terms, and are willing to work with the Debtors on the logistics of transitioning the railcar fleet. On the Petition Date, the Debtors filed an omnibus motion seeking to, among other things, reject railcar leases with all other existing lessors. On August 27, 2020, the Debtors filed motions seeking, among other things, to assume, as amended and restated, their unexpired railcar leases with three of the Strategic Partners, and the Bankruptcy Court entered orders granting these motions [Docket Nos. 566, 567, 568] on September 22, 2020. The Debtors anticipate filing a motion seeking similar relief with respect to their unexpired railcar leases with a fourth Strategic Partner.

## ARTICLE VII.
## MATERIAL DEVELOPMENTS AND
## ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

**A.     Expected Timetable of the Chapter 11 Cases**

The Restructuring Support Agreement requires the Debtors to secure confirmation of a chapter 11 plan no later than December 11, 2020, subject to extension upon written agreement between the Debtors and the Required Consenting Stakeholders. In addition, the Restructuring Support Agreement provides for an outside date to emerge from chapter 11 of December 30, 2020; *provided* that the parties to the Restructuring Support Agreement may agree in writing to extend this outside date. To ensure that the Debtors and their stakeholders will benefit from the Restructuring Support Agreement, the Debtors intend to move as quickly as practicable during the Chapter 11 Cases. Accordingly, the Debtors could emerge from chapter 11 within 184 days after the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors or that certain conditions precedent to the Effective Date will have occurred by the outside date under the Restructuring Support Agreement.**

58

**B.      First/Second Day Relief**

On or about the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, suppliers and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Andrew Eich, Executive Vice President, Chief Financial Officer, and Treasurer of Covia Holdings Corporation, in Support of Chapter 11 Petitions and First Day Motions*, filed on June 30, 2020 [Docket No. 15]. At a hearing on June 30, 2020, the Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/Covia.

**C.      Other Procedural and Administrative Motions**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On July 8, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 123] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On August 3, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 306].

- Interim Compensation Motion. On July 8, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. On August 3, 2020, the Bankruptcy Court entered an order granting the Interim Compensation Motion [Docket No. 305].

- Retention Applications. On July 8, 2020, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis LLP as legal counsel, Kobre & Kim as special litigation counsel, PJT Partners LP as investment banker, AlixPartners LLP as financial advisor, Ernst & Young LLP as audit services provider, and KPMG as tax consultant (collectively, the "Retention Applications"). On July 14, 2020, the Debtors filed an application to retain DLA Piper LLP as legal counsel to Covia's disinterested directors, and on July 21, 2020, the Debtors filed an application to retain Jackson Walker LLP as legal counsel On August 3, 2020, the Bankruptcy Court approved each of the Retention Applications, and on August 20, 2020, the Bankruptcy Court approved the retention applications of DLA Piper LLP

and Jackson Walker LLP.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

- De Minimis Asset Transactions Motion.  On July 8, 2020, the Debtors filed the *Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* [Docket No. 131] (the "De Minimis Asset Transactions Motion"), seeking authority to implement procedures to (a) (i) use, sell, or transfer certain assets or (ii) acquire certain assets in any individual transactions or a series of related transactions from a single buyer/seller or group of related buyers/sellers for which the aggregate sale price is equal to or less than $10 million, or (b) abandon certain assets to the extent a sale thereof cannot be consummated at a value greater than the cost of liquidating such asset—without prior Bankruptcy Court approval.  On August 3, 2020, the Bankruptcy Court entered an order granting the De Minimis Asset Transactions Motion [Docket No. 303].

- De Minimis Claims Settlement Motion.  On July 8, 2020, the Debtors filed the *Debtors' Motion to Authorize and Establish Procedures for Settlement of De Minimis Claims* [Docket No. 136] (the "De Minimis Claims Settlement Motion"), seeking authority to implement procedures to allow the Debtors to compromise and settle both prepetition and postpetition claims, cross-claims, litigation, and causes of action, including but not limited to, prepetition claims threatened or actions brought by various claimants against one or more of the Debtors or their estates in judicial, administrative, or other actions or proceedings.  On August 3, 2020, the Bankruptcy Court entered an order approving the De Minimis Claims Settlement Motion [Docket No. 304].

- Executory Contracts and Unexpired Lease Rejection Procedures Motion.  On July 8, 2020, the Debtors filed the *Debtors' Motion to Approve Procedures to Reject Executory Contracts and Unexpired Leases* [Docket No. 137] (the "Rejection Procedures Motion"), seeking authority to implement procedures by which the Debtors may reject certain of their prepetition executory contracts and prepetition unexpired leases.  On August 3, 2020, the Bankruptcy Court entered an order approving the Rejection Procedures Motion [Docket No. 307].

### D.    Appointment of Official Committee

On July 16, 2020, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 166], notifying parties in interest that the U.S. Trustee appointed the Committee in the Chapter 11 Cases.  The Committee is currently composed of the following members: (1) Banc of America Leasing & Capital, LLC; (2) Pension Benefit Guaranty Corporation; (3) SMBC Rail Services, LLC; (4) GATX Corporation; (5) Rango, Inc.; (6) AJ McDirtt, Inc.; and (7) Twin Eagle Sand Logistics, LLC.  The Committee has engaged Morgan, Lewis & Bockius LLP as its legal counsel and FTI Consulting, Inc. as its financial advisor [Docket Nos. 527 and 528].

### E.    Motions to Reject Executory Contracts and Unexpired Leases

On June 30, 2020, the Debtors filed the *Debtors' Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Railcar Lease Agreements, Authorizing the Abandonment of any Remaining Personal Property in Connection Therewith, and Authorizing Procedures Governing the Return of Rejected Railcars* [Docket No. 30], seeking entry of an order (a) authorizing them to reject certain railcar leases and abandon rejected railcars and related personal property; (b) approving proposed procedures to govern the return of rejected railcars under rejected railcar leases; and (c) granting related relief.  The

Bankruptcy Court approved the Debtors' rejection of these leases pursuant to the order entered at Docket No. 336.

## F.   Schedules and Statements

On August 12, 2020, the Debtors filed their Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Report (the "Schedules and Statements").

## G.   Establishment of a Claims Bar Date

On July 8, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 133] (the "Bar Date Motion"). On August 3, 2020, the Bankruptcy Court entered an order [Docket No. 302] (the "Bar Date Order") granting the Bar Date Motion and establishing September 18, 2020 as the general claims bar date (the "General Claims Bar Date"), December 26, 2020, as the governmental claims bar date (the "Governmental Claims Bar Date"), and the later of (1) the General Claims Bar Date or the Governmental Claims Bar Date, as applicable, and (2) September 27, 2020, as the railcar lease rejection damages bar date. Further, the Debtors published notice of the bar dates in accordance with the Bar Date Order. Pursuant to the Bar Date Order, any party required, but who fails, to file a proof of claim in accordance with the Bar Date Order on or before the applicable bar date shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in the Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim.

## H.   Certain Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

On May 4, 2020, Sand Revolution II, LLC and Fevid Transport LLC (the "SR/Fevid Plaintiffs") filed a lawsuit in the 129th Judicial District of Harris County, Texas against Covia. The SR/Fevid Plaintiffs' Second Amended Petition alleges that Covia failed to pay certain fees under a contract and that Covia's insolvency on May 4, 2020 allowed the SR/Fevid Plaintiffs to terminate the contract. The SR/Fevid Plaintiffs seek damages for breach of contract, judicial declarations, and attorney's fees. The lawsuit has been stayed since June 30, 2020, when Covia filed a Suggestion of Bankruptcy. On August 3, 2020, the SR/Fevid Plaintiffs filed a motion in the Bankruptcy Court for relief from the automatic stay [Docket No. 310]. On August 27, 2020, the SR/Fevid Plaintiffs' motion for relief from the automatic stay was denied without prejudice [Docket No. 488]. On July 31, 2020, Covia filed an adversary complaint

in the Bankruptcy Court to recover certain advances that Covia made to the SR/Fevid Plaintiffs [Adv. Docket No. 1]. On September 22, 2020, the SR/Fevid Plaintiffs filed an answer to the complaint [Adv. Docket No. 7], and the adversary proceeding remains pending as of the date hereof.

On February 7, 2019, Wingard Water Corporation, Charles D. Roberts, and Oral Wingard (together, the "Wingard Plaintiffs") commenced litigation against Covia in the United States District Court for the Eastern District of Oklahoma. On May 29, 2019, the Wingard Plaintiffs filed their First Amended Complaint wherein they asserted claims for conversion, unjust enrichment, trespass and damage to real property, private nuisance, and an in rem claim for reformation of deed. On September 3, 2020, the Wingard Plaintiffs filed a motion in the Bankruptcy Court for relief from the automatic stay [Docket No. 519]. The Wingard Plaintiffs' stay relief motion remains pending as of the date hereof.

On September 10, 2020, Covia commenced an adversary proceeding against FTS International Services, Inc. ("FTSI") (*Covia Holdings Corporation v. FTS International Services, LLC*, Adv. Proc. No. 20-03143 (DRJ) (S.D. Tex.) (the "Adversary Proceeding")), on account of FTSI's purported termination of that certain Amended and Restated Supply Agreement dated as of May 3, 2019 (the "Supply Agreement") between Covia and FTSI for the sale of proppant to FTSI. On July 14, 2020, notwithstanding the Debtors' pending Chapter 11 Cases, FTSI purported to terminate the Supply Agreement on the basis that it is a forward contract subject to termination under section 556 of the Bankruptcy Code and refused to pay certain amounts that were due under the Supply Agreement. Covia's Adversary Proceeding against FTSI includes four counts related to FTSI's attempted termination of the Supply Agreement.

- In Count I, Covia requests the entry of a declaratory judgment finding that (1) the Supply Agreement cannot be terminated under section 556 of the Bankruptcy Code, because FTSI is not a forward contract merchant; (2) the automatic stay under section 362(a)(3) of the Bankruptcy Code applies to the Supply Agreement; and (3) FTSI may not terminate the Supply Agreement pursuant to an *ipso facto* clause; or, in the alternative, (4) FTSI's purported termination of the Supply Agreement was (a) for a reason other than that set forth in the Supply Agreement, and/or (b) improper and, following notice, constitutes a material breach that entitles Covia to terminate the Supply Agreement pursuant to the Supply Agreement, which, in either event, entitles Covia to certain fees as set forth in the Supply Agreement.

- In Count II, Covia seeks a declaratory judgment that FTSI was not entitled to terminate the Supply Agreement and FTSI's purported termination of the Supply Agreement violated sections 362(a)(3) and 365(e) of the Bankruptcy Code.

- In Count III, Covia pleads anticipatory breach of contract as an alternative claim for relief based on FTSI's threatened termination of the Supply Agreement and its failure to pay the required fees under the Supply Agreement.

- Finally, in Count IV, Covia seeks damages for breach of the Supply Agreement, in the event that the Bankruptcy Court determines that FTSI was permitted to terminate the Supply Agreement, because FTSI has failed to pay amounts due under the Supply Agreement.

On September 22, 2020, FTSI and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (Lead Case No. 20-34622 (DRJ) (S.D. Tex.)). On September 24, 2020, FTSI filed a motion for partial summary judgment in the Adversary Proceeding, seeking judgment in its favor in part on Count I, and on Counts II and III in their entirety. FTSI's motion for partial summary judgment remains pending as of the date hereof.

**I.      The Committee's Standing Motion**

On October 1, 2020, the Committee filed the Standing Motion, seeking standing to pursue certain estate claims related to the UFS Merger.  While many of the details of the Standing Motion were filed under seal, as summarized above in Article VI.F, the Committee believes that the claims described therein are significant, identifiable, and material.  These claims can be divided into four categories:  (1)  avoidance of at least $690 million of the Debtors' obligations to the Senior Creditors related to financing the shareholder dividends in connection with the UFS Merger; (2) avoidance of the redemption and shareholder dividends that flowed to Sibelco and former shareholders of the merged entities; (3) avoidance of the Debtors' spinoff of the HPQ Division, potentially worth more than $400 million, immediately prior to the UFS Merger; and (4) breach of fiduciary duty and related claims against the Debtors' current or former directors and officers arising from the UFS Merger.  The Committee believes these claims are highly colorable and could result in more than $1 billion in recoveries.

The Standing Motion also constitutes the commencement of a "Challenge" as defined in the *Final Order (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 404], pursuant to which the Committee is challenging the liens and claims of the Senior Creditors.

The Debtors believe that the putative estate claims identified the Committee's Standing Motion are without legal merit and lack any basis in the facts.  The Senior Creditors also vigorously and categorically dispute the allegations in the Committee's Standing Motion that are asserted against the Term Loan Lenders and believe such claims are frivolous.  Accordingly, the Debtors and the Senior Creditors intend to oppose the Committee's Standing Motion.

**J.      SEC Matters**

On March 18, 2019, in connection with a non-public SEC investigation, the Debtors received a subpoena seeking information relating to certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy Segment. The SEC's investigation has focused on public statements made by Fairmount Santrol from at least October 2014 to May 2018 and whether the company overstated the performance and commercial potential of value-added proppant products it was developing and selling for use by oil and gas companies in fracking, including PowerProp, Propel SSP and Propel SSP 350. Since the issuance of the subpoena, the SEC has requested additional information and subpoenaed certain former employees to testify. On July 7, 2020, the Debtors received a written "Wells Notice" from the SEC staff indicating the staff's preliminary determination to recommend to the SEC that the SEC file an action against the Debtors relating to the Debtors' previously disclosed SEC investigation alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and rules thereunder. A "Wells Notice" is neither a formal charge of wrongdoing nor a finding that the Debtors violated any law. The investigation is ongoing, and the Debtors cannot provide an estimate of the potential range of loss, if any, that may result.

**ARTICLE VIII.**
**RISK FACTORS**

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Debtors believe that the Committee may object to the classification of the Claims and Interests under the Plan.

2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.      The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

4.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even though certain creditors have agreed pursuant to the Restructuring Support Agreement to support the Plan, there can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that

this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims or Allowed Interests against them would ultimately receive with respect to their Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation, with the consent of the Required Consenting Senior Creditors. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

5.      Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.      Continued Risk After Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, and potential revaluing of their assets due to the Chapter 11 Cases. *See* Article VIII.C of this Disclosure Statement. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the Debtors' liabilities that will be subject to the Plan. Even if the Debtors' debts are reduced or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable

terms.  Even once the Plan is implemented, the Debtors' operating results may be adversely affected by the possible reluctance of advertisers to do business with a company that recently emerged from bankruptcy proceedings.

7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the best interest of creditors or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.  Further, the Committee or other parties in interest may object to the amount or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the votes cast by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

66

11.     Releases, Injunctions, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including, but not limited to, agreeing to significant reductions in the amounts of their Claims against the Debtors' Estates, equitizing certain funded debt, and agreeing not to trade their equity interests, which would otherwise result in certain negative tax implications to the Debtors, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

12.     The Committee's Standing Motion May Be Granted

If the Committee's Standing Motion is granted, the Plan may require material revision and may require resolicitation. Among other revisions, the Plan's release, injunction, and exculpation provisions may need to be revised or removed, and the proposed distributions to the Term Loan/Swap Claimants may either need to be circumscribed or escrowed pending resolution of the estate claims authorized by the Standing Motion post-Confirmation.

**B.     Risks Related to Recoveries under the Plan**

1.     The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections attached to this Disclosure Statement as **Exhibit F** hereto (the "Financial Projections") represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.     The Debtors May Be Controlled by Significant Holders

If the Plan is confirmed and consummated, Holders of Allowed Secured Term Loan Claims, Allowed Secured Swap Agreement Claims, Allowed Deficiency Claims, and Allowed General Unsecured Claims will receive their Pro Rata share of the New Common Equity. The Holders of Allowed Secured Term Loan Claims, Allowed Secured Swap Agreement Claims, Allowed Deficiency Claims, and Allowed General Unsecured Claims will own approximately 100% of the New Common Equity (subject to dilution on account of the Management Incentive Plan). If the holders of a significant portion

of the New Common Equity were to act as a group, such holders would be in a position to control the outcome of actions requiring shareholder approval.

        3.        <u>The Implied Value of the New Common Equity is Not Intended to Represent the Trading Value of the New Common Equity</u>

The Reorganized Debtors' valuation is not intended to represent the trading value of the New Common Equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. If a market were to develop, actual market prices of such securities at issuance will depend on the following considerations, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Equity may be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Equity to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued under the Plan does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Equity in the public or private markets.

        4.        <u>The New Common Equity is Subject to Dilution</u>

The ownership percentage represented by the New Common Equity distributed on the Effective Date under the Plan will be subject to dilution from the New Common Equity issued in connection with (a) the Management Incentive Plan and (b) the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

        5.        <u>Certain Tax Implications of the Plan</u>

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

        6.        <u>The Debtors May Not Be Able to Accurately Report Their Financial Results</u>

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Businesses.**

1.      The Debtors' and the Reorganized Debtors' Business and Financial Performance Depend in Part on the Level of Activity in the Oil and Gas Industries

Approximately 54% of the Debtors' revenues for 2019 were derived from sales to companies in the oil and gas industries.  As a result, the Debtors' and the Reorganized Debtors' operations depend, in part, on the levels of activity in oil and gas exploration, development, and production.  More specifically, the demand for the proppants they produce is closely related to the number of oil and gas wells completed in geological formations where sand-based proppants are used in hydraulic fracturing activities.  These activity levels are affected by both short- and long-term trends in oil and gas prices, among other factors.

Industry conditions that impact the activity levels of oil and natural gas producers and proppant sales are influenced by numerous factors over which the Debtors and the Reorganized Debtors have no control, including:

- governmental regulations, including the policies of governments regarding the exploration for and production and development of their oil and natural gas reserves;

- global weather conditions and natural disasters;

- worldwide political, military and economic conditions;

- the cost of producing and delivering oil and natural gas;

- commodity prices;

- development of alternative energy sources;

- changes in demand for proppants, including the types of proppants used; and

- the ability of the oil and gas industry to comply with OSHA standards for respirable dust.

In recent years, oil and gas prices and, therefore, the level of exploration, development and production activity, have experienced significant fluctuations.  Worldwide economic, political and military events, including war, terrorist activity, events in the Middle East and initiatives by OPEC and other large non-OPEC producers have contributed, and are likely to continue to contribute, to price and volume volatility.  Additionally, warmer than normal winters in North America and other weather patterns may adversely impact the short-term demand for natural gas and, therefore, demand for our products.  Reduction in demand for natural gas to generate electricity could also adversely impact the demand for frac sand.

Any significant reduction in oil and natural gas prices would generally depress the level of oil and natural gas exploration, development, production and well completion activity, which could result in a corresponding decline in the demand for the frac sand the Debtors and the Reorganized Debtors produce.  Such a decline could result in the Debtors and the Reorganized Debtors selling fewer tons of frac sand at lower prices or selling lower priced products, which would have a material adverse effect on their business, results of operations and financial condition.  When demand for frac sand increases, there may not be a corresponding increase in the prices for the Debtors' and the Reorganized Debtors' products and their customers may not switch back to higher-priced products, which could have a material adverse effect on the Debtors' and the Reorganized Debtors' results of operations and financial condition.  The commercial development of economically-viable alternative energy sources could have a similar effect.

69

In addition, the price the Debtors and the Reorganized Debtors receive for sales of frac sand may be impacted by short-term fluctuations in the demand for frac sand, and any negative fluctuations in this demand could have an adverse effect on the Debtors' and the Reorganized Debtors' results of operations and cash flows.

2.  The Debtors' and the Reorganized Debtors' Operations Are Subject to the Seasonal or Cyclical Nature of Their Customers' Businesses, Which Could Adversely Affect Their Results of Operations

The substantial majority of the Debtors' and the Reorganized Debtors' sales are to customers in industries that have historically been seasonal, such as glassmaking, construction and foundry, or cyclical, such as the oil and natural gas industry.  During periods of economic slowdown, such customers often reduce their production rates and capital expenditures and defer or cancel pending projects.  Such developments occur even among customers that are not experiencing financial difficulties.  For example, the Debtors sell more of their products in the second and third quarters to customers who operate in the Industrial Segment due to the seasonal rise in construction driven by more favorable weather conditions. The Debtors sell fewer of their products in the first and fourth quarters due to reduced construction and recreational activity largely as a result of adverse weather conditions.  As a result, the Debtors' and the Reorganized Debtors' results of operations may fluctuate on a quarterly basis and relative to corresponding periods in prior years, and any of these factors could adversely affect their business and cause their results of operations to decline.  The Debtors and the Reorganized Debtors cannot predict or control the factors that affect demand for their products.  Negative developments in the above factors, among others, could cause the demand for industrial and recreational sand to decline, which could adversely affect the Debtors' and the Reorganized Debtors' business, financial condition, results of operations, cash flows and prospects.

3.  The Debtors and the Reorganized Debtors Depend on Rail Transportation to Transport Their Products

The Debtors' and the Reorganized Debtors' business depends significantly on rail transportation. A significant disruption of the rail transportation services utilized by them or their customers could materially and adversely affect the Debtors' and the Reorganized Debtors' business and results of operations.  From time to time, high demand and unusually adverse weather conditions may cause rail congestion, delays and logistical problems.  Rail congestion may affect the Debtors' and the Reorganized Debtors' ability to supply our products to customers in a timely or cost-effective manner, particularly in situations where their facilities are not located close to customer locations.

In addition to the products the Debtors and the Reorganized Debtors supply, railcars transport many types of products across various industries.  If railcar owners sell or lease railcars to their competitors or to companies operating in other industries, the Debtors and the Reorganized Debtors may not have enough railcars to transport our products. The Debtors' and the Reorganized Debtors' failure to properly anticipate their customers' rail transportation needs or to effectively expend capital on the Debtors' and the Reorganized Debtors' railcar fleet could result in losing business to their competitors.

In many cases, the Debtors and the Reorganized Debtors rely on third parties to maintain the rail lines from their facilities to the national rail network, and any failure by those third parties to maintain the lines could impede the Debtors' and the Reorganized Debtors' delivery of products, impose additional costs on the Debtors and the Reorganized Debtors and have a material adverse effect on their business, results of operations and financial condition.

70

4.      The Debtors and the Reorganized Debtors Depend on Trucking to Transport a Significant Portion of Their Products, Particularly in Areas of Increasing Demand for Their Products

In addition to the Debtors' and the Reorganized Debtors' rail network, they depend on trucking services, particularly in areas in which their customers' activity has rapidly increased resulting in spikes in demand for transportation.  For example, the Debtors and the Reorganized Debtors have significant demand from the Permian Basin in West Texas.  As a result, there is high demand for qualified truck drivers to supply the goods necessary to support the increased activity in West Texas at a time when unemployment in the region is low, putting significant pressure on the supply of available qualified truck drivers.  Any delay or inability to secure the personnel and services necessary to deliver the Debtors' and the Reorganized Debtors' products to customers in high activity areas in a timely and cost-effective manner could cause customers to use a competitor and could have a material adverse effect on the Debtors' and the Reorganized Debtors' business, results of operations and financial condition.

The U.S. trucking industry periodically experiences a shortage of qualified drivers, sometimes during periods of economic expansion in which alternative employment opportunities are more plentiful and freight demand increases, or alternatively during periods of economic downturns, in which unemployment benefits might be extended and financing may be limited for independent contractors who seek to purchase equipment or for students who seek financial aid for driving school.  The Debtors' and the Reorganized Debtors' independent contractors are responsible for paying for their own equipment, fuel, and other operating costs, and significant increases in these costs could cause them to seek higher compensation from us or seek other opportunities within or outside the trucking industry.  The U.S. trucking industry also suffers from a high driver turnover rate.  If the Debtors and the Reorganized Debtors are unable to attract qualified independent contractors, they could be forced to, among other things, limit their growth, decrease the number of tractors in service, adjust independent contractor compensation, or pay higher rates to third-party truckload carriers, which could adversely affect their profitability and results of operations if not offset by a corresponding increase in customer rates.

5.      The Debtors' and the Reorganized Debtors' Operations Depend on Their Rights and Ability to Mine Properties and on Having Renewed or Received the Required Permits and Approvals from Governmental Authorities and Other Third Parties

The Debtors and the Reorganized Debtors hold numerous governmental, environmental, mining and other permits, water rights and approvals authorizing operations at each of their facilities.  A decision by a governmental agency or other third party to deny or delay issuing a new or renewed permit or approval, or to revoke or substantially modify an existing permit or approval, could have a material adverse effect on the Debtors' and the Reorganized Debtors' ability to continue operations at the affected facility.  Furthermore, federal, state and local governments could impose a moratorium on mining operations in certain areas.  Expansion of the Debtors' and the Reorganized Debtors' existing operations is also predicated on securing the necessary environmental or other permits, and water rights or approvals, which they may not receive in a timely manner or at all.  In some instances, the Debtors and the Reorganized Debtors have received access rights or easements from third parties, which allow for a more efficient operation than would exist without the access or easement.  A third party could seek to suspend the access or easement, which could have a materially adverse effect on the Debtors' and the Reorganized Debtors' business, results of operations or financial condition.

71

6. <u>The Debtors and the Reorganized Debtors May Be Adversely Affected by Decreased, or Shifts in, Demand for Frac Sand or the Development of Effective Alternative Proppants or New Processes That Replace Hydraulic Fracturing</u>

Frac sand and coated sand are proppants used in the completion and re-completion of oil and natural gas wells through the process of hydraulic fracturing. Frac sand is the most commonly used proppant and is less expensive than ceramic proppant. A significant shift in demand from sand-based proppants to other proppants, such as ceramic proppants, or a shift in demand from higher-margin sand-based proppants to lower-margin sand-based proppants, could have a material adverse effect on the Debtors' and the Reorganized Debtors' business, financial condition and results of operations. The hydraulic fracturing industry is not fully mature and is still subject to technological change. The development and use of new technologies for effective alternative proppants, new technologies allowing for improved placement of proppants at reduced volumes, or the development of new processes to replace hydraulic fracturing altogether, could also cause a decline in demand for the sand-based proppants the Debtors and the Reorganized Debtors produce and could have a material adverse effect on their business, financial condition and results of operations.

Similarly, over the last two years, the Debtors' and the Reorganized Debtors' industry has seen a shift towards the use of in-basin sand, which is available closer to the wellsite. As a result, the Debtors and the Reorganized Debtors have developed frac sand production capacity to meet the growing demand for in-basin sand. The increase in supply of in-basin sand, which may be of lower cost, in the Permian, Mid-Continental, and Eagle Ford basins, could adversely affect the Debtors' and the Reorganized Debtors' locations where they sell Northern White sand, and their business as a whole if supply and demand are not congruent with their production capabilities.

In addition, the discovery by competitors of minerals in locations which are closer to the Debtors' and the Reorganized Debtors' customers could provide competitors with a geographic advantage. Any significant reduction in demand for products sold from the Debtors' and the Reorganized Debtors' facilities could have an adverse effect on their profitability, results of operations and financial condition.

7. <u>A Large Portion of the Debtors' and the Reorganized Debtors' Sales Is Generated by a Limited Number of Customers, and the Loss of, or a Significant Reduction in Purchases by, Their Largest Customers Could Adversely Affect the Debtors' and the Reorganized Debtors' Operations</u>

In 2019, the Debtors' and the Reorganized Debtors' top 10 customers accounted for approximately 36% of their revenues and no customers individually exceeded 10% of their revenues. These customers may not continue to purchase the same level of the Debtors' and the Reorganized Debtors' products in the future due to a variety of reasons. For example, some of the Debtors' and the Reorganized Debtors' top customers could go out of business or, alternatively, be acquired by other companies that purchase the same products and services provided by the Debtors and the Reorganized Debtors from other third-party providers. The Debtors' and the Reorganized Debtors' customers could also seek to capture and develop their own sources of minerals they purchase from the Debtors and the Reorganized Debtors.

The Debtors and the Reorganized Debtors have sold product to their largest customers on both a purchase order basis and pursuant to supply agreements. The Debtors and the Reorganized Debtors currently have supply agreements with certain of their top customers that contain customary termination provisions that would allow the customer to terminate the agreement in the event of the Debtors' and the Reorganized Debtors' insolvency, upon a bankruptcy filing or upon an uncured breach of the applicable agreement. Upon the expiration of the Debtors' and the Reorganized Debtors' current supply agreements, they may choose to renegotiate existing contracts on less favorable terms or at reduced volumes in order to

preserve relationships with their customers. Upon the expiration of the current contract terms, the Debtors and the Reorganized Debtors may be unable to renew existing contracts or enter into new contracts on terms favorable to them, or at all. The demand for the Debtors' and the Reorganized Debtors' products or prevailing prices at the time their current supply agreements expire may render entry into new long-term supply agreements difficult or impossible. Any renegotiation of the Debtors' and the Reorganized Debtors' contracts on less favorable terms, or inability to enter into new contracts on economically acceptable terms upon the expiration of their current contracts, could have a material adverse effect on the Debtors' and the Reorganized Debtors' business, financial condition and results of operations.

If any of the Debtors' and the Reorganized Debtors' major customers substantially reduces or altogether ceases purchasing our products and the Debtors and the Reorganized Debtors are not able to generate replacement sales, their business, financial condition and results of operations could be materially and adversely affected.

8.     The Debtors and the Reorganized Debtors Do Not Own the Land on Which the Majority of Their Terminal Facilities are Located and in Some Cases Do Not Own the Related Terminal Assets

The Debtors and the Reorganized Debtors do not own the land on which the majority of their terminals are located and instead own leasehold interests and rights-of-way for the operation of these facilities. Upon expiration, termination or other lapse of our current leasehold terms, the Debtors and the Reorganized Debtors may be unable to renew their existing leases or rights-of-way on terms favorable to them, or at all. Any renegotiation on less favorable terms or inability to enter into new leases on economically acceptable terms upon the expiration, termination or other lapse of the Debtors' and the Reorganized Debtors' current leases or rights-of-way could cause them to cease operations on the affected land, increase costs related to continuing operations elsewhere and have a material adverse effect on the Debtors' and the Reorganized Debtors' business, financial condition and results of operations. In addition, operating a terminal under a lease can involve escalating costs to the Debtors and the Reorganized Debtors and additional operational difficulties, including with regard to hiring and retaining skilled personnel, which may be specifically controlled by the lessor.

In addition, with respect to certain terminals, the Debtors and the Reorganized Debtors do not own the terminal assets themselves and have instead negotiated either long term leases with third parties or, in the case of certain customer-owned terminals, exclusive access agreements to the terminal. Any leases are subject to the risks of renegotiation at less favorable terms or the risk of failure to enter into new leases on economically acceptable terms. In certain circumstances, the terminals the Debtors and the Reorganized Debtors use are owned by customers and their terminal access agreements are tied to supply agreements with these customers. In these cases, it is possible that the Debtors' and the Reorganized Debtors' ability to continue operating these terminals could be impeded if the customer's volume needs diverge from the Debtors' and the Reorganized Debtors' ability to supply those needs and the customer no longer allows them access to or use of the terminals.

9.     Inaccuracies in the Debtors' and the Reorganized Debtors' Estimates of Mineral Reserves Could Result in Lower Than Expected Sales and Higher Than Expected Costs

The Debtors and the Reorganized Debtors base their mineral reserve estimates on engineering, economic and geological data assembled and analyzed by their engineers and geologists, which are reviewed by outside firms. However, estimates of the quantities and qualities of mineral reserves and costs to mine recoverable reserves are imprecise because they are based on several factors and assumptions, all of which may vary considerably from actual results, such as:

73

- statistical inferences drawn from available drilling data;

- products, operating costs, mining technology improvements, development costs and reclamation costs;

- assumptions concerning future effects of regulation, including the issuance of required permits and taxes by governmental agencies; and

- changes in product mix.

Any inaccuracy in the Debtors' and the Reorganized Debtors' estimates related to their mineral reserves could result in lower than expected sales and higher than expected costs.

10. <u>An Epidemic, Pandemic or Public Health Crisis Could Disrupt the Debtors' and the Reorganized Debtors' Operations and Have a Material Adverse Effect on Their Business</u>

The Debtors' and the Reorganized Debtors' business could be materially and adversely affected by the outbreak of a widespread health epidemic or pandemic, such as coronavirus, avian flu or African swine flu. Outbreaks of contagious illness occur from time to time around the world. The occurrence of such an outbreak or other adverse public health developments could materially disrupt the Debtors' and the Reorganized Debtors' business and operations, including if government authorities impose mandatory closures, seek voluntary closures or impose restrictions on operations. Furthermore, the risk of contracting viruses or other illnesses that may be transmitted through human contact could cause employees to avoid interacting with other people, which could materially and adversely affect the ability to adequately staff the Debtors' and the Reorganized Debtors' operations. An outbreak could also cause disruption in the Debtors' and the Reorganized Debtors' supply chain and adversely impact their ability to ensure supplies to their facilities and to provide safety measures to protect their employees, which could materially and adversely affect the Debtors' and the Reorganized Debtors' continuous operations. If an outbreak reaches pandemic levels, there may also be long-term effects on the economies of effected countries. Any of the foregoing within the countries in which the Debtors and the Reorganized Debtors or their customers and suppliers operate or are dependent on supplies or revenues would severely disrupt their operations and could have a material adverse effect on the Debtors' and the Reorganized Debtors' business, results of operations, cash flows and financial condition.

The extent to which the Debtors' and the Reorganized Debtors' operations will be impacted by the outbreak will depend largely on future developments, which are highly uncertain and cannot be accurately predicted, including new information which may emerge concerning the severity of the outbreak and the actions by the government authorities to contain the outbreak or treat its impact, among other things. Insurance may be unavailable to cover any losses the Debtors and the Reorganized Debtors incur as a result of the outbreak. Even if a virus or other illness does not spread significantly, the perceived risk of infection or health risk may affect the Debtors' and the Reorganized Debtors' business. Their operations could also be disrupted if any of their employees or employees of their customers and suppliers were suspected of having a contagious illness or susceptible to becoming infected with a contagious illness, since this could require the Debtors and the Reorganized Debtors or their customers and suppliers to screen or quarantine some or all of such employees.

11. <u>The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness</u>

The Reorganized Debtors' ability to generate cash to fund their operations and make scheduled payments on or refinance their debt obligations following emergence depends on the Reorganized Debtors'

financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to fund their operations and pay the principal, premium, if any, and interest on their indebtedness or to refinance it on acceptable terms or at all.

12.     The Debtors Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' operations, including their ability to execute their business plan will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:

- the Debtors' creditors or other third parties may take actions or make decisions that are inconsistent with and detrimental to the plans the Debtors believe to be in their best interests;

- the Debtors may be unable to obtain court approval with respect to certain matters in the Chapter 11 Cases from time to time;

- the Bankruptcy Court may not agree with the Debtors' objections to positions taken by other parties;

- the Debtors may not be able to confirm and consummate the Plan or may be delayed in doing so;

- the Debtors may not be able to obtain and maintain normal credit terms with vendors, strategic partners, and service providers;

- the Debtors may not be able to continue to invest in their products and services, which could hurt their competitiveness;

- the Debtors may not be able to enter into or maintain contracts that are critical to their operations at competitive rates and terms, if at all;

- the Debtors may be exposed to risks associated with third parties seeking and obtaining court approval to (a) terminate or shorten the Debtors' exclusivity period to propose and confirm the Plan, (b) appoint a chapter 11 trustee or (c) convert the Chapter 11 Cases to chapter 7 liquidation cases; and

- the Debtors' customers may choose to advertise with their competitors.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' ability to compete for advertising dollars and their relationship with customers, as well as with business partners, vendors, and employees, which in turn could adversely affect the Debtors' operations and financial condition, particularly if the Chapter 11 Cases are protracted.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to timely respond to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the ultimate impact of events that occur

75

during these proceedings will have on the Debtors' business, financial condition, and results of operation cannot be accurately predicted or quantified.

13.      <u>Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses</u>

The Debtors' future results will be dependent upon the timely and successful confirmation and implementation of a plan of reorganization. If a restructuring is protracted, it could adversely affect the Debtors' operating results, including their relationships with advertising customers, business partners, and employees. The longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers will lose confidence in the Debtors' ability to reorganize their businesses successfully and seek to establish alternative commercial relationships. If the Debtors experience a protracted reorganization, there is a significant risk that the value of the enterprise would be substantially eroded to the detriment of all stakeholders.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

14.      <u>Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance</u>

During the Chapter 11 Cases, the Debtors' financial results may be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, or claims assessments may significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance may not be indicative of their financial performance after the Petition Date.

The Debtors' capital structure will be significantly altered under the Plan. The Debtors also expect to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("<u>Reorganizations</u>"). Under fresh-start accounting rules that may apply to the Debtors upon the Effective Date, the Debtors' assets and liabilities would be adjusted to fair value, which could have a significant impact on their financial statements. Accordingly, if fresh-start accounting rules apply, the Debtors' financial condition and results of operations following emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in their historical financial statements. In connection with the Chapter 11 Cases and the development of the Plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods. Such charges could be material to the Debtors' consolidated financial position, liquidity, and results of operations. The Financial Projections contained in **Exhibit F** hereto do not currently reflect the effect of fresh start accounting, which may have a material effect on the financial projections.

15.      <u>The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases</u>

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, or the final resolution of such litigation. The effect of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

16.      The Loss of Employees Could Adversely Affect the Debtors' Operations

As a result of the Chapter 11 Cases, the Debtors may experience increased levels of employee attrition, and their employees likely will face considerable distraction and uncertainty.  A loss of key personnel or material erosion of employee morale could adversely affect the Debtors' business and results of operations.  The Debtors' ability to engage, motivate and retain key employees or take other measures intended to motivate and incent key employees to remain with them through the pendency of the Chapter 11 Cases is limited by restrictions on implementation of incentive programs under the Bankruptcy Code. The loss of services of members of our senior management team could impair the Debtors' ability to execute their strategy and implement operational initiatives, which would be likely to have a material adverse effect on their financial condition, liquidity and results of operations.

17.      Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of a plan of reorganization (a) would be subject to compromise or treatment under the plan of reorganization or (b) would be discharged in accordance with the terms of the plan of reorganization.  However, there can be no assurance that the aggregate amount of such claims that are not subject to treatment under the Plan or that are not discharged will not be material.

18.      The Debtors May Have Substantial Indebtedness Upon Emergence From Chapter 11

The terms of the Plan contemplate that upon the Effective Date, the Debtors will have the New Term Loan. The substantial amount of indebtedness thereunder could have important consequences to the Debtors, including:

- limiting their ability to borrow additional amounts for working capital, capital expenditures, debt service requirements, execution of their business strategy or other purposes;

- limiting their ability to use operating cash flow in other areas of their business because the Debtors must dedicate a substantial portion of these funds to service debt;

- increasing their vulnerability to general adverse economic and industry conditions, including increases in interest rates;

- limiting their ability to capitalize on business opportunities and to react to competitive pressures; and

- limiting their ability or increasing the costs to refinance indebtedness.

19.      Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of certain Claims.

## ARTICLE IX.
## SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims or Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As set forth in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Classes 4, 5A, 5B, and 5C (collectively, the "Voting Classes").  The Holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 5D, 6, 7, 8 or 9.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

*The Voting Record Date is September 30, 2020*.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

*The Voting Deadline is November 27, 2020, at 11:59 p.m. (prevailing Central Time)*.  In order to be counted as votes to accept or reject the Plan, all ballots must be (1) electronically submitted utilizing the online balloting portal maintained by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline (but only if the instructions included with your ballot permit submission of your ballot via the online balloting portal); or (2) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots (or a master ballot

78

reflecting your vote, as applicable) are *actually received* by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline at the following address:

<div style="border:1px solid black; padding:10px; text-align:center;">

**DELIVERY OF BALLOTS**

**COVIA BALLOT PROCESSING**
**C/O PRIME CLERK LLC**

**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, New York 10165**

</div>

**IF DELIVERING YOUR BALLOT TO THE ABOVE ADDRESS, PLEASE SEND AN EMAIL TO COVIABALLOTS@PRIMECLERK.COM AT LEAST 24 HOURS BEFORE YOUR ARRIVAL AND PROVIDE THE ANTICIPATED DATE AND TIME OF YOUR DELIVERY.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL FREE AT (877) 606-3610.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## D.     Ballots Not Counted

***No ballot will be counted toward Confirmation if, among other things***:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), the administrative agents under the Bank Facilities, or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

### ARTICLE X.
### CONFIRMATION OF THE PLAN

## A.     Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the

Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**B.      Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As demonstrated by the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis takes into account all intercompany liabilities on the Debtors' books and records and all Claim Holders' estimated recoveries therein reflect the collection on intercompany claims.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Equity to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

The Committee disagrees with the Debtors' Liquidation Analysis because it does not ascribe any value to the claims identified in the Committee's Standing Motion.  Such claims would not be released, and therefore could be pursued, in a liquidation.  If pursued and successful, the Committee believes that such claims could provide substantial returns to the Debtors' estates even in a liquidation scenario.

**C.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows.  Creditors and other interested parties should review Article VIII of this Disclosure

Statement, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[46]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class containing Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided that* the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy

---

[46]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Allowed Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## F.   Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit G** attached hereto and incorporated herein by reference.  As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Covia enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis.  Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

For the avoidance of doubt, all parties in interest shall not be deemed (1) to accept or acquiesce to any methodology utilized by the Debtors or their advisors in preparing the Valuation Analysis, or (2) to accept or acquiesce to any proposed value for the Reorganized Debtors.  All parties in interest reserve their rights to set forth their own estimates of the enterprise value of the Reorganized Debtors in connection with Plan Confirmation.  As noted above, the Committee disagrees with the Debtors' Valuation Analysis and believes that it underestimates the Debtors' total enterprise value.

# ARTICLE XI.
## CERTAIN SECURITIES LAW MATTERS

### A.      Issuance of Securities under the Plan

Shares of New Common Equity and the New Term Loan to be issued in respect of Claims pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (1) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (2) to the extent that such exemption under section 1145 of the Bankruptcy Code is not available (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

### B.      Subsequent Transfers of Securities Issued under the Plan

Securities issued in reliance upon section 1145 of the Bankruptcy Code (1) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (2) are freely tradable and transferable (subject to any restrictions in the New Organizational Documents) by any holder thereof that, at the time of transfer, (a) is not an "affiliate" of Reorganized Covia as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within ninety days of such transfer, (c) has not acquired such securities from an "affiliate" within one year of such transfer and (d) is not an entity that is an "underwriter."

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a person, whether through owning voting securities, by contract, or otherwise.  Accordingly, an officer, director or significant stockholder of a reorganized debtor or its successor may be deemed to be a "controlling person" of the debtor or successor under a plan of reorganization.

To the extent issuance under Section 1145(a) of the Bankruptcy Code is unavailable and Securities issued under the Plan must instead be issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such securities will be "restricted securities" subject to resale restrictions and may

be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and applicable state and local securities law.

**The Debtors recommend that potential recipients of Securities issued under the Plan consult their own counsel concerning their ability to freely trade such Securities in compliance with the federal securities laws and any applicable "Blue Sky" laws.  The Debtors make no representations concerning, and do not provide, any opinions or advice with respect to the Securities or the bankruptcy matters described in this Disclosure Statement.  The Debtors make no representation concerning the ability of a Person to dispose of such Securities.**

Should Reorganized Covia elect, on or after the Effective Date, to reflect any ownership of the Securities issued pursuant to the Plan through the facilities of the Depository Trust Company (the "DTC"), Reorganized Covia need not provide to DTC any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such securities under applicable securities laws.  Notwithstanding anything to the contrary in the Plan, no Entity, including, for the avoidance of doubt, DTC, shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer to the holders of the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

<div align="center">

**ARTICLE XII.**
**CERTAIN UNITED STATES FEDERAL**
**INCOME TAX CONSEQUENCES OF THE PLAN**

</div>

**A.      Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, dealers and traders in securities, insurance companies,

<div align="center">84</div>

financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the Tax Code, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in Section 451 of the Tax Code), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, Claims, the New Common Equity, or the New Term Loan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims (*i.e.*, (i) the Secured Term Loan Claims; (ii) the Secured Swap Agreement Claims; (iii) any Claims against Covia that are Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims; and (iv) any Claims against one or more Debtors other than Covia that is are Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims) constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (2) that are deemed to reject the Plan, or (3) that are not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is:  (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

1.     <u>In General</u>

For U.S. federal income tax purposes, the Debtors and certain non-Debtor domestic affiliates are members of an affiliated group of corporations (or entities disregarded for U.S. federal income tax purposes that are wholly owned by members of such group), of which Covia is the common parent.

As of December 31, 2019, the Debtors estimate that they have approximately $291 million of federal net operating losses ("NOLs"), $183 million of disallowed interest expense carryforwards under section 163(j) of the Tax Code (the "163(j) Deductions"), and approximately $17.4 million of foreign tax credit carryforwards (together with any capital losses, interest expenses, and certain other tax attributes, collectively, the "Tax Attributes"). In general, NOLs may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018. Subject to any applicable limitations, NOLs carried to taxable years before 2021 may offset 100 percent of taxable income and NOLs carried to taxable years starting with 2021 may be used to offset 80 percent of taxable income for any tax year thereafter. Further, NOLs arising in tax years after 2017, and before 2021, may be carried back to each of the five tax years preceding the tax year of such loss. The Debtors may generate additional Tax Attributes during the 2020 tax year prior to the Effective Date. Any Tax Attributes remaining upon implementation of the Plan may be available to offset taxable income or directly offset federal tax liability in future years, thereby reducing the Debtors' future aggregate tax obligations, subject to the discussion below regarding section 382 of the Tax Code. As discussed below, however, certain of the Debtors' Tax Attributes are expected to be reduced upon implementation of the Plan.

2.     <u>Cancellation of Debt and Reduction of Tax Attributes</u>

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the issue price of the New Term Loan, (ii) the fair market value of the New Common Equity, (iii) the amount of Cash (if any) and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. The 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

86

As noted above, in connection with the Restructuring Transactions, the Debtors expect to realize COD Income. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the New Term Loan and the fair market value of the New Common Equity, neither of which can be determined until after the Plan is consummated.

3.     <u>Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes</u>

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.[47]

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "<u>Pre-Change Losses</u>") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Equity pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

    a.   *General Section 382 Annual Limitation*

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 0.89 percent for August 2020). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable

---

[47]     Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses. However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that is commenced within 30 days of the publication of the finalized new rules in this area. Accordingly, the Debtors do not expect the proposed regulations to apply to them or to the Reorganized Debtors.

year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### b. *Special Bankruptcy Exceptions*

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Importantly, the Debtors may (in connection with the Plan) implement certain Restructuring Transactions that would result in different entities issuing the New Common Equity and/or the New Term Loan than the current obligor on the Claims, which is why the discussion below discusses potential tax consequences where the New Common Equity and/or New Term Loan do not constitute consideration that can be received tax-free. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Claim may depend, in part, on whether (1) the Secured Term Loan Claims; (2) the Secured Swap Agreement Claims; (3) any Claims against Covia that are Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims; or (4) any Claims against one or more Debtors other than Covia that is are

Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims surrendered constitute a "security" of a Debtor for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of (1) the Secured Term Loan Claims; (2) the Secured Swap Agreement Claims; (3) any Claims against Covia that are Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims; or (4) any Claims against one or more Debtors other than Covia that is are Allowed General Unsecured Claims, Term Loan Deficiency Claims, or Swap Agreements Deficiency Claims as "securities" for U.S. federal income tax purposes.

> 1.  Consequences to Holders of Class 4 Secured Term Loan Claims and Secured Swap Agreements Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Class 4 Secured Term Loan Claim or an Allowed Secured Swap Agreements Claim, respectively, shall receive its Pro Rata share of: (a) the Excess Cash; (b) the New Term Loan; and (c) the New Common Equity.

As a general matter, any Class 5A, 5B, or 5C Claims that constitute deficiency claims with respect to Class 4 Claims are not separately cognizable claims for U.S. federal income tax purposes, and any recovery received on account of such Class 5A, 5B, or 5C Claims will be treated as having been received in such U.S. Holder's capacity as a Holder of a Class 4 Claim.

If (a) the Class 4 Claims qualify as a "security" of the Debtor entity that issues the New Term Loan and/or New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer), and (b) in the case of a U.S. Holder holding such a Claim in the Debtor entity (or a "party to the reorganization," in a tax sense, with such issuer) that issues the New Term Loan (but not the New Common Equity), if the New Term Loan qualifies as a "security," then a U.S. Holder of Class 4 Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a U.S. Holder of such a Class 4 Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (a) the sum of (i) Cash (if any) and (ii) the fair market value of non-Cash consideration received[48] and (b) the difference between (i) the fair market value (or issue price, in the case of debt instruments) of consideration received pursuant to the Plan and (ii) such U.S. Holder's adjusted basis, if any, in such Class 4 Claim. The U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (a) the tax basis of the Class 4 Claim surrendered by such U.S. Holder increased by (b) gain recognized (if any) by such U.S. Holder, decreased by (c) the fair market value

---

[48]   The New Common Equity or the New Term Loan may constitute "boot" if it is not issued by the same entity that is the obligor on the Class 4 Claims (or a "party to the reorganization," in a tax sense, with such entity).

(or issue price, in the case of debt instruments) of consideration received, allocated between the consideration received in accordance with the respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the non-Cash consideration received should include the holding period for the exchanged Class 4 Claim. The holding period for any other property received (if any) should begin on the day following the receipt of such property.

If (a) the Class 4 Claims do not qualify as a "security" of the Debtor that issues the New Term Loan and/or New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer), or (b)(i) in the case of a U.S. Holder holding such a Class 4 Claim in the Debtor entity (or a "party to the reorganization," in a tax sense, with such issuer) that issues the New Term Loan (but not the New Common Equity), if the New Term Loan does not qualify as a "security," and (ii) if the issuer of New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer) is different than the Debtor entity in which the U.S. Holder holds its Class 4 Claims, then a U.S. Holder of the Class 4 Claims should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value (or issue price, in the case of debt instruments) of consideration received, and (b) the U.S. Holder's adjusted tax basis in its Class 4 Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount," as discussed below, and accrued but untaxed interest, whether the Class 4 Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Class 4 Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Class 4 Claim for more than one year at the time of the exchange. The holding period for debt received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the U.S. Holder should obtain a tax basis in the non-Cash consideration received equal to the fair market value (or issue price, in the case of debt instruments) of such property.

2.      Consequences to Holders of Class 5A Parent General Unsecured & Deficiency Claims, 5B TechniSand General Unsecured & Deficiency Claims, and Class 5C Cheyenne General Unsecured & Deficiency Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of: (a) a Claim against Covia that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the New Common Equity; and (b) a Claim against one or more Debtors other than Covia that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the New Common Equity.

As noted above, any Class 5A, 5B, or 5C Claims that constitute deficiency claims with respect to Class 4 Claims are not separately cognizable claims for U.S. federal income tax purposes, and any recovery received on account of such Class 5A, 5B, or 5C Claims will be treated as having been received in such U.S. Holder's capacity as a Holder of a Class 4 Claim. The following discussion applies only to Class 5A, 5B, and 5C Claims that are not treated as Class 4 Claims.

If any of the Class 5A, Class 5B, or Class 5C Claims qualifies as a "security" of the Debtor entity that issues the New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer), then the U.S. Holders of such Class 5A, Class 5B, and Class 5C Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a U.S. Holder of such Class 5A, Class 5B, or Class

90

5C Claim should not recognize gain or loss. The U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to the tax basis of the Class 5A, Class 5B, or Class 5C Claim surrendered by such U.S. Holder. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the consideration received should include the holding period for the exchanged Class 5A, Class 5B, or Class 5C Claim.

If either (a) the Class 5A, Class 5B, or Class 5C Claims do not qualify as a "security" of the Debtor entity that issues the New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer), or (b) if the issuer of New Common Equity (or a "party to the reorganization," in a tax sense, with such issuer) is different than the Debtor entity in which the U.S. Holder holds its Class 5A, Class 5B, or Class 5C Claim, then the U.S. Holders of such Class 5A, Class 5B, and Class 5C Claims should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of the New Common Equity received, and (b) the U.S. Holder's adjusted tax basis in its Class 5A, Class 5B, or Class 5C Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount," as discussed below, and accrued but untaxed interest, whether the Class 5A, Class 5B, or Class 5C Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Class 5A, Class 5B, or Class 5C Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Class 5A, Class 5B, or Class 5C Claim for more than one year at the time of the exchange. The holding period for debt received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the U.S. Holder should obtain a tax basis in the New Common Equity received equal to the fair market value of such property.

3.      Accrued Interest

To the extent that any amount received by a U.S. Holder of Claims under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the exchanged Claims, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on such U.S. Holder's Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

91

4.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges such Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal to ¼ of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.  U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

5.      U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New Term Loan

a.  *Payments of Qualified Stated Interest*

Payments or accruals of "qualified stated interest" (as defined below) on the New Term Loan will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the New Term Loan, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

b.  *Original Issuance Discount*

Where, as here, certain U.S. Holders of Class 4 Claims receiving debt instruments are also receiving other property in exchange for their Claims (*i.e.*, New Common Equity and Cash), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their Class 4 Claims.  In such case, the issue price of the New Term Loan will depend, in part, on the issue price of the "investment unit" (*i.e.*, the New Term Loan, New Common Equity, and Cash), and the respective fair market values of the elements of consideration that compose the investment unit.  The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument.  As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market (*i.e.*, whether there is trading on an "established securities market" at any time during the 31-day period ending 15 days after the Effective Date).  In general, consideration can be treated as being traded on an established market for these purposes even if no trades

92

actually occur and there are merely firm or indicative quotes available with respect to the items discussed below. Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent[] the fair market value of the property" being valued.

If none of the components of the investment unit nor the surrendered Class 4 Claims are publicly traded on an established market, then the issue price of the New Term Loan would generally be determined under section 1273(b)(4) or 1274 of the Tax Code, as applicable. If none of the components of the investment unit are publicly traded on an established market, but the Class 4 Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of such Class 4 Claims.

If the investment unit received in exchange for Class 4 Claims is considered to be publicly traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. In the event that the New Term Loan is publicly traded on an established market but the New Common Equity is not treated as publicly traded on an established market, the determination of the issue price of the loans under the New Term Loan is unclear. Such issue price could be based on (i) in the case where the Class 4 Claims are also publicly traded on an established market, on the trading value of such Class 4 Claims, allocated as described above, (ii) based on the demonstrated trading price of the New Term Loan, or (iii) the stated redemption price at maturity of the New Term Loan.

If an issue price is determined for the investment unit received in exchange for surrendered Class 4 Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the New Term Loan.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as the New Term Loan, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any New Term Loan have not yet been determined; to the extent not all the interest on the New Term Loan is unconditionally payable in cash at least annually, the New Term Loan may be considered to be issued with OID. Moreover, the New Term Loan could be treated as issued with OID to the extent the allocation rules described above result in the New Term Loan having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the New Term Loan multiplied by the remaining number of complete years to maturity from their original issue date, or if the New Term Loan provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the New Term Loan is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Term Loan, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any

93

Cash payment on the New Term Loan that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the New Term Loans is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New Term Loan, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the New Term Loan.

### c.  *Sale, Taxable Exchange or other Taxable Disposition*

Upon the disposition of the New Term Loan by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New Term Loan, as applicable.  A U.S. Holder's adjusted tax basis in their interest in the New Term Loan will be determined in the manner set forth above.  A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income.  A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such New Term Loan for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

### 6.  <u>U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Equity</u>

### a.  *Dividends on New Common Equity*

Any distributions made on account of the New Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Covia as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Equity.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### b.  *Sale, Redemption, or Repurchase of New Common Equity*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Equity.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Equity for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.

7.      Limitations on Use of Capital Losses

A U.S. Holder of a Class 4, Class 5A, Class 5B, or Class 5C Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

8.      Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

9.      Disputed Ownership Fund Treatment

To the extent property (*e.g.*, New Common Equity) is deposited into a Disputed Claims Reserve as opposed to being issued out of "treasury stock" by the Reorganized Debtors directly to Holders as Claims are resolved, then with respect to any of the assets that are subject to potential disputed claims of ownership or uncertain distributions (including, in particular, the Disputed Claims Reserve), the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account or appreciation in property between the Effective Date and the date of distribution) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property (*e.g.*, New Common Equity) is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders. Notwithstanding the foregoing, the treatment for U.S. federal income tax purposes of an exchange of a Claim for New Common Equity as a sale, a "recapitalization," or otherwise should generally be unaffected by the use of a disputed ownership fund (including a Disputed Claims Reserve).

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Equity and the New Term Loan.

1.      Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Class 4, Class 5A, Class 5B, or Class 5C Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of New Term Loan

a.      *Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest)*

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in Reorganized Covia (or, in the case of interest received pursuant to the Plan, the Debtors) within the meaning of Section 871(h)(3) of the Tax Code and Treasury Regulations thereunder;

96

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Covia (or, in the case of interest received pursuant to the Plan, the Debtors), actually or constructively through the ownership rules under Section 864(d)(4) of the Tax Code;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Covia (or, as applicable, the Debtors) or Reorganized Covia's (or, as applicable, the Debtors') paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the New Term Loan paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the New Term Loan or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), provided the appropriate statement is provided to Reorganized Covia (or, with respect to interest received pursuant to the Plan, the Debtors) or Reorganized Covia's (or, as applicable, the Debtors') paying agent unless an applicable income tax treaty provides otherwise. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### b.    *Sale, Taxable Exchange, or Other Disposition of the New Term Loan*

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption, or other taxable disposition of the New Term Loan (other than any amount representing accrued but unpaid interest on the loan) unless:

97

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the New Term Loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Interest Attributable to Accrued, Untaxed Interest)." To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).   If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable income tax treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

3. <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Equity</u>

a. *Dividends on New Common Equity*

Any distributions made with respect to New Common Equity (other than certain distributions of stock of Reorganized Covia) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Covia, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain).  Except as described below, dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

98

*b.   Sale, Redemption, or Repurchase of New Common Equity of Reorganized Covia*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Equity of Reorganized Covia unless:

(1)   such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(2)   such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(3)   the issuer of such New Common Equity is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Equity.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The FIRPTA rules are discussed in greater detail below.

4.   FIRPTA

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to the New Common Equity of Reorganized Covia, rules with respect to USRPHCs may apply.  In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation.  Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI.  Further, the buyer of the New Common Equity of Reorganized Covia may be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.  At this time, it is unknown whether the FIRPTA rules will apply to the New Common Equity of Reorganized Covia.

To the extent the FIRPTA rules are applicable, distributions out of Reorganized Covia's current and accumulated earnings and profits (and therefore taxable as dividends) will be subject to withholding as described above under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Equity—Dividends on New Common Equity." To the extent any distribution exceeds Reorganized Covia's current and accumulated earnings and profits (and therefore is not taxable as a dividend), such distribution will first be treated as a return of tax basis and thereafter as gain from the sale or exchange or a USRPI (as defined below), and, in each case, subject to withholding at a tax rate of 15 percent of the gross amount of any such distribution.

Under the FIRPTA rules, if a class of stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such class of stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. Whether and when the New Common Equity of Reorganized Covia will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

5.      FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S.-source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.  Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

6.      Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.   The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Class 4, Class 5A, Class 5B, or Class 5C Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that

100

Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XIII.
### RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other available scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 13, 2020                    Covia Holdings Corporation
                                            on behalf of itself and all other Debtors


                                            */s/ Andrew Eich*
                                            _____

                                            Andrew Eich
                                            EVP, Chief Financial Officer, and Treasurer
                                            Covia Holdings Corporation

101

**Exhibit A**

**Plan of Reorganization**

*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COVIA HOLDINGS CORPORATION, *et al.*,[1] | ) | Case No. 20-33295 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**COVIA HOLDINGS CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Genevieve M. Graham (TX Bar No. 24085340)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:      mcavenaugh@jw.com
      vanaya@jw.com
      ggraham@jw.com
      vargeroplos@jw.com

Jonathan S. Henes, P.C. (Admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      jonathan.henes@kirkland.com

-and-

Benjamin M. Rhode (Admitted *pro hac vice*)
Scott J. Vail (Admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      benjamin.rhode@kirkland.com
      scott.vail@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 13, 2020

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/Covia.  The location of Debtor Covia Holdings Corporation's principal place of business and the Debtors' service address is:  3 Summit Park Drive, Suite 700, Independence, Ohio 44131.

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST AND THE PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THE PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THE PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.**

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References**................................................................................1

- A.    Defined Terms .................................................................................1
- B.    Rules of Interpretation .................................................................16
- C.    Computation of Time.....................................................................17
- D.    Governing Law ..............................................................................17
- E.    Reference to Monetary Figures......................................................17
- F.    Reference to the Debtors or the Reorganized Debtors ...................17
- G.    Consenting Stakeholder Consent Right ........................................18

**Article II. Administrative and Priority Claims** .........................................................18

- A.    Administrative Claims ...................................................................18
- B.    Professional Fee Claims.................................................................19
- C.    L/C Facility Claims........................................................................20
- D.    Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses ..............................................................21
- E.    Priority Tax Claims........................................................................21

**Article III. Classification, Treatment, and Voting of Claims and Interests** ............21

- A.    Classification of Claims and Interests ...........................................21
- B.    Summary of Classification.............................................................21
- C.    Treatment of Classes of Claims and Interests................................22
- D.    Special Provision Governing Unimpaired Claims..........................28
- E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
- F.    Subordinated Claims......................................................................28
- G.    Intercompany Interests...................................................................28
- H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...............................................................................28

**Article IV. Provisions for Implementation of the Plan**..............................................29

- A.    General Settlement of Claims and Interests....................................29
- B.    Restructuring Transactions ............................................................29

C.  Sources of Consideration for Plan Distributions .................................................30
D.  Issuance of the New Term Loan ..........................................................................30
E.  The Exit Facility ..................................................................................................30
F.  Issuance and Distribution of New Common Equity ............................................31
G.  Management of Reorganized Covia .....................................................................31
H.  Exemption from Registration Requirements ........................................................32
I.  Cancellation of Existing Securities and Agreements...........................................32
K.  Corporate Existence .............................................................................................33
L.  New Organizational Documents...........................................................................33
M.  New Board ............................................................................................................34
N.  Corporate Action..................................................................................................34
O.  Vesting of Assets in the Reorganized Debtors ....................................................34
P.  Effectuating Documents; Further Transactions ...................................................35
Q.  Section 1146(a) Exemption .................................................................................35
R.  Management Incentive Plan..................................................................................35
S.  Employee Matters ................................................................................................36
T.  Preservation of Rights of Action .........................................................................36

**Article V. Treatment of Executory Contracts and Unexpired Leases .....................................37**
A.  Assumption and Rejection of Executory Contracts and Unexpired Leases .........37
B.  Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases....................................................................................................................38
C.  Claims Based on Rejection of Executory Contracts or Unexpired Leases...........38
D.  Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.......38
E.  Modifications, Amendments, Supplements, Restatements, or Other Agreements.39
F.  Indemnification Provisions ...................................................................................39
G.  Insurance Policies ................................................................................................40
H.  Reservation of Rights...........................................................................................41
I.  Nonoccurrence of Effective Date ........................................................................41
J.  Contracts and Leases Entered into After the Petition Date .................................41

**Article VI. Provisions Governing Distributions .........................................................................41**
A.  Timing and Calculation of Amounts to Be Distributed.......................................41
B.  Distribution Agent. ..............................................................................................41
C.  Rights and Powers of Distribution Agent............................................................42
D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ..........42
E.  Compliance Matters..............................................................................................44
F.  Foreign Currency Exchange Rate ........................................................................44
G.  Claims Paid or Payable by Third Parties .............................................................45
H.  Setoffs and Recoupment ......................................................................................45
I.  Allocation between Principal and Accrued Interest .............................................46

**Article VII. Procedures for Resolving Contingent, Unliquidated,  and Disputed Claims .....46**
A.  Resolution of Disputed Claims.............................................................................46
B.  Time to File Objections to Disputed Claims and Disputed Interests....................47
C.  Disputed Claims....................................................................................................47
D.  Adjustment to Claims and Interests without Objection ........................................48
E.  No Interest.............................................................................................................48
F.  Disallowance of Claims.........................................................................................48

G.  Amendments to Proofs of Claim ......................................................................49
H.  Distributions after Allowance ........................................................................49

**Article VIII. DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS .49**

A.  Discharge of Claims and Termination of Interests .........................................49
B.  Releases by the Debtors ..................................................................................50
C.  Releases by Holders of Claims and Interests ..................................................51
D.  Exculpation ......................................................................................................52
E.  Injunction ........................................................................................................53
F.  Release of Liens ...............................................................................................53
G.  Protection against Discriminatory Treatment .................................................54
H.  Recoupment .....................................................................................................54
I.  Document Retention ........................................................................................54
J.  Reimbursement or Contribution .....................................................................54
K.  Term of Injunctions or Stays ..........................................................................55
L.  Release of Preference Actions .........................................................................55
M.  Reservation of Rights of the SEC ...................................................................55

**Article IX. EFFECT OF CONFIRMATION OF THE PLAN ...................................................55**

A.  Jurisdiction and Venue ....................................................................................55
B.  Order Approving the Disclosure Statement ....................................................55
C.  Voting Report ..................................................................................................56
D.  Judicial Notice .................................................................................................56
E.  Transmittal and Mailing of Materials; Notice ................................................56
F.  Solicitation ......................................................................................................56
G.  Burden of Proof ...............................................................................................57
H.  Bankruptcy Rule 3016(a) Compliance ...........................................................57
I.  Compliance with the Requirements of Section 1129 of the Bankruptcy Code ....57
J.  Securities Under the Plan ................................................................................62
K.  Releases and Discharges ..................................................................................62
L.  Release and Retention of Causes of Action ....................................................63
M.  Approval of Restructuring Support Agreement and Other Restructuring Documents and Agreements ............................................................................63
N.  Confirmation Hearing Exhibits .......................................................................63
O.  Objections to Confirmation of the Plan ..........................................................63
P.  Retention of Jurisdiction .................................................................................63
Q.  Plan Supplement .............................................................................................63

**Article X. Conditions Precedent to the Effective Date ...............................................64**

A.  Conditions Precedent to the Effective Date. ...................................................64
B.  Waiver of Conditions Precedent .....................................................................65
C.  Effect of Non-Occurrence of Conditions to Consummation ...........................65

**Article XI. Modification, Revocation, or Withdrawal of the Plan .........................................65**

A.  Modification of Plan ........................................................................................65
B.  Effect of Confirmation on Modifications ........................................................65
C.  Withdrawal of Plan ..........................................................................................65

**Article XII. Retention of Jurisdiction** ...................................................................................**66**

**Article XIII. Miscellaneous Provisions** ...............................................................................**68**

    A.     Immediate Binding Effect.................................................................................68

    B.     Additional Documents ......................................................................................68

    C.     Payment of Statutory Fees ...............................................................................68

    D.     Statutory Committee and Cessation of Fee and Expense Payment. .....................69

    E.     Reservation of Rights.......................................................................................69

    F.     Successors and Assigns ....................................................................................69

    G.     Service of Documents.......................................................................................69

    H.     Term of Injunctions or Stays ...........................................................................70

    I.     Entire Agreement; Controlling Document.........................................................71

    J.     Plan Supplement ..............................................................................................71

    K.     Non-Severability..............................................................................................71

    L.     Votes Solicited in Good Faith..........................................................................71

    M.    Closing of Chapter 11 Cases............................................................................72

    N.     Waiver or Estoppel ..........................................................................................72

    O.     Substantial Consummation ...............................................................................72

**INTRODUCTION**

Covia Holdings Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint prearranged plan of reorganization. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate chapter 11 plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate substantive consolidation for any of the Debtors. The classification of Claims and Interests set forth in Article III of the Plan should apply separately to each Debtor.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, historical financial information, operations, valuation, projections, and risk factors, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.**

**ARTICLE I.**

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.      Defined Terms**

Capitalized terms used in the Plan have the meanings ascribed to them below.

1.      "*Adequate Protection Superpriority Claims*" shall have the meaning set forth in the Cash Collateral Order.

2.      "*Ad Hoc Term Lender Group*" shall have the meaning set forth in the Restructuring Support Agreement.

3.      "*Ad Hoc Term Lender Group Fees and Expenses*" means, collectively, all of the reasonable and documented fees and expenses of the Ad Hoc Term Lender Group incurred in connection with the Restructuring Transactions, including the reasonable and documented fees and disbursements of Paul, Weiss, Rifkind, Wharton & Garrison LLP as lead counsel to the Consenting Stakeholders, Porter Hedges LLP as local counsel to the Consenting Stakeholders, Centerview Partners LLC, Inc. as financial advisors to the Consenting Stakeholders, Lyons, Benenson & Company Inc. as compensation advisor to the Consenting Stakeholders, the Term Loan Agent, and any other professionals retained by the Ad Hoc Term Lender Group in connection with the Restructuring Transactions, in each case: (a) in accordance with the terms of their applicable engagement letters (if any) or other contractual arrangements with the Company Parties, the Restructuring Support Agreement, and the Plan; and (b) without any requirement for the filing of retention applications or any interim or final fee applications in the Chapter 11 Cases, with any balance(s), including estimates of fees and expenses to be incurred through the Effective Date, paid in full in Cash on the Effective Date.

4.      "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date pursuant to sections 328,

330, or 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) the Adequate Protection Superpriority Claims; (c) the Allowed Professional Fee Claims; (d) the Ad Hoc Term Lender Group Fees and Expenses and (e) the Term Loan Agent Fees and Expenses.

5.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims), which shall be:  (a) 30 days after the Effective Date with respect to Claims that arose before the Effective Date and (b) the deadline for filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth in the Bar Date Order; *provided that* the deadline for Filing requests for payment of Administrative Claims arising from or related to the rejection of Unexpired Leases pursuant to the *Order (I) Authorizing the Rejection of Certain Railcar Lease Agreements, (II) Authorizing the Abandonment of any Remaining Personal Property in Connection Therewith, (III) Authorizing Procedures Governing the Return of Rejected Railcars, and (IV) Granting Related Relief* [Docket No. 336] shall be September 27, 2020.

6.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.      "*Allowed*" means, with respect to any Claim against or Interest in a Debtor, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable, that is Filed on or before the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of an Administrative Claim is not required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided that*, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been allowed by a Final Order.  Except as otherwise specified in the Plan, any Final Order, or as otherwise agreed by the Debtors, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims (as determined by Final Order of the Bankruptcy Court), the amount of an Allowed Claim shall not include interest or fees on such Claim accruing from and after the Petition Date.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt:  (x) any Proof of Claim or any request for payment of an Administrative Claim (other than requests for payment of Professional Fee Claims), that is Filed after the applicable Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "*Allow*" and "*Allowing*" shall have correlative meanings.

8.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547–553, and 724(a)

2

of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

9.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of Texas.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 302].

13.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.     "*CARES Act Tax Refund Adjustment*" means any tax refunds received by the Debtors under the CARES Act, to the extent such refunds have been received as of the Measurement Date; *provided that* the CARES Act Tax Refund Adjustment cannot exceed the amount included for such refunds in fiscal year 2021 in the Covia management business plan dated May 12, 2020.

15.     "*Cash*" means the legal tender of the United States of America or legal tender under any applicable jurisdiction, including bank deposits, checks, and other similar items.

16.     "*Cash Adjustment*" means the amount (which shall not be negative) by which Excess Cash exceeds $110,000,000, which amount shall not exceed $25,000,000.

17.     "*Cash Collateral Order*" means the *Final Order (I) Authorizing The Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing and (V) Granting Related Relief* [Docket No. 405] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

18.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, interest, guaranty, suit, obligation, liability, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, choate or inchoate, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of

3

any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

19. "*Certificate*" means any document, instrument, or other writing evidencing a Claim against or an Interest in the Debtors.

20. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code pursuant to the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 38].

21. "*Cheyenne*" means Cheyenne Sand Corp.

22. "*Cheyenne Unsecured Claims Equity Pool*" means 0.7% of the New Common Equity, subject to dilution by the Management Incentive Plan.

23. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

24. "*Claims Bar Date*" means, collectively, the applicable dates (including the Administrative Claims Bar Date) by which Proofs of Claim and requests for payment of Administrative Claims must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

25. "*Claims, Noticing, and Solicitation Agent*" means Prime Clerk LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

26. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

27. "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

28. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

29. "*Company*" means Covia and all of its direct and indirect subsidiaries.

30. "*Company Parties*" shall have the meaning set forth in the Restructuring Support Agreement.

31. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

32. "*Confirmation Date*" means the date on which Confirmation occurs.

33. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

4

34.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

35.     "*Consenting Stakeholder*" shall have the meaning set forth in the Restructuring Support Agreement.

36.     "*Consenting Stakeholder Consent Right*" means, with respect to each Definitive Document, the applicable consent right of the Required Consenting Stakeholders with respect to such Definitive Document as set forth in the Restructuring Support Agreement.

37.     "*Consummation*" means the occurrence of the Effective Date.

38.     "*Converted L/C Facility Claims*" means the L/C Facility Claims that are converted into the Exit Facility on a dollar-for-dollar basis in accordance with the terms of the L/C Facility.

39.     "*Covia*" means Covia Holdings Corporation.

40.     "*Covia Interests*" means the Interests in Covia.

41.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

42.     "*Debtor*" means one of the Debtors, in its capacity as a debtor and debtor in possession.

43.     "*Debtors*" means, collectively, (a) Covia, (b) Alpha Resins, LLC, (c) Best Sand Corporation, (d) Best Sand of Pennsylvania, Inc., (e) Bison Merger Sub I, LLC, (f) Black Lab LLC, (g) Cheyenne, (h) Construction Aggregates Corporation of Michigan, Inc., (i) Covia Finance Company LLC, (j) Covia Specialty Minerals Inc., (k) Fairmount Logistics, LLC, (l) Fairmount Minerals, LLC, (m) Fairmount Santrol Inc., (n) FML Resin, LLC, (o) FML Sand, LLC, (p) FML Terminal Logistics, LLC, (q) FMSA Inc., (r) Mineral Visions Inc., (s) Self-Suspending Proppant LLC, (t) Shakopee Sand LLC, (u) Specialty Sand LLC, (v) Standard Sand Corporation, (w) TechniSand, (x) Wedron Silica Company, (y) West Texas Housing LLC, (z) Wexford Sand Co., (aa) Wisconsin Industrial Sand Company L.L.C., and (bb) Wisconsin Specialty Sands, Inc., each in its respective capacity as a debtor and debtor in possession in the Chapter 11 Cases.

44.     "*Definitive Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement. Each Definitive Document shall be subject to the Consenting Stakeholder Consent Right.

45.     "*Designated Affiliate*" means any affiliate of a Holder of a Term Loan Claim to whom such Holder assigns (a) such Term Loan Claim and (b) the distributions to be provided pursuant to Article VI.D.3 on account of such Term Loan Claim.

46.     "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Covia Holdings Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 628], as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

47.     "*Disclosure Statement Order*" means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relie*f [Docket No. 683], entered by the Bankruptcy Court on October 13, 2020, approving, among other things, the Disclosure Statement and solicitation procedures with respect to the Plan.

48.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; and (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order.

49.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities designated by the Reorganized Debtors to make or to facilitate distributions that are to be made pursuant to the Plan.

50.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the Debtors and the Required Consenting Stakeholders, or designated in a Final Order; *provided that* any Holder of a Term Loan Claim may assign such Term Loan Claim and the distributions to be provided for hereunder to such Holder on account of such claim to a Designated Affiliate so long as notice thereof is provided to the Term Loan Agent at least two (2) Business Days prior to the Effective Date.

51.     "*D&O Liability Insurance Policies*" means all Insurance Policies that have been issued (or provide coverage) at any time to directors', managers', officers', members', and trustees' liability maintained by the Debtors, the Reorganized Debtors, or the Estates as of the Effective Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

52.     "*DTC*" means The Depository Trust Company or any successor securities clearing agency.

53.      "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

54.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

55.     "*ERISA*" means the Employee Retirement Income Security Act of 1974, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

56.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

57.     "*Excess Cash*" means all Cash on the Company's consolidated balance sheet as of the Measurement Date (inclusive of Cash posted to collateralize letters of credit), minus all fees and expenses expected to be paid by the Debtors to any professional for services rendered on or prior to the Effective Date; *provided that* the amount of Excess Cash shall be reduced to the extent necessary so that both (a) Cash (inclusive of Cash posted to collateralize letters of credit) on the Measurement Date exceeds Minimum Cash at Emergence and (b) Liquidity on the Measurement Date exceeds or is equal to Minimum Liquidity

6

at Emergence.  For the avoidance of doubt, Liquidity on the Measurement Date shall include Liquidity reasonably expected to be available under the Exit Facility, even if such size and terms have not been finalized as of the date that is ten (10) Business Days prior to the Effective Date.

58.　　"*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the Term Loan Agent; (e) the Term Loan Lenders; (f) the L/C Agent; (g) the L/C Facility Lenders; (h) each current and former predecessor, successor, Affiliate (regardless of whether such interests are held directly or indirectly), subsidiary, direct and indirect equityholder, fund, portfolio company, and management company of each Entity in clauses (a) through (g); and (i) each Related Party of each Entity in clauses (a) through (h); *provided that* no current or former Holder of Covia Interests, each in their capacity as such, is an Exculpated Party unless such Holder is also a current director, officer or employee of a Debtor or an Affiliate of a Debtor.

59.　　"*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

60.　　"*Exit Facility*" means the financing to be provided to the Reorganized Debtors on the Effective Date, in the principal amount of at least $100 million, in accordance with the Exit Facility Credit Agreement.

61.　　"*Exit Facility Agent*" means the administrative agent under the Exit Facility Credit Agreement, and any successors thereto in such capacity.

62.　　"*Exit Facility Arranger*" means the financial institution(s), if any, arranging, acting as lead arranger and/or bookrunners for the Exit Facility.

63.　　"*Exit Facility Collateral*" means all of the real, personal, and mixed property identified in the Exit Facility Documents as "Collateral" (or any variation of such term).

64.　　"*Exit Facility Credit Agreement*" means the credit agreement governing the Exit Facility, the form of which shall be included in the Plan Supplement.

65.　　"*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and all other agreements, documents, and instruments related thereto and any other documentation necessary to effectuate the incurrence of the Exit Facility, including any guarantee agreements, pledge and collateral agreements, notes, UCC financing statements or other perfection documents, intercreditor agreements, subordination agreements, fee letters, and other security documents or instruments executed in connection with the Exit Facility.

66.　　"*Exit Facility Lenders*" means each of the lenders under the Exit Facility Credit Agreement, solely in their capacity as such.

67.　　"*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

68.　　"*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim, the Claims, Noticing, and Solicitation Agent.

69.　　"*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

70.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided that* the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

71.      "*Financing Claims Equity Pool*" means 68.3% of the New Common Equity, subject to dilution from the Management Incentive Plan.

72.      "*General Unsecured Claim*" means any Claim against a Debtor that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim, (d) an L/C Facility Claim; (e) an Other Priority Claim; (f) a Term Loan Deficiency Claim; (g) a Swap Agreements Deficiency Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.

73.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

74.      "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

75.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

76.      "*Indemnification Provisions*" means the provisions in place immediately before or as of the Effective Date, whether in a Debtor's bylaws, certificates of incorporation, limited liability company agreement, partnership agreement, management agreement, other formation or organizational document, board resolution, indemnification agreement, contract, or otherwise providing the basis for any obligation of a Debtor as of the Effective Date to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals, and each such Entity's respective Affiliates, as applicable.

77.      "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

78.      "*Insurance Policies*" means all insurance policies that have been issued at any time to or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors), including D&O Liability Insurance Policies, and all agreements, documents, or instruments relating thereto.

79.      "*Insurer*" means any company or other Entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy or self-insured claims, and any respective predecessors, successors and/or affiliates of any of the foregoing.

80.      "*Intercompany Claim*" means any Claim against a Debtor that is held by another Debtor or a direct or indirect subsidiary of a Debtor.

81.  "*Intercompany Interest*" means any Interest in a Debtor that is held by another Debtor or a direct or indirect subsidiary of a Debtor.

82.  "*Interest*" means any equity security as such term is defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

83.  "*Interim Compensation Order*" means the *Order (A) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (B) Granting Related Relief* [Docket No. 305] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

84.  "*IRS*" means the Internal Revenue Service.

85.  "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

86.  "*L/C Facility*" means the letter of credit facility provided for under the L/C Facility Documents.

87.  "*L/C Facility Agreements*" means, collectively, the agreements governing the L/C Facility, such agreements attached to the L/C Order as Annex 1 and Annex 2 thereto.

88.  "*L/C Facility Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the L/C Facility Documents, including, but not limited to, any and all principal amounts outstanding, fees, expenses, costs, other charges and accrued but unpaid interest arising under the L/C Facility Agreement.

89.  "*L/C Facility Documents*" means the L/C Facility Agreement and all other agreements, documents, instruments, and amendments related thereto, including the L/C Order and any guaranty agreements, pledge and collateral agreements, UCC financing statements or other perfection documents, intercreditor agreements, subordination agreements, fee letters, and other security agreements.

90.  "*L/C Facility Lender*" means PNC Bank, National Association, and any successors thereto, solely in its capacity as the issuer of any letters of credit outstanding under the L/C Facility.

91.  "*L/C Order*" means the *Final Order (I) Authorizing Debtors to (A) Terminate the Securitization Facility, (B) Cash Collateralize Existing Letters of Credit Under the Securitization Facility, (C) Enter into Agreements Governing the Existing Letters of Credit and Providing for Future Potential Availability of Additional Letters of Credit, (D) Cash Collateralize Additional Letters of Credit and (II) Granting Related Relief* [Docket No. 339].

92.  "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

93.      "*Liquidity*" means the aggregate of:  (a) total available Cash (inclusive of Cash posted to collateralize letters of credit) on the Company's consolidated balance sheet as of the Measurement Date; and (b) solely as it related to the Exit Facility, the lesser of (i) the total borrowing base or (ii) the total commitment amount under the Exit Facility to be measured on the date that is ten (10) Business Days prior to the Effective Date, in each of the foregoing clauses (i) and (ii) less the face value of any letters of credit outstanding as of the Measurement Date.

94.      "*Management Incentive Plan*" means a post-Effective Date management incentive plan for certain participating employees of the Reorganized Debtors and their Affiliates, to be established and implemented in accordance with Article IV.R of the Plan and in form and substance reasonably acceptable to the Required Consenting Stakeholders, which shall provide for the terms and conditions under which the MIP Pool may be allocated and distributed to certain participating employees of the Reorganized Debtors and Affiliates.

95.      "*Measurement Date*" means the date of the last available month-end balance sheet information as of the date that is ten (10) business days prior to the Effective Date.

96.      "*Minimum Cash at Emergence*" means $75,000,000, which amount will be (i) increased or decreased by the Net Working Capital Adjustment and (ii) increased by the CARES Act Tax Refund Adjustment.

97.      "*Minimum Liquidity at Emergence*" means $175,000,000, which amount will be (i) increased or decreased by the Net Working Capital Adjustment and (i) increased by the CARES Act Tax Refund Adjustment.

98.      "*MIP Pool*" means a pool of cash- and/or equity-based awards, which shall be reserved for distribution to certain participating employees of the Reorganized Debtors or their Affiliates pursuant to the Management Incentive Plan.

99.      "*Net Working Capital Adjustment*" shall have the meaning set forth in the Restructuring Support Agreement.

100.      "*New Board*" means the board of directors or the board of managers of Reorganized Covia.

101.      "*New Common Equity*" means the common equity of Reorganized Covia.

102.      "*New Employment Agreements*" means new employment agreements to be entered into between Reorganized Covia and certain members of the executive management team of Covia identified by the Required Consenting Stakeholders prior to the date the Plan Supplement is first Filed, consistent with the terms set forth in the Restructuring Term Sheet.

103.      "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Covia, including charters, certificates of incorporation, bylaws, operating agreements, or other organizational documents, formation documents, or shareholders' agreements, as applicable, consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable).

104.      "*New Term Loan*" means the $825,000,000 (which amount shall be reduced by the Cash Adjustment) in aggregate principal amount of new secured term loans to be issued pursuant to the Plan and the New Term Loan Documents.

10

105.     "*New Term Loan Agent*" means the administrative agent under the New Term Loan Credit Agreement, and any successors thereto in such capacity.

106.     "*New Term Loan Credit Agreement*" means the credit agreement governing the New Term Loan the form of which shall be included in the Plan Supplement.

107.     "*New Term Loan Documents*" means, collectively, the New Term Loan Agreement, all other agreements, documents, and instruments evidencing or securing the New Term Loan, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents), and any other documentation necessary to effectuate the incurrence of the New Term Loan.

108.     "*New Term Loan Lenders*" means each of the lenders under the New Term Loan Credit Agreement, solely in their capacity as such.

109.     "*Other Priority Claims*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

110.     "*Other Secured Claim*" means a Secured Claim against a Debtor that is not:  (a) an L/C Facility Claim; (b) a Term Loan/Swap Claim; or (c) a Secured Tax Claim.

111.     "*Parent Unsecured Claims Equity Pool*" means 28.4% of the New Common Equity, less the amount of New Common Equity to satisfy any Allowed Adequate Protection Superpriority Claims, and subject to dilution by the Management Incentive Plan.

112.     "*PBGC*" means the Pension Benefit Guaranty Corporation.

113.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

114.     "*Pension Plan*" means the Covia Holdings Corporation Pension Plan.

115.     "*Petition Date*" means June 29, 2020.

116.     "*Plan*" means this *Chapter 11 Plan of Reorganization of Covia Holdings Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* and all exhibits, supplements, appendices, and schedules, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article XI.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

117.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors in accordance with the Disclosure Statement Order or such later date as may be approved by the Bankruptcy Court (as it may thereafter be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law) on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  The Plan Supplement shall be comprised of, among other documents, the following:  (a) the New Organizational Documents; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Retained Causes of Action; (e) if known, the identity of the members of the Reorganized Covia Board; (f) the New

11

Term Loan Agreement; (g) the Exit Facility Agreement; (h) the Restructuring Transactions Exhibit; (i) a description of the material terms of the Management Incentive Plan; (j) the New Employment Agreements; and (k) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

118.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

119.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

120.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

121.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

122.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash as soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

123.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

124.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

125.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

126.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

127.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, Affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

12

128.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Holder of a L/C Facility Claim; (d) each Holder of a Term Loan Claim; (e) each Holder of a Swap Agreements Claim; (f) each Consenting Stakeholder; (g) each of the Term Loan Credit Agreement Agents; (h) with respect to each of the foregoing entities in clauses (a) through (g), such Entity and its current and former Affiliates; and (i) each Related Party of each Entity in clause (a) through (h); *provided that* any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

129.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Holder of a L/C Facility Claim; (d) each Holder of a Term Loan Claim; (e) each Holder of a Swap Agreements Claim; (f) each Consenting Stakeholder; (g) each of the Term Loan Credit Agreement Agents; (h) each Holder of Claims or Interests who (i) votes in favor of the Plan or (ii) abstains from voting, are not entitled to vote, or vote to reject the Plan, *and* in each of subclauses (i) and (ii), does do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; (i) with respect to each of the foregoing entities in clauses (a) through (h), such Entity and its current and former Affiliates; and (j) each Related Party of each Debtor, each Reorganized Debtor, and each Entity in clause (a) through (i); *provided that* any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a  "Releasing Party"; *provided further* that for the avoidance of doubt, no Holder of a Claim that is party to or has otherwise signed the Restructuring Support Agreement may opt out of the releases.

130.    "*Reorganized Covia*" means Covia, as reorganized pursuant to and under the Plan or any successor thereto, as set forth in the Plan and the New Organizational Documents.

131.    "*Reorganized Debtors*" means a Debtor, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

132.    "*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

133.    "*Restructuring Support Agreement*" means that certain Amended and Restated Restructuring Support Agreement and all exhibits and attachments thereto (including the Restructuring Term Sheet), made and entered into as of June 29, 2020, by and among the Debtors and the Consenting Stakeholders (as defined therein), as such may be amended, supplemented, or modified from time to time in accordance with its terms, together with all term sheets, exhibits, annexes, or other documents related thereto.

134.    "*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement.

135.    "*Restructuring Transactions*" means those intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the Plan.

136.    "*Restructuring Transactions Exhibit*" means an exhibit that sets forth the steps to be carried out to effectuate the Restructuring Transactions.

13

137.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of certain Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Reorganized Debtors, as applicable, in accordance with the Plan, which list shall be included in the Plan Supplement.

138.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of certain Executory Contracts and Unexpired Leases to be rejected by the Reorganized Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time by the Debtors or Reorganized Debtors, as applicable, in accordance with the Plan, which list shall be included in the Plan Supplement.

139.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement, *provided that* such schedule shall not include any Causes of Action against any Released Party, and any such inclusion will be deemed void *ab initio*.

140.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

141.     "*SEC*" means the United States Securities and Exchange Commission.

142.     "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

143.     "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

144.     "*Secured Swap Agreements Claims*" means Swap Agreements Claims that are Secured.

145.     "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

146.     "*Secured Term Loan Claims*" means any Term Loan Claims that are Secured.

147.     "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

148.     "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

149. "*Severance Obligations*" means the severance obligations of Covia or Reorganized Covia, as applicable, with respect to certain members of the executive management team of Covia, both prior to and following the Effective Date, consistent with the terms set forth in the Restructuring Term Sheet.

150. "*Swap Agreement Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Swap Agreements, including, but not limited to, any and all principal amounts outstanding, fees, expenses, costs, other charges and accrued but unpaid interest arising under the Swap Agreements.

151. "*Swap Agreements*" means (a) that certain ISDA 2002 Master Agreement, dated as of May 30, 2018, by and among BNP Paribas and Covia, as successor in interest to Unimin Corporation and (b) that certain ISDA Master Agreement, dated as of June 28, 2018, by and among Barclays Bank PLC and Covia.

152. "*Swap Agreements Deficiency Claim*" means the unsecured portion of the Swap Agreements Claim.

153. "*Tax Code*" means the United States Internal Revenue Code of 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

154. "*TechniSand*" means TechniSand, Inc.

155. "*TechniSand Unsecured Claims Equity Pool*" means 2.6% of the New Common Equity, subject to dilution by the Management Incentive Plan.

156. "*Term Loan Agent*" means Barclays Bank PLC as the administrative agent and collateral agent, and any successor agent thereto, under the Term Loan Credit Agreement, and any successors thereto in such capacity.

157. "*Term Loan Agent Fees and Expenses*" means, collectively, all of the reasonable and documented fees and expenses of the Term Loan Agent incurred in connection with the Restructuring Transactions, including the reasonable and documented fees and disbursements of counsel to the Term Loan Agent, (a) in accordance with the pursuant to the terms and conditions of the Term Loan Documents, terms of its applicable engagement letter (if any) or other contractual arrangements with the Company Parties, the Restructuring Support Agreement, and the Plan; and (b) without any requirement for the filing of retention applications or any interim or final fee applications in the Chapter 11 Cases, with any balance(s), including estimates of fees and expenses to be incurred through the Effective Date, paid in full in Cash on the Effective Date.

158. "*Term Loan Claim*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Term Loan Credit Agreement Documents and all Obligations (as defined in the Term Loan Credit Agreement), including, but not limited to, any and all principal amounts outstanding, fees, expenses, costs, other charges and accrued but unpaid interest arising under the Term Loan Credit Agreement, and the Adequate Protection Superpriority Claims.

159. "*Term Loan Credit Agreement*" means that certain Credit and Guaranty Agreement, dated as of June 1, 2018, among Covia, as borrower; certain subsidiaries of Covia, as Guarantors; the Term Loan Lenders; Barclays Bank PLC and BNP Paribas Securities Corp., as joint lead arrangers and joint bookrunners; the Term Loan Agent, as administrative agent and collateral agent; and ABN Amro Capital USA LLC, HSBC Bank USA, National Association, KBC Bank N.V. and PNC Bank, National Association, as co-syndication agents; Keybank National Association and Wells Fargo Bank, N.A., as co-documentation

agents; and Citizens Bank, N.A., as managing agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

160.    "*Term Loan Credit Agreement Agents*" means the Term Loan Agent and any arranger, bookrunner, collateral agent, syndication agent, documentation agent, managing agent, or similar Entity under the Term Loan Credit Agreement, including any successors thereto.

161.    "*Term Loan Credit Agreement Documents*" means, collectively, the Term Loan Credit Agreement and any other Loan Document (as defined in the Term Loan Credit Agreement).

162.    "*Term Loan Deficiency Claim*" means the unsecured portion of the Term Loan Claim that is not an Adequate Protection Superpriority Claim.

163.    "*Term Loan Lenders*" means each of the lenders under the Term Loan Credit Agreement, solely in their capacity as such.

164.    "*Third Party Release*" means the release provided by the Releasing Parties in favor of the Released Parties as set forth in Article VIII.C of the Plan.

165.    "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

166.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

167.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

168.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

169.    "*Voting Deadline*" means November 27, 2020 at 11:59 p.m. prevailing Central Time, or such later date and time as agreed to by the Debtors and the Requisite Consenting Stakeholders.

**B.    Rules of Interpretation**

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (4) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest or Consenting Stakeholder includes that Entity's authorized successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise

16

specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12); unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, to the extent applicable to the Chapter 11 Cases; (13) any effectuating provisions may be interpreted by the Debtors or the  Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (15) all references herein to consent, acceptance, or approval shall (unless otherwise specified) be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which (unless otherwise specified) may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

**C.      Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided that* corporate, limited liability company, or partnership governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.      Consenting Stakeholder Consent Right**

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, the New Employment Agreements, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I) as if stated in full herein.   Failure to reference the rights referred to in the immediately preceding paragraph as such rights related to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

<p align="center"><strong>ARTICLE II.</strong></p>

<p align="center"><strong>ADMINISTRATIVE AND PRIORITY CLAIMS</strong></p>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, L/C Facility Claims, Ad Hoc Term Lender Group Fees and Expenses, Term Loan Agent Fees and Expenses, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise specifically provided in the Plan, and except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment with respect to such Holder, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and L/C Facility Claims) will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Administrative Claim, an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  For the avoidance of doubt, the Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses shall be Allowed Administrative Claims payable on the Effective Date; *provided* that notwithstanding anything to the contrary in this Article II.A, each Holder of Allowed Superiority Claims will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed Adequate Protection Superpriority Claim, an amount of New Common Equity equal to the amount of such Allowed Adequate Protection Superpriority Claim as of the Effective Date.

Except as otherwise provided in this Article II.A, and except for Professional Fee Claims, L/C Facility Claims, and claims for the Ad Hoc Term Lender Group Fees and Expenses and Term Loan

<p align="center">18</p>

Agent Fees and Expenses, and unless previously Filed, requests for payment of Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

**B.    Professional Fee Claims**

   1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Reorganized Debtors shall pay Professional Fee Claims owing to the Professionals in Cash to such Professionals in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that* the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

   2.    <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

   3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five (5) Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses

19

that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided that* the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, for any fees and expenses incurred from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, or the Committee. For any fees and expenses incurred from and after the Confirmation Date, the Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, Reorganized Debtors, and the Committee, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.      L/C Facility Claims

The L/C Facility Claims shall be Allowed as of the Effective Date in an amount equal to (a) the face amount of all letters of credit outstanding under the L/C Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment and (c) any and all accrued and unpaid fees, expenses and indemnification or other obligations of any kind payable under the L/C Facility.

Except to the extent that a Holder of an Allowed L/C Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed L/C Facility Claim, on the Effective Date, each Holder of an Allowed L/C Facility Claim shall, receive either: (a) to the extent clause (b) below does not apply, reinstatement of such L/C Facility Claim, and all liens and security interests on the Cash Collateral Account (as defined in the L/C Order) granted under the L/C Order to secure the obligations arising under the L/C Facility shall continue to remain in effect and be deemed granted to secure the obligations arising under the Exit Facility Documents (or shall have its applicable Letters of Credit cancelled and replaced by a replacement letter of credit as soon as reasonably practicable following the Effective Date), or (b) conversion of such Allowed L/C Facility Claims into Converted L/C Facility Claims, and the letters of credit with respect to such Converted L/C Facility Claims shall upon such conversion become outstanding letters of credit under the Exit Facility and the issuers thereof shall be secured parties under the Exit Facility. If the Allowed L/C Facility Claims become Converted L/C Facility Claims, contemporaneously with such conversion, then such Converted L/C Facility Claims shall have the benefit of all liens and claims granted under the Exit Facility Documents and the L/C Collateral (as defined in the L/C Order) shall be released.

20

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, requests for payment and expenses of professionals compensated pursuant to the L/C Order are not required to be Filed and served other than in compliance with the procedures set forth in the L/C Order.

**D.      Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses**

The Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses shall be Allowed Administrative Claims without the need for any application to the Bankruptcy Court.  On the Effective Date, unless otherwise agreed, the Debtors or the Reorganized Debtors, as applicable, shall pay in full in Cash all outstanding Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses not previously paid without the need for any application or notice to or approval by the Bankruptcy Court.  Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses invoiced after the Effective Date, but covering the period prior to or on the Effective Date, shall be paid by the applicable Reorganized Debtors following receipt of invoices therefor.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses related to implementation, consummation and defense of the Plan, the Plan Supplement, and the Restructuring Transactions.

**E.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

<div align="center">

**ARTICLE III.**

**CLASSIFICATION, TREATMENT,
AND VOTING OF CLAIMS AND INTERESTS**

</div>

**A.      Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is summarized in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below apply separately to each of the Debtors.  Unless otherwise indicated, except to the extent that the Debtors and a Holder of such Allowed Claim or Interest, as applicable, agree to a less favorable treatment, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not

<div align="center">21</div>

then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.[2]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4 | Secured Term/Swap Claims | Impaired | Entitled to Vote |
| 5A | Parent General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5B | TechniSand General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5C | Cheyenne General Unsecured & Deficiency Claims | Impaired | Entitled to Vote |
| 5D | Other General Unsecured & Deficiency Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Covia Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.     Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise,

---

[2]   The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.

1.     <u>Class 1 — Secured Tax Claims</u>

     (a)     *Classification*:  Class 1 consists of all Secured Tax Claims.

     (b)     *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive at the option of the Reorganized Debtors:

          (i)     payment in full in Cash of such Holder's Allowed Secured Tax Claim; or

          (ii)     equal semiannual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under applicable non-bankruptcy law, subject to the option of the applicable Reorganized Debtor to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

     (c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 — Other Secured Claims</u>

     (a)     *Classification*:  Class 2 consists of all Other Secured Claims.

     (b)     *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive at the option of the Reorganized Debtors:

          (i)     payment in full in Cash;

          (ii)     Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default;

          (iii)     delivery of the collateral securing such Allowed Other Secured Claim; or

          (iv)     such other treatment rendering such Allowed Other Secured Claim Unimpaired.

     (c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     Class 3 — Other Priority Claims

(a)     *Classification*:  Class 3 consists of all Other Priority Claims.

(b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive at the option of the Reorganized Debtors:

(i)     Cash in an amount equal to such Allowed Other Priority Claim; or

(ii)     such other treatment rendering such Allowed Other Priority Claim Unimpaired.

(c)     *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.     Class 4 — Secured Term/Swap Claims

(a)     *Classification*:  Class 4 consists of all Secured Term Loan Claims and all Secured Swap Agreements Claims.

(b)     *Allowance*:  The Secured Term Loan Claims shall be Allowed Secured Claims in the amount of $1,039,473,399.80, and the Secured Swap Agreements Claims shall be Allowed Secured Claims in the amount of $23,573,550.50.

(c)     *Treatment*:  Each Holder of an Allowed Secured Term Loan Claim or an Allowed Secured Swap Agreements Claim, respectively, shall receive its Pro Rata share of:

(i)     the Excess Cash;

(ii)     the New Term Loan; and

(iii)     the Financing Claims Equity Pool.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Therefore, Holders of Allowed Term Loan Claims and Allowed Secured Swap Agreements Claims are entitled to vote to accept or reject the Plan.

5.     Class 5A — Parent General Unsecured & Deficiency Claims

(a)     *Classification:*  Class 5A consists of all Claims against Covia that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims.

(b)     *Allowance*:  The Term Loan Deficiency Claims against Covia shall be Allowed Claims in an amount equal to $539,500,799.77, minus the aggregate amount of any Allowed Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Term Loan Deficiency Claims.  The Swap Agreements Deficiency Claims against Covia shall be Allowed Claims in an amount equal to $12,234,992.59, minus the aggregate amount of any Allowed

24

Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Swap Agreements Deficiency Claims.

(c) *Treatment*:  Each Holder of a Claim against Covia that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Parent Unsecured Claims Equity Pool.

(d) *Voting:*  Class 5A is Impaired under the Plan.  Therefore, Holders of Allowed Claims against Covia that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims are entitled to vote to accept or reject the Plan.

6. Class 5B — TechniSand General Unsecured & Deficiency Claims

(a) *Classification:*  Class 5B consists of all Claims against TechniSand that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims.

(b) *Allowance*:  The Term Loan Deficiency Claims against TechniSand shall be Allowed Claims in an amount between $539,500,799.77 and $1,562,790,683.68, minus the aggregate amount of any Allowed Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Term Loan Deficiency Claims.  The Swap Agreements Deficiency Claims against TechniSand shall be Allowed Claims in an amount between $12,234,992.59 and $35,441,527.52, minus the aggregate amount of any Allowed Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Swap Agreements Deficiency Claims.[3]

(c) *Treatment:*  Each Holder of a Claim against TechniSand that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the TechniSand Unsecured Claims Equity Pool.

(d) *Voting:*  Class 5B is Impaired under the Plan.  Therefore, Holders of Allowed Claims against TechniSand that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims are entitled to vote to accept or reject the Plan.

7. Class 5C — Cheyenne General Unsecured & Deficiency Claims

(a) *Classification:*  Class 5C consists of all Claims against Cheyenne that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims.

---

[3] Holders of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims assert that their Term Loan Deficiency Claims and Swap Agreements Deficiency Claims should be separately calculated at TechniSand based on the positive difference between (a) the total face amount of the Term Loan Claims and Swap Agreements Claims and (b) the aggregate amount of the distributable value at such Debtor entity that is Collateral Value. The rights of all parties in interest regarding the amount of such Holders' Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against TechniSand are reserved.

(b) *Allowance*:  The Term Loan Deficiency Claims against Cheyenne shall be Allowed Claims in an amount between $539,500,799.77 and $1,573,938,196.12, minus the aggregate amount of any Allowed Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Term Loan Deficiency Claims. The Swap Agreements Deficiency Claims against Cheyenne shall be Allowed Claims in an amount between $12,234,992.59 and $35,694,334.80, minus the aggregate amount of any Allowed Adequate Protection Superpriority Claims as of the Effective Date and that are held by Holders of Swap Agreements Deficiency Claims.[4]

(c) *Treatment:*  Each Holder of a Claim against Cheyenne that is an Allowed General Unsecured Claim, Term Loan Deficiency Claim, or Swap Agreements Deficiency Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of the Cheyenne Unsecured Claims Equity Pool.

(d) *Voting:*  Class 5C is Impaired under the Plan.  Therefore, Holders of Allowed Claims against Cheyenne that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims are entitled to vote to accept or reject the Plan.

8. Class 5D — Other General Unsecured & Deficiency Claims

(a) *Classification:*  Class 5D consists of all Claims against Debtors other than Covia, TechniSand, and Cheyenne that are General Unsecured Claims, Term Loan Deficiency Claims, and Swap Agreements Deficiency Claims.

(b) *Treatment:*  All Other General Unsecured & Deficiency Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Other General Unsecured & Deficiency Claims will not receive any distribution on account of such Allowed Other General Unsecured & Deficiency Claims.

(c) *Voting:*  Class 5D is Impaired under the Plan.  Holders of Other General Unsecured & Deficiency Claims, if any, are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9. Class 6 — Intercompany Claims

(a) *Classification*:  Class 6 consists of all Intercompany Claims.

(b) *Treatment*:  All Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, either

---

[4]  Holders of Term Loan Deficiency Claims and Swap Agreements Deficiency Claims assert that their Term Loan Deficiency Claims and Swap Agreements Deficiency Claims should be separately calculated at Cheyenne based on the positive difference between (a) the total face amount of the Term Loan Claims and Swap Agreements Claims and (b) the aggregate amount of the distributable value at such Debtor entity that is Collateral Value. The rights of all parties in interest regarding the amount of such Holders' Term Loan Deficiency Claims and Swap Agreements Deficiency Claims against Cheyenne are reserved.

26

Reinstated or distributed, contributed, set off, settled, cancelled, released, or otherwise addressed.

(c)     *Voting*:  Holders of Intercompany Claims are either:  (i) Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code; or (ii) Impaired, and such Holders of Intercompany Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10.     Class 7 — Intercompany Interests

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment*:  All Intercompany Interests shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders, either Reinstated in accordance with Article III.G of the Plan, distributed, contributed, or cancelled, released, or otherwise addressed.

(c)     *Voting*:  Holders of Intercompany Interests are either:  (i) Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code; or (ii) Impaired, and such Holders of Intercompany Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11.     Class 8 — Covia Interests

(a)     *Classification*:  Class 8 consists of all Covia Interests.

(b)     *Treatment*:  On the Effective Date, Covia Interests will be cancelled, released, and extinguished without any distribution on account of such Covia Interests.

(c)     *Voting*:  Class 8 is Impaired under the Plan and Holders of Class 8 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Interests are therefore not entitled to vote to accept or reject the Plan.

12.     Class 9 — Section 510(b) Claims

(a)     *Classification*:  Class 9 consists of all Section 510(b) Claims.

(b)     *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim may only become Allowed by Final Order of the Bankruptcy Court.

(c)     *Treatment*:  All Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

27

(d)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Section 510(b) Claims, if any, are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## D.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

## E.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

## F.     Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## G.     Intercompany Interests

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims and Interests that receive New Common Equity under the Plan, and the Intercompany Interests shall receive no recovery or distribution.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications in the Restructuring Transactions Exhibit).

## H.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to

28

render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### B.    Restructuring Transactions

On or before the Effective Date, the applicable Debtors or Reorganized Debtors, with the consent of the Required Consenting Stakeholders, will, among other things, enter into any transaction, including those transactions set forth in the Restructuring Transactions Exhibit, and will take any action as may be necessary or advisable to effect the transactions described in the Plan, including, as applicable, the issuance, transfer, or cancellation of any assets, securities, notes, instruments, certificates, and other documents required to be issued, transferred, or cancelled pursuant to the Plan or any Restructuring Transaction.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (4) the execution and delivery of the New Term Loan Documents, and any filing related thereto; (5) the execution and delivery of the Exit Facility Documents, and any filing related thereto; and (6) all other actions that the applicable Debtors or the Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

29

C.      **Sources of Consideration for Plan Distributions**

Distributions under the Plan will be funded with, or effectuated by, as applicable, (1) Cash held on the Effective Date by or for the benefit of the Debtors, (2) the issuance of the New Common Equity, (3) the issuance of the New Term Loan, and (4) the issuance of or borrowings under the Exit Facility Credit Agreement.

D.      **Issuance of the New Term Loan**

On the Effective Date, Reorganized Covia and its applicable Affiliates will execute the New Term Loan Documents, pursuant to which Reorganized Covia (or a specified Debtor Affiliate) will issue the New Term Loan to applicable Holders of Claims in partial exchange for such Holders' respective Claims as set forth in Article III.C hereof.  The issuance of the New Term Loan is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims or Interests. All Holders of Allowed Term Loan Credit Agreement Claims entitled to distributions of the New Term Loan hereunder shall be deemed to be a party to, and bound by, the applicable New Term Loan Documents, regardless of whether such Holder has executed a signature page.  On the Effective Date, all of the Liens, guarantees, and security interests to be granted in accordance with the New Term Loan Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Term Loan Documents, (3) shall be deemed perfected on the Effective Date and (4) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

Subject to the occurrence of the Effective Date, the New Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Covia and its applicable Affiliates party thereto and shall be enforceable in accordance with their respective terms.  Each distribution and issuance of the New Term Loan under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of the New Term Loan by any Holder of any Claim shall be deemed as such Holder's agreement to the New Term Loan Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

The Reorganized Debtors and the Holders (or the agent for the Holders) that are granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.      **The Exit Facility**

On the Effective Date, the applicable Reorganized Debtors and certain Affiliates shall enter into the Exit Facility Documents, including any documents required in connection with the creation or perfection of Liens in connection therewith.  The Confirmation Order shall include approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection

30

therewith, authorization of the Reorganized Debtors to enter into, execute, and perform under the Exit Facility Documents and all related documents and agreements to the extent a party thereto, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to any Claims, Causes of Action, avoidance, reduction, recharacterization, subordination (whether contractual or otherwise), cross claim, disallowance, impairment, objection, or challenges under any applicable law or regulation by any Person for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.

The lenders (or the agent for the lenders) under the Exit Facility shall have valid, binding, and enforceable Liens on the Exit Facility Collateral in accordance with the Exit Facility Documents. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Exit Facility Documents are granted in good faith as an inducement to the lenders under the Exit Facility to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, recharacterization, or subordination (whether contractual or otherwise) for any purposes whatsoever, and the priorities of any such Liens and security interests shall be as set forth in the relevant Exit Facility Documents. The Reorganized Debtors and the Persons and entities granted such Liens are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

**F.      Issuance and Distribution of New Common Equity**

All Covia Interests shall be canceled on the Effective Date and Reorganized Covia shall issue the New Common Equity to Holders of Claims entitled to receive the New Common Equity pursuant to the Plan in the proportions set forth in the Plan. The issuance of New Common Equity shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors or by Holders of any Claims or Interests, as applicable. All New Common Equity issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. For the avoidance of doubt, the acceptance of New Common Equity by any Holder of any Claim or Interest shall be deemed as such Holder's agreement to the New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with its terms.

**G.      Management of Reorganized Covia**

Prior to the Effective Date, the Debtors shall enter into the New Employment Agreements, with certain members of the executive management team of Covia identified by the Required Consenting Stakeholders and notified prior to the date the Plan Supplement is first Filed, which shall be effective as to the Reorganized Debtors as of the Effective Date. Members of the executive management team of Covia that are not identified and notified by the Required Consenting Stakeholders prior to the date the Plan Supplement is first Filed shall not enter into New Employment Agreements, and shall be entitled to receive the Severance Obligations.

31

### H.      Exemption from Registration Requirements

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Common Equity, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) to the extent that such exemption under section 1145 of the Bankruptcy Code is not available (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Securities issued in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable (subject to any restrictions in the New Organizational Documents) by any holder thereof that, at the time of transfer, (1) is not an "affiliate" of Reorganized Covia as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, (3) has not acquired such securities from an "affiliate" within one year of such transfer and (4) is not an entity that is an "underwriter."

To the extent issuance under Section 1145(a) of the Bankruptcy Code is unavailable and Securities issued under the Plan must instead be issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and applicable state and local securities law.

**The Debtors recommend that potential recipients of Securities issued under the Plan consult their own counsel concerning their ability to freely trade such Securities in compliance with the federal securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a Person to dispose of such Securities.**

Should Reorganized Covia elect, on or after the Effective Date, to reflect any ownership of the Securities issued pursuant to the Plan through the facilities of DTC, Reorganized Covia need not provide to DTC any further evidence other than the Plan or the Confirmation Order with respect to the treatment of such securities under applicable securities laws. Notwithstanding anything to the contrary in the Plan, no Entity, including, for the avoidance of doubt, DTC, shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer to the holders of the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### I.      Cancellation of Existing Securities and Agreements

On the Effective Date, except with respect to the Exit Facility, the New Term Loan, or as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, Certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in,

32

the Debtors giving rise to any rights or obligations relating to Claims against or Interests in the Debtors (except with respect to any Claim or Interest that is Reinstated pursuant to the Plan) shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; *provided that*, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or Confirmation Order, Confirmation, or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of:  (1) allowing Holders to receive distributions as specified under the Plan; and (2) allowing and preserving the rights of the Term Loan Credit Agreement Agents, as applicable, to make distributions as specified under the Plan on account of Allowed Claims and Allowed Interests, as applicable.

## J.      Holders of Royalty Interests

The legal and equitable rights, interests, defenses, and obligations of holders of certain royalty interests related to the Debtors' business activities and owners of royalty and other interests in the Debtors' extracted minerals, and holders of claims related to royalty interests shall not be Impaired in any manner by the provisions of the Plan.  Nor shall anything in the Plan impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors.  To the extent applicable, such Claims or Interests shall be Reinstated pursuant to the Plan.

Notwithstanding the foregoing, nothing in this Article IV.J shall limit the Debtors' rights to reject any Executory Contract or Unexpired Lease in accordance with the Bankruptcy Code or pursuant to Article V hereof.

## K.      Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

## L.      New Organizational Documents

To the extent advisable or required under the Plan or applicable non-bankruptcy law, on the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Exhibit, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation or formation in accordance with the applicable corporate or formational laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend, amend and restate, supplement, or modify the New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation or formation and the New

33

Organizational Documents.  The executive management team of Covia must be consulted with respect to the post-emergence governance of Reorganized Covia.

**M.**      **New Board**

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the members of the New Board will be identified at or prior to the Confirmation Hearing.  The constitution and size of the New Board shall be determined by the Required Consenting Stakeholders; *provided that* the Reorganized Board shall include the Chief Executive Officer of Reorganized Covia.  The executive management team of Covia must be consulted with respect to the composition of the New Board.  To the extent any such Person is an Insider, the Debtors also will disclose the nature of any compensation to be paid to such Person.  Each such Person shall serve from and after taking office pursuant to the terms of the applicable New Organizational Documents.

**N.**      **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1)  implementation of the Restructuring Transactions; (2) formation by the Debtors or such other party as contemplated in the Plan, Plan Supplement, or Confirmation Order, of Reorganized Debtors, and any transactions related thereto; (3) selection of, and the election or appointment (as applicable) of, the directors, managers, members, and officers for the Reorganized Debtors; (4) adoption of and entry into any employment agreements, including the New Employment Agreements; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for or contemplated in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.

On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Term Loan Documents, the Exit Facility Documents, the New Employment Agreements, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

**O.**      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, or entered into in connection with or pursuant to, the Plan, on the Effective Date,

34

all property in each Debtor's Estate, all Causes of Action of the Debtors (unless otherwise released or discharged pursuant to the Plan or other settlement), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Term Loan Documents, the L/C Facility, and Exit Facility Documents, and Liens securing obligations on account of any Other Secured Claims that are Reinstated pursuant to the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**P.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**Q.      Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Entity) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Term Loan and the Exit Facility; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**R.      Management Incentive Plan**

The Debtors, with the consent of the Required Consenting Stakeholders, shall establish the aggregate percentage of the Management Incentive Plan, which shall be disclosed in the Plan Supplement. Immediately prior to the Effective Date, the Debtors shall reserve the equity portion of the MIP Pool consistent with the Plan Supplement.  Within 90 days following the Effective Date, the New Board shall: (i) otherwise determine the terms and conditions of the Management Incentive Plan, (ii) implement the

Management Incentive Plan, and (iii) approve of the grant of certain awards under the Management Incentive Plan.

### S.        Employee Matters

Unless otherwise provided herein, including with regard to the New Employment Agreements, or otherwise amended or modified as set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases, all employee wages, compensation, benefit, and incentive programs and arrangements in place as of the Effective Date with the Debtors, including any Severance Obligations, shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Upon confirmation of the Plan of Reorganization, the Pension Plan will remain in effect in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder).  Therefore, as a result, PBGC shall be deemed to have withdrawn as of the Effective Date with prejudice any contingent proofs of Claim or other Claims filed by PBGC against the Debtors with respect to the Pension Plan without incurring liability in the bankruptcy and without any further action of the Debtors or the Reorganized Debtors or PBGC and without any further action, order, or approval of the Bankruptcy Court.

Prior to the Effective Date, Reorganized Covia shall have entered into the New Employment Agreements in accordance with Article IV.G of the Plan.

### T.        Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

Except as otherwise provided for in the Plan, the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan, or pursuant to a Final Order.**  Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

36

Except as otherwise provided for in the Plan, the Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. Except as otherwise provided for in the Plan, the applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. Except as otherwise provided for in the Plan, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (including those set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases) shall be deemed assumed as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed, assumed and assigned, or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; or (4) is the subject of a motion to reject that is pending on the Effective Date. On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases identified in this Article V.A of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or

37

deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Reorganized Debtors, as applicable, no later than 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.E of the Plan, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent, or disputed.**  All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided that* the Reorganized Debtors may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity; *provided further* that notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any such dispute and approving the assumption of any such Executory Contract or Unexpired Lease, the

38

Reorganized Debtors shall have the right to reject any such Executory Contract or Unexpired Lease that is subject to dispute, whether by amending the Schedule of Rejected Executory Contracts and Unexpired Leases in accordance with Article V.A of the Plan or otherwise.

At least seven (7) days prior to the first day of the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment and proposed cure amounts to be sent to applicable third parties, which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors no later than the time specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

E.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan or as otherwise agreed between the Parties thereto, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      **Indemnification Provisions**

On and as of the Effective Date, the Indemnification Provisions will be assumed by the Debtors, and shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date, and the Reorganized Debtors' governance documents shall provide for indemnification, defense, reimbursement, and limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former directors, equityholders, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals to the fullest extent permitted by law and at least to the same extent as provided under the Indemnification Provisions against any Cause of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  None of the Reorganized Debtors will amend or restate their respective governance documents before, on, or after the Effective Date

to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such rights to indemnification, defense, reimbursement, limitation of liability, or advancement of fees and expenses. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Indemnification Provisions.

## G.      Insurance Policies

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (1) on the Effective Date, the Insurance Policies shall be treated as and deemed to be Executory Contracts under the Plan, and unless otherwise provided in the Plan, each of the Debtors shall be deemed to have assumed all Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code, and such Insurance Policies shall re-vest in the applicable Reorganized Debtor unaltered, and the Reorganized Debtors shall remain liable in full for all of their and the Debtors' obligations thereunder, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any Cure amount, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Insurance Policies; (2) on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit, or restrict the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtors who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date, and notwithstanding anything to the contrary in the Plan, all of the Debtors' current and former directors', managers', officers', members', and trustees' rights as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein and in accordance with the terms of the D&O Liability Insurance Policies; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or Entity, as applicable, under the Insurance Policies, and all such rights and obligations shall be determined under the Insurance Policies and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred; and (4) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct action claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (iii) all costs in relation to each of the foregoing; (c) the Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) in each instance in accordance with the terms of the Insurance Policies; and (d) the Insurers to cancel any Insurance Policy, and take other actions relating to the Insurance Policies (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

**H.**      **Reservation of Rights**

Neither the exclusion nor the inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan, including by rejecting such contract or lease effective as of the Confirmation Date.

**I.**      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**J.**      **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by the entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**      **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan or the Confirmation Order, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.**      **Distribution Agent.**

All distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of

41

its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

## C.     Rights and Powers of Distribution Agent

### 1.     Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

### 2.     Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual and documented attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

## D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.     Distributions Generally

Except as otherwise provided herein, the Distribution Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further*, *however*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

Unless otherwise agreed, distributions to Holders of Term Loan Claims under the Plan shall be made to the Term Loan Agent.  The Reorganized Debtors shall reimburse the Term Loan Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

### 2.     Distributions on Account of Obligations of Multiple Debtors

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed claim plus applicable interest, if any.

For all purposes associated with distributions under the Plan on account of any Secured Term Loan Claims or Secured Swap Agreements Claims in Class 4, all guarantees by any Debtor of the

obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.      Record Date of Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, distributions to Holders of Allowed Secured Term Loan Claims shall be made to such Holders that are listed on the register or related document maintained by the Term Loan Agent as of the Distribution Record Date; *provided that* any Holder of a Term Loan Claim may assign such Term Loan Claim and the distributions to be provided for hereunder to such Holder on account of such claim to one or more Designated Affiliates so long as notice thereof is provided to the Term Loan Agent and Covia at least two (2) Business Days prior to the Effective Date; *provided further* that the New Term Loan Credit Agreement shall permit such Holder or its Designated Affiliate to assign all or a portion of its interest in the New Term Loan to an Affiliate by executing and delivering an assignment agreement to the New Term Loan Agent in accordance with the terms of the New Term Loan Credit Agreement, but without the consent of Reorganized Covia or the New Term Loan Agent.

4.      Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim or Disputed Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all of the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided that*, if the Reorganized Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Disputed Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims and Allowed Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.      De Minimis Distributions; Minimum Distributions

No fractional units or amounts of New Common Equity or the New Term Loan shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts, and such fractional amount shall be deemed to be zero. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance of a number of units or amounts of New Common Equity or the New Term Loan that is not a whole number, the actual distribution of units or amounts of New Common Equity or the New Term Loan shall be rounded as follows:  (a) fractions of greater than one-half shall be rounded to the next higher whole number; and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units or amounts of New

43

Common Equity or the New Term Loan to be distributed to Holders of Allowed Claims and Interests shall be adjusted as necessary to account for the foregoing rounding.

The Distribution Agent shall not make any distributions to a Holder of an Allowed Claim or an Allowed Interest on account of such Allowed Claim or Allowed Interest of New Common Equity, the New Term Loan, or Cash where such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $100.00, and each Claim or Interest to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against or Interest in the Reorganized Debtors or their property.

6.    Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the later of (x) the Effective Date and (y) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall be discharged and forever barred.

7.    Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, Automated Clearing House, or credit card, or as otherwise provided in applicable agreements.

**E.    Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and any Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**F.    Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S.

dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### G.      Claims Paid or Payable by Third Parties

#### 1.       Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor (or other Distribution Agent), as applicable.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor (or other Distribution Agent), as applicable, on account of such Claim, such Holder shall, within 10 Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 10-Business Day grace period specified above until the amount is repaid.

#### 2.       Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim may be expunged to the extent of any such payment on the Claims Register by the Claims, Noticing, and Solicitation Agent without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 3.       Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Policies or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such Insurers under the applicable Insurance Policies, and applicable non-bankruptcy law.

### H.      Setoffs and Recoupment

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim (other than Allowed Term Loan Claims), any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim (other than Allowed Term Loan Claims) to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the

45

Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## I.        Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim, if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

## A.        Resolution of Disputed Claims

### 1.        Allowance of Claims and Interests

On and after the Effective Date, each of the Reorganized Debtors shall have and shall retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date, including any Cause of Action retained pursuant to Article IV.T of the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against or Interest in any Debtor shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

### 2.        Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority:  (a) to File, withdraw, or litigate to judgment, objections to Disputed Claims against or Disputed Interests in any of the Debtors; (b) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

46

3.      Estimation of Claims

Before or after the Effective Date, in consultation with the Required Consenting Stakeholders, the Debtors or the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Disputed Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Disputed Claim; *provided that* such limitation shall not apply to Disputed Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Disputed Claim is estimated.

Each of the foregoing Disputed Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**B.      Time to File Objections to Disputed Claims and Disputed Interests.**

Any objections to Disputed Claims and Disputed Interests shall be Filed on or before the later of (1) the first Business Day following the date that is 180 days after the Effective Date and (2) such later date as may be specifically fixed by the Bankruptcy Court.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

**C.      Disputed Claims**

After the Effective Date, the Reorganized Debtors shall (directly or indirectly) issue New Common Equity to Holders of Claims ultimately determined to be Allowed after the Effective Date (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan.

New Common Equity (or other property) may be either (1) deposited into a Disputed Claims reserve (rather than being issued directly by the Reorganized Debtors to Holders as Claims are resolved) or (2) issued out of "treasury stock" by the Reorganized Debtors directly to Holders as Claims are resolved; *provided that* the amount of New Common Equity (or other property) to be deposited into the Disputed Claims reserve (if any) shall be (a) mutually acceptable to the Debtors, the Committee and the Required Consenting Stakeholders or (b) otherwise determined by an order of the Bankruptcy Court.  Such method for the issuance of New Common Equity has not yet been determined. To the extent that any Property is deposited into a Disputed Claims reserve (*i.e.*, under clause (1) above), such Disputed Claims reserve will

47

be subject to "disputed ownership fund" treatment under section 1.468B-9 of the Treasury regulations promulgated under the Tax Code. All corresponding elections with respect to such Disputed Claims reserves shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to any Disputed Claims reserve, and any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such Disputed Claims reserves shall be paid out of the assets of the Disputed Claims reserves (and reductions shall be made to amounts disbursed from the Disputed Claims reserve to account for the need to pay such taxes).

## D.      Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## E.      No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against or Interests in the Debtors, and no Holder of a Claim against or Interest in the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## F.      Disallowance of Claims

Except as otherwise expressly provided for herein, all Claims of any Entity from which property is recoverable, based on an order from the Bankruptcy Court, under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that is avoidable, based on an order from the Bankruptcy Court, under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered by the Bankruptcy Court and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.

Subject in all respects to Article V.F, all Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein, agreed to by the Reorganized Debtors or otherwise pursuant to an order of the Bankruptcy Court, all Proofs of Claim Filed after the applicable Claims Bar Date shall be deemed disallowed in full and expunged as of the Effective Date, forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

**G.      Amendments to Proofs of Claim**

A Proof of Claim against any Debtor may be amended before the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or Interest or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, or applicable nonbankruptcy law.  On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors or Reorganized Debtors, as applicable; *provided that* the foregoing shall not apply to Administrative Claims other than 503(b)(9) Claims.

**H.      Distributions after Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

## ARTICLE VIII.

## DISCHARGE, RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.      Discharge of Claims and Termination of Interests**

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based

49

upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B.      Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to or related to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

This Article VIII.B shall not operate to waive or release any right, Claim, or Cause of Action (i) in favor of any Debtor or Reorganized Debtor, as applicable, arising in the ordinary course of business under any contractual obligation owed to such Debtor or Reorganized Debtor (including any such accounts receivables obligations carried on the Debtors' books and records and any such obligations under any Executory Contract or Unexpired Lease assumed by a Debtor or Reorganized Debtor, as applicable) that is not satisfied or discharged under the Plan or (ii) as expressly set forth herein, any Definitive Documents, the Confirmation Order, or the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      Releases by Holders of Claims and Interests

On and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or any Definitive Document, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or

51

the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the Definitive Documents, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Nothing in the Plan, the Confirmation Order, or Section 1141 of the Bankruptcy Code shall be construed as discharging, releasing or relieving the Reorganized Debtors, or their successors, from any liability imposed under ERISA or the Tax Code with respect to the Pension Plan solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability as a result of the Plan or Confirmation Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above provided by any Holders of Covia Interests (other than Covia Interests held by SRC-Sibelco NV and its Affiliates) do not release any Entity from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

D.     Exculpation

Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim or Interest related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have,

participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.      Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, or compromised pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party from enforcing their rights under the Plan or under any document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan, including by bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan.

F.      Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, the New Term Loan Documents, the Exit Facility Documents, the L/C Facility (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan,

**all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than, solely in the event that the Allowed L/C Facility Claims become Converted L/C Facility Claims) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Reorganized Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

### G. Protection against Discriminatory Treatment

To the maximum extent provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including no Governmental Unit, shall discriminate against any Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### H. Recoupment

In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### I. Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### J. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**K.        Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**L.        Release of Preference Actions**

As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law; *provided that*, except as expressly provided in this Article VIII or otherwise in the Plan, or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.

**M.        Reservation of Rights of the SEC**

Nothing in the Plan or Confirmation Order (i) releases any non-Debtor Entity from any Claim or Cause of Action of the SEC or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, Causes of Action, proceedings, or investigations against any non-Debtor Entity in any forum.

**ARTICLE IX.**

**EFFECT OF CONFIRMATION OF THE PLAN**

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

**A.        Jurisdiction and Venue**

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

**B.        Order Approving the Disclosure Statement**

On October 13, 2020, the Bankruptcy Court entered the Disclosure Statement Order, which, among other things, (a) approved the Disclosure Statement as containing adequate information within the meaning

55

of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

### C.        Voting Report

Prior to the Confirmation Hearing, the Claims, Noticing, and Solicitation Agent Filed the Voting Report.  All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

### D.        Judicial Notice

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing).  Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

### E.        Transmittal and Mailing of Materials; Notice

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article VIII of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002, (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Disclosure Statement Order, and such transmittal and service were appropriate, adequate, and sufficient. Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

### F.        Solicitation

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations.  The Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan.  The Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of New Common Equity and any debt securities that were offered or sold under the Plan and, pursuant to section 1125(e) of the Bankruptcy Code, and no Released Party is or shall be liable on account of such solicitation for violation of any applicable law, rule,

56

or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such debt securities.

### G.    Burden of Proof

The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.  The Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

### H.    Bankruptcy Rule 3016(a) Compliance

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

### I.    Compliance with the Requirements of Section 1129 of the Bankruptcy Code

The Plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1.    <u>Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

(a)    Standing

Each of the Debtors has standing to file a plan and the Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

(b)    Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, L/C Facility Claims, and Priority Tax Claims, which are not required to be classified.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

(c)    Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan specifies all Classes of Claims and Interests that are not Impaired.

(d)    Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, Article III Article III of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

(e)    No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a

particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

(f)     Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Immediately upon the Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Effective Date pursuant to the terms of the Plan.  Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

(g)     Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The New Organizational Documents comply with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

(h)     Impairment/Unimpairment of Classes of Claims and Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code:  (i) Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), and Class 3 (Other Priority Claims) are Unimpaired under the Plan:  (ii) Class 3 (Secured Term/Swap Claims), Class 5A (Parent General Unsecured & Deficiency Claims), Class 5B (TechniSand General Unsecured & Deficiency Claims), Class 5C (Cheyenne General Unsecured & Deficiency Claims), Class 5D (Other General Unsecured & Deficiency Claims), Class 8 (Covia Interests), and Class 9 (Section 510(b) Claims) are Impaired under the Plan, and (iii) Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) are either Unimpaired or Impaired under the Plan.

(i)     Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to Article V of the Plan, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed unless such Executory Contract or Unexpired Lease is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b) of the Bankruptcy Code.

The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan.  Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

(j)     Settlement of Claims and Causes of Action

58

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Specifically, the settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (iii) the proportion of creditors and parties in interest that support the settlement; (iv) the competency of counsel reviewing the settlement; the nature and breadth of releases to be obtained by officers and directors; and (v) the extent to which the settlement is the product of arm's-length bargaining.

(k)     Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure Costs identified in the Schedule of Assumed Executory Contracts and Unexpired Leases and any amendments thereto, as applicable, represent the amount, if any, that the Debtors propose to pay in full and complete satisfaction of such default claims.  Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

(l)     Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, procedures governing cure disputes, and (v) indemnification obligations.

2.     Section 1129(a)(2) — Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.  In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.  Furthermore, the solicitation of acceptances or rejections of the Plan was: (a) pursuant to the Disclosure Statement Order; (b) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (c) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.  Accordingly, the Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

59

3. <u>Section 1129(a)(3) — Proposal of Plan in Good Faith</u>

The Debtors have proposed the Plan in good faith and not by any means forbidden by law based on the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize.

4. <u>Section 1129(a)(4) — Bankruptcy Court Approval of Certain Payments as Reasonable</u>

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved. The fees and expenses incurred by Professionals retained by the Debtors or the Committee shall be payable according to the orders approving such Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.

5. <u>Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy</u>

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the individuals proposed to serve on the New Board and each such individual's compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement), and the appointment to, or continuance in, such office of such Person is consistent with the interests of Holders of Claims and Interests and with public policy.

6. <u>Section 1129(a)(6) — Approval of Rate Changes</u>

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the Debtors.

7. <u>Section 1129(a)(7) — Best Interests of Creditors and Interest Holders</u>

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits Filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8. <u>Section 1129(a)(8) — Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class</u>

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.  Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Claims, Professional Fee Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10.  Section 1129(a)(10) — Acceptance by at Least One Impaired Class

At least one Impaired Class has voted to accept the Plan.  Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11.  Section 1129(a)(11) — Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  Based upon the evidence proffered or adduced at, or prior to, or in affidavits Filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except as such liquidation is proposed in the Plan.  Furthermore, the Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12.  Section 1129(a)(12) — Payment of Bankruptcy Fees

Article II.E of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13.  Section 1129(a)(13) — Retiree Benefits

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

14.  Section 1129(a)(14) — Domestic Support Obligations

The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

15.  Section 1129(a)(15) — The Debtors Are Not Individuals

The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

16.  Section 1129(a)(16) — No Applicable Nonbankruptcy Law Regarding Transfers

Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

17.  Section 1129(b) — Confirmation of Plan Over Rejection of Impaired Classes

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any).  To determine whether a plan is "fair and equitable" with respect to a

61

class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property." To determine whether a plan is "fair and equitable" with respect to a class of interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property." There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

18.     Section 1129(c) — Confirmation of Only One Plan With Respect to the Debtors

The Plan is the only plan that has been Filed in these Chapter 11 Cases with respect to the Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

19.     Section 1129(d) — Principal Purpose Not Avoidance of Taxes

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

20.     Section 1129(e) — Small Business Case

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

**J.     Securities Under the Plan**

Pursuant to the Plan, and without further corporate or other action, the New Common Equity and any debt issued or assumed by the Reorganized Debtors will be issued or entered into, as applicable, on the Effective Date subject to the terms of the Plan.

**K.     Releases and Discharges**

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims and Interests, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (i) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (ii) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (iii) is an integral element of the transactions incorporated into the Plan; (iv) confers material benefit on, and is in the best interests of, the Debtors, their estates, and their creditors; (v) is important to the overall objectives of the Plan to finally resolve all Claims and Interests among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (vi) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (vii) given and made after due notice and opportunity for hearing; and (viii), without limiting the foregoing, with respect to the releases and injunctions in Article VIII of the Plan, are (A) essential elements of the Restructuring Transactions and Plan, terms and conditions without which the Consenting Stakeholders would not have entered into the Restructuring Support Agreement, (B) narrowly tailored, and (C) in consideration of the substantial financial contribution of the Consenting Creditors under the Plan. Furthermore, the injunction set forth in Article VIII is an essential component of

62

the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

**L.      Release and Retention of Causes of Action**

It is in the best interests of Holders of Claims and Interests that the provisions in Article VIII of the Plan be approved.

**M.      Approval of Restructuring Support Agreement and Other Restructuring Documents and Agreements**

All documents and agreements necessary to implement the Plan, including the Restructuring Support Agreement, are essential elements of the Plan, are necessary to consummate the Plan and the Restructuring Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

**N.      Confirmation Hearing Exhibits**

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

**O.      Objections to Confirmation of the Plan**

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

**P.      Retention of Jurisdiction**

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

**Q.      Plan Supplement**

The Debtors Filed the Plan Supplement.  All of the documents contained in the Plan Supplement comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.

**ARTICLE X.**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B of the Plan:

1.      the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect;

2.      the Final Disclosure Statement Order shall remain in full force and effect;

3.      the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order; *provided that* in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed, modified, vacated, or reversed, and shall be effective immediately upon its entry;

4.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

5.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

6.   each of the New Term Loan Documents and Exit Facility Documents shall have been duly executed, in form and substance reasonably acceptable to the Required Consenting Stakeholders, and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of each of the New Term Loan and the Exit Facility shall have been satisfied or duly waived in accordance with the terms thereof;

7.      Reorganized Covia and each counterparty shall have entered into each of the New Employment Agreements in compliance with Article IV.R and Article IV.S of the Plan;

8.      no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting, in any material respect, the consummation of the Plan or any of the Restructuring Transactions contemplated thereby;

9.      all Ad Hoc Term Lender Group Fees and Expenses and Term Loan Agent Fees and Expenses pursuant to the terms and conditions of the Term Loan Documents and any orders of the Bankruptcy Court shall have been paid in full;

10.      all Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

11.      all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with

64

the applicable governmental units in accordance with applicable laws, and all conditions precedent to the consummation of such agreements, instruments or other documents shall have been waived or satisfied in accordance with their terms and to the extent applicable, the closing of such agreements, instruments or other documents shall have occurred.

**B.**     **Waiver of Conditions Precedent**

The conditions to the Effective Date set forth in this Article X  may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**C.**     **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor, any Holders of Claims or Interests, or any other Entity.

## ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.**     **Modification of Plan**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, consistent with the terms set forth herein, and, as appropriate, not resolicit votes on such modified Plan, including (a) modifying the treatment applicable to a Class of Claims or Interests to the extent the Bankruptcy Court indicates it will not confirm the Plan on account of such treatment, and (b) reclassifying any Claim or Interest in one particular Class together with any substantially similar Claim or Interest in a different Class, as applicable, to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided that* nothing contained in Article XI.A of the Plan shall impact or otherwise modify the rights of the  Consenting Stakeholders under the Restructuring Support Agreement.

**B.**     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**     **Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void

in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests (including any Disputed Claims);

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; *provided that* the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     decide and resolve all matters related to the issuance of the New Term Loan;

11.     decide and resolve all matters related to the Disputed Claims Reserve;

12.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

17.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

18.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

19.     enforce all orders previously entered by the Bankruptcy Court; and

20.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan

67

Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XII, the provisions of this Article XII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.      Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.      Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

68

**D.      Statutory Committee and Cessation of Fee and Expense Payment.**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases, provided, however, that the Committee will stay in existence solely for the limited purpose of filing and prosecuting final fee applications.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for the fees and expenses incurred by the Committee's professionals in connection with the matters identified in clauses (1) and (2) of the foregoing sentence.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Covia Holdings Corporation**<br>3 Summit Park Drive, Suite 700<br>Independence, OH 44131<br>Attn:    Chadwick P. Reynolds, EVP, Chief Legal<br>Officer and Secretary<br>(chad.reynolds@coviacorp.com)<br><br>with copies for information only (which shall not constitute notice) to: |
| **Counsel to the Debtors** | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:    Jonathan S. Henes, P.C.<br>(jonathan.henes@kirkland.com)<br><br>-and-<br><br>**Kirkland & Ellis LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 |

Attn:  Benjamin M. Rhode
(benjamin.rhode@kirkland.com)
Scott J. Vail
(scott.vail@kirkland.com)

-and-

**Jackson Walker L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Attn:  Matthew D. Cavenaugh
(mcavehaugh@jw.com)
Vienna F. Anaya
(vanaya@jw.com)
Genevieve M. Graham
(ggraham@jw.com)
Victoria N. Argeroplos
(vargeroplos@jw.com)

<table>
<tr><td>**Counsel to the Ad Hoc Term Lender Group**</td><td>**Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attn:  Brian S. Hermann<br>(bhermann@paulweiss.com)<br>Andrew M. Parlen<br>(aparlen@paulweiss.com)</td></tr>
</table>

-and-

**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 70022
Attn:  John F. Higgins
(jhiggins@porterhedges.com)
M. Shane Johnson
(sjohnson@porterhedges.com)
Megan N. Young-John
(myoung-john@porterhedges.com)

**H.     Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      **Entire Agreement; Controlling Document**

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, the Confirmation Order, and all documents related thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan.  Except as set forth in the Plan, in the event that any provision of the Restructuring Support Agreement, the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

J.      **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.primeclerk.com/Covia or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

K.      **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors in consultation with the Required Consenting Stakeholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the New Organizational Documents, the New Term Loan Documents, the Exit Facility Documents, as any of such documents may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to their terms; (2) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (3) non-severable and mutually dependent.

L.      **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Stakeholders, and each of their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Reorganized Debtors will have any liability for

71

the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

## M.      Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

## N.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

## O.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Dated:  October 13, 2020

COVIA HOLDINGS CORPORATION
on behalf of itself and all other Debtors

*/s/ Andrew Eich*
_____

Andrew Eich
EVP, Chief Financial Officer, and Treasurer
Covia Holdings Corporation

Prepared by:

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Genevieve M. Graham (TX Bar No. 24085340)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                     vanaya@jw.com
                     ggraham@jw.com
                     vargeroplos@jw.com

Jonathan S. Henes, P.C. (Admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jonathan.henes@kirkland.com

-and-

Benjamin M. Rhode (Admitted *pro hac vice*)
Scott J. Vail (Admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:           benjamin.rhode@kirkland.com
                     scott.vail@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit B**

**Restructuring Support Agreement**

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT*

This AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of July 7, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Covia Holdings Corporation, a company incorporated under the Laws of Delaware ("**Covia**") and certain of its direct and indirect subsidiaries that are or become parties to this Agreement (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, on June 29, 2020, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, the Company Parties and the Consenting Stakeholders entered into that certain Restructuring Support Agreement, dated as of June 29, 2020 (the "**Original Agreement**"), upon the terms and conditions set forth therein, pursuant to which the Company Parties and the Consenting Stakeholders intended to effectuate the transactions contemplated by the Original Agreement;

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring transactions with respect to the existing debt of, existing equity interests in, and certain other obligations of the Company Parties on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A**

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

WHEREAS, the Parties have agreed to amend and restate the Original Agreement to, among other things, (i) implement the Restructuring Transactions, including through the Chapter 11 Cases, and (ii) take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Ad Hoc Term Lender Group**" means the *ad hoc* group of holders of Term Loan Claims that is represented by Paul, Weiss, Porter Hedges and Centerview.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

2

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas (Houston Division) presiding over the Chapter 11 Cases or other court having jurisdiction over the Chapter 11 Cases, including to the extent of any withdrawal of reference under 28 U.S.C. 157, the United States District Court for the Southern District of Texas.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Documents**" has the meaning set forth in Section 3.01.

"**Cash Collateral Order**" means any order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final).

"**Centerview**" means Centerview Partners LLC, as financial advisor and investment banker to the Ad Hoc Term Lender Group.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Term Loan Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Documents**" has the meaning set forth in Section 3.01.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"**Confirmation Order**" means the order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

3

"**DIP Documents**" has the meaning set forth in Section 3.01.

"**Disclosure Statement**" means the disclosure statement in support of the Plan and any exhibits and schedules thereto, as may be amended or supplemented from time to time in accordance with the terms of this Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case, whether or not arising under or in connection with any employment agreement and including any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) in a Company Party).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Exit Facility Documents**" has the meaning set forth in Section 3.01.

"**First Day Pleadings**" means the "first-day" pleadings that the Company Parties file upon commencement of the Chapter 11 Cases, and any orders related thereto.

"**Go-Forward Railcar Leases**" mean any leases, documents, agreements or instruments entered into or assumed (including as amended) by any Company Party with any Strategic Partner;

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**MIP Documents**" has meaning set forth in Section 3.01.

"**Milestones**" has the meaning set forth in the Restructuring Term Sheet.

"**New Employment Agreements**" has the meaning set forth in Section 3.01.

"**New Organizational Documents**" has the meaning set forth Section 3.01.

"**New Term Loan**" has the meaning set forth in the Restructuring Term Sheet.

"**New Term Loan Documents**" has the meaning set forth in Section 3.01.

4

"**New Term Loan Facility**" means the senior secured term loan facility in respect of the New Term Loan pursuant to the New Term Loan Documents.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as lead counsel to the Ad Hoc Term Lender Group.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization, including any exhibits and schedules thereto, filed by the Debtors under chapter 11 of the Bankruptcy Code, that embodies the Restructuring Transactions (as may be amended or supplemented from time to time in accordance with the terms of this Agreement).

"**Plan Effective Date**" means the occurrence of the Effective Date (as defined in the Plan) of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with this Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be filed by the Debtors with the Bankruptcy Court.

"**Porter Hedges**" means Porter Hedges LLP as local counsel to the Ad Hoc Term Lender Group.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Railcar Leases**" means the unexpired railcar leases (excluding the Go-Forward Railcar Leases), including any amendments or modifications thereto, entered into by any Company Party as of the Petition Date.

"**Releases**" has the meaning set forth in the Restructuring Term Sheet.

"**Required Consenting Stakeholders**" means, as of the relevant date, Consenting Stakeholders holding at least 60.01% of the aggregate outstanding principal amount of approximately $1.559 billion Term Loans that are held by Consenting Stakeholders.

5

"**Restructuring Expenses**" means the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter as the case may be.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement and attached hereto as **Exhibit A**.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Day Pleadings**" means the "second-day" pleadings that the Company Parties file in the Chapter 11 Cases, and any orders related thereto.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Sibelco**" has the meaning set forth in Section 5.01.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**Strategic Partners**" means the go-forward railcar lessor partners whom the Company Parties have entered into (or will enter into on or around the Petition Date) letters of intent regarding the terms and conditions of such go-forward arrangements.

"**Term Loan**" means loans outstanding under the Term Loan Credit Agreement.

"**Term Loan Claims**" means any Claim on account of, arising under, derived from, or based upon the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"**Term Loan Credit Agreement**" means that certain Credit and Guaranty Agreement, dated June 1, 2018, by and among Covia, as borrower, certain subsidiaries of Covia, as guarantors; Barclays Bank PLC and BNP Paribas Securities Corp., as joint lead arrangers and joint bookrunners; Barclays Bank PLC, as administrative agent and collateral agent; ABN Amro Capital USA LLC, HSBC Bank USA, National Association, KBC Bank N.V. and PNC Bank, National Association, as co-syndication agents; Keybank National Association and Wells Fargo Bank, N.A., as co-documentation agents; and Citizens Bank, N.A., as managing agent, as may be amended, restated, amended and restated, supplemented, or other otherwise modified from time to time.

"**Term Loan Documents**" means, collectively, the Term Loan Credit Agreement and all instruments, security agreements, collateral agreements, guaranty agreements, intercreditor agreements, pledges, and other documents with respect to the Term Loan.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit B**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties.

**Section 2.**     *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     holders of at least 50.01% of the aggregate outstanding principal amount under the Term Loan Credit Agreement shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(c)     the Company Parties shall have paid, or caused to be paid, all Restructuring Expenses of the Ad Hoc Term Lender Group, in each case for which an invoice has been received by the Company Parties.

**Section 3.**     *Definitive Documents*.

3.01.     The Definitive Documents governing the Restructuring Transactions shall include all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by this Agreement and that are otherwise necessary to implement, or otherwise relate to the Restructuring Transactions, including, without limitation, the following:  (A) the Plan; (B) the Disclosure Statement; (C) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the First Day Pleadings; (F) the Second Day Pleadings; (G) the Plan Supplement; (H) the motion(s) and related pleadings seeking the use of cash collateral and the Cash Collateral Order (the "**Cash Collateral Documents**"); (I) the agreement with respect to the New Term Loan Facility and any agreements, commitment letters, documents, or instruments related thereto (collectively, the "**New Term Loan Documents**"); (J) the agreement with respect to the Exit Facility and any agreements, commitment letters, documents, or instruments related thereto (the "**Exit Facility Documents**"); (K) any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests to be issued in accordance with the Plan) or other governance documents for the reorganized Debtors (the "**New Organizational Documents**"); (L) the definitive documentation with respect to any management incentive plan (the "**MIP Documents**"); (M) any new, amended, or assumed employment agreements or documents with respect to the Company Parties' officers (the "**New Employment Agreements**"); (N) any motion(s), orders and related pleadings seeking approval of the Debtors' incurrence of postpetition financing, if necessary, and all agreements, documents, interim and final orders and/or amendments in connection therewith (the "**DIP Documents**"); (O) the motion(s) and related pleadings seeking confirmation of the Plan and the Confirmation Order (the "**Confirmation Documents**"); (P) any such other agreements, pleadings, orders, and documentation desired or necessary to consummate and document the Restructuring Transactions; and (Q) any other document that has or may have a material impact on the legal or economic rights of the Consenting

8

Stakeholders.  For the avoidance of doubt, Definitive Documents shall not include the Go-Forward Railcar Leases.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all respects with the terms of this Agreement (as it may be modified, amended, or supplemented in accordance with Section 14), including the Restructuring Term Sheet.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders.

**Section 4.**   *Milestones*.  The Restructuring Transactions shall be implemented in accordance with the Milestones set forth in the Restructuring Term Sheet, each of which shall be subject to extension by mutual agreement between the Company Parties and the Required Consenting Stakeholders.

**Section 5.**   ***Commitments of the Consenting Stakeholders***.

5.01.   General Commitments.

(a)   During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)   support the Restructuring Transactions and act in good faith and take all commercially reasonable actions necessary to implement and consummate the Restructuring Transactions in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement and the Plan, as applicable;

(ii)   use commercially reasonable efforts to assist the Company Parties to oppose any party or person from taking any actions contemplated in Section 5.01(b); and

(iii)   negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement and the Plan to which it is required to be a party.

(b)   During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)   object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)   propose, file, support, or vote for any Alternative Restructuring Proposal; provided, however, that notwithstanding any provisions to contrary herein, the Consenting Stakeholders have the right to continue to diligence, analyze, negotiate, and agree to an Alternative Restructuring Proposal with Sibelco NV ("Sibelco") within thirty (30) days after the Petition Date;

9

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests;

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii)     object to the Company Parties' (a) retention of any professionals in connection with the Restructuring Transactions, if applicable, and (b) payment of the reasonable and documented fees and expenses incurred by such professionals in connection with the Restructuring Transactions; provided that such fees and expenses are incurred pursuant to and in accordance with the terms of the engagement letters between such professionals and the Company Parties.

5.02.     Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iv)     use any commercially reasonably efforts to give, subject to applicable Laws, any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

10

(v)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above unless a Termination Date has occurred.

(b)      During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement and the Plan.

**Section 6.      *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) be construed to prohibit any Consenting Stakeholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising its rights or remedies specifically reserved herein or in the Definitive Documentation; (b) be construed to prohibit or limit any Consenting Stakeholder from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the Agreement Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not prohibited by this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transaction; or (c) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee).

**Section 7.      *Commitments of the Company Parties*.**

7.01.   Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      support and seek approval of the Releases;

(d)      use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring Transactions;

(e)      promptly pay all Restructuring Expenses of the Ad Hoc Term Lender Group, in each case for which an invoice has been received by the Company Parties;

(f)      inform counsel to the Consenting Stakeholders as soon as reasonably practicable (i) the occurrence, or failure to occur, of any event of which any Company Party has actual knowledge which occurrence or failure would be likely to cause or likely to result in, or has caused or resulted in (A) any representation or warranty of the Company Parties contained in this

11

Agreement to be false in any material respect, (B) any covenant of any Company Party contained in this Agreement not to be satisfied in any material respect, or (C) any applicable condition precedent contained in the Plan or this Agreement, not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions, (iii) receipt of any written notice from any governmental or regulatory body in connection with this Agreement or the Restructuring Transactions, (iv) receipt of any written notice of any proceeding (including any insolvency proceeding) commenced, or, to the actual knowledge of the Company Parties, threatened against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions, and (v) any matter or circumstance which is likely to be a material impediment to the implementation or consummation of the Restructuring Transactions;

(g)      provide to the Consenting Stakeholders, the Ad Hoc Term Lender Group, Paul, Weiss and Centerview: (i) reasonable access during normal business hours to the books, records, and facilities of the Company Parties, (ii) reasonable access to the management of and advisors to the Company Parties for the purpose of evaluating the Company Parties' finances and operations and participating in the planning process with respect to the Restructuring Transactions, (iii) timely updates regarding the Restructuring Transactions, including any material developments or any material conversations with parties in interest, (iv) status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, and (v) any other reasonable information related to the Restructuring Transactions reasonably requested by the Consenting Stakeholders in writing (e-mail shall suffice);

(h)      to the extent applicable, object to any motion filed with the Bankruptcy Court by any person (i) seeking the entry of an order terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted, would have an adverse effect on the consummation of the Restructuring Transactions;

(i)      use its commercially reasonable efforts to (i) operate the business of the Company Parties in the ordinary course and in a manner consistent with past practices and this Agreement and (ii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors, and others having material business dealings with the Company Parties, in each case, taking into account the effect of filing for chapter 11 and the Company Parties' status as debtors-in-possession;

(j)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(k)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

12

(l)      to the extent practicable, provide to Paul, Weiss draft copies of all Definitive Documents and any other documents that the Company Parties intend to file with the Bankruptcy Court that may affect the Consenting Stakeholders at least two (2) Business Days prior to the date when such Company Party intends to file or execute such document and shall, without limiting any approval rights set forth in this Agreement, consult in good faith with Paul, Weiss regarding the form and substance of such proposed filing with the Bankruptcy Court.

7.02.   Negative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      file any pleading seeking entry of an order and/or fail to timely object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order (i) directing the appointment an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (A) is inconsistent with this Agreement in any material respect or (B) would reasonably be expected to frustrate the purposes of this Agreement;

(d)      seek to (i) assume (including as amended) or (ii) liquidate, settle, allow any Claims related to, any unexpired lease or executory contract with a Strategic Partner, without (A) consulting in good faith with the Consenting Stakeholders and (B) using commercially reasonable efforts to obtain such Strategic Partner's agreement to express and provide public support for the Restructuring Transactions; provided, however, that for the avoidance of doubt, the Consenting Stakeholders have the right to oppose and object with respect to the foregoing;

(e)      seek to (i) reject or assume (including as amended) or (ii) liquidate, settle, allow, or object to Claims related to, any unexpired leases or executory contracts, including the Railcar Leases but excluding the Go-Forward Railcar Leases, without the prior written consent of the Required Consenting Stakeholders, with such consent not to be unreasonably withheld;

(f)      except in the ordinary course of business consistent with past practice, enter into or amend, adopt, restate, supplement, or otherwise modify or accelerate any material (i) deferred compensation, incentive, retention, bonus or other compensatory arrangements, policies, programs, practices, plans or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control agreements with or for the benefit of any employee or (ii) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Company, in each case, without the prior written consent of the Required Consenting Stakeholders;

(g)      subject to Section 8.01 and Section 8.02 of this Agreement, directly or indirectly propose, file, support, vote for, consent to, encourage, or take any other action in furtherance of the negotiation or formulation of any Alternative Restructuring Transaction;

13

(h)      enter into any settlement over $1 million regarding any Claims against or Interests in any Company Party without the prior written consent of the Required Consenting Stakeholders, with such consent not to be unreasonably withheld;

(i)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement, without the prior written consent of the Required Consenting Stakeholders; or

(j)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.      *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals received by any Company Party; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals. Subject to Section 8.01, if any Company Party receives a written or oral proposal or expression of interest regarding any Alternative Restructuring Proposal, within two (2) Business Days, the Company Party shall notify (with email being sufficient) Paul, Weiss and Centerview of any such proposal or expression of interest, with such notice to include a copy of such proposal, if it is in writing or otherwise provide a summary of the material terms thereof.  If the board of directors (or similar governing body) of any Company Party determines, in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, such Company Party shall notify Paul, Weiss and Centerview within two (2) Business Days of such determination.

8.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

14

**Section 9.**      *Transfer of Interests and Securities*.

9.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)      either (1) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (2) the transferee is a Consenting Stakeholder thereof and the transferee provides notice of such Transfer (including the amount, type of Company Claims/Interests Transferred, and identity of the transferor) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.   Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount, type of Company Claim/Interest acquired, and identity of the transferor) to counsel to the Company Parties within two (2) Business Days of such acquisition.

9.04.   This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.   Notwithstanding Section 9.01, any Consenting Stakeholder may Transfer any Company Claim/Interest to a Qualified Marketmaker and a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests, in each case, if (i) such Qualified

15

Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 9.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.    *Representations and Warranties of Consenting Stakeholders*.**  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

16

(f)      solely with respect to holders of Company Claims/Interests, it acknowledges that (i) the offer and sale of any securities will not be registered under the Securities Act and (ii) the offering and issuance of any securities is intended to be exempt from registration under the Securities Act pursuant to (A) Section 1145 of the Bankruptcy Code or (B) Section 4(a)(2) of the Securities Act and/or Regulation D thereunder.

**Section 11.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required, other than any consent or approval obtained prior to, or contemporaneously with, the Agreement Effective Date, by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events*.**

12.01.  <u>Consenting Stakeholder Termination Events</u>.    This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a prior written notice in accordance with <u>Section 16.10</u> hereof upon the occurrence and continuation of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, obligations, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after the Required Consenting Stakeholders transmit

17

a written notice to the Company Parties in accordance with Section 16.10 hereof detailing any such breach;

(b)　　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after the Required Consenting Stakeholders transmit a written notice to the Company Parties in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)　　the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(d)　　the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)　　the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement;

(f)　　the occurrence of an event of default that is not otherwise waived or cured under any Cash Collateral Document and/or DIP Document, as applicable;

(g)　　any Company Party (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner inconsistent with, or that constitutes a breach of, this Agreement without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior written consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clauses (i) and (ii);

(h)　　any Company Party (i) withdraws the Plan, (ii) makes a public announcement that it intends to accept an Alternative Restructuring Proposal or withdraw the Plan or (iii) enters into a definitive agreement with respect to an Alternative Restructuring Proposal;

(i)　　the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan that is materially adverse to the Consenting Stakeholders, unless the Company Parties have sought a stay of such relief within five (5) Business Days after the date such relief has been granted, and such order is stayed, reversed, or vacated within ten (10) Business Days after the date such relief has been granted; or

(j)       the Required Consenting Stakeholders agree to an Alternative Restructuring Proposal with Sibelco, consistent with Section 5.01(b)(ii).

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a)       the breach in any material respect of any provision set forth in this Agreement by one or more of the Consenting Stakeholders holding an amount of Term Loan Claims that would result in non-breaching Consenting Stakeholders holding less than two-thirds (66.67%) of the aggregate outstanding principal amount of Term Loans that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)       the board of directors, board of managers, or such similar governing body of any Company Party determines, subject to Section 8.01 and Section 8.02 of this Agreement, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties under applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)       the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)       the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

12.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.05.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting

19

Stakeholder withdrawing or changing its vote pursuant to this Section 12.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d).  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.     *Disclosure; Publicity.***

The Company Parties shall, to the extent reasonably practicable and permitted by applicable law, regulation or legal or regulatory process or requirement, submit drafts to counsel to the Consenting Stakeholders of any press releases, public documents, and any and all filings with the Bankruptcy Court, the Securities Exchange Commission, or otherwise that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least forty-eight hours prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall consider any such comments in good faith.  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the Restructuring Transactions without the express written consent of the other Parties; *provided*, *further*, that (a) before the Petition Date, if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing Party) and (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Term Loan Claims held by all the Consenting Stakeholders collectively. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages in redacted form with respect to the amount of Term Loan Claims held by each Consenting Stakeholder and, if so requested, with respect to the specific name of each Consenting Stakeholder (*provided* that the signature pages may be filed in unredacted form with the Bankruptcy Court under seal).  Notwithstanding the provisions in this Section 13, any Party may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

**Section 14.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this 14.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (1) each Company Party and (2) the Required Consenting Stakeholders; provided, however, that (i) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; (ii) any waiver, modification, amendment, or supplement to the definition of Required Consenting Stakeholders shall require the prior written consent of each applicable Consenting Stakeholder that is a member of the Ad Hoc Term Lender Group; and (iii) any waiver, modification, amendment, or supplement to this Section 14 shall require the prior written consent of each Party.  Any consent required to be provided pursuant to this Section 14 may be delivered by email from counsel. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(c)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**     *Survival.*

Notwithstanding the termination of this Agreement pursuant to Section 12, the agreements and obligations of the Parties set forth in the following Sections: Section 1, Section 12.05, Section 15, and Section 16 (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Stakeholders in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**Section 16.**     *Miscellaneous*.

16.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance

21

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02. <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof,

22

is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to a Company Party, to:

Covia Holdings Corporation
3 Summit Park Drive, Suite 700
Independence, OH 44131
Attention: Chadwick P. Reynolds, EVP, Chief Legal Officer and Secretary
E-mail: chad.reynolds@coviacorp.com

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Benjamin M. Rhode; Scott J. Vail
E-mail: benjamin.rhode@kirkland.com; scott.vail@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Jonathan S. Henes, P.C.
E-mail: jhenes@kirkland.com

(b)  if to a Consenting Stakeholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Brian S. Hermann; Andrew M. Parlen; Sean A. Mitchell
E-mail: bhermann@paulweiss.com; aparlen@paulweiss.com; smitchell@paulweiss.com

16.11. <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.12. <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.13. <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.14. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.18. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.19. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 13</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.


[*Signature Page Follows.*]

25

**COVIA HOLDINGS CORPORATION**

Alpha Resins, LLC
Best Sand Corporation
Best Sand of Pennsylvania, Inc.
Bison Merger Sub I, LLC
Black Lab LLC
Cheyenne Sand Corp.
Construction Aggregates Corporation of Michigan, Inc.
Covia Finance Company LLC
Covia Holdings Corporation
Covia Specialty Minerals Inc.
Fairmount Logistics LLC
Fairmount Minerals, LLC
Fairmount Santrol Inc.
FML Resin, LLC
FML Sand, LLC
FML Terminal Logistics, LLC
FMSA Inc.
Mineral Visions Inc.
Self-Suspending Proppant LLC
Shakopee Sand LLC
Specialty Sands, Inc.
Standard Sand Corporation
TechniSand, Inc.
Wedron Silica Company
West Texas Housing LLC
Wexford Sand Co.
Wisconsin Industrial Sand Company L.L.C.
Wisconsin Specialty Sands, Inc.


By: _____

Name: Chadwick P. Reynolds, EVP, Chief Legal Officer and Secretary

Authorized Signatory


[*Company Parties Signature Page*]

[*Consenting Stakeholder Signature Pages Omitted*]

**EXHIBIT A**

**Restructuring Term Sheet**

*Execution Version*

_____

## COVIA HOLDINGS CORPORATION

## AMENDED AND RESTATED RESTRUCTURING TERM SHEET

## July 7, 2020

_____

This Amended and Restated Term Sheet (including the exhibits attached hereto, this "Term Sheet")[1] sets forth the principal terms of a restructuring (the "Restructuring") of the existing debt, existing equity interests in, and certain other obligations of Covia Holdings Corporation ("Covia") on behalf of itself and certain of its subsidiaries listed on **Annex 1** hereto (collectively with Covia, the "Company" or the "Debtors"), through a chapter 11 plan of reorganization (the "Plan") to be filed by the Company in connection with commencing cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Following the occurrence of the effective date of the Plan according to its terms (the "Restructuring Effective Date"), Covia shall be referred to herein as "Reorganized Covia". This Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.**

**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE REASONABLY ACCEPTABLE TO THE CONSENTING STAKEHOLDERS (AS DEFINED HEREIN) AND THE COMPANY IN THE MANNER SET FORTH IN THE RSA.**

**THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY.**

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended and Restated Restructuring Support Agreement (the "RSA") to which this Term Sheet is attached as Exhibit A.

| Restructuring Summary | |
|---|---|
| Claims and Interests to be Restructured | **Term Loan Claims**: In a principal amount not less than $1.559 billion, plus all interest accrued and unpaid from time to time or capitalized as provided in the Term Loan Agreement (as defined below), fees, and other expenses arising and payable under that certain Credit and Guaranty Agreement, dated as of June 1, 2018 (as amended, modified, or otherwise supplemented from time to time, the "Term Loan Agreement"), by and among Covia, as borrower, certain subsidiaries of Covia, as guarantors, Barclays Bank plc, as administrative agent (the "Term Loan Agent"), and the lenders party thereto from time to time (together with the other Secured Parties (as defined in Term Loan Agreement), the "Term Loan Lenders").  The claims under the Term Loan Agreement are referred to herein as the "Term Loan Claims".<br><br>**Receivables Financing Claims**: Consisting of up to $37.0 million in principal or face amount, including reimbursement obligations in respect of letters of credit, plus accrued and unpaid interest (at the non-default rate), fees, and other expenses arising and payable under that certain Receivables Financing Agreement, dated as of March 31, 2020 (as amended, modified, or otherwise supplemented from time to time, the "Receivables Financing Agreement"), by and among non-Debtor Covia Financing LLC, as borrower, PNC Bank, National Association, as administrative agent, the lenders party thereto from time to time, and certain other parties thereto.  The claims under the Receivables Financing Agreement are referred to herein as the "Receivables Financing Claims".<br><br>**Swap Agreement Claims**: Consisting of a net liability on a present value basis, as of June 22, 2020, of approximately $35.8 million in obligations under five separate interest rate swap agreements that were entered into pursuant to one of the following master swap agreements: (i) that certain ISDA 2002 Master Agreement, dated as of May 30, 2018, by and among BNP Paribas and Covia, as successor in interest to Unimin Corporation (the "BNP Swap Agreement") or (ii) that certain ISDA Master Agreement, dated as of June 28, 2018, by and among Barclays Bank PLC and Covia (the "Barclays Swap Agreement", and collectively with the BNP Swap Agreement, the "Swap Agreements").  The claims under the Swap Agreements are referred to herein as the "Swap Agreement Claims".<br><br>**Other Secured Debt**: Approximately $16 million in aggregate principal amount, consisting of a $10 million industrial revenue bond and $6 million in other debt (collectively, the "Other Secured Debt").  The claims under the Other Secured Debt are referred to herein as the "Other Secured Claims".<br><br>**HoldCo General Unsecured Claims**:  Consisting of any prepetition claim against Covia that is not a Term Loan Claim, a Receivables Financing Claim, a Swap Agreement Claim, an Other Secured Claim, or a claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "Holdco General Unsecured Claims").<br><br>**Non-HoldCo General Unsecured Claims**:  Consisting of any prepetition claim against the Company other than Covia that is not a Term Loan Claim, a Receivables Financing Claim, a Swap Agreement Claim, an Other Secured |

<table>
<tr>
<td></td>
<td>

Claim, or a claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "Non-Holdco General Unsecured Claims").

**General Unsecured Claims**: Consisting of HoldCo General Unsecured Claims and Non-HoldCo General Unsecured Claims (the "General Unsecured Claims").

**Equity Interests**: As used herein, "Equity Interests" shall have the meaning ascribed to such term in the RSA.

</td>
</tr>
<tr>
<td>Overview of the Restructuring</td>
<td>

The Restructuring will be implemented through prearranged Chapter 11 Cases by the Company to pursue confirmation of the Plan. Votes on the Plan will be solicited from (i) the Term Loan Lenders and holders of Swap Agreement Claims and (ii) certain holders of General Unsecured Claims.

As a component of the Restructuring, (i) the Term Loan Lenders and holders of Swap Agreement Claims will receive, in exchange for their Term Loan Claims and Swap Agreement Claims, respectively, their pro rata share of (a) all excess cash on the Company's balance sheet as of the Measurement Date *pro forma* for all remaining professional fees expected to be paid through the Emergence Date, subject to the Minimum Liquidity at Emergence and the Minimum Cash at Emergence requirements, which shall be (x) increased or decreased by the Net Working Capital Adjustment[2] and (y) increased if any proceeds associated with early receipt of the CARES Act Tax Refunds scheduled to be received in FY 2021 have been received as of the Measurement Date (for the avoidance of doubt, any CARES Act Tax Refunds adjustment cannot exceed the amount included in FY 2021 in the Covia management business plan dated May 12, 2020);[3] (b) $825 million in New Term Loans

</td>
</tr>
</table>

---

[2]   "Measurement Date" means the date of the last available month-end balance sheet information as of the date which is ten (10) business days prior to the date upon which the Company emerges from the Chapter 11 Cases in the Bankruptcy Court ("Emergence Date").

"Net Working Capital Adjustment" shall equal the Target Net Working Capital Balance *less* the Actual Net Working Capital Balance. A Net Working Capital Adjustment greater than $0 shall increase the Minimum Liquidity at Emergence and Minimum Cash at Emergence requirements on a dollar for dollar basis and a Net Working Capital Adjustment smaller than $0 shall decrease the Minimum Liquidity at Emergence and Minimum Cash at Emergence requirements on a dollar for dollar basis.

"Target Net Working Capital Balance" shall equal the target Trade Receivables Balance *plus* the target Inventories Balance *less* the target Accounts Payable Balance as implied by the Business Plan dated May 12, 2020 (as included in the file titled "NWC Adjustment June 24, 2020.xlsx") as of the Measurement Date.

"Actual Net Working Capital Balance" shall equal the actual Trade Receivables Balance *plus* the actual Inventories Balance *less* the actual Accounts Payable Balance as stated on Covia's balance sheet as of the Measurement Date.

For avoidance of doubt, the "Trade Receivables Balance" shall be equal to the sum of the following general ledger accounts on Covia's balance sheet: Trade Receivables – Third Parties (#230010), Allowance for Doubtful Accounts (#230030), and Trade Receivables – Intra Group (#230049).

For avoidance of doubt, the "Inventories Balance" shall be equal to the sum of the following general ledger accounts on Covia's balance sheet: Raw Materials Inventory (#210010), Work in Progress Inventory (#210030), Finished Goods Inventory (#210040), Inventory Reserve (#210041), and Parts & Supplies Inventory (#210060).

For avoidance of doubt, the "Payables Balance" shall be equal to the absolute value of the sum of the following general ledger accounts on Covia's balance sheet: Accounts Payable (includes freight) (#530010), I/C (Payable) Receivable-Unimin Group (#190083), I/C (Payable) Receivable-Sibelco Subsidiaries (#190086).

[3]   As of the Restructuring Effective Date, Covia will distribute to the Term Loan Lenders and holders of Swap Agreement Claims all excess cash on the Company's balance sheet in excess of $175 million of total Liquidity ("Minimum Liquidity at Emergence") and $75 million of total available cash and cash equivalents plus all cash posted to collateralize letters of credit ("Minimum Cash at Emergence"), in each case subject to adjustment for the Net Working Capital Adjustment and subject to upward adjustment for any proceeds associated with early receipt of the CARES Act Tax Refunds (to the extent scheduled to

3

pursuant to the New Term Loan Facility (each as defined below) and (c) 100% of Reorganized Covia Equity (as defined below), subject to adjustment for treatment of General Unsecured Claims and dilution from the MIP (as defined below); (ii) the holders of Other Secured Claims will have such claims reinstated; (iii) the holders of HoldCo General Unsecured Claims will receive their pro rata share of an amount to be determined of the Reorganized Covia Equity, subject to dilution from the MIP; and (iv) holders of Non-HoldCo General Unsecured Claims will receive their pro rata share of an amount to be determined of the Reorganized Covia Equity, subject to dilution from the MIP

On or around the Petition Date, the Receivables Financing Agreement shall be terminated and replaced with a letter of credit facility (the "L/C Facility") pursuant to an interim order (the "L/C Facility Order") authorizing, among other things, (i) Covia's funding of a new letter of credit collateral account held at non-Debtor Covia Financing LLC, (ii) entry into the Payoff and Reassignment Agreement, dated as of June [___], 2020, among Covia, Covia Financing LLC, the Sub Originators[4], PNC Bank, National Association, and PNC Capital Markets LLC (the "Payoff Agreement"), (iii) Covia's and the Sub-Originators' entry into and performance of their respective obligations under the Payoff Agreement and the Reimbursement Agreement for Cash-Collateralized Standby Letters of Credit, dated as of June [___], 2020, among PNC Bank, National Association, Covia Financing LLC, and Covia (the "Reimbursement Agreement" and, together with the Payoff Agreement, the "Letter of Credit Agreements"), and (iv) execution of the transactions contemplated by the Letter of Credit Agreements.

As of the Restructuring Effective Date, the Term Loan Claims, General Unsecured Claims and Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect, the L/C Facility may be reinstated (or refinanced with the Exit Facility), and the Other Secured Claims will be reinstated.

| | |
|---|---|
| Post-Emergence Capital Structure | As of the Restructuring Effective Date, the Company pro forma exit capital structure will consist of the following:<br><br>**New Term Loan**: A $825 million senior secured term loan facility (the "New Term Loan Facility" and the loans issued thereunder, the "New Term Loans"), subject to the Cash Adjustment, with an interest rate of LIBOR + 400 bps (100 bps floor), payable in cash unless the Company elects the PIK and cash option[5]. |

be received in FY 2021 have been received as of the Measurement Date; for the avoidance of doubt, any CARES Act Tax Refunds adjustment cannot exceed the amount included in FY 2021 in the Covia management business plan dated May 12, 2020) (the "Excess Cash Distribution").  If the Excess Cash Distribution is (i) less than $90 million (the "Termination Threshold"), then the Consenting Stakeholders may terminate the RSA or (ii) more than $110 million, such Excess Cash Distribution will reduce the amount of New Term Loans on a dollar-for-dollar basis, subject to a maximum New Term Loan reduction of $25 million (i.e., minimum New Term Loan amount of $800 million and no cap on maximum Excess Cash Distribution) (the "Cash Adjustment").

"Liquidity" means total available cash and cash equivalents plus all cash posted to collateralize letters of credit plus the lesser of the total borrowing base and the total commitment amount pursuant to the New Revolving Credit Facility less the face value of any letters of credit outstanding as of the Measurement Date.

[4]     The "Sub-Originators" include Debtors Best Sand Corporation, Covia Specialty Minerals Inc., Fairmount Santrol Inc., FML Sand, LLC, FML Terminal Logistics, LLC, Mineral Visions Inc., TechniSand, Inc., Wedron Silica Company, and Wisconsin Industrial Sand Company L.L.C.

[5]     For the avoidance of doubt, the Company may elect the PIK and cash option (the "PIK/Cash Election") beginning on, from and after the Restructuring Effective Date through March 31, 2023 (the "Election Period"), if the Company's pro forma FCCR

| | The New Term Loans shall be subject to a minimum liquidity covenant of $50 million, to be tested quarterly and shall mature on July 31, 2026.  The Company shall be required to obtain ratings for the New Term Loans from S&P and Moody's.  Further, the New Term Loan will have other terms reasonably acceptable to the Company and the Required Consenting Stakeholders, and set forth in the Plan Supplement.<br><br>The New Term Loans shall be secured by liens on substantially all assets of Reorganized Covia and each of its direct and indirect subsidiaries (including, for the avoidance of doubt, subsidiaries domiciled in Canada and Mexico) and shall be guaranteed by each of its direct and indirect subsidiaries of Reorganized Covia (including, for the avoidance of doubt, subsidiaries domiciled in Canada and Mexico).<br><br>**New Revolving Credit Facility**: At least a $100 million senior secured revolving credit facility (the "<u>Exit Facility</u>") on terms reasonably acceptable to the Company and the Required Consenting Stakeholders, and set forth in the Plan Supplement, sufficient to replace existing letters of credit and fund the ongoing liquidity needs of Reorganized Covia and its subsidiaries.[6]<br><br>**Reorganized Covia Equity**:  Reorganized Covia shall issue equity (the "<u>Reorganized Covia Equity</u>") on the Restructuring Effective Date to the Term Loan Lenders, the holders of Swap Agreement Claims and holders of General Unsecured Claims in the amounts set forth below. |
|---|---|
| **Proposed Treatment of Claims and Interests Under the Plan** ||
| Administrative, Priority Tax, Other Priority Claims, and Other Secured Claims | On or as soon as reasonably practicable following the Restructuring Effective Date, each holder of an administrative, priority tax, other priority claim, or other secured claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim:<br><br>• payment in full in cash;<br>• reinstatement pursuant to section 1124 of the Bankruptcy Code;<br>• delivery of the collateral securing any such secured claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or<br>• such other treatment rendering such claim unimpaired. |

---

is < 2.00x.  The FCCR shall be tested on a quarterly trailing twelve-month basis as if Covia had paid the all-in cash interest rate for that twelve-month period. If Covia is eligible to make the PIK/Cash Election and decides to make the PIK/Cash Election, the all-in interest rate will be LIBOR + 450 bps (100 bps floor), with 2.75% PIK and LIBOR + 175 bps (100 bps floor) payable in cash.  During any period where Covia is not eligible for the PIK/Cash Election and any time after March 31, 2023, or if Covia is eligible to make the PIK/Cash Election and decides not to make the PIK/Cash Election, in each case, the all-in interest rate will be LIBOR + 400 bps (100 bps floor), payable in cash.  During any periods in which Covia has not made the PIK/Cash Election, Covia may, at its option, pursue open market repurchases of debt with any liquidity in excess of $175 million (measured at the end of each fiscal year).

"<u>FCCR</u>" shall be calculated as a quotient, (i) the numerator of which is LTM Adj. EBITDA (<u>provided</u>, that such amount shall only reflect non-cash adjustments to EBITDA) *minus* LTM capex *minus* LTM cash taxes paid (for the avoidance of doubt, any LTM tax refunds shall not be included in the calculation of LTM cash taxes paid) and (ii) the denominator of which is LTM cash interest at all-cash rate of LIBOR + 400 bps (100 bps floor); *provided*, that, if the applicable date of determination is less than 12 months following the Restructuring Effective Date, "LTM cash interest" for purposes of the preceding clause (ii) shall be deemed to be the interest payments made or due on or prior to such date of determination (but, in each case, following the Restructuring Effective Date) at an all-cash rate of LIBOR + 400 bps (100 bps floor), on an annualized basis.

[6]    *See* footnote 2 for Minimum Liquidity at Emergence and Minimum Cash at Emergence.

| Term Loan Claims and Swap Agreement Claims | The Term Loan Lenders and holders of Swap Agreement Claims shall receive, in full and final satisfaction of their Term Loan Claims and Swap Agreement Claims, respectively, their pro rata share of the following consideration in accordance with the Plan:<br><br>• all excess cash on the Company's balance sheet as of the Measurement Date *pro forma* for all remaining professional fees expected to be paid through the Emergence Date, subject to Minimum Liquidity at Emergence and Minimum Cash at Emergence requirements, which shall be (a) increased or decreased by the Net Working Capital Adjustment, and which shall be (b) increased if any proceeds associated with early receipt of the CARES Act Tax Refunds scheduled to be received in FY 2021 have been received as of the Measurement Date (for the avoidance of doubt, any CARES Act Tax Refunds adjustment cannot exceed the amount included in FY 2021 in the Covia management business plan dated May 12, 2020);<br>• $825 million in New Term Loans pursuant to the New Term Loan Facility, subject to the Cash Adjustment; and<br>• 100% of the Reorganized Covia Equity, less an amount that is acceptable to the Required Consenting Stakeholders and Covia on account of the treatment of General Unsecured Claims and dilution from the MIP. |
|---|---|
| Receivables Financing Claims | All Receivables Financing Claims (other than certain indemnifications surviving under the Receivables Financing Agreement) shall be terminated pursuant to the L/C Facility Order. Among other forms of relief, the L/C Facility Order:<br><br>• authorizes Covia to make a cash capital contribution to Covia Financing LLC in an amount sufficient to pay all obligations under the Receivables Financing Agreement and to fund an L/C collateral account held at Covia Financing LLC with cash to secure Covia Financing LLC's reimbursement obligations under the Reimbursement Agreement in an amount at all times equal to 105% of the undrawn face amount of the outstanding letters of credit;<br>• authorizes Covia to make cash capital contributions to Covia Financing LLC in the future to cash collateralize additional letters of credit in accordance with the Reimbursement Agreement in amounts up to 105% of the undrawn face amount of such future letters of credit;<br>• authorizes Covia to accept the transfer from Covia Financing LLC of the pool receivables held by Covia Financing LLC in connection with the Receivables Financing;[7] and<br>• pursuant to section 364(c)(1) of the Bankruptcy Code, grants (i) PNC Bank, National Association superpriority administrative claims with priority in payment with respect to the indemnity obligations of Covia under the Reimbursement Agreement and (ii) Covia Financing LLC |

---

[7]    For the avoidance of doubt: (a) nothing contained in the L/C Facility Order will require (or be construed to require) Covia to transfer any of the A/R Assets (as defined in the L/C Facility Order) to any Sub-Originator following the A/R Assets Transfer (as defined in the L/C Facility Order); and (b) nothing contained in the L/C Facility Order shall prohibit (or be construed to prohibit) Covia from transferring any of the A/R Assets to any Sub-Originator following the A/R Assets Transfer.

6

| | |
|---|---|
| | and the PNC Bank, National Association superpriority administrative claims with priority in payment with respect to indemnity obligations of the applicable Debtors under the Receivables Financing Agreement, in each case over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than with respect to the "Carve Out" (as to be defined in the Cash Collateral Order). |
| HoldCo General Unsecured Claims | The holders of HoldCo General Unsecured Claims shall receive, in full and final satisfaction of their HoldCo General Unsecured Claims, their pro rata share of an amount to be determined of the Reorganized Covia Equity, subject to dilution from the MIP. |
| Non-HoldCo General Unsecured Claims | The holders of Non-HoldCo General Unsecured Claims shall receive, in full and final satisfaction of their Non-HoldCo General Unsecured Claims, their pro rata share of an amount to be determined of the Reorganized Covia Equity, subject to dilution from the MIP. |
| Section 510(b) Claims | On the Restructuring Effective Date, all claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution. |
| Equity Interests | The Equity Interests will be cancelled, released and extinguished as of the Restructuring Effective Date and will be of no further force or effect, and the holders of Equity Interests will not receive any share of the Reorganized Covia Equity. |
| Intercompany Claims | All claims held by one Debtor or an affiliate thereof in any other Debtor or an affiliate thereof will be, at the option of Reorganized Covia with the consent of the Required Consenting Stakeholders, (a) reinstated or (b) distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims. |
| Intercompany Interests | All interests held by one Debtor in any other Debtor will be, at the option of Covia, (a) reinstated or (b) cancelled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders. |
| **Implementation** | |
| Structuring | The Restructuring contemplated by this Term Sheet, including the corporate structure of Reorganized Covia and its direct and indirect subsidiaries, shall be subject to further negotiation and definitive documentation and structured in a manner as determined by Covia and the Required Consenting Stakeholders to be tax efficient. |
| Milestones[8] | The Restructuring must conform to the following timetable (each event, a "Milestone"); *provided* that such Milestones may be extended by written agreement between the Company and the Required Consenting Stakeholders: |

---

[8]   All motions and orders (including the Plan, Disclosure Statement, and motion for approval of the Disclosure Statement) that are specified opposite "Milestones" above shall be in form and substance reasonably acceptable to Covia and the Required Consenting Stakeholders as provided in the RSA.

| | |
|---|---|
| | • the Plan, Disclosure Statement, and a motion for approval of the Disclosure Statement shall be filed in the Chapter 11 Cases within 30 days of the Petition Date;<br><br>• a motion for an order setting the claims bar date in the Chapter 11 Cases shall be filed within 14 days of the Petition Date;<br><br>• an order setting the general claims bar date in the Chapter 11 Cases shall be entered by the Bankruptcy Court within 60 days of the Petition Date;<br><br>• an order approving the Railcar Lease Rejection Motion shall be entered by the Bankruptcy Court within 60 days of the Petition Date, unless the Bankruptcy Court grants an extension of the period contemplated by Section 365(d)(5) of the Bankruptcy Code, in which case this 60 day period shall be correspondingly extended;<br><br>• an order approving the Disclosure Statement shall be entered by the Bankruptcy Court within 60 days of the filing of the Plan and Disclosure Statement;<br><br>• an order confirming the Plan shall be entered by the Bankruptcy Court within 45 days of the entry of an order approving the Disclosure Statement; and<br><br>• the Restructuring Effective Date shall occur within 150 days of the Petition Date (the "Outside Date"). |
| Conditions Precedent to the Restructuring Effective Date | The occurrence of the Restructuring Effective Date shall be subject to the following conditions precedent:<br><br>• the orders approving the Disclosure Statement and the Plan shall have been entered and such orders shall not have been stayed, modified, or vacated on appeal;<br><br>• the Definitive Documents shall be approved by the parties thereto, consistent with their consent and approval rights set forth in the RSA;<br><br>• the RSA shall not have been terminated and the RSA shall remain in full force and effect in accordance with its terms;<br><br>• entry into the New Term Loan and the Exit Facility (in each case, with all conditions precedent thereto having been satisfied or waived);<br><br>• issuance of the Reorganized Covia Equity;<br><br>• establishment of a professional fee escrow account funded in the amount of estimated accrued but unpaid professional fees incurred by the Company during the Chapter 11 Cases;<br><br>• payment of all reasonable and documented fees and expenses incurred at any time in connection with the Company by (a) the Term Loan Agent, (b) Paul Weiss, Rifkind Wharton & Garrison LLP, as lead counsel to the ad hoc group of Term Loan Lenders, (c) Porter Hedges LLP as local counsel to the ad hoc group of Term Loan Lenders, (d) Centerview Partners LLC, as financial advisor to the ad hoc group of Term Loan Lenders, (e) Lyons, Benenson & Company Inc. as compensation consultant to the ad hoc group of Term Loan Lenders, and (f) any other professional retained by the ad hoc group of Term Loan Lenders with the Company's prior written consent; and |

| | • all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been obtained. |
|---|---|
| **Corporate Governance and Employee Matters** | |
| Board of Directors | The constitution and size of the board of directors of Reorganized Covia (the "Reorganized Board") shall be determined by the Required Consenting Stakeholders; *provided*, that the Reorganized Board shall include the Chief Executive Officer of Reorganized Covia<br><br>The members of the Reorganized Board will be identified at or prior to the hearing to consider confirmation of the Plan.  The senior management team of Covia will have consultation rights with respect to the post-emergence governance of Reorganized Covia. |
| Corporate Governance Documents | In connection with the Restructuring Effective Date, and consistent with section 1123(a)(6) of the Bankruptcy Code, Reorganized Covia shall adopt customary corporate governance documents, including amended and restated certificates of incorporation, bylaws, and shareholders' agreements in form and substance acceptable to the Required Consenting Stakeholders, in consultation with Covia. |
| Employment Obligations | Unless otherwise amended or modified as set forth in the Plan Supplement, and subject to the terms attached hereto as **Annex 2**, all employee wages, compensation, benefits, severance plans, and incentive programs in place with the Company as of the Restructuring Effective Date (including, but not limited to, the Company's non-qualified deferred compensation plans) shall be assumed by Reorganized Covia and shall remain in place as of the Restructuring Effective Date, and Reorganized Covia will continue to honor such agreements, arrangements, programs, and plans, in each case, so long as current or future liabilities associated with such programs have been disclosed to the advisors to the Ad Hoc Term Lender Group prior to the Restructuring Effective Date (including, for the avoidance of doubt, any of the foregoing entered into or otherwise made effective after the date of the RSA but prior to the Restructuring Effective Date).  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Restructuring Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. |
| Employment Agreements | The Plan shall provide for the entry by certain members of the senior management team of Covia into new employment agreements, which shall be on the terms set forth in the Employment Agreement Term Sheet attached hereto as **Annex 2**. |
| Indemnification of Prepetition Directors, Officers, Managers, *et al*. | Under the Restructuring, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company, as applicable, shall be assumed and survive the effectiveness of the Restructuring. |
| Management Incentive Plan ("MIP") | Reorganized Covia shall adopt and implement a MIP as described in **Annex 2**. |

9

| **Miscellaneous Provisions** | |
| --- | --- |
| Debtor Releases, Third-Party Releases, and Exculpation | The exculpation provisions, the Company releases, and the "third-party" releases to be included in the Plan will be as set forth in **Annex 3** hereto in all material respects.<br><br>The foregoing exculpation and releases shall be subject to the applicable releasee's support of the Restructuring Transactions. |
| Executory Contracts and Unexpired Leases | On the Restructuring Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (to be scheduled and attached to the Plan) shall be deemed assumed as of the Restructuring Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) was previously assumed, assumed and assigned, or rejected by the Company; (ii) previously expired or terminated pursuant to its own terms; (iii) is identified on the Rejected Executory Contract and Unexpired Lease List (to be appended as a schedule to the Plan); or (iv) is the subject of a motion to reject that is pending on the Restructuring Effective Date. |
| Regulatory Requirements | All parties shall abide by, and use their reasonable best efforts to obtain, any regulatory and licensing requirements or approvals to consummate the Restructuring as promptly as practicable including, but not limited to, requirements or approvals that may arise as a result of such party's equity holdings in Reorganized Covia. |
| Exemption from SEC Registration | The issuance of all securities in connection with the Plan will be exempt to the extent permitted under section 1145 of the Bankruptcy Code and otherwise pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended, or Regulation D thereunder. |
| Registration Rights | Customary registration rights will be provided to Consenting Stakeholders that, at the time the Plan is consummated, are unable to sell under Rule 144 without being limited by the volume limitations thereunder; *provided* that such registration rights will fall away for any such Consenting Stakeholder at the time such Consenting Stakeholder is able to sell under Rule 144 without being limited by the volume limitations thereunder. |

10

**Annex 1**

**Debtors**

Alpha Resins, LLC
Best Sand Corporation
Best Sand of Pennsylvania, Inc.
Bison Merger Sub I, LLC
Black Lab LLC
Cheyenne Sand Corp.
Construction Aggregates Corporation of Michigan, Inc.
Covia Finance Company LLC
Covia Specialty Minerals Inc.
Fairmount Logistics LLC
Fairmount Minerals, LLC
Fairmount Santrol Inc.
FML Resin, LLC
FML Sand, LLC
FML Terminal Logistics, LLC
FMSA Inc.
Mineral Visions Inc.
Self-Suspending Proppant LLC
Shakopee Sand LLC
Specialty Sands, Inc.
Standard Sand Corporation
Technisand, Inc.
Wedron Silica Company
West Texas Housing LLC
Wexford Sand Co.
Wisconsin Industrial Sand Company L.L.C.
Wisconsin Specialty Sands, Inc.

**Annex 2**

**Employment Agreement Term Sheet**

(See attached.)

**FINAL**

## COVIA HOLDINGS CORPORATION
## MANAGEMENT EMPLOYMENT CONTRACTS

This term sheet (the "Term Sheet") summarizes the proposed management employment contracts for Covia Holdings Corporation (the "Company").

| | |
|---|---|
| *Overview*: | General.  Prior to the date on which the Plan Supplement is filed (the "Plan Supplement Date"), the requisite term loan lenders that are parties to the RSA (the "Lenders") will notify each member of the Company's executive leadership team identified on Exhibit A to this Term Sheet (each, an "Executive") whether the Executive is expected to continue in employment with the Company following the effective date of the Company's Plan of Reorganization (the "Emergence Date").  If the Executive is expected to continue in employment, then the Company and such Executive will enter into an employment contract (the "Agreement") that will be effective on the Emergence Date and that is consistent in all material respects with this Term Sheet.  If the Executive is not expected to continue in employment, then the Executive will be promptly terminated by the Company following the Emergence Date, and will receive the Executive's Change in Control Severance (as described below) on the terms and conditions set forth in this Term Sheet.<br><br>Term.  Each Agreement shall have an initial term of three (3) years that automatically extends for consecutive twelve (12)-month periods unless either party provides at least sixty (60) days' prior written notice of non-renewal (the period the Agreement is in effect, the "Term"). |
| *Position*: | Title.  Each Executive will have the title and position specified on Exhibit A to this Term Sheet and will have the duties and responsibilities customarily associated with such position in a company of the size and nature of the Company. |
| *Compensation and Benefits*: | Base Salary.  Each Executive's base salary ("Base Salary") is set forth on Exhibit A to this Term Sheet.<br><br>Annual Bonus.  Each Executive's target bonus opportunity ("Target Bonus") is set forth on Exhibit A to this Term Sheet.  Each Executive will earn an annual bonus based on the achievement of reasonably attainable performance goals established in good faith by the Company's Compensation Committee of the board of directors of the reorganized Company.<br><br>Benefit Plans.  Each Executive will be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally and/or for the benefit of its executives, subject to satisfying the applicable eligibility requirements, except to the extent such plans are duplicative of the benefits otherwise provided in the Agreement.<br><br>Long-Term Incentive Compensation.  Each Executive who is employed by the Company on the applicable grant date or has not indicated an intention to terminate due to Constructive Termination prior to the grant date will receive one or more awards under a cash- and equity-based management incentive plan (the "MIP").  The detailed terms of the MIP shall provide for an incentive pool (covering a specified aggregate percentage of the Company's post-Emergence Date equity that will be included in the Plan Supplement), emergence grants, individual allocations of emergence and future grants, conditions of emergence and future grants, and other MIP terms and conditions, as established by the board of directors of the reorganized Company within 90 days after the Emergence Date. |

KE 69457533

| | |
|---|---|
| *Termination*: | <u>General</u>.  Each Executive's employment will terminate (i) automatically upon Executive's death, (ii) due to Executive becoming disabled within the meaning of the Company's long-term disability plan applicable to the Executive (a "<u>Disability</u>"), (iii) upon written notice by the Company with or without Cause, or (iv) upon written notice by Executive whether or not due to a Constructive Termination. |
| | <u>Severance</u>.[1]  Upon a termination of Executive's employment (i) by the Company without Cause, (ii) by Executive due to a Constructive Termination or (iii) upon expiration of the Term due to non-renewal of the Agreement by the Company (each, a "<u>Qualifying Termination</u>"), Executive will receive: (A) a cash lump sum severance payment equal to the product of (x) the severance multiple specified for Executive on <u>Exhibit A</u> to this Term Sheet and (y) the sum of Executive's Base Salary and Target Bonus, (B) a pro rata annual bonus for the performance period in which such termination occurs, with the pro-ration determined based on the number of days that Executive was employed by the Company during the performance period and the amount of the annual bonus determined based on actual performance for the entire performance period (a "<u>Pro Rata Bonus</u>"), (C) reimbursement of premiums under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, for the number of months specified for Executive on <u>Exhibit A</u> to this Term Sheet, and (D) outplacement assistance services for the number of months specified for Executive on <u>Exhibit A</u> to this Term Sheet.  Notwithstanding the current definition of Constructive Termination, during the four (4)-month period immediately following the Emergence Date, if an Executive chooses to quit as a result of being dissatisfied with the MIP opportunity provided by the new Board, the Company will treat such resignation as a Constructive Termination and pay such Executive the standard (non-enhanced) severance. |
| | <u>Change in Control Severance</u>.  If Executive's Qualifying Termination occurs within the four (4)-month period immediately preceding, or the two (2)-year period immediately following, a Change in Control (to be defined in a customary manner for restructuring MIP arrangements and included in the definitive documentation governing the MIP), then (A) Executive's severance multiple will be increased as set forth on <u>Exhibit A</u> to this Term Sheet, and (B) the Pro Rata Bonus will be determined based on deemed achievement of the performance criteria at target levels.  The Agreement will include an explicit waiver that the emergence will not be deemed a Change in Control; *however*, if the Executive's employment is terminated by the Company without Cause or by the Executive due to a Constructive Termination (other than as a result of being dissatisfied with the MIP opportunity provided by the new Board), in either case, within the four (4)-month period immediately following the Emergence Date, then the Company will pay such Executive the Change in Control Severance. |
| | <u>Disability Severance</u>.  Upon a termination of Executive's employment due to Executive's death or Disability, Executive will receive a Pro Rata Bonus. |
| | <u>Release</u>.  Executive will be required to execute and not revoke a customary release of claims that will be attached to the Agreement. |
| | <u>Section 280G</u>.  Section 280G and 4999 language to be included, to substantively match the Executive Severance Plan language. |

---

[1]  Note to Draft:  Severance terms for Agreement with C. Jones may vary from this Term Sheet in order to accommodate terms of existing retention agreement.

| | |
|---|---|
| *Restrictive Covenants*: | <u>General</u>.  The Agreement will include customary confidentiality, trade secret, Company property, non-compete, employee non-solicit/non-hire, and non-disparagement covenants. |
| *Dispute Resolution Provisions*: | <u>Governing Law</u>.  Ohio<br><br><u>Choice of Forum</u>.  Ohio<br><br><u>Dispute Resolution</u>.  Arbitration<br><br><u>Attorney's Fees</u>.  The Company will reimburse the Executive for costs and expenses (including reasonable attorneys' fees) for claims based on events occurring within 120 days after the Emergence Date if the Executive substantially prevails on a material issue.  For all other claims, each party will bear its own costs and expenses. |
| *Definitions*: | "<u>Cause</u>," "<u>Disability</u>" and "<u>Constructive Termination</u>" will have the meanings set forth in the Covia Executive Severance Plan. |
| Final Documentation: | The final documentation related to the Agreements will not contain any material restrictions, limitations or additional obligations that are not set forth herein. |

**EXHIBIT A**

| Name (Title & Position) | Base Salary | Target Bonus Percentage | Severance Multiple | Change in Control Severance Multiple | Benefits Continuation Period | Outplacement Assistance Services |
|---|---|---|---|---|---|---|
| Richard Navarre (Chairman, President and Chief Executive Officer) | $1,050,000 | 115% | 2.0x | 2.99x | 24 months | 18 months |
| Campbell Jones (EVP, Chief Operating Officer) | $725,000 | 75% | 1.5x | 2.0x | 18 months | 12 months |
| Andrew Eich (EVP, Chief Financial Officer) | $550,000 | 75% | 1.5x | 2.0x | 18 months | 12 months |
| Brian Richardson (EVP, Chief Transformation Officer) | $475,000 | 75% | 1.5x | 2.0x | 18 months | 12 months |
| Chad Reynolds (EVP, Chief Legal Officer and Secretary) | $462,000 | 75% | 1.5x | 2.0x | 18 months | 12 months |
| Cameron Berry (EVP, Energy) | $330,000 | 60% | 1.5x | 2.0x | 18 months | 12 months |
| Paolo Gennari (EVP, Industrial) | $330,000 | 60% | 1.5x | 2.0x | 18 months | 12 months |
| [●] (SVP) | $[●] | [●]% | 1.0x | 1.5x | 12 months | 9 months |
| [●] (VP) | $[●] | [●]% | 0.75x | 1.0x | 9 months | 6 months |

**Annex 3**

**Debtor Releases, Third-Party Releases, and Exculpation**

| Definitions | The following terms shall have the following definitions for purposes of this **Annex 3**: |
|---|---|
| | • "Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors[1]; (c) each of the Consenting Stakeholders; (d) the Term Loan Agent; (e) each current and former Affiliate[2] of each Entity in clauses (a) through (d); and (f) each Related Party[3] of each Entity in clauses (a) through (e). |
| | • "Released Parties" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the Term Loan Agent; (e) each current and former Affiliate of each Entity in clauses (a) through (d); and (f) each Related Party of each Entity in clauses (a) through (e); *provided* that any holder of a Claim against or Equity Interest in the Debtors that votes against or objects to the Plan or opts out of the Third Party Release[4] shall not be a Released Party. |
| | • "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the Term Loan Agent; (e) each holder of Claims or Equity Interests that (i) votes in favor of the Plan or (ii) abstains from voting, is not entitled to vote, or votes to reject the Plan and does not opt out of the Third Party Release on a timely submitted ballot or opt-out form; (f) each current and former Affiliate of each Entity in clauses (a) through (e); and (g) each Related Party of each Entity in clauses (a) through (f). |
| Releases by the Debtors | Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Restructuring Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Restructuring Effective Date, each Released Party is deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates[5], in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action[6], directly or derivatively, by, through, for, or because of the foregoing Entities, from |

---

[1] "Reorganized Debtor" means, collectively, and each in its capacity as such, the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Restructuring Effective Date, and from and after the Restructuring Effective Date, shall include (without limitation) Reorganized Covia.

[2] "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

[3] "Related Party" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

[4] "Third Party Release" means the release provided by the Releasing Parties in favor of the Released Parties as set forth in this Annex 3.

[5] "Estate" means, as to each Debtor, the estate created for such Debtor in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

[6] "Causes of Action" means claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens,

| | |
|---|---|
| | any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against or Equity Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Equity Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Agreement or documents ancillary thereto, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation[7], the pursuit of Consummation[8], or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Restructuring Effective Date related to or related to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Restructuring Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| Releases by Holders of Claims and Equity Interests | On and after the Restructuring Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Restructuring Effective Date, each of the Releasing Parties is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized |

---

indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

[7]  "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

[8]  "Consummation" means the occurrence of the Restructuring Effective Date.

| | |
|---|---|
| | Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against or Equity Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Equity Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Agreement or documents ancillary thereto, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or any Definitive Document, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Restructuring Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Restructuring Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| Exculpation | Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Restructuring Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by the Final Order[9] to have constituted actual fraud, willful misconduct, or gross negligence, but in all |

---

[9]    "Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or

|  | respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| --- | --- |

the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

**EXHIBIT B**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of July 7, 2020 (the "**Agreement**"),[1] by and among Covia Holdings Corporation and its subsidiaries bound thereto and the Consenting Stakeholders, including [_____], the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | | |
|---|---|---|
| **Claims/Interests** | **Amount** | **Transferor** |
| Term Loan | $[●] | [●] |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit C**

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of July 7, 2020 (the "**Agreement**"),[2] by and among Covia Holdings Corporation and its subsidiaries bound thereto and the Consenting Stakeholders, and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | | |
|---|---|---|
| **Claims/Interests** | **Amount** | **Transferor** |
| Term Loan | $[●] | [●] |

---

[2]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit C**

**Corporate Organization Chart**



**Exhibit D**

**Disclosure Statement Order**

(*Intentionally Omitted*)

**Exhibit E**

**Liquidation Analysis**

**Liquidation Analysis**[1]

A.  Introduction

The Debtors, together with their financial advisor and legal counsel, have prepared a hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Plan and Disclosure Statement for purposes of evaluating whether the Plan meets the requirements under section 1129(a)(7) of the Bankruptcy Code, frequently referred to as the "best interests of creditors" test.  Section 1129(a)(7) of the Bankruptcy Code provides that Holders of Claims in an impaired class that does not vote to accept the plan must "receive or retain under the plan on account of such Claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date."  *See* 11 U.S.C. § 1129(a)(7)(ii).

B.  Basis of Presentation

The Liquidation Analysis represents an estimated recovery for all creditors of the Debtors based upon a hypothetical liquidation of the Debtors, assuming that the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code and a chapter 7 trustee (the "Trustee") is appointed to convert assets into cash for distribution to creditors.  The Liquidation Analysis assumes the orderly liquidation of substantially all of the Debtors' assets (including the non-Debtor affiliates) over a 2 to 4-month period beginning on or about June 30th, 2020  (the "Conversion Date"), with an additional 2-month period for the administrative closure of the cases. This timeline anticipates that the majority of the Debtors' assets are liquidated through an accelerated wind-down of the Company's operations during the initial 2 to 4 months of the chapter 7 cases.

The Liquidation Analysis assumes that the Debtors enter chapter 7 on the Conversion Date.  The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation, such as various potential employee severance and Worker Adjustment and Retraining Notification Act ("WARN") obligations, unpaid chapter 11 administrative expenses, and certain executory contract and unexpired lease rejection Claims.  Such Claims could be significant; some may be administrative expenses, and others may be entitled to priority in payment over General Unsecured Claims.  Certain of these liquidation-specific Claims are excluded from the Liquidation Analysis.  Also excluded from the Liquidation Analysis are estimates for the tax consequences, both federal and state, that may be triggered upon the liquidation and/or sale of assets in the manner described.  Such tax consequences may be material.  Included in the Liquidation Analysis are Claims arising from the rejection of certain unexpired leases, including railcar leases.

In addition, the Liquidation Analysis does not include recoveries resulting from any potential fraudulent transfer or other litigation or avoidance actions, which are assumed to have zero value for purposes of the Liquidation Analysis.

---

[1]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement.

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated, proceeding.  The Liquidation Analysis takes into account unsecured prepetition Intercompany Claims and the equity interests of each parent and subsidiary relationship.  The Liquidation Analysis assumes that liquidation value is allocated among the Debtors and non-Debtor affiliates to satisfy these Intercompany Claims and Interests, which in turn may alter the liquidation value available to satisfy third-party Claims at each entity. The results of the individual entity-by-entity analysis have been consolidated for a combined total liquidation value as presented herein.  The amounts received and distributed are presented on a net basis.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management team and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team.  Further, the actual amounts of Claims against the Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the Claims asserted during chapter 7. Accordingly, the Debtors cannot ensure that the values assumed would be realized or the Claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.  The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

### C.    Overview of the Liquidation Analysis

The Liquidation Analysis has been prepared assuming that the chapter 11 cases convert to chapter 7 on the Conversion Date, the Debtors' operations are wound down in an accelerated manner, their assets are liquidated, and that such liquidation would be substantially completed within a 2 to 4-month period.  It is presumed that the chapter 7 Trustee would resolve all Claims and other matters involving the Debtors' estates and make additional distributions during an additional 2-month period for the administrative closure of the case.   The three major components of the liquidation process are as follows:

- Generation of cash proceeds from the sale of assets;

- Costs and post-conversion operational cash flow related to the liquidation process, such as personnel retention costs, Claims reconciliation costs, estate wind-down costs, severance costs, and trustee and professional fees; and

- Distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is based on unaudited book values as of June 30th, 2020, unless otherwise stated (the "Estimated Book Value").  The Estimated Book Value is assumed to be

2

representative of the Debtors' assets and liabilities as of the Conversion Date.  Asset values are determined by legal entity but presented on a consolidating basis for presentation purposes.

In preparing the Liquidation Analysis, the Debtors reviewed their books and records, conferred with their financial and legal advisors, and relied on their advisors' professional judgments to estimate an amount of Claims that will ultimately become Allowed Claims.  Such Claims have not been evaluated by the Debtors or Allowed by the Bankruptcy Court and, accordingly, the final amount of Allowed Claims against the Debtors may differ from the Claim amounts used to complete this Liquidation Analysis.

When considering the generation of cash proceeds and the distribution thereof, the Debtors believe that the present value of distributions, to the extent available, may be further reduced because such distributions in a chapter 7 may not occur until after the initial 2- to 4-month liquidation period assumed in the analysis.  Moreover, in the event that litigation becomes necessary to resolve Claims asserted in a chapter 7, distributions to creditors may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to creditors.  The effects of this potential delay on the value of distributions under the Liquidation Analysis have not been considered in this analysis.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined, as summarized in the following charts and Article X.B of the Disclosure Statement, that the Plan will provide creditors with a recovery that is not less than creditors would receive pursuant to a liquidation of the Debtors' assets under chapter 7 bankruptcy proceeding.

D.      Disclaimer

THE LIQUIDATION ANALYSIS WAS PREPARED SOLELY AS A GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS. THE LIQUIDATION ANALYSIS RELIES ON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE DEBTORS' AND THEIR ADVISORS' CONTROL. ADDITIONALLY, VARIOUS DECISIONS ARE BASED UPON CERTAIN ASSUMPTIONS, WHICH ARE SUBJECT TO CHANGE.

THERE CAN BE NO GUARANTEE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE HYPOTHETICAL LIQUIDATION VALUES OF THE DEBTORS' ASSETS REFLECT THE ACTUAL VALUES THAT WOULD BE REALIZED IF THE DEBTORS WERE TO UNDERGO AN ACTUAL LIQUIDATION, AND SUCH ACTUAL VALUES COULD VARY MATERIALLY FROM THOSE SHOWN HEREIN.  NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE

3

**BANKRUPTCY CODE WOULD OR WOULD NOT APPROXIMATE EITHER THE ASSUMPTIONS ON WHICH THIS LIQUIDATION ANALYSIS IS BASED OR THE RESULTS OF THE LIQUIDATION ANALYSIS REFLECTED HEREIN.**

**THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS AND HAS NOT BEEN PRODUCED IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.**

### E.  Liquidation Analysis

High Recovery Case:

| Consolidated Liquidation Analysis: High Recovery | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Notes | Net Book Value as of June 30, 2020 | | | | | CHC[a] | | TechniSand[b] | | Cheyenne Sand[c] | | Others[d] | | Consolidated | |
| ($000s) | | CHC[a] | TechniSand[b] | Cheyenne Sand[c] | Others[d] | Consolidated | $ | % | $ | % | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | | | | | | | |
| Cash & Cash Equivalents | 1 | $214,112 | $0 | $0 | $0 | $214,112 | $214,112 | 100.0% | $0 | N/A | $0 | N/A | $0 | N/A | $214,112 | 100.0% |
| Restricted Cash | 2 | 1,940 | - | - | - | 1,940 | 1,940 | 100.0% | - | N/A | - | N/A | - | N/A | 1,940 | 100.0% |
| Accounts Receivables | 3 | 85,552 | - | - | - | 85,552 | 81,232 | 95.0% | - | N/A | - | N/A | - | N/A | 81,232 | 95.0% |
| Raw Materials | 4 | 37,131 | - | - | 26,582 | 63,712 | 21,476 | 57.8% | - | N/A | - | N/A | 16,392 | 61.7% | 37,868 | 59.4% |
| Finished Goods | 5 | 12,547 | - | - | 14,022 | 26,569 | 9,264 | 73.8% | - | N/A | - | N/A | 9,373 | 66.8% | 18,637 | 70.1% |
| Income Tax Receivables | 6 | 33,779 | - | - | - | 33,779 | 33,779 | 100.0% | - | N/A | - | N/A | - | N/A | 33,779 | 100.0% |
| Other Receivables & Current Assets | 7 | 19,153 | - | - | 12,209 | 31,362 | 572 | 3.0% | - | N/A | - | N/A | - | 0.0% | 572 | 1.8% |
| Property, Plant, & Equipment | 8 | 448,900 | - | - | 436,183 | 885,083 | 81,349 | 18.1% | - | N/A | - | N/A | 77,281 | 17.7% | 158,630 | 17.9% |
| Goodwill, Intangibles and Prepaid Assets | 9 | 52,442 | - | - | 54,011 | 106,454 | 13,279 | 25.3% | - | N/A | - | N/A | - | 0.0% | 13,279 | 12.5% |
| Investments | 10 | 297,840 | 37,725 | 9,555 | 41,461 | 386,581 | 171,648 | 57.6% | 9,559 | 25.3% | 5,226 | 54.7% | 70,235 | 169.4% | 256,668 | 66.4% |
| Other Noncurrent Assets | 11 | 2,766 | - | - | 5,382 | 8,148 | 138 | 5.0% | - | N/A | - | N/A | 269 | 5.0% | 407 | 5.0% |
| **Total Gross Liquidation Proceeds** | | **$1,206,162** | **$37,725** | **$9,555** | **$589,850** | **$1,843,292** | **$628,788** | **52.1%** | **$9,559** | **25.3%** | **$5,226** | **54.7%** | **$173,551** | **29.4%** | **$817,123** | **44.3%** |
| (+) Proceeds from Preference Actions | 12 | | | | | | $5,006 | | $131 | | $0 | | $3,762 | | $8,898 | |
| **Encumbered Value** | | | | | | | **$543,935** | | **$5,038** | | **$3,397** | | **$171,639** | | **$724,010** | |
| **Unencumbered Value** | | | | | | | **$89,858** | | **$4,651** | | **$1,829** | | **$5,673** | | **$102,011** | |
| (-) Wind-Down / Reclam. / Operating Exp. | 13 | | | | | | ($27,427) | | $0 | | $0 | | ($20,626) | | ($48,053) | |
| (-) Chapter 11 Professional Fee Carve-Out | 14 | | | | | | (14,552) | | - | | - | | - | | (14,552) | |
| (-) Chapter 7 Trustee Fees | 15 | | | | | | (19,037) | 3.0% | (291) | 3.0% | (157) | 3.0% | (5,319) | 3.1% | (24,804) | 3.0% |
| (-) PTO/Accrued Wages | 16 | | | | | | (1,038) | | - | | - | | - | | (1,038) | |
| (-) Chapter 7 Professional Fees | 17 | | | | | | (1,400) | | - | | - | | (600) | | (2,000) | |
| (-) Liquidation Fees | 18 | | | | | | (4,931) | | - | | - | | (9,647) | | (14,578) | |
| (-) Adeq. Protection Super Priority Claim | 19 | | | | | | TBD | | TBD | | TBD | | TBD | | TBD | |
| **Net Liquidation Proceeds** | | | | | | | **$565,409** | | **$9,399** | | **$5,069** | | **$141,120** | | **$720,997** | |
| **Remaining Encumbered Value** | | | | | | | **$523,354** | | **$5,038** | | **$3,397** | | **$141,120** | | **$672,910** | |
| **Remaining Unencumbered Value** | | | | | | | **$42,055** | | **$4,360** | | **$1,672** | | **$0** | | **$48,087** | |
| (+) L/C and Equipment Collateral | 20 | | | | | | $2,725 | | $0 | | $0 | | $10,912 | | $13,637 | |
| **Net Liquidation Proceeds Plus Collateral** | | | | | | | **$568,133** | | **$9,399** | | **$5,069** | | **$152,032** | | **$734,634** | |

| Claims Recovery | | Claim | | | | | CHC[a] | | TechniSand[b] | | Cheyenne Sand[c] | | Others[d] | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class  Claim | Notes | CHC[a] | TechniSand[b] | Cheyenne Sand[c] | Others[d] | Consolidated | $ | % | $ | % | $ | % | $ | % | $ | % |
| Class 1 - Secured Tax Claims | 21 | $2,710 | $90 | $0 | $2,200 | $5,000 | $2,710 | 100.0% | $90 | 100.0% | $0 | N/A | $2,200 | 100.0% | $5,000 | 100.0% |
| Class 2 - Other Secured Claims | 22 | 2,725 | - | - | 10,912 | 13,637 | 2,725 | 100.0% | - | N/A | - | N/A | 10,912 | 100.0% | 13,637 | 100.0% |
| Class 3 - Other Priority Claims | 23 | 1,000 | - | - | - | 1,000 | 1,000 | 100.0% | - | N/A | - | N/A | - | N/A | 1,000 | 100.0% |
| Class 4 - Secured Term/Swap Claims | 24 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 523,354 | 32.4% | 5,038 | 0.3% | 3,397 | 0.2% | 138,920 | 8.6% | 670,710 | 41.6% |
| Class 5A - Parent Deficiency Claims | 25 | 943,291 | - | - | - | 943,291 | 26,807 | 2.8% | - | N/A | - | N/A | - | N/A | 26,807 | 2.8% |
| Class 5A - Parent Gen. Unsec. Claims | 25 | 406,000 | - | - | - | 406,000 | 11,538 | 2.8% | - | N/A | - | N/A | - | N/A | 11,538 | 2.8% |
| Class 5B - TechniSand Deficiency Claims | 26 | - | 943,291 | - | - | 943,291 | - | N/A | 3,545 | 0.4% | - | N/A | - | N/A | 3,545 | 0.4% |
| Class 5B - TechniSand Gen. Unsec. Claims | 26 | - | 193,000 | - | - | 193,000 | - | N/A | 725 | 0.4% | - | N/A | - | N/A | 725 | 0.4% |
| Class 5C - Chey. Deficiency Claims | 27 | - | - | 943,291 | - | 943,291 | - | N/A | - | N/A | 1,613 | 0.0% | - | N/A | 1,613 | 0.2% |
| Class 5C - Chey. Gen. Unsec. Claims | 27 | - | - | 35,000 | - | 35,000 | - | N/A | - | N/A | 60 | 0.0% | - | N/A | 60 | 0.2% |
| Class 5D - Other Deficiency Claims | 28 | - | - | - | 943,291 | 943,291 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 5D - Other Gen. Unsec. Claims | 28 | - | - | - | 319,000 | 319,000 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 6 - Intercompany Claims | 29 | 35,711 | - | - | - | 35,711 | - | 0.0% | - | N/A | - | N/A | - | N/A | - | 0.0% |
| Class 7 - Intercompany Interests | 30 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 8 - Covia Interests | 31 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 9 - Section 510(b) Claims | 32 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| **Total Recovery** | | **$2,062,146** | **$1,807,090** | **$1,649,000** | **$1,946,113** | | **$568,133** | **27.6%** | **$9,399** | **0.5%** | **$5,069** | **0.3%** | **$152,032** | **7.8%** | **$734,634** | |

**Notes**: [a] Covia Holdings Corporation; [b] TechniSand, Inc.; [c] Cheyenne Sand Corp.; [d] All Other Debtor Entities

Middle Recovery Case:

| Consolidated Liquidation Analysis: Middle Recovery | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Net Book Value as of June 30, 2020 | | | | | CHC[a] | | TechniSand[b] | | Cheyenne Sand[c] | | Others[d] | | Consolidated | |
| ($000s) | Notes | CHC[a] | TechniSand[b] | Cheyenne Sand[c] | Others[d] | Consolidated | $ | % | $ | % | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | | | | | | | |
| Cash & Cash Equivalents | 1 | $214,112 | $0 | $0 | $0 | $214,112 | $214,112 | 100.0% | $0 | N/A | $0 | 0.0% | $0 | N/A | $214,112 | 100.0% |
| Restricted Cash | 2 | 1,940 | - | - | - | 1,940 | 1,940 | 100.0% | - | N/A | - | 0.0% | - | N/A | 1,940 | 100.0% |
| Accounts Receivables | 3 | 85,552 | - | - | - | 85,552 | 76,078 | 88.9% | - | N/A | - | 0.0% | - | N/A | 76,078 | 88.9% |
| Raw Materials | 4 | 37,131 | - | - | 26,582 | 63,712 | 17,189 | 46.3% | - | N/A | - | 0.0% | 11,787 | 44.3% | 28,976 | 45.5% |
| Finished Goods | 5 | 12,547 | - | - | 14,022 | 26,569 | 8,289 | 66.1% | - | N/A | - | 0.0% | 8,387 | 59.8% | 16,675 | 62.8% |
| Income Tax Receivables | 6 | 33,779 | - | - | - | 33,779 | 33,779 | 100.0% | - | N/A | - | 0.0% | - | N/A | 33,779 | 100.0% |
| Other Receivables & Current Assets | 7 | 19,153 | - | - | 12,209 | 31,362 | 457 | 2.4% | - | N/A | - | 0.0% | - | 0.0% | 457 | 1.5% |
| Property, Plant, & Equipment | 8 | 448,900 | - | - | 436,183 | 885,083 | 56,832 | 12.7% | - | N/A | - | 0.0% | 57,129 | 13.1% | 113,961 | 12.9% |
| Goodwill, Intangibles and Prepaid Assets | 9 | 52,442 | - | - | 54,011 | 106,454 | 6,639 | 12.7% | - | N/A | - | 0.0% | - | 0.0% | 6,639 | 6.2% |
| Investments | 10 | 297,840 | 37,725 | 9,555 | 41,461 | 386,581 | 136,306 | 45.8% | 8,368 | 22.2% | 4,131 | 1.1% | 56,691 | 136.7% | 205,496 | 53.2% |
| Other Noncurrent Assets | 11 | 2,766 | - | - | 5,382 | 8,148 | - | 0.0% | - | N/A | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Gross Liquidation Proceeds** | | **$1,206,162** | **$37,725** | **$9,555** | **$589,850** | **$1,843,292** | **$551,621** | **45.7%** | **$8,368** | **22.2%** | **$4,131** | **0.2%** | **$133,993** | **22.7%** | **$698,114** | **37.9%** |
| (+) Proceeds from Preference Actions | 12 | | | | | | $2,503 | | $65 | | $0 | | $1,881 | | $4,449 | |
| **Encumbered Value** | | | | | | | **$480,710** | | **$4,276** | | **$2,685** | | **$132,289** | | **$619,960** | |
| **Unencumbered Value** | | | | | | | **$73,414** | | **$4,158** | | **$1,446** | | **$3,586** | | **$82,603** | |
| (-) Wind-Down / Reclam. / Operating Exp. | 13 | | | | | | ($38,401) | | $0 | | $0 | | ($21,986) | | ($60,387) | |
| (-) Chapter 11 Professional Fee Carve-Out | 14 | | | | | | (14,552) | | - | | - | | - | | (14,552) | |
| (-) Chapter 7 Trustee Fees | 15 | | | | | | (16,647) | 3.0% | (253) | 3.0% | (124) | 3.0% | (4,076) | 3.0% | (21,100) | 3.0% |
| (-) PTO/Accrued Wages | 16 | | | | | | (1,038) | | - | | - | | - | | (1,038) | |
| (-) Chapter 7 Professional Fees | 17 | | | | | | (1,750) | | - | | - | | (750) | | (2,500) | |
| (-) Liquidation Fees | 18 | | | | | | (3,677) | | - | | - | | (7,273) | | (10,950) | |
| (-) Adeq. Protection Super Priority Claim | 19 | | | | | | TBD | | TBD | | TBD | | TBD | | TBD | |
| **Net Liquidation Proceeds** | | | | | | | **$478,058** | | **$8,180** | | **$4,008** | | **$101,789** | | **$592,036** | |
| **Remaining Encumbered Value** | | | | | | | **$461,383** | | **$4,276** | | **$2,685** | | **$101,789** | | **$570,133** | |
| **Remaining Unencumbered Value** | | | | | | | **$16,676** | | **$3,905** | | **$1,322** | | **$0** | | **$21,903** | |
| (+) L/C and Equipment Collateral | 20 | | | | | | $2,725 | | $0 | | $0 | | $10,912 | | $13,637 | |
| **Net Liquidation Proceeds Plus Collateral** | | | | | | | **$480,783** | | **$8,180** | | **$4,008** | | **$112,702** | | **$605,673** | |

| Claims Recovery | | | | Claim | | | CHC[a] | | TechniSand[b] | | Cheyenne Sand[c] | | Others[d] | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class  Claim | Notes | CHC[a] | TechniSand[b] | Cheyenne Sand[c] | Others[d] | Consolidated | $ | % | $ | % | $ | % | $ | % | $ | % |
| Class 1 - Secured Tax Claims | 21 | $5,420 | $180 | $0 | $4,400 | $10,000 | $5,420 | 100.0% | $180 | 100.0% | $0 | N/A | $4,400 | 100.0% | $10,000 | 100.0% |
| Class 2 - Other Secured Claims | 22 | 2,725 | - | - | 10,912 | 13,637 | 2,725 | 100.0% | - | N/A | - | N/A | 10,912 | 100.0% | 13,637 | 100.0% |
| Class 3 - Other Priority Claims | 23 | 1,500 | - | - | - | 1,500 | 1,500 | 100.0% | - | N/A | - | N/A | - | N/A | 1,500 | 100.0% |
| Class 4 - Secured Term/Swap Claims | 24 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 461,383 | 28.6% | 4,276 | 0.3% | 2,685 | 0.2% | 97,389 | 6.0% | 565,733 | 35.1% |
| Class 5A - Parent Deficiency Claims | 25 | 1,048,267 | - | - | - | 1,048,267 | 7,185 | 0.7% | - | N/A | - | N/A | - | N/A | 7,185 | 0.7% |
| Class 5A - Parent Gen. Unsec. Claims | 25 | 375,000 | - | - | - | 375,000 | 2,570 | 0.7% | - | N/A | - | N/A | - | N/A | 2,570 | 0.7% |
| Class 5B - TechniSand Deficiency Claims | 26 | - | 1,048,267 | - | - | 1,048,267 | - | N/A | 3,166 | 0.3% | - | N/A | - | N/A | 3,166 | 0.3% |
| Class 5B - TechniSand Gen. Unsec. Claims | 26 | - | 185,000 | - | - | 185,000 | - | N/A | 559 | 0.3% | - | N/A | - | N/A | 559 | 0.3% |
| Class 5C - Chey. Deficiency Claims | 27 | - | - | 1,048,267 | - | 1,048,267 | - | N/A | - | N/A | 1,279 | 0.1% | - | N/A | 1,279 | 0.1% |
| Class 5C - Chey. Gen. Unsec. Claims | 27 | - | - | 35,000 | - | 35,000 | - | N/A | - | N/A | 43 | 0.1% | - | N/A | 43 | 0.1% |
| Class 5D - Other Deficiency Claims | 28 | - | - | - | 1,048,267 | 1,048,267 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 5D - Other Gen. Unsec. Claims | 28 | - | - | - | 306,000 | 306,000 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 6 - Intercompany Claims | 29 | 35,711 | - | - | - | 35,711 | - | 0.0% | - | N/A | - | N/A | - | N/A | - | 0.0% |
| Class 7 - Intercompany Interests | 30 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 8 - Covia Interests | 31 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 9 - Section 510(b) Claims | 32 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| **Total Recovery** | | **$2,034,356** | **$1,799,180** | **$2,697,267** | **$2,983,580** | | **$480,783** | **23.6%** | **$8,180** | **0.5%** | **$4,008** | **0.1%** | **$112,702** | **3.8%** | **$605,673** | |

**Notes**: [a]Covia Holdings Corporation; [b]TechniSand, Inc.; [c]Cheyenne Sand Corp.; [d]All Other Debtor Entities

6

Low Recovery Case:

**Consolidated Liquidation Analysis: Low Recovery**

| ($000s) | Notes | Net Book Value as of June 30, 2020 CHCᵃ | TechniSandᵇ | Cheyenne Sandᶜ | Othersᵈ | Consolidated | CHCᵃ $ | % | TechniSandᵇ $ | % | Cheyenne Sandᶜ $ | % | Othersᵈ $ | % | Consolidated $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds** | | | | | | | | | | | | | | | | |
| Cash & Cash Equivalents | 1 | $214,112 | $0 | $0 | $0 | $214,112 | $214,112 | 100.0% | $0 | N/A | $0 | 0.0% | $0 | N/A | $214,112 | 100.0% |
| Restricted Cash | 2 | 1,940 | - | - | - | 1,940 | 1,940 | 100.0% | - | N/A | - | 0.0% | - | N/A | 1,940 | 100.0% |
| Accounts Receivables | 3 | 85,552 | - | - | - | 85,552 | 71,696 | 83.8% | - | N/A | - | 0.0% | - | N/A | 71,696 | 83.8% |
| Raw Materials | 4 | 37,131 | - | - | 26,582 | 63,712 | 13,751 | 37.0% | - | N/A | - | 0.0% | 9,429 | 35.5% | 23,180 | 36.4% |
| Finished Goods | 5 | 12,547 | - | - | 14,022 | 26,569 | 7,313 | 58.3% | - | N/A | - | 0.0% | 7,400 | 52.8% | 14,714 | 55.4% |
| Income Tax Receivables | 6 | 33,779 | - | - | - | 33,779 | 33,779 | 100.0% | - | N/A | - | 0.0% | - | N/A | 33,779 | 100.0% |
| Other Receivables & Current Assets | 7 | 19,153 | - | - | 12,209 | 31,362 | 343 | 1.8% | - | N/A | - | 0.0% | - | 0.0% | 343 | 1.1% |
| Property, Plant, & Equipment | 8 | 448,900 | - | - | 436,183 | 885,083 | 32,315 | 7.2% | - | N/A | - | 0.0% | 36,977 | 8.5% | 69,292 | 7.8% |
| Goodwill, Intangibles and Prepaid Assets | 9 | 52,442 | - | - | 54,011 | 106,454 | - | 0.0% | - | N/A | - | 0.0% | - | 0.0% | - | 0.0% |
| Investments | 10 | 297,840 | 37,725 | 9,555 | 41,461 | 386,581 | 100,964 | 33.9% | 7,222 | 19.1% | 3,037 | 0.8% | 43,147 | 104.1% | 154,369 | 39.9% |
| Other Noncurrent Assets | 11 | 2,766 | - | - | 5,382 | 8,148 | - | 0.0% | - | N/A | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Gross Liquidation Proceeds** | | **$1,206,162** | **$37,725** | **$9,555** | **$589,850** | **$1,843,292** | **$476,213** | **39.5%** | **$7,222** | **19.1%** | **$3,037** | **31.8%** | **$96,953** | **16.4%** | **$583,425** | **31.7%** |
| (+) Proceeds from Preference Actions | 12 | | | | | | $0 | | $0 | | $0 | | $0 | | $0 | |
| **Encumbered Value** | | | | | | | **$419,008** | | **$3,542** | | **$1,974** | | **$95,455** | | **$519,979** | |
| **Unencumbered Value** | | | | | | | **$57,205** | | **$3,680** | | **$1,063** | | **$1,499** | | **$63,446** | |
| (-) Wind-Down / Reclam. / Operating Exp. | 13 | | | | | | ($52,730) | | $0 | | $0 | | ($23,058) | | ($75,787) | |
| (-) Chapter 11 Professional Fee Carve-Out | 14 | | | | | | (14,552) | | - | | | | | | (14,552) | |
| (-) Chapter 7 Trustee Fees | 15 | | | | | | (14,310) | 3.0% | (217) | 3.0% | (91) | 3.0% | (2,909) | 3.0% | (17,526) | 3.0% |
| (-) PTO/Accrued Wages | 16 | | | | | | (1,038) | | - | | - | | - | | (1,038) | |
| (-) Chapter 7 Professional Fees | 17 | | | | | | (2,100) | | - | | - | | (900) | | (3,000) | |
| (-) Liquidation Fees | 18 | | | | | | (2,423) | | - | | - | | (4,898) | | (7,322) | |
| (-) Adeq. Protection Super Priority Claim | 19 | | | | | | TBD | | TBD | | TBD | | TBD | | TBD | |
| **Net Liquidation Proceeds** | | | | | | | **$389,061** | | **$7,005** | | **$2,946** | | **$65,189** | | **$464,200** | |
| **Remaining Encumbered Value** | | | | | | | **$389,061** | | **$3,542** | | **$1,974** | | **$65,189** | | **$459,765** | |
| **Remaining Unencumbered Value** | | | | | | | **$0** | | **$3,463** | | **$972** | | **$0** | | **$4,435** | |
| (+) L/C and Equipment Collateral | 20 | | | | | | $2,725 | | $0 | | $0 | | $10,912 | | $13,637 | |
| **Net Liquidation Proceeds Plus Collateral** | | | | | | | **$391,785** | | **$7,005** | | **$2,946** | | **$76,101** | | **$477,837** | |

| Class   Claim | Notes | CHCᵃ | TechniSandᵇ | Claim Cheyenne Sandᶜ | Othersᵈ | Consolidated | CHCᵃ $ | % | TechniSandᵇ $ | % | Cheyenne Sandᶜ $ | % | Othersᵈ $ | % | Consolidated $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class 1 - Secured Tax Claims | 21 | $8,120 | $280 | $0 | $6,600 | $15,000 | $8,120 | 100.0% | $280 | 100.0% | $0 | N/A | $6,600 | 100.0% | $15,000 | 100.0% |
| Class 2 - Other Secured Claims | 22 | 2,725 | - | - | 10,912 | 13,637 | 2,725 | 100.0% | - | N/A | - | N/A | 10,912 | 100.0% | 13,637 | 100.0% |
| Class 3 - Other Priority Claims | 23 | 2,000 | - | - | - | 2,000 | 2,000 | 100.0% | - | N/A | - | N/A | - | N/A | 2,000 | 100.0% |
| Class 4 - Secured Term/Swap Claims | 24 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 1,614,000 | 378,941 | 23.5% | 3,542 | 0.2% | 1,974 | 0.1% | 58,589 | 3.6% | 443,045 | 27.5% |
| Class 5A - Parent Deficiency Claims | 25 | 1,170,956 | - | - | - | 1,170,956 | - | 0.0% | - | N/A | - | N/A | - | N/A | - | 0.0% |
| Class 5A - Parent Gen. Unsec. Claims | 25 | 344,000 | - | - | - | 344,000 | - | 0.0% | - | N/A | - | N/A | - | N/A | - | 0.0% |
| Class 5B - TechniSand Deficiency Claims | 26 | - | 1,170,956 | - | - | 1,170,956 | - | N/A | 2,765 | 0.2% | - | N/A | - | N/A | 2,765 | 0.2% |
| Class 5B - TechniSand Gen. Unsec. Claims | 26 | - | 177,000 | - | - | 177,000 | - | N/A | 418 | 0.2% | - | N/A | - | N/A | 418 | 0.2% |
| Class 5C - Chey. Deficiency Claims | 27 | - | - | 1,170,956 | - | 1,170,956 | - | N/A | - | N/A | 944 | 0.1% | - | N/A | 944 | 0.1% |
| Class 5C - Chey. Gen. Unsec. Claims | 27 | - | - | 35,000 | - | 35,000 | - | N/A | - | N/A | 28 | 0.1% | - | N/A | 28 | 0.1% |
| Class 5D - Other Deficiency Claims | 28 | - | - | - | 1,170,956 | 1,170,956 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 5D - Other Gen. Unsec. Claims | 28 | - | - | - | 293,000 | 293,000 | - | N/A | - | N/A | - | N/A | - | 0.0% | - | 0.0% |
| Class 6 - Intercompany Claims | 29 | 35,711 | - | - | - | 35,711 | - | 0.0% | - | N/A | - | N/A | - | N/A | - | 0.0% |
| Class 7 - Intercompany Interests | 30 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 8 - Covia Interests | 31 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| Class 9 - Section 510(b) Claims | 32 | - | - | - | - | - | - | N/A | - | N/A | - | N/A | - | N/A | - | N/A |
| **Total Recovery** | | **$2,006,556** | **$1,791,280** | **$1,649,000** | **$1,924,513** | | **$391,785** | **19.5%** | **$7,005** | **0.4%** | **$2,946** | **0.2%** | **$76,101** | **4.0%** | **$477,837** | |

**Notes**: ᵃCovia Holdings Corporation; ᵇTechniSand, Inc.; ᶜCheyenne Sand Corp.; ᵈAll Other Debtor Entities

**Notes to the Liquidation Analysis**

The following notes describe the significant assumptions that were made with respect to assets and wind-down expenses. Certain assets were also assumed to be sold on a going-concern basis at assumed discounted valuations. In addition, currently no value is being ascribed to avoidance actions on fraudulent transfers or other litigation proceeds, which are highly speculative.

*Gross Liquidation Proceeds:*

**1.    Cash & Cash Equivalents**

- The Debtors' aggregate cash and marketable securities balance as of June 30, 2020 is approximately $214 million.
- All cash and cash equivalents are assumed to be encumbered and fully recoverable.

**2.    Restricted Cash**

- Restricted cash of approximately $2 million is expected to be encumbered and fully recoverable.

**3.    Accounts Receivable**

- Accounts Receivable recovery is based on an accounts receivable aging report as of June 30, 2020. The Debtors expect to recover a variable percentage of accounts receivable in a liquidation scenario. For current amounts, the Debtors expect a 90% to 100% recovery. For amounts less than 30 days past due, the Debtors expect a recovery range of 85% to 98%. For amounts past due less than 60 days but more than 30 days, the Debtors expect a recovery range of 70% and 90%. For amounts past due less than 90 days and more than 60 days, the Debtors expect a recovery range of 15% and 40%. For amounts past due over 90 days, the Debtors expect a de minimis recovery.
- 30.5% of accounts receivable are assumed to be unencumbered.

**4.    Raw Materials**

- Raw materials and parts inventory include wet sand, spare parts, and diesel fuel.
- The Liquidation Analysis assumes the wet sand can be liquidated at a significant discount to dry sand spot rates and valued at $4/ton, $5/ton, and $8/ton for low, middle and high recovery cases respectively.
- Liquidation values for parts/supplies and other raw materials were calculated based on a recovery range of 40% to 60% of net book value.

8

**5.      Finished Goods**

- The finished industrial sand inventory is assumed to be sold at a 5% to 25% discount to prevailing spot market prices due to a lack of market depth to absorb high sand volumes.
- Industrial sand inventory is valued based on the most recent sale price for specific sand grade and packaging at different locations.
- Frac sand inventory is priced by grade and location and assumed to sell at a 5% to 25% discount to spot price due to weak market demand and liquidity.

**6.      Income Tax Receivable**

- The Debtors' anticipated income tax refund, primarily from the CARES Act refund application, is expected to be fully recoverable.

**7.      Other Receivables & Current Assets**

- Other current assets mainly comprise current prepaid assets including insurance and geological drilling costs.  These are not assumed to have recoverable value.
- Other current receivables are miscellaneous non-customer receivable amounts and assumed to have a recovery rate of between 15% and 25%.

**8.      Property, Plant & Equipment (PP&E)**

- Information for most PP&E, except for mineral reserves, was obtained from the fixed asset register as of June 30, 2020.
- Furniture and computers are expected to have a low liquidation value at 6%, 8% and 10% of net book value for low, middle and high recovery cases.
- Land is assumed to be liquidated for values between 10% and 20% of net book value. Developed land for mining is expected to have a significantly lower recovery than raw land.
- Recovery from buildings and leasehold improvements is calculated based on 5% to 15% of net book value.
- Value for mineral reserves is only assumed to be recoverable for owned mineral reserves due to the weak market environment. A recovery value on a 5 to 15 cents per ton basis is assumed, with the rate being lower than historical purchase prices due to the current market oversupply and depressed demand. The tonnage estimate is based on proven and probable reserves at owned industrial sites (100% of tonnage) and owned hybrid sites (50% of tonnage).
- Equipment recoveries are expected to be between 6% and 10%. Much of the equipment is site specific (conveyor belts, electrical interchanges, etc.) or related to sand mining (wet screens, siloes, etc.) and likely has minimal recoverable value in liquidation.
- Rail-related assets are assumed to have low to minimal recovery as it would be difficult to repurpose site-specific trackage.

9. **Goodwill, Intangibles and Prepaid Assets**

- Goodwill and other intangibles are not assumed to have recoverable value.
- The recovery of prepaid assets is mainly dependent on the status of claims and the contract termination status of one significant prepaid asset. There is significant uncertainty regarding the ability to recover this prepaid asset due to the financial condition of the counterparty. It is assumed to be recovered at 0%, 50%, and 100% for low, middle and high recovery cases.

10. **Investments**

- Investments recovery assumes that Covia's Canada business and Mexico business (excluding Fairmount Minerals Sales de Mexico) are sold based on a 3x to 5x multiple of simple average of the trailing 12-months adjusted EBITDA through December 2019, April 2020 and June 2020, while the recovery of other foreign entities is based on the liquidation value of assets net of liabilities.
- For Covia Holdings Corporation, recovery from Investments includes proceeds from sale of Covia Canada Ltd., and its stakes in Grupo Materias Primas de Mexico S. de R. L. de C. V. and Grupo Materias Primas, S. de R. L. de C. V.
- Distributable value at Covia Finance Company LLC is generated from its share of the proceeds from the sale of Grupo Materias Primas de Mexico S. de R. L. de C. V. and Grupo Materias Primas, S. de R. L. de C. V.
- Distributable value at TechniSand, Inc. is based on the liquidation value of Covia Europe ApS (Denmark) and Santrol (Yixing) Proppant Co. Ltd (China).
- Recovery at Cheyenne Sand Corp. is estimated to be its share of sale proceeds of Lake Shore Sand Company (Ontario) Ltd., which is assumed to be sold as part of Covia's Canada business.

11. **Other Noncurrent Assets**

- Deferred financing fees and miscellaneous assets are assumed to have a 5% recovery in the high recovery case and 0% recovery in low and middle recovery cases.

12. **Proceeds from Preference Actions**

- Preference action recovery is estimated at 0% to 5% of total payments made to certain vendors during the 90 days prior to June 29, 2020.

*Wind-Down Costs and Other Expenses:*

13. **Wind-Down / Reclamation / Operating Expenses**

- This category includes the cost of personnel needed to effect the liquidation, along with any site regulatory reclamation liabilities owed, partially offset by operating margin earned on certain assets that are operated during the beginning of the liquidation period.

10

- In all three recovery cases, energy facilities are assumed to be immediately idled. The idling period prior to liquidation varies from 4 months in the low recovery case to 2 months in the high recovery case.
- Some Industrial sites are assumed to remain operational during the liquidation. In the high recovery case, two months of operation is assumed at a 93% monthly average rate of historical production output. In the middle recovery case, 2 months of operation is assumed at an 83% monthly average rate of historical production output. In the low recovery case, operations are assumed to extend over 3 months at a 63% monthly average rate of historical production output.
- Within the energy and industrial mine-related expenses, there are three expense categories: Initial Idling Costs, Ongoing Idling Costs, and Reclamation Costs.
  o The Initial Idling Costs represent the costs that will be incurred when a decision is made to idle a plant, as well as the costs associated with the initial ramp-down period; this includes some one-time items such as severance pay.
  o The Ongoing Idling Costs include costs needed to maintain the idled sites, such as security, dewatering, utilities, and general overhead costs, which could include permits, property taxes, insurance, etc.
  o The Reclamation Costs includes the cost needed to reclaim a mine site that is idled and will trigger regulatory reclamation liabilities. In all three cases, the total Reclamation Costs are estimated to be approximately $43 million based on the closure of the energy mines. Surety bonds are assumed to cover approximately $9 million of this liability, leaving approximately $34 million as wind-down expense. Reclamation liabilities are not assumed to be triggered for industrial or hybrid sites.

## 14.    Chapter 11 Professional Fee Carve-Out

- The Restructuring Support Agreement includes a $10 million carve-out for Chapter 11 professional fees. This category also includes an estimate of two months of accrued professional fees and chapter 11 trustee fees.

## 15.    Chapter 7 Trustee Fees

- The Liquidation Analysis assumes chapter 7 Trustee Fees of 3.0% on gross recoveries.

## 16.    PTO/Accrued Wages

- The Liquidation Analysis assumes all paid time-off and accrued wages will be paid to employees.

## 17.    Chapter 7 Professional Fees

- Chapter 7 Professional Fees include estimates for legal and financial advisory professionals required during the wind-down period. The expense estimate depends on the duration and complexity of the wind-down process. Total chapter 7 professional fees are estimated to be $2 to $3 million, based on precedent cases.

11

18.    **Liquidation Fees**

- Liquidation Fees are expected to be 15% for assets sold through a liquidator (furniture and computers, land, equipment, and rail related assets) and a 2% fee for assets marketed through investment bankers and mineral brokers (buildings and leasehold improvements and mineral reserves).

19.    **Adequate Protection Superpriority Claim**

- The amount of any adequate protection superpriority claim for any diminution of value of the collateral for Term Loan/Swap Claims is to be determined.  Solely for the purpose of the Liquidation Analysis, the amount of this claim is assumed to be zero.

*Other Assets Available for Distribution*

20.    **L/C and Equipment Collateral**

- L/C and equipment collateral includes collateral for the Other Secured Claims, which comprise Claims on account of an industrial revenue bond, capital leases, and a de minimis amount of promissory notes. The industrial revenue bond is assumed to recover fully from a letter of credit backed by cash collateral and the capital leases are assumed to recover fully via the return of leased equipment.

*Recovery Analysis:*

21.    **Class 1 — Secured Tax Claims**

- Class 1 consists of all Secured Tax Claims. The Liquidation Analysis assumes $5 million to $15 million of remaining prepetition tax liabilities for low to high recovery cases.
- The estimated recovery rate is 100%.

22.    **Class 2 — Other Secured Claims**

- Class 2 includes approximately $3.5 million in capital leases, a $10 million industrial revenue bond, and approximately $94,000 in promissory notes.
- Recovery for capital leases is assumed to come from the return of collateral to the lessor.
- The industrial revenue bond is assumed to recover directly from a corresponding letter of credit backed by cash collateral.
- Promissory notes are assumed to recover fully in the Liquidation Analysis.

23.    **Class 3 — Other Priority Claims**

- Class 3 consists primarily of estimated prepetition employee health care benefit claims.

- The estimated recovery rate is 100%.

24.   **Class 4 — Secured Term/Swap Claims**

- Class 4 includes the $1,558.5 million principal amount and $19.6 million in accrued interest outstanding under the Term Loan Credit Agreement, and $35.9 million termination liability associated with swap agreements.
- The Liquidation Analysis projects an estimated recovery of 27.5% to 41.6% for Class 4 Secured Term/Swap Claims.

25.   **Class 5A — Parent General Unsecured & Deficiency Claims**

- The Liquidation Analysis assumes that Class 5A Parent Deficiency Claims will range from $943 million to $1,171 million based on the estimated amount of the Secured Term/Swap Claims relative to the estimated value of the collateral for the Debtors' obligations under the Term Loan Credit Agreement solely for purposes of the Liquidation Analysis.
- The estimated recovery rate ranges from 0.0% to 2.8%.
- Class 5A Parent General Unsecured Claims comprise claims on account of Covia's rejection of unexpired railcar leases (~$289 to $334 million), claims on account of Covia's rejection of unexpired railcar terminal leases (~$13 to $22 million), other vendor claims (~$7 to $10 million), pension-related claims (~$35 million), and claims related to vendor payments subject to clawback through preference actions (~$0 to $5 million).  The Liquidation Analysis assumes that Class 5A General Unsecured Claims range from $344 million to $406 million based on estimates of trade debt and damages arising from rejection of certain contracts.
- The estimated recovery rate ranges from 0.0% to 2.8%.

26.   **Class 5B — TechniSand General Unsecured & Deficiency Claims**

- The Liquidation Analysis assumes that Class 5B Deficiency Claims range from $943 million to $1,171 million based on the estimated amount of the Secured Term/Swap Claims relative to the estimated value of the collateral for the Debtors' obligations under the Term Loan Credit Agreement solely for purposes of the Liquidation Analysis.
- The estimated recovery rate ranges from 0.2% to 0.4%.
- Class 5B General Unsecured Claims comprise claims on account of TechniSand's rejection of unexpired railcar leases (~$141 to $155 million), claims on account of TechniSand's rejection of unexpired railcar terminal leases (~$1 to $2 million), other vendor claims (~$0 to $1 million), and pension-related claims (~$35 million). The Liquidation Analysis assumes that Class 5B General Unsecured Claims range from $177 million to $193 million based on estimates of trade debt and damages arising from rejection of certain contracts.
- The estimated recovery rate ranges from 0.2% to 0.4%.

27.  **Class 5C — Cheyenne General Unsecured & Deficiency Claims**

- The Liquidation Analysis assumes that Class 5C Deficiency Claims range from $943 million to $1,171 million based on the estimated amount of the Secured Term/Swap Claims relative to the estimated value of the collateral for the Debtors' obligations under the Term Loan Credit Agreement solely for purposes of the Liquidation Analysis.
- The estimated recovery rate ranges from 0.1% to 0.2%.
- Class 5C General Unsecured Claims comprise pension-related claims (~$35 million).
- The estimated recovery rate ranges from 0.1% to 0.2%.

28.  **Class 5D — Other General Unsecured & Deficiency Claims**

- The Liquidation Analysis assumes that Class 5D Other Deficiency Claims range from $943 million to $1,171 million based on the estimated amount of the Secured Term/Swap Claims relative to the estimated value of the collateral for the Debtors' obligations under the Term Loan Credit Agreement solely for purposes of the Liquidation Analysis.
- Class 5D Other General Unsecured Claims comprise claims on account of the Class 5D Debtors' rejection of unexpired railcar leases (~$247 to $262 million), claims on account of the Class 5D Debtors' rejection of unexpired railcar terminal leases (~$6 to $11 million), other vendor claims (~$5 to $7 million) , pension-related claims (~$35 million), and claims related to vendor payments subject to clawback through preference actions (~$0 to $4 million).[2] The Liquidation Analysis assumes that Class 5D Other General Unsecured Claims range from $293 million to $319 million based on estimates of trade debt and damages arising from rejection of certain contracts.
- The Debtors estimate that there will be no Class 5D recoveries in all three scenarios.

29.  **Class 6 — Intercompany Claims**

- The Debtors estimate that there will no Class 6 recoveries in all three scenarios.

30.  **Class 7 — Intercompany Interests**

- The Debtors estimate that there will no Class 7 recoveries in all three scenarios.

31.  **Class 8 — Covia Interests**

- The Debtors estimate that there will no Class 8 recoveries in all three scenarios.

32.  **Class 9 — Section 510(b) Claims**

- The Debtors estimate that there will no Class 9 recoveries in all three scenarios.

---

[2]  "Class 5D Debtors" means, collectively, each Debtor other than Covia, TechniSand, and Cheyenne.

14

**Exhibit F**

**Financial Projections**

## Financial Projections[1]

The financial projections for the Debtors contained herein are based on the Debtors' 2021–2024 business plan (the "Financial Projections") as informed by current and projected conditions in each of the Debtors' markets and businesses.

The Financial Projections were prepared by management with the assistance of the Debtors' advisors and are based upon a number of assumptions made by management with respect to the future performance of the Debtors' operations. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Article VIII of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission (the "SEC") or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

**Principal Assumptions for the Financial Projections**

PJT Partners LP ("PJT") relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to PJT (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Debtors. PJT does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially from the Financial Projections and as a result, the actual total enterprise value of the

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement or the Plan, as applicable.

Reorganized Debtors may be significantly higher or lower than the estimated range herein. *See* Article VIII of the Disclosure Statement entitled "Risk Factors."

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. *See* Article VIII of the Disclosure Statement entitled "Risk Factors."

Under Accounting Standards Codification "ASC" 852, "Reorganizations," the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon the occurrence of the Effective Date. For avoidance of doubt, the Effective Date for purposes of the Financial Projections is assumed to be December 31, 2020. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which effect could be material.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, Plan, Debtors' business plan (including any projections of results, sales, earnings, costs, expenditures, cash flows, growth rates and business initiatives) and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. In deciding whether to vote to accept or reject the Plan, holders of claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections and should consult with their own advisors. Further, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law. You are advised, however, to consult any further disclosures we make on related subjects in our public announcements and SEC filings.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future

results, performance, or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article VIII of the Disclosure Statement.

**General Assumptions and Methodology**

The Financial Projections, which are presented on a consolidated basis, include the operations of the Debtors' Energy and Industrial Segments for fiscal years 2021–2024 (the "Projection Period"). The Financial Projections were developed using a bottoms-up forecasting approach while considering longer-term trend assumptions for revenue outlook and profitability by major product/end-market. Growth drivers, including new product and cost-saving initiatives, have been incorporated.

The Debtors' post-emergence capital structure reflects that as outlined in the Restructuring Support Agreement attached to the Disclosure Statement as Exhibit B. The capital structure will include an $800 million to $825 million New Term Loan and at least a $100 million Exit Facility.

The New Term Loan will have an interest rate of L+400 (100 bps LIBOR floor), payable in cash, unless the Debtors elect the payment-in-kind ("PIK") and cash option of L+450 (100 bps LIBOR floor) with 2.75% PIK and L+175 (100 bps LIBOR floor), payable in cash (the "PIK and Cash Option"). For avoidance of doubt, the Company may elect the PIK and Cash Option from and after the Effective Date through March 31, 2023, if the Debtors' pro-forma fixed charge coverage ratio ("FCCR") is less than 2.00x. The New Term Loan will have a minimum liquidity covenant of $50 million, to be tested on a quarterly basis, and will mature on July 31, 2026.

The terms and conditions of the Exit Facility are to be included in the Plan Supplement.

As outlined in the Restructuring Support Agreement attached to the Disclosure Statement as Exhibit B, the Debtors expect to have at least $75 million of Minimum Cash at Emergence, which may be increased or decreased by a Net Working Capital Adjustment and increased if any proceeds associated with early receipt of the CARES ACT Tax Refund Adjustment have been received prior to the date of the last available month-end balance sheet information as of the date that is ten business days prior to the Effective Date.

The Financial Projections consist of the following unaudited pro forma financial statements for each year in the Projection Period: (1) projected consolidated statements of operations; (2) projected consolidated balance sheets; and (3) projected consolidated statements of cash flows.

## Financial Projections

| Projected Consolidated Income Statement | | | | | |
|---|---|---|---|---|---|
| *($ in millions)* | Notes | 2021E | 2022E | 2023E | 2024E |
| Net Revenue | Note A | $980 | $1,152 | $1,302 | $1,392 |
| Operating Expenses | Note B | (883) | (1,027) | (1,145) | (1,213) |
| Adj. EBITDA | | $97 | $125 | $157 | $179 |
| Restructuring Expense | Note C | (8) | – | – | – |
| DD&A | Note D | (75) | (75) | (71) | (67) |
| Operating Profit | | $14 | $50 | $86 | $111 |
| Interest Expense | Note E | (46) | (47) | (44) | (43) |
| Income Tax Expense | Note F | (3) | (10) | (17) | (22) |
| Net Income | | ($34) | ($6) | $25 | $46 |

| Projected Consolidated Cash Flow Statement | | | | | |
|---|---|---|---|---|---|
| *($ in millions)* | | 2021E | 2022E | 2023E | 2024E |
| Net Income | | ($34) | ($6) | $25 | $46 |
| DD&A | Note D | 75 | 75 | 71 | 67 |
| Non-Cash Interest Expense | Note G | 22 | 23 | 6 | – |
| Income Tax Expense | Note F | 3 | 10 | 17 | 22 |
| Net Cash Tax Refund / (Payment) | Note H | 19 | (15) | (18) | (18) |
| Changes in Working Capital | Note I | (5) | (25) | (7) | (1) |
| Cash Flow from Operations | | $80 | $61 | $94 | $116 |
| Capital Expenditures | Note J | (60) | (60) | (60) | (60) |
| Cash Flow from Investing | | ($60) | ($60) | ($60) | ($60) |
| Repayments on New Term Loan | Note K | – | – | – | – |
| Proceeds / (Repayments) on Exit Facility | Note L | – | – | – | – |
| Cash Flow from Financing | | $– | $– | $– | $– |
| Beginning Cash Balance | Note M | $105 | $126 | $127 | $160 |
| (+/-) Net Cash Flow | | 21 | 1 | 34 | 56 |
| Ending Cash Balance | | $126 | $127 | $160 | $216 |

| Projected Consolidated Balance Sheet | | | | | |
|---|---|---|---|---|---|
| *($ in millions)* | | 2021E | 2022E | 2023E | 2024E |
| Cash & Cash Equivalents | | $126 | $127 | $160 | $216 |
| Trade Receivables | Note I | 129 | 154 | 167 | 171 |
| Inventories | Note I | 104 | 123 | 137 | 142 |
| Other Current Assets | Note I | 27 | 31 | 33 | 34 |
| Total Current Assets | | $386 | $434 | $497 | $564 |
| PP&E | Note N | $1,175 | $1,160 | $1,149 | $1,142 |
| Goodwill and Intangibles | Note O | 150 | 150 | 150 | 150 |
| Other Non-Current Assets | | 35 | 35 | 35 | 35 |
| Total Assets | | $1,746 | $1,779 | $1,831 | $1,890 |
| Trade & Other Payables | Note I | 189 | 211 | 233 | 242 |
| Total Current Liabilities | | 189 | 211 | 233 | 242 |
| Total Debt | Note P | 837 | 860 | 866 | 866 |
| Employee Benefit Obligations | | 64 | 64 | 64 | 64 |
| Other Non-Current Liabilities | | 32 | 32 | 32 | 32 |
| Total Liabilities | | $1,122 | $1,167 | $1,195 | $1,204 |
| Total Equity | | $624 | $612 | $636 | $686 |
| Total Liabilities & Equity | | $1,746 | $1,779 | $1,831 | $1,890 |

4

**Notes to Financial Projections**

Note A:  Net Revenue
Net revenue is comprised of all sales to clients in the Debtors' two segments:  Energy and Industrial.

Note B:  Operating Expenses
Operating expenses consist of expenses related to operating each of the Debtors' segments.  These costs are primarily comprised of personnel, material costs, and transportation.

Note C:  Restructuring Expense
Restructuring expense relates to internal restructuring-related expense related to realization of certain cost savings initiatives in the Debtors' operations in 2021.

Note D:  DD&A
Depreciation expense is related to machinery, equipment, buildings, and improvements.  Depletion expense is related to mineral rights.  Amortization expense is related to goodwill.  DD&A is subject to material change based on valuation and the potential implementation of fresh start accounting in connection with emergence.

Note E:  Interest Expense
Interest expense illustratively assumes an $800 million New Term Loan and illustratively assumes a 2.5% interest rate on $33 million of expected post-emergence letters of credit fronted by the Exit Facility.  The terms and conditions of the Exit Facility are still to be determined and the assumptions made herein about the interest expense on the Exit Facility are illustrative.

Note F:  Income Tax Expense
Income tax expense is forecast assuming a 19% all-in tax rate applied to operating profit. This calculation relies on certain illustrative assumptions and may be subject to change based on, among other considerations, recent changes in law or regulatory guidance and the tax consequences of the Restructuring Transactions.

Note G:  Non-Cash Interest Expense
Non-cash interest expense illustratively assumes an $800 million New Term Loan.  The non-cash interest expense assumes that the Debtors elect the PIK and Cash Option on the New Term Loan through March 31, 2023.

Note H: Net Cash Tax Refund / (Payment)
The 2021 net cash tax refund is a result of the CARES Act Tax Refund Adjustment, which is forecast to be received in 2021.  The Debtors are currently projected to be net cash taxpayers in 2022–2024.  This calculation relies on certain illustrative assumptions and may be subject to change based on, among other considerations, recent changes in law or regulatory guidance and the tax consequences of the Restructuring Transactions.

Note I:  Net Working Capital
Working capital is forecasted to require investment for the Debtors as revenues increase and continue to grow.  The Financial Projections assumed the Debtors' working capital accounts, including trade receivables, inventories, other current assets, and trade and other payables continue to perform according to the historical relationships with respect to revenue and expense activity. Trade receivables, inventories, and accounts payable balances are projected based on days-outstanding calculations and forecasted to be generally in line with historical and current ratios.

Note J:  Capital Expenditures
Capital expenditures ("CAPEX") include the Debtors' forecasts of both maintenance and growth CAPEX.  The maintenance CAPEX includes spending related to the upkeep of existing property, plant and equipment.  Growth CAPEX includes spend related to investing in the existing infrastructure, new product growth, and certain unspecified growth opportunities.

Note K: Repayments on New Term Loan
No repayments on the New Term Loan are assumed and any excess cash flow is assumed to accumulate as cash on the balance sheet.

Note L: Proceeds / (Repayments) on Exit Facility
The Exit Facility is not assumed to be funded.  The Exit Facility is expected to be utilized to front letters of credit and provide standby liquidity to the Debtors.

Note M: Beginning Cash Balance
The beginning cash balance reflects $75 million of cash per the Minimum Cash at Emergence requirement and assumes $30 million of additional cash per the Net Working Capital Adjustment, each as described in the Restructuring Support Agreement attached to the Disclosure Statement as Exhibit B and the Plan.

Note N:  PP&E
The Debtors' property, plant, and equipment ("PP&E") is depreciated over the useful life of each individual asset.  The Debtors' PP&E is subject to material change based on valuation and the potential implementation of fresh start accounting in connection with emergence.

Note O:  Goodwill and Intangibles
Goodwill and intangibles are subject to material change based on valuation and the potential implementation of fresh start accounting in connection with emergence.

Note P:  Total Debt
Total debt assumes an $800 million New Term Loan, accrued debt through election of the PIK and Cash Option on the New Term Loan through March 31, 2023,  no funded debt amounts on the Exit Facility, and $15 million of other secured debt.

6

**Exhibit G**

**Valuation Analysis**

## Valuation Analysis[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, PJT, as investment banker to the Debtors, has estimated a range of total enterprise value (the "Enterprise Value") and implied equity value (the "Equity Value") for the Reorganized Debtors pro forma for the transactions contemplated by the Plan (the "Valuation Analysis").  The Valuation Analysis is based on financial and other information provided by the Debtors' management, as well as the Financial Projections, attached to the Disclosure Statement as **Exhibit F**, and information provided by other sources. The Valuation Analysis is as of September 24, 2020, with an assumed Effective Date of December 31, 2020.  The Valuation Analysis utilizes market data as of September 24, 2020.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques to the extent deemed appropriate by PJT.

In preparing the Valuation Analysis, PJT considered a variety of financial analyses, including (1) comparable companies analysis; (2) discounted cash flow analysis; and (3) precedent transaction analysis.  PJT deemed a precedent transaction analysis to be of limited relevance given the limited number of transactions that were publicly available for review were not recent, and therefore, of limited relevance as the industry has evolved since those transactions occurred.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of an assumed Effective Date of December 31, 2020, is approximately $900 million to approximately $1,150 million (with the mid-point of such range being approximately $1,025 million).

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, PJT estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less the estimated market value of the New Term Loan, plus excess balance sheet cash on the Effective Date.  PJT has assumed that the New Term Loan, which is expected to have a face value of $800 million, will have a market value of approximately $657 million to $688 million (with the mid-point of such range being approximately $673 million as of the Effective Date).

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement.

The expected market value of the New Term Loan is based on the facts and circumstances particular to the flexibility that certain features of the New Term Loan are expected to provide the Reorganized Debtors and holders of the Reorganized Debtors' equity, including, but not limited to, a debt portability feature and a payment-in-kind ("PIK") and cash interest election option (the "PIK and Cash Option").

The debt portability feature is a function of the Senior Creditors' agreement that a change of control with respect to the Reorganized Debtors will not constitute an event of default or an acceleration event under the New Term Loan Documents. In addition, the New Term Loan will have an interest rate of L+400 (100 bps LIBOR floor), payable in cash, unless the Debtors elect the PIK and Cash option in which case the New Term Loan will have an interest rate of L+450 (100 bps LIBOR floor) with 2.75% PIK and L+175 (100 bps LIBOR floor), payable in cash. The Company may elect the PIK and Cash Option from and after the Effective Date through March 31, 2023, if the Debtors' pro-forma fixed charge coverage ratio ("FCCR") is less than 2.00x.

PJT has assumed that the Reorganized Debtors will have, as of the Effective Date, indebtedness that includes (i) approximately $673 million (at the midpoint) of market value of New Term Loan to be distributed under the terms of the Plan to the Holders of Secured Term Loan Claims and Secured Swap Agreements Claims, (ii) approximately $15 million of other secured debt[2] (*i.e.*, debt issued on account of a Secured Claim that is not an L/C Facility Claim, a Term Loan/Swap Claim, or a Secured Tax Claim), and (iii) a pro forma excess cash balance of approximately $25 million. Therefore, PJT estimated that the potential range of Equity Value for the Reorganized Debtors is between approximately $237 million and approximately $487 million (with the mid-point of such range being approximately $362 million).

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the Effective Date. PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF SEPTEMBER 24, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE

---

[2] Solely for purposes of the Valuation Analysis, other secured debt also includes approximately $1.5 million of secured debt at Covia Canada.

2

ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR PREDICTION OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED INDEBTEDNESS TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE ACTUAL VALUE OF NEWLY ISSUED SECURITIES AND FUNDED INDEBTEDNESS IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AND FUNDED INDEBTEDNESS AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL DEBT AND EQUITY HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, AND THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE MIP.

The Debtors' management team advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the company and the Enterprise Value thereof.

The Financial Projections include certain illustrative assumptions regarding expected cash tax liabilities. The impact of any changes to these illustrative assumptions regarding cash tax liabilities, including as a result of the tax consequences of the Restructuring Transactions (which could include elimination of or limitation of tax attributes, changes to the tax basis of assets, and the triggering of other tax implications) could materially impact the Valuation Analysis. Such matters are subject to many uncertainties and contingencies that are difficult to predict, certain of which rely on the form of the Restructuring Transactions, and some of which cannot be determined with certainty until after the Restructuring Transactions are consummated.

3

In preparing the Valuation Analysis for the Reorganized Debtors, PJT: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) discussed the Debtors' performance, future prospects, and industry observations with certain members of the Debtors' senior management; (3) considered certain economic and industry information relevant to the Debtors' operating businesses; (4) reviewed certain publicly available financial data for public companies that PJT deemed generally relevant in analyzing the value of the Reorganized Debtors; (5) reviewed certain publicly available data for, and considered the market values implied therefrom, precedent transactions in the industrial and energy industries involving companies comparable in certain respects to the Reorganized Debtors; and (6) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors.  PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Plan.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT.  THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE, ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE.

4